Mark C. Holscher (SBN 139582)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone (213) 680-8400
Facsimile: (213) 680-8500
Email: mark.holscher@kirkland.com

Christopher W. Keegan (SBN 232045)
Anna Terteryan (SBN 300368)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: chris.keegan@kirkland.com
Email: anna.terteryan@kirkland.com

Gabor Balassa (admitted *pro hac vice*)
Ryan Moorman (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: gbalassa@kirkland.com
Email: ryan.moorman@kirkland.com

*Counsel for Defendant Eli Lilly and Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY & CO.,<br><br>Defendant. | CASE NO. 3:23-CV-03943-JD<br><br>**DEFENDANT ELI LILLY AND COMPANY'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT**<br><br>Judge: Hon. James Donato<br>Hearing Date: January 11, 2024<br>Time: 10:00 am<br>Courtroom: 11 |

**NOTICE OF MOTION & MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 10:00 a.m. on January 11, 2024, or as soon thereafter as the matter may be heard, before the Honorable Judge James Donato, United States District Judge for the Northern District of California, Defendant Eli Lilly and Company ("Lilly") will and hereby does move for dismissal of this action pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).

Lilly seeks dismissal of this action under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the papers on file in this matter, the arguments of counsel, and any other matter the Court wishes to consider.

# TABLE OF CONTENTS

**Page**

BACKGROUND ....3

A. The Parties Memorialize Their Rights and Responsibilities in the Agreement....3

B. REZPEG Completes Phase 1 and Phase 2 Trials, but Misses Its Endpoints. ..4

C. Nektar Brings this Suit, Blaming Lilly for REZPEG's Shortcomings....5

ARGUMENT....5

I. NEKTAR FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT....5

A. Lilly Did Not Breach the Commercially Reasonable Efforts Provisions. ....5

B. Lilly Did Not Breach the Supposed Good Research Practices "Provision." ....9

II. NEKTAR FAILS TO PLEAD A BREACH OF THE IMPLIED COVENANT....9

A. Nektar's Allegations That Lilly "Delayed" REZPEG Fail to State a Claim. .10

B. Nektar's Allegation That Lilly Improperly Terminated the Agreement Fails. ....11

C. Nektar Does Not Allege Injury or Damages. ....12

III. NEKTAR FAILS TO PLEAD NEGLIGENT MISREPRESENTATION....12

IV. NEKTAR FAILS TO PLEAD A UCL VIOLATION. ....14

V. NEKTAR CANNOT OBTAIN PUNITIVE DAMAGES FOR ANY OF ITS CLAIMS. .15

CONCLUSION ....15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*19 Recordings Ltd. v. Sony Music Ent.*,
97 F. Supp. 3d 433 (S.D.N.Y. 2015)....................10

*All. Mortg. Co. v. Rothwell*,
10 Cal. 4th 1226 (1995)....................15

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*,
158 Cal. App. 4th 226 (2d Dist. 2007)....................12

*Arce v. Kaiser Found. Health Plan, Inc.*,
181 Cal. App. 4th 471 (2d Dist. 2010)....................14

*BankUnited, N.A. v. Merritt Env't Consulting Corp.*,
360 F. Supp. 3d 172 (S.D.N.Y. 2018)....................6

*Cel-Tech Comm'cs, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999)....................14

*City of New York v. 611 W. 152nd St., Inc.*,
273 A.D.2d 125 (N.Y. App. Div. 2000)....................6

*Cohen v. CBR Sys., Inc.*,
625 F. Supp. 3d 997 (N.D. Cal. 2022)....................1

*Cookware Co. (USA), LLC v. Austin*,
2016 WL 7378762 (S.D.N.Y. Dec. 8, 2016)....................15

*Covic v. Allstate Indem. Co.*,
2016 WL 10489841 (N.D.N.Y. Sept. 7, 2016)....................15

*D&L Holdings v. RCG Goldman Co.*,
287 A.D.2d 65 (N.Y. App. Div. 2001)....................10, 11

*Deutsche Bank Sec., Inc. v. Rhodes*,
578 F. Supp. 2d 652 (S.D.N.Y. 2008)....................10

*Gilmore v. Wells Fargo Bank N.A.*,
75 F. Supp. 3d 1255 (N.D. Cal. 2014)....................12

*InspiRX, Inc. v. Lupin Atlantis Holdings SA*,
554 F. Supp. 3d 542 (S.D.N.Y. 2021)....................6

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
880 F. Supp. 2d 1029 (N.D. Cal. 2012)....................13

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
507 F. Supp. 3d 490 (S.D.N.Y. 2020)....................11, 12

*Jujamcyn Theaters LLC v. Fed. Ins. Co.*,
2023 WL 2366789 (S.D.N.Y. Mar. 6, 2023)....................2

*KLS Diversified Master Fund, L.P. v. McDevitt*,
507 F. Supp. 3d 508 (S.D.N.Y. 2020)....................9

*Korea Supply v. Lockheed Martin*,
29 Cal. 4th 1134 (2003)....................15

*LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*,
725 F.3d 184 (2d Cir. 2013)....................10

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
842 F. Supp. 2d 682 (S.D.N.Y. 2012)....................9

*MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Ent. Corp.*,
80 F. Supp. 3d 507 (S.D.N.Y. 2015)....................9

*Megaris Furs, Inc. v. Gimbel Bros., Inc.*,
172 A.D.2d 209 (N.Y. App. Div. 1991)....................6

*Mtume v. Sony Music Ent.*,
2020 WL 4895360 (S.D.N.Y. Aug. 19, 2020)....................10

*Neilson v. Union Bank of Cal., N.A.*,
290 F. Supp. 2d 1101 (C.D. Cal. 2003)....................13

*Ozeran v. Jacobs*,
798 F. App'x 120 (9th Cir. 2020)....................14

*Peters v. Accurate Bldg. Inspectors Div. of Ubell Ent., Inc.*,
29 A.D.3d 972 (N.Y. App. 2006)....................5

*Pfizer Inc. v. Super. Ct.*,
182 Cal. App. 4th 622 (2010)....................14

*PM Grp., Inc. v. Stewart*,
154 Cal. App. 4th 55 (2d Dist. 2007)....................15

*Quintanilla v. WW Int'l, Inc.*,
541 F. Supp. 3d 331 (S.D.N.Y. 2021)....................10

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
34 Cal. 4th 979 (2004)....................13

*Rocanova v. Equitable Life Assur. Soc. of U.S.*,
634 N.E.2d 940 (N.Y. 1994)....................15

*Russell v. Zimmer, Inc.*,
2023 WL 6151720 (7th Cir. Sept. 21, 2023) ....................6, 7

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
441 F. Supp. 3d 1 (S.D.N.Y. 2020)....................6, 7, 8

*Shersher v. Super. Ct.*,
154 Cal. App. 4th 1491 (2007) ....................14

*Springbrook Vill. Batesville LLC v. Se. Indiana Title Inc.*,
195 N.E.3d 398 (Ind. Ct. App. 2022)....................12

*State Street Bank v. Inversiones Errazuriz Limitada*,
374 F.3d 158 (2d Cir. 2004)....................11

*Tendyne Holdings, Inc. v. Securityholders' Representative Comm.*,
2019 WL 2717857 (D. Del. June 28, 2019)....................7

*Thomas v. Lewis Eng'g, Inc.*,
848 N.E.2d 758 (Ind. Ct. App. 2006)....................12

*Transit Funding Assocs., LLC v. Cap. One Equip. Fin. Corp.*,
149 A.D.3d 23 (N.Y. App. 2017) ....................12

*Trustpilot Damages LLC v. Trustpilot, Inc.*,
2021 WL 2667029 (S.D.N.Y. June 29, 2021) ....................9

*Vess v. Ciba–Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ....................13

*Wilder v. World of Boxing LLC*,
310 F. Supp. 3d 426 (S.D.N.Y. 2018)....................12

**Statutes**

Cal. Bus. & Prof. Code § 17200 ....................14

**Rules**

Fed. R. Civ. P. 9(b) ....................2, 12, 13

In 2017, Defendant Eli Lilly and Company paid Plaintiff Nektar Therapeutics $150 million for the right to codevelop Nektar's investigational drug, REZPEG. Under the terms of their license agreement, a joint steering committee comprised of an equal number of Lilly and Nektar employees controlled REZPEG's development. In addition to its $150 million payment, Lilly agreed to bear 75 percent of development costs in exchange for almost all the financial upside if the drug proved successful. Over the next six years, Lilly poured millions of dollars into REZPEG's development in pursuit of FDA approval.

Unfortunately, like most drug candidates, REZPEG did not work as the parties hoped. It failed a phase 2 trial in lupus, its lead indication. And it causes injection site reactions that limited its marketability as a drug to treat skin conditions. Had REZPEG been viable, Lilly had the rights to market it, with only relatively minor royalty obligations to Nektar. LA § 6.3.[1] But after REZPEG failed the phase 2 trial, Lilly agreed, at Nektar's request, to terminate the Agreement and return the program to Nektar.

Nektar nevertheless filed this lawsuit as part of a publicity campaign to blame Lilly for REZPEG's shortcomings, which included press releases and an investor call that same day. The Complaint acknowledges REZPEG flunked the phase 2 trial, that it causes injection site reactions (*i.e.*, rashes), and that Nektar asked Lilly to terminate the Agreement (which Lilly had no obligation to do). But the Complaint also features allegations second-guessing scientific judgments made during the parties' collaboration, ignoring Nektar's contractual role in determining REZPEG's development. The Complaint also raises a mathematical error in two phase 1 trials for non-lead indications, falsely implying that Lilly made those calculations before admitting that a third-party contractor was responsible.

According to Nektar, Lilly made these decisions and allowed these mistakes because it wanted to tank its own six-year, nine-figure investment in REZPEG to help another drug in its portfolio, called lebrikizumab, that the Agreement expressly allowed Lilly to develop and commercialize. These allegations are baseless. It makes no sense that Lilly, allegedly believing REZPEG had promise, would walk away from the opportunity to commercialize *both* drugs, when almost all of REZPEG's commercial upside would have gone to Lilly under the Agreement. Nektar's Complaint should be dismissed.

---

[1] The Agreement "is incorporated by reference in Plaintiffs' complaint because it is extensively referenced and forms the basis of Plaintiffs' claims," and therefore must be treated as part of the Complaint itself. *Cohen v. CBR Sys., Inc.*, 625 F. Supp. 3d 997, 1000 n.3 (N.D. Cal. 2022).

***First***, Nektar's breach of contract claim fails. It alleges Lilly breached the Agreement's "Commercially Reasonable Efforts" provision. But Nektar's allegations sound in negligence—whether Lilly was "reasonable" or "correct" in light of a standard of scientific or professional care—not the level of effort Lilly exerted. Lilly was only required to use the same "efforts, expertise and resources" that Lilly uses on "comparable" drugs, and Nektar never alleges that Lilly did not. Nektar tries to salvage this claim by also alleging Lilly breached an obligation to use "Good Research Practices," but the provision Nektar cites plainly applies only to Nektar, not Lilly, despite the Complaint's efforts to conceal that fatal defect.

***Second***, Nektar's breach of the implied covenant claim fails because "New York law [] does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Jujamcyn Theaters LLC v. Fed. Ins. Co.*, 2023 WL 2366789, at *4 (S.D.N.Y. Mar. 6, 2023). New York law governs the Agreement, and the Complaint states expressly that the good faith and fair dealing claim is premised on the breach-of-contract allegations. In any event, Nektar fails to allege that Lilly exercised discretion in an arbitrary or irrational manner, as it must to survive a motion to dismiss. To try differentiating its implied covenant claim, Nektar tacks on one additional allegation—that Lilly allegedly terminated the Agreement in bad faith—but the termination provision expressly allows Lilly to terminate the Agreement "at will" for any reason.

***Third***, Nektar's negligent misrepresentation claim fails because it does not allege the particulars of any supposed misrepresentation as Rule 9(b) requires. In fact, Nektar deliberately obfuscates the circumstances underlying the claim, alternating between allegations that Lilly "generated" the errant calculation and acknowledgements that a "subcontractor" conducted the statistical analysis. Nektar's claim also fails under the economic loss rule because its damages are the same as its contract claim.

***Fourth***, Nektar's unfair competition claim fails. The Complaint simply parrots the statute and alleges Lilly "favored" its own drug. But the statute does not preclude a party from pursuing its own business interests, and Lilly bargained for the right to develop other drugs that treated the same conditions.

***Fifth***, punitive damages are unavailable for any of Nektar's substantive claims.

## BACKGROUND

### A. The Parties Memorialize Their Rights and Responsibilities in the Agreement.

In July 2017, the parties executed a license agreement ("Agreement" or "LA") to codevelop REZPEG, which was then in the very early stages of clinical development. Compl. ¶ 17. The Agreement required Lilly to pay Nektar a $150 million upfront licensing fee, and Lilly agreed to bear 75% of development costs. LA §§ 4.11(a), 6.1-6.2. While Nektar was entitled to milestone payments and royalties on sales, Lilly retains substantially all earnings, giving it every incentive to develop and bring REZPEG to market. *Id.* §§ 6.3-6.4.

The parties negotiated a governance structure for their collaboration that largely precluded either party from unilaterally dictating REZPEG's development. The Agreement required decisions to be made through a joint steering committee ("JSC"), comprised of an equal number of Lilly and Nektar employees, which oversaw a joint "Product Development Plan" and "Development Program" for all "the work performed by Nektar and Lilly . . . under th[e] Agreement." *Id.* §§ 3.1, 3.2. JSC decisions required unanimity, and the Agreement required the parties to submit disagreements to a dispute-resolution process that culminated in an executive-level meeting. *Id.* § 3.7. Only if the disagreement persisted did one company have final say: Nektar in an "Initial Development Phase," and Lilly for any disputes thereafter. *Id*. The Complaint does not mention this framework. Instead, it misleadingly says Lilly "undertook full responsibility for the continued clinical development of REZPEG," ignoring the JSC's role. *Compare* Compl. ¶ 18, *with* LA § 3.7. And, while it criticizes certain decisions, Nektar never alleges it submitted a disagreement to the dispute-resolution process, or that Lilly unilaterally broke any deadlock.

In allocating responsibility for important decisions to the JSC, the Agreement does not impose standards of care on Lilly. Instead, Lilly, along with Nektar, agreed to use "Commercially Reasonable Efforts" or "CRE" in carrying out its responsibilities, *id.* §§ 4.1, 4.5, 4.9, meaning each would use the same "effort, expertise and resources normally used by the Party in the development and/or commercialization of a comparable pharmaceutical product Controlled by such Party." *Id.* § 1.1. As Nektar performed some research activities in the first instance, it separately committed to use Lilly's list of "Good Research Practices" and to follow other policies. *Id.* § 4.8.

Like all major pharmaceutical companies, Lilly has a pipeline of drugs in clinical development, including multiple drugs in the same therapeutic area. In March 2019, Lilly acquired Dermira, along with its investigational eczema treatment called lebrikizumab. Compl. ¶ 30. The Agreement allowed Lilly to develop other drug candidates at the same time as it worked on REZPEG as long as those drug candidates did not have the same mechanism of action (*i.e.*, the biochemical interaction that produces the desired therapeutic result). LA §§ 12.1, 1.1. Nektar does not dispute that lebrikizumab satisfied this condition.

**B. REZPEG Completes Phase 1 and Phase 2 Trials, but Misses Its Endpoints.**

Shortly after the parties entered the Agreement, they agreed that REZPEG's lead indication was lupus. Compl. ¶ 26. They later added eczema and psoriasis as secondary indications. *Id.* ¶ 27. The parties ultimately conducted phase 1 trials in all three indications between 2017 and 2022. *Id.* ¶¶ 34, 66. REZPEG's treatment of lupus moved to phase 2 in 2020. *Id.* ¶ 70.

The Complaint extensively discusses a mathematical error that occurred during the phase 1 eczema trial, and repeatedly indicates that Lilly incorrectly calculated the EASI score used to measure a drug's efficacy in eczema. *E.g.*, Compl. ¶ 38 ("Lilly failed to correctly set up its statistical algorithm . . ."), ¶ 39 ("Lilly incorrectly calculated . . ."), ¶ 40 ("Lilly generated the erroneous EASI scores . . ."). Despite Nektar's obfuscation and attempts to attribute these errors to Lilly, it ultimately admits Lilly engaged a "subcontractor to conduct the statistical analysis of . . . the eczema and psoriasis clinical trials." *Id.* ¶ 23. In other words, a "subcontractor" made the "calculations" of the "erroneous EASI scores" that Nektar highlights—not Lilly. The Complaint also alleges a similar error in calculating the PASI score in the phase 1 psoriasis trial. *Id.* ¶¶ 64-69. Nektar acknowledges that the parties advanced REZPEG and designed a phase 2 clinical trial for eczema, notwithstanding the calculation error. *Id.* ¶¶ 56, 60.

The Complaint admits that REZPEG causes injection site reactions (rashes). *Id.* ¶ 54. These were a significant concern to Lilly. *Id.* ¶ 52. While injection site reactions are a common side effect of injectable therapies, *id.*, Lilly had concerns about the marketability of a drug designed to *treat* skin conditions that also *caused* skin conditions. According to Lilly's research, injection-site reactions would have "a negative impact on [customer] preference." *Id.* ¶ 62.

Injection site reactions were not REZPEG's only problem. It also failed its phase 2 lupus trial, which halted its progress towards FDA approval for this lead indication. *Id.* ¶ 73. After this failure,

Nektar asked Lilly to terminate the Agreement—and to relinquish its interest in REZPEG—so Nektar could continue to develop the drug on its own. *Id.* ¶ 77. Even though Lilly had invested six years and nine-figures in the drug candidate, it agreed to Nektar's request, and gave full ownership to Nektar. *Id.*

**C. Nektar Brings this Suit, Blaming Lilly for REZPEG's Shortcomings.**

Three months after Lilly granted Nektar's request to terminate the Agreement, Nektar brought this suit, blaming Lilly for REZPEG's issues. Nektar's allegations fall into three categories. First, Nektar blames Lilly for the phase 1 calculation errors. Comp. ¶ 93. Second, Nektar alleges Lilly "unreasonably designed" the phase 2 eczema trial because Lilly wanted to slow REZPEG's development. *Id.* ¶ 125. Third, Nektar alleges Lilly "underpower[ed]" the failed phase 2 lupus trial, speculating about what Lilly "could have" done differently with the benefit of hindsight. *Id.* ¶ 72. None of these allegations make sense since they suggest Lilly supposedly tanked its own development program because it wanted to "accelerate" the development of lebrikizumab, even though Lilly had a right to sell that drug alongside REZPEG, and Lilly would have reaped nearly all profits from REZPEG sales. Nektar nevertheless brings breach of contract, implied covenant, negligent misrepresentation, and unfair competition claims.

## ARGUMENT

**I. NEKTAR FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT.**

Under New York law, which governs the Agreement under Section 12.12, plaintiffs must "set forth the contract provisions they allege the defendant breached" and identify the conduct they allege constitutes a breach. *Peters v. Accurate Bldg. Inspectors Div. of Ubell Ent., Inc.*, 29 A.D.3d 972, 973 (N.Y. App. 2006) (dismissing claim). Nektar identifies two distinct clauses that impose two distinct obligations: (1) the CRE clause, which mandates a required level of effort by both parties; and (2) the "Good Research Practices" clause, which imposes a standard of care on Nektar alone. Nektar's claim fails because it does not premise any alleged breach on Lilly's lack of effort, and the "Good Research Practices" clause sets a contractual standard of care only for Nektar's research, not Lilly's.

**A. Lilly Did Not Breach the Commercially Reasonable Efforts Provisions.**

Nektar first argues Sections 4.1, 4.5, and 4.9 of the Agreement "required Lilly to use commercially reasonable efforts in designing and conducting [] studies, in developing REZPEG, and in bringing it to market." Compl. ¶ 86. Level of effort clauses—like "commercially reasonable efforts," "best efforts,"

and "hell or high water" provisions—impose on companies a contractually mandated level of effort in pursuing a contractually specified objective. The standard for "commercially reasonable efforts" is a "fairly lenient one," as a party must show "at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests." *InspiRX, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 556 (S.D.N.Y. 2021) (citation and quotation marks omitted). This contrasts with a "hell or high water" provision which requires "the signatory to use all efforts possible, no matter the cost." *Id*. at 557.

Courts evaluating whether a party met its contractual CRE obligations focus exclusively on the party's *efforts*—not on whether the party's *performance* was reasonable or negligent. *Id*. at 556-57 (evaluating "efforts"); *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020) (dismissing claim because it contained only "wholly conclusory statements" about the defendant's "efforts"); *see also Russell v. Zimmer, Inc.*, 2023 WL 6151720, at *5 (7th Cir. Sept. 21, 2023) (affirming dismissal because complaint contain no allegations comparing actual efforts to level of effort mandated by agreement). And they do not draw negative inferences from mistakes or unsatisfactory results because "the mere fact" that defendant's efforts did not produce a plaintiff's desired outcome "[does] not imply" those efforts fell short of required effort. *See Shane*, 441 F. Supp. 3d at 4 (granting motion to dismiss commercially reasonable efforts claim); *InspiRx*, 554 F. Supp. 3d at 563 ("The Agreement required Lupin to exert commercially reasonable efforts. It did not guarantee success."). The treatment of CRE provisions under New York law is consistent with that of the Agreement, which defines CRE as "effort, expertise and resources normally used by the Party" on similar drugs. LA § 1.1.

Level of effort provisions do not impose a "standard of care," and "claims based on negligent or grossly negligent performance of a contract are not cognizable." *City of New York v. 611 W. 152nd St., Inc.*, 273 A.D.2d 125, 126 (N.Y. App. Div. 2000); *Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, 211 (N.Y. App. Div. 1991) ("Plaintiffs' second cause of action alleges negligent performance of the contract, a cause of action which simply does not exist."). To state a claim based on a party's "negligent" or "unreasonable" performance, a plaintiff must allege the defendant breached the "level of care and skill" the contract required a party to "exercise" in carrying out its responsibilities. *See, e.g.*, *BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 177–78 (S.D.N.Y. 2018) (contract specifying

work must be performed "in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants."). Unlike other contracts, the Agreement between Lilly and Nektar does not impose a standard of care that Lilly must meet in carrying out its obligations.

Nektar's claim for breach of the CRE provisions fails because Nektar does not allege Lilly exerted inadequate effort or failed to devote sufficient expertise or resources to REZPEG's development relative to what Lilly "normally used." Instead, the Complaint "contains only conclusory assertions that [defendant] breached the Agreement by failing to use Commercially Reasonable Efforts," but it does not include facts supporting a plausible inference that Lilly failed to "exert effort and expend resources 'consistent with commercially reasonable practices normally and typically used' by [defendant.]" *Accord Tendyne Holdings, Inc. v. Securityholders' Representative Comm.*, 2019 WL 2717857, at *2-3 (D. Del. June 28, 2019) (dismissing CRE claim); *see also Russell*, 2023 WL 6151720, at *5 (affirming dismissal of CRE claim for failure to allege defendant deviated from usual efforts expended).

1. The Phase 1 EASI and PASI Calculations

Nektar fails to allege a breach of the CRE obligations in Sections 4.1, 4.5, or 4.9 because it does not plead any facts regarding the efforts Lilly made. *See Shane*, 441 F. Supp. 3d at 4 ("The complaint does not offer any information about what would have constituted a commercially-reasonable air conditioning system under the circumstances, nor does it allege that defendant's conduct fell short of this objective standard in any particular ways."). Instead, Nektar describes what it calls "botched math" using language borrowed from negligence actions to address a "standard of care" Lilly purportedly should have used in calculating the EASI score, alleging Lilly was "grossly negligent" in setting up its statistical algorithm. Compl. ¶¶ 38, 67. The Complaint further alleges Lilly did not "correctly" implement the statistical analysis plan or properly supervise the subcontractor performing the eczema study. *Id*. ¶¶ 40-41. And that Lilly's PASI calculation in the psoriasis study was "fundamentally flawed." *Id.* ¶¶ 67, 93.

Whether Lilly was "reasonable," "negligent," or "correct," or if the work it oversaw was "flawed," would be relevant to whether Lilly was negligent or satisfied a standard of professional care, but is not relevant to whether Lilly exerted adequate "effort, expertise and resources" in the REZPEG collaboration. *Shane*, 441 F. Supp. 3d at 4. Nowhere does Nektar allege that Lilly's testing "effort" was inadequate, that Lilly chose employees or subcontractors with insufficient "expertise" to conduct that testing, or that Lilly

committed insufficient "resources" to the testing, let alone that any of Lilly's alleged efforts fell short of what Lilly "normally used" in developing "comparable pharmaceutical products." LA § 1.1. What the Complaint alleges is a mistake that Lilly supposedly should have caught. But CRE provisions do not ensure work will be mistake-free, as long as reasonable efforts are used.

2. The Phase 2 Eczema and Lupus Trials

Nektar's criticisms of the phase 2 eczema and lupus trials suffer the same defects. First, Nektar alleges that Lilly suggested an "unreasonable" design for the phase 2 eczema study because it was "concerned" about "a higher injection site reaction rate," "proposed including [] 'interim' analyses of the study data," and proposed "extremely stringent" criteria for "ending the trial early." Compl. ¶¶ 55, 57, 59-60, 96-97. Second, Nektar criticizes Lilly's "underpowering" of the phase 2 lupus study by allegedly failing to "reasonably" use the interim analysis to guide the lupus study's progress. *Id.* ¶¶ 57, 71. Nektar then hypothesizes two "examples" of "reasonable steps" that Lilly "could have" done differently, before asserting again that Lilly was "grossly negligent." *Id.* ¶ 72.

Like its allegations regarding the phase 1 EASI and PASI scores, Nektar's after-the-fact criticisms are no substitute for pleading facts showing that Lilly's "effort" breached the CRE clauses. For example, Nektar does not plead the phase 2 studies suffered from Lilly hiring too few scientists, hiring personnel with insufficient experience and inadequate credentials, or underpaying its personnel. These same defects doom Nektar's claim based on "underpowering" the lupus study. What Nektar hypothesizes Lilly "could have" done is irrelevant because a "court's evaluation of a party's compliance with a 'commercially reasonable efforts' requirement does not involve a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result." *Shane*, 441 F. Supp. 3d at 4.

The hindsight nature of Nektar's criticisms is all the more apparent in light of the Agreement's joint steering committee, which oversaw development and made decisions through consensus. Nektar does not allege that it submitted a disagreement to the dispute resolution process, or that Lilly unilaterally imposed its decisions on Nektar. Nor does Nektar plead facts showing REZPEG would have passed the phase 2 lupus trial but for the decisions about which it now complains. All the Complaint reveals is Nektar's dissatisfaction with results of the clinical trials and allegations about a supposed subjective desire to favor lebrikizumab. But Lilly's "subjective beliefs" are irrelevant because "'commercially reasonably

efforts' . . . provide[s] an objective standard of reasonableness rather than [defendant's] mere subjective belief." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012).

**B. Lilly Did Not Breach the Supposed Good Research Practices "Provision."**

Because the CRE clause is only a measure of Lilly's *level of efforts*, Nektar also tries to argue the Agreement imposes a *standard of care* on Lilly that Lilly breached. Without citing any section of the Agreement, Nektar alleges "Lilly also agreed to engage in 'Good Research Practices'" that—unlike the CRE clause—imposes "quality standards." Compl. ¶¶ 20-22. Nektar also claims, without factual support, that Lilly made certain "representations" through the Good Research Practices clauses, including that "data would be 'managed to ensure accuracy, completeness, and retrievability.'" *Id.* ¶ 92.

The only section of the Agreement that imposes an obligation to comply with "Good Research Practices" is Section 4.8, captioned "Certain Standards *Applicable to Nektar Work*." Section 4.8 goes on to address Lilly's right to monitor and audit Nektar's compliance with these standards. Because Section 4.8, by its text, applies only to Nektar, it cannot be the basis of a breach by Lilly. Thus, Nektar resorts to citing Part A of Schedule 4.8. Compl. ¶¶ 21, 92, 119. But this merely lists the scientific standards that comprise the "Good Research Practices." Nowhere does Section 4.8 impose any professional requirements for the research Lilly performed under the Agreement, as Nektar falsely alleges. *Compare* LA Sch. 4.8, *with* Compl. ¶ 92. The parties understood how to impose "quality standards," and they decided not to impose them on Lilly. *See KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 542 (S.D.N.Y. 2020) ("when a term is expressly included in a contractual provision, its exclusion from other provisions within the same contract reflects the parties' intent that the omission was intentional"). As Nektar fails to cite any applicable clause imposing "Good Research Practices" on Lilly, its breach of contract claim should be dismissed. *See Trustpilot Damages LLC v. Trustpilot, Inc.*, 2021 WL 2667029, at *8 (S.D.N.Y. June 29, 2021) (plaintiff failed to identify "a specific provision of the contract that was breached") *aff'd*, 2022 WL 2124865 (2d Cir. June 13, 2022).

**II. NEKTAR FAILS TO PLEAD A BREACH OF THE IMPLIED COVENANT.**

The elements for breach of the implied covenant of good faith and fair dealing are the same as those for breach of contract, because "breach of this implied covenant is 'merely a breach of the underlying contract, not a separate cause of action.'" *MeehanCombs Glob. Credit Opportunities Funds, LP v.*

*Caesars Ent. Corp.*, 80 F. Supp. 3d 507, 514 (S.D.N.Y. 2015) (citation omitted). Accordingly, an implied covenant claim "must be dismissed" if "the two claims depend on the same facts" or if "the relief sought in claiming a breach of the implied covenant of good faith is intrinsically tied to the damages allegedly resulting from the breach of contract." *19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 439 (S.D.N.Y. 2015) (citation omitted). In addition, the "covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." *D&L Holdings v. RCG Goldman Co.*, 287 A.D.2d 65, 73 (N.Y. App. Div. 2001). Nor does it "create duties that negate explicit rights under a contract." *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013). Nektar's breach of the implied covenant claim cannot overcome these prohibitions.

### A. Nektar's Allegations That Lilly "Delayed" REZPEG Fail to State a Claim.

Nektar alleges Lilly breached the implied covenant because it intended "to delay regulatory approval or to ensure REZPEG would fail." Compl. ¶ 109. This claim fails for two independent reasons.

First, the only specific conduct Nektar identifies in furtherance of this alleged motive is the same conduct "as detailed above" to support the contract claim. *Id.* "Where, as all agree is the case here, a claim for breach of the implied covenant of good faith and fair dealing is based on the same facts as a claim for a breach of contract, the former must be dismissed as redundant. . . . This is so even where the breach of contract claim is also dismissed." *Mtume v. Sony Music Ent.*, 2020 WL 4895360, at *5 (S.D.N.Y. Aug. 19, 2020) (citations omitted); *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008) ("[T]he factual allegations in its contract claim encompass and include the factual allegations in its breach of implied covenant claim."). Otherwise, finding Lilly breached the implied covenant—based on facts that were not a breach of contract—would "imply" additional obligations the parties did not bargain for. *See 19 Recordings Ltd.*, 97 F. Supp. 3d at 438 ("[T]he implied covenant cannot be used to create independent obligations beyond the contract.").

Second, Nektar's implied covenant claim fails for the independent reason that it does not allege the Agreement allocated discretion to Lilly, or that Lilly exercised that discretion in an "arbitrary or irrational" manner. *See Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 352 (S.D.N.Y. 2021) (dismissing implied covenant claim). Nektar's allegations that Lilly was somehow negligently responsible

for the calculation error in the phase 1 trials have nothing to do with Lilly exercising discretion. And with respect to the phase 2 trial design, Nektar never alleges that Lilly had discretion to set the development plan without input from Nektar or the JSC's oversight.

Even if it did, Nektar does not allege any facts suggesting Lilly's decisions on phase 2 designs were "arbitrary and irrational" under the Agreement. The exercise of discretion is only arbitrary and irrational if it "will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *State Street Bank v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004). Here, however, Nektar does not allege Lilly's discretion "destroyed" the "fruits of the contract." Rather, it identifies a disagreement the parties had on how to optimize a clinical trial design. As Nektar pleads, the parties "began discussing" phase 2 designs, Lilly "proposed" interim analyses, and Nektar "objected." Compl. ¶¶ 56-57. Lilly then "acknowledged" Nektar's concerns, and the parties "restructure[ed]" the trial. *Id*. ¶¶ 57, 60. None of this is arbitrary, and Nektar altogether fails to grapple with the joint governance structure that allocated discretion to the joint steering committee, not unilaterally to Lilly. LA §§ 3.1-2.

**B. Nektar's Allegation That Lilly Improperly Terminated the Agreement Fails.**

Recognizing that it cannot premise its breach of the implied covenant claim on the same allegations as its contract claim, Nektar alleges that "Lilly's termination of the Agreement was a violation of the implied covenant" because it "arose not out of any organic failure on the part of REZPEG, nor of any financial constraint at Lilly, but rather because Lilly found an improper road around the bargain it had struck." Compl. ¶ 111. New York law squarely forecloses this claim because it seeks to impose additional conditions on the rights Lilly bargained for. *D&L Holdings*, 287 A.D. 2d at 73.

Under the "Termination At Will By Lilly" provision, "Lilly may terminate this Agreement in its entirety . . . at any time without cause upon ninety (90) days' written Notice to Nektar." LA § 11.2. Termination "at will" does not require that Lilly have a particular reason for exercising its right, and it certainly does not limit Lilly's termination rights to circumstances where REZPEG had "an organic failure" or Lilly faced "financial constraints." *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020) (dismissing claim arising from exercise of contractual termination right, noting "[i]t cannot be a breach of the implied covenant of good faith and fair dealing to do what a contract explicitly authorizes a party to do."), *aff'd,* 29 F.4th 118 (2d Cir. 2022). Rather, settled law says

a party that exercises its right to terminate a contract at will means "its motives for doing so are irrelevant." *Id.* at 504; *Transit Funding Assocs., LLC v. Cap. One Equip. Fin. Corp.*, 149 A.D.3d 23, 29 (N.Y. App. 2017) ("Where a contract allows one party to terminate the contract in 'its sole discretion' and for 'any reason whatsoever,' the covenant of good faith and fair dealing cannot serve to negate that provision."). Nor can Nektar plausibly allege that Lilly's reasons for doing so were arbitrary, as *Nektar asked* Lilly to terminate. Compl. ¶ 77. Nektar's implied covenant claim based on the termination thus fails.

### C. Nektar Does Not Allege Injury or Damages.

Nektar's breach of the implied covenant fails for the independent reason that Nektar does not allege cognizable damages caused by the purported breach. *See Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 448 (S.D.N.Y. 2018) (dismissing implied covenant claim because plaintiff failed to "show that the breach . . . 'proximately cause[d] his or her damages'" (citation omitted)). Nektar alleges it was damaged because it did not receive milestone and royalty payments due to the termination. Compl. ¶¶ 109-110. But the Agreement did not guarantee these payments; REZPEG needed to hit the milestones, and Lilly was entitled to terminate the Agreement "at will" before that happened. Nektar's claim fails as a result. *See Golden Unicorn*, 2023 WL 4561718, at *9 (S.D.N.Y. Jul. 18, 2023) (allegations of damages in implied covenant claims "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach") (quotation omitted).

## III. NEKTAR FAILS TO PLEAD NEGLIGENT MISREPRESENTATION.

A claim for negligent misrepresentation under California law[2] requires (1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 243 (2d Dist. 2007). A plaintiff must plead each element with particularity under Rule 9(b). *See Gilmore v. Wells Fargo Bank N.A.*, 75 F. Supp. 3d 1255, 1270 (N.D. Cal. 2014) ("agree[ing] with the line of cases

---

[2] Nektar appears to premise Counts III and IV on California law. Lilly assumes only for the purpose of this motion that Nektar is correct because Indiana law, which is Lilly's domicile, clearly forecloses a negligent misrepresentation claim because it "require[s] a showing of duty." *Springbrook Vill. Batesville LLC v. Se. Indiana Title Inc.*, 195 N.E.3d 398, 404 (Ind. Ct. App. 2022); *Thomas v. Lewis Eng'g, Inc.*, 848 N.E.2d 758, 760 (Ind. Ct. App. 2006) ("But it is clear that to date Indiana has not recognized that a duty exists to support the tort outside the limited context of an employment relationship.").

that hold that negligent misrepresentation is a species of fraud, and, hence, must be plead in accordance with Rule 9(b)"). The sole basis of Nektar's negligent misrepresentation claim is its allegation that "Lilly misrepresented to Nektar the efficacy of REZPEG in the Eczema Study by representing that the result of the Botched Math was REZPEG's actual performance on the EASI score, when it was not." Compl. ¶ 115. Nektar's claim fails for several independent reasons.

First, Nektar does not allege with particularity that Lilly lacked reasonable grounds for believing the information was true. The Complaint pleads a single conclusory sentence: "The serious error in the Botched Math would have been immediately apparent to any person with even basic familiarity with EASI." *Id.* ¶ 117. But that fails to explain who made the miscalculation, what information Lilly allegedly saw that would have alerted it to the error, or why it was unreasonable for Lilly to rely on the persons who made the error. *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1142 (C.D. Cal. 2003) (negligent misrepresentation claim "fails to plead that [defendant] made the representations alleged lacking reasonable grounds to believe that they were true"). Nektar is deliberately vague on these points, alleging Lilly "generated" the erroneous data, Compl. ¶ 39, while elsewhere it appears to admit a subcontractor conducted the erroneous statistical analysis, *id.* ¶¶ 23, 41. Because Nektar does not allege with the required specificity or otherwise the "who, what, when, where, and how" of the alleged misrepresentation, its claim fails. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Second, the "economic loss rule" bars Nektar's claim. This rule bars a plaintiff from using a tort (like negligent misrepresentation) to recover damages premised on an alleged "broken contractual promise." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). Here, Nektar's negligent misrepresentation claim is premised entirely on purported breaches of contract, and nothing more. Nektar asserts (1) "Under the Agreement, Lilly was responsible for conducting the Eczema study," (2) "Lilly represented in the Agreement that it would employ 'Good Research Practices,'" and (3) "Lilly represented [in the Agreement] that 'All data in reports ***must*** be reviewed to ensure that the reports accurately reflect the data.'" Compl. ¶ 119. Nektar alleges purely economic losses as a result. *Id.* ¶ 121. Under California law, Nektar cannot bring "tort claims [that] consist of nothing more than [the] alleged failure to make good on [] contractual promises," as Nektar does here. *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012) (dismissing claim).

## IV. NEKTAR FAILS TO PLEAD A UCL VIOLATION.

The crux of Nektar's California Unfair Competition Law ("UCL") claim is that Lilly "unfairly" favored its own eczema drug, lebrikizumab, at the expense of REZPEG. Compl. ¶¶ 124-127. A UCL claim requires the plaintiff to allege the defendant's business practice was "unlawful, unfair, or fraudulent." *Cel-Tech Comm'cs, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); Cal. Bus. & Prof. Code § 17200. Nektar does not allege Lilly did anything unlawful or fraudulent, and its claim that Lilly's conduct was unfair fails for two independent reasons.

First, there was nothing unfair about Lilly's development of lebrikizumab because Lilly bargained for the right to develop other eczema drugs. The Agreement only prohibited work on Competing Products under the exclusivity provision, and Nektar does not contend lebrikizumab is a Competing Product as defined in the Agreement. LA § 12.1.

Second, at best, Nektar tries to allege a breach of contract. But contractual breaches are not UCL violations unless the complaint alleges a "systematic breach." *See Arce v. Kaiser Found. Health Plan, Inc.*, 181 Cal. App. 4th 471, 490 (2d Dist. 2010) ("appellate courts have recognized that 'a systematic breach of certain types of contracts . . . can constitute an unfair business practice under the UCL.'" (citing cases)). Nektar makes no such allegation here.

Third, Nektar has no available remedies. "The only remedies available to a private plaintiff under California's UCL are the equitable remedies of injunction and restitution." *Ozeran v. Jacobs*, 798 F. App'x 120, 122 (9th Cir. 2020). Restitution is unavailable here because Nektar does not, and cannot, allege that Lilly has any of Nektar's money or property. *See Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491, 1498 (2007) (restitution "must represent the return of money or property the defendant acquired through its unfair practices"). Just the opposite: Nektar received $150 million in license fees from Lilly, and all legal interests in REZPEG's future development. Nor has Nektar alleged any threat of future harm as required for injunctive relief, given that the allegedly unfair conduct—Lilly's purported control over and delay of REZPEG's development—is no longer occurring. *See Pfizer Inc. v. Super. Ct.*, 182 Cal. App. 4th 622, 631 n.5 (2010) (injunctive relief unavailable under UCL where alleged misconduct "has ceased and there is no threat that the misconduct to be enjoined is likely to be repeated in the future").

## V. NEKTAR CANNOT OBTAIN PUNITIVE DAMAGES FOR ANY OF ITS CLAIMS.

The Court should strike Nektar's request for punitive damages because the remedy is unavailable under all four counts, and courts routinely strike requests for punitive damages arising from contract claims at the motion to dismiss stage. *See, e.g.*, *Cookware Co. (USA), LLC v. Austin*, 2016 WL 7378762, at *6 (S.D.N.Y. Dec. 8, 2016); *Covic v. Allstate Indem. Co.*, 2016 WL 10489841, at *4 (N.D.N.Y. Sept. 7, 2016). First, Nektar cannot recover punitive damages under Counts I and II because "[p]unitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 634 N.E.2d 940, 943 (N.Y. 1994). Nektar must show the breach "demonstrate[s] egregious tortious conduct" and that "such conduct was part of a pattern of similar conduct directed at the public generally." *Id*. at 944. Nektar's allegations of flawed study design and computational errors do not register as tortious conduct, much less a pattern of "egregious tortious conduct" required for a contract-based punitive damages.

Second, Nektar cannot recover punitive damages on Count III because "it is well settled that punitive damages are not recoverable for negligent misrepresentation." *PM Grp., Inc. v. Stewart*, 154 Cal. App. 4th 55, 69 (2d Dist. 2007); *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1241 (1995).

Third, Nektar cannot recover punitive damages on Count IV because damages are not an available remedy under the UCL. *See Korea Supply v. Lockheed Martin*, 29 Cal. 4th 1134, 1148 (2003) ("attorney fees and damages, including punitive damages, are not available under the UCL").

Because Nektar has no possible basis to recover punitive damages, its request should be struck.

## <u>CONCLUSION</u>

Lilly respectfully requests the Complaint be dismissed in its entirety with prejudice.

DATED: September 29, 2023

Respectfully submitted,

*s/ Ryan Moorman*

Mark C. Holscher (SBN 139582)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone (213) 680-8400
Facsimile: (213) 680-8500
Email: mark.holscher@kirkland.com

Christopher W. Keegan (SBN 232045)
Anna Terteryan (SBN 300368)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: chris.keegan@kirkland.com
Email: anna.terteryan@kirkland.com

Gabor Balassa (admitted *pro hac vice*)
Ryan Moorman (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: gbalassa@kirkland.com
Email: ryan.moorman@kirkland.com

*Counsel for Defendant Eli Lilly and Company*