**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100

May 15, 2025

Honorable Judge James Donato
San Francisco Courthouse, Courtroom 11, 19th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:   *Nektar Therapeutics v. Eli Lilly and Company*, 23-cv-3943-JD (N.D. Cal.)
      Discovery Regarding Nektar's Use of the Application Microsoft Teams Chats

Dear Judge Donato:

Following the Court's Order permitting Defendant Eli Lilly to take discovery into "use of Microsoft Teams by plaintiff Nektar Therapeutics employees and non-preservation of evidence" (Dkt. 167), Lilly issued expansive document requests and deposed six Nektar employees totaling more than 23 hours of testimony. Nektar turned over nearly 1,400 additional documents, including, at Lilly's request, *all* Teams chats in Nektar's possession for its custodians, without applying search terms and regardless of their relevance to this dispute. Nektar also offered all of the witnesses for an unlimited amount of deposition time.

This extensive discovery confirmed what Nektar has consistently represented: (1) reflecting their limited utility as a substantive communication tool in a highly regulated industry, Nektar's Teams chats have been subject to a 24-hour preservation policy as a matter of general business practice for years; (2) after litigation arose, Nektar's General Counsel explicitly directed employees not to use Teams chats to communicate about the lawsuit or the Nektar/Lilly relationship, and employees complied with that directive; and (3) consistent with the highly regulated nature of Nektar's drug development work, Nektar employees perform and memorialize their substantive work in email and documents (not Teams chats), and Nektar preserves those materials *forever* as a matter of general business practice.

Nektar submits this letter in response to Lilly's May 9 submission (Dkt. 184), to correct errors and misstatements in Lilly's letter.

I.   **Nektar's Teams Chat Retention Policy Was Appropriate, as Extensive Discovery Confirmed**

Nektar operates in a highly regulated industry where rigorous documentation of substantive work is required by regulatory authorities. As a result, Nektar preserves its emails and documents—the electronic means by which it conducts its business—*forever*.[1] Indeed, even emails that an employee attempts to delete are still preserved due to Nektar's backup systems and

---

[1] Cummings Dep. Tr. at 180:2-19; Zalevsky Dep. Tr. at 128:25-130:16; Jue Dep. Tr. at 119:10-23; Yu Dep. Tr. at 142:1-13; Liu Dep. Tr. at 210:25-211:17.

cloud computing infrastructure.[2]  This comprehensive document preservation system is critical to the company's core business operations.[3]  It is from this repository of emails and documents that Nektar produced nearly 1.4 million pages of documents related to Rezpeg and the parties' license agreement—including all relevant documents from Teams.

Teams offers videoconferencing capabilities, document storage, and a chat function.  From the outset, Nektar has maintained a 24-hour retention policy for Teams chats, consistent with the policy it implemented for Skype before transitioning to Teams in 2021.[4]  The policy was implemented by Nektar's IT personnel, who understood that chats are designed for ephemeral, real-time messages rather than substantive work.[5]  Each of Nektar's deponents consistently testified that they and other employees perform their substantive work in email and primary documents (like Word, Power Point, and Excel)—not Teams chats.[6]  Teams chats are typically used for brief, logistical communications like, "can we meet today," "I am running late," "have you sent out the meeting invite for this meeting," or "where can I find this document."[7]  The testimony of Nektar's witnesses is corroborated by more than 1,300 chats and chat chains that Nektar produced to Lilly in this litigation.  The overwhelming majority of these communications consist of brief, administrative messages such as:

- "Morning ladies, please may I request to take Thursday next day as PTO? My apologies for the short notice."  (**Exhibit A** hereto.)
- "feel free to ping if there is anything i can help lookup."  (**Exhibit B** hereto.)
- "Wrapping up a call and will ring you in a few minutes."  (**Exhibit C** hereto.)
- "Hi! I will be in SFO in about an hour."  (**Exhibit D** hereto.)
- "Can you kindly share the link to the working IM slide decks."  (**Exhibit E** hereto.)
- "my apologies, should have cancelled the call for today (NA ClinOps).  Sarah is out of the office."  (**Exhibit F** hereto.)
- "Are you able to talk?"  (**Exhibit G** hereto.)
- "Opening meeting starting now."  (**Exhibit H** hereto.)
- "Are you free for a quick chats?"  (**Exhibit I** hereto.)

In its recent discovery, Lilly sought, among other things, *all* Teams chats in Nektar's possession—regardless of subject matter and without limiting search terms.  Despite the extraordinary breadth of Lilly's requests, Nektar collected and produced 1,317 Teams chats and chat chains unfiltered by any keyword searches.  The chats fall into two categories: (1) 899 chats

---

[2]  Cummings Dep. Tr. at 180:20-181:10.
[3]  Zalevsky Dep. Tr. at 130:17-131:9; Jue Dep. Tr. at 119:24-120:6; Liu Dep. Tr. at 211:21-212:4.
[4]  Cummings Dep. Tr. at 50:8-21, 70:9-12.
[5]  Cummings Dep. Tr. at 70:22-71:6.
[6]  Zalevsky Dep. Tr. at 126:7-14, 128:25-130:16; Jue Dep. Tr. at 115:18-116:19, 119:10-23; Yu Dep. Tr. at 141:20-142:13, 32:3-10, 75:21-24, 77:4-8, 77:24-78:5; Liu Dep. Tr. at 210:25-211:17, 46:11-17, 64:11-15; Cummings Dep. Tr. at 179:6-24.
[7]  Zalevsky Dep. Tr. at 126:7-127:20, 33:14-34:2, 70:19-23; Jue Dep. Tr. at 115:18-117:9, 25:3-7, 25:19-24, 26:3-6, 37:19-24, 66:22-25; Yu Dep. Tr. at 138:21-140:6, 44:23-45:15, 75:13-17, 141:8-19; Liu Dep. Tr. at 209:20-210:15, 44:8-45:15, 64:7-15, 67:16-19, 180:21-181:3; Cummings Dep. Tr. at 178:10-24.

embedded in emails from Nektar's custodians dated June 1, 2022 to mid-April 2025 (when Nektar performed the collection), and (2) 418 chat chains from Nektar's custodians created from February 2025 (when Nektar changed its retention policy in response to Lilly's criticism) to mid-April 2025.

The "embedded" chats consist of messages automatically forwarded to email when a recipient does not respond within a certain period. Because Nektar preserves all emails, Nektar located and produced all 899 embedded chats. These embedded chats were not responsive to Lilly's earlier document requests and/or did not hit on the parties' agreed upon search terms. Significantly, not a single embedded chat reveals a Nektar employee discussing the lawsuit or the issues in dispute. Most demonstrate that chats are for brief, non-substantive communications, such as those set forth above. The same holds true for the 418 full chat chains from 2025, which show that custodians continue to use Teams chats for procedural communications like, "Hi Christie. How are you?"; "available for a quick chat?"; "yup!" (**Exhibit J** hereto; *see also* Cummings Dep. Tr. at 186:18-187:15.)[8]

Moreover, on the same day that Nektar filed this action, its General Counsel (Mark Wilson) addressed roughly 30 Nektar employees (not just "four document custodians," as Lilly claims) in a Teams videoconference to discuss the lawsuit and provide clear instructions on appropriate communications going forward. At that meeting, ***Mr. Wilson expressly directed employees not to discuss the lawsuit or Lilly's historical work under the license agreement, including through Teams chats.*** Mr. Wilson ensured his directive was clearly understood and invited employees to ask clarifying questions. He also directed employees to reach out to him if they had any questions or concerns going forward.[9] As each deponent has confirmed under oath, Nektar's custodians faithfully complied with Mr. Wilson's instruction and have not used Teams chats to discuss the license agreement, Lilly's work under the agreement, or the lawsuit.[10]

---

[8] In one deposition, Lilly directed a real-time inspection of Teams on a witness' work computer for her to read through irrelevant Teams chats and perform numerous key word searches for a staggering 31 pages of transcript. (Liu Dep. Tr. at 70:5-95:24, 99:15-100:19, 108:6-109:11, 110:12-113:18.) The Teams chats that Dr. Liu located and read again confirm that Nektar typically uses Teams chats for administrative communications—not substantive work. (Liu Dep. Tr. at 78:4-12 (chat about moving documents to an archive folder), 78:23-79:6 (chat about creating a folder to save publications), 90:7-10 (chat whereby Dr. Zalevsky wrote, "Thanks for the meeting everyone. I need to drop off now."), 95:12-18 (chat whereby Dr. Liu informed a colleague she would be unable to attend a meeting and requested that the colleague attend in her absence).)

[9] Zalevsky Dep. Tr. at 105:4-106:8, 138:13-20; Jue Dep. Tr. at 27:3-10, 28:2-7, 29:4-7, 81:14-22, 83:4-13, 84:12-15, 86:16-23, 96:6-13, 121:20-122:2; Wilson Dep. Tr. at 139:4-10, 199:15-201:1; Cummings Dep. Tr. at 183:15-20.

[10] Zalevsky Dep. Tr. at 141:5-12; Jue Dep. Tr. at 122:18-25, 81:14-22, 90:16-19; Cummings Dep. Tr. at 184:2-185:22. Danni Yu and Yi Liu, two of Nektar's document custodians in this action, were on PTO on August 7, 2023, and thus did not attend the meeting, though, as they confirmed in their sworn testimony, they both complied with the instruction. (Yu Dep. Tr. at 145:16-22, 146:9-21; Liu Dep. Tr. at 208:21-209:18, 229:15-22.) Further, Nektar and Lilly agreed during discovery that Nektar would collect documents from seventeen current and former employees (the "custodians"). Of those seventeen custodians, six left Nektar's employment months and years

Thus, even had employees used Teams chats to discuss Lilly or the collaboration between the parties, Nektar had no chats to preserve or produce before litigation was anticipated in the summer of 2023, as they were automatically discarded in the normal course of business. After the summer of 2023, Nektar had no relevant chats because, as detailed below, Nektar's General Counsel directed employees not to use chats to communicate about the lawsuit or Nektar/Lilly relationship, and Nektar's employees confirmed that they complied with that instruction.

Given these facts—Nektar's preservation of all emails and documents, that chats are designed and were used for ephemeral, real-time messages rather than substantive work, the instruction not to use chats to discuss any relevant issue and custodians' compliance therewith—Nektar's 24-hour retention policy for chat messages is proportional and appropriate. Indeed, Lilly's extensive discovery, including more than 23 hours of depositions, has uncovered not a shred of evidence of any spoliation of relevant material.

## II. Lilly Selected Irrelevant Chats From Nektar's Production That Do Not Support Lilly's Position

Of the 1,317 Teams chats and chat chains Nektar produced, Lilly cites just *17* to argue that "Discovery Revealed Substantive Teams Chat Communications and Chats Relevant to Litigation." (Dkt. 184 at 6.) This cherry-picking is telling. Even setting aside the 1,300 concededly irrelevant Teams Chats, these 17 documents confirm precisely the opposite of what Lilly suggests. *Not one references Lilly's work, the parties' license agreement, or the lawsuit*.

For example, one of Lilly's cited chats contains no communication at all—it merely alerts Jonathan Zalevsky that he was "added [] to the NKTR-358 Program_jnt team!" (*See* Dkt 184 at Ex. 6). Four others are non-substantive, administrative communications coordinating meetings. (*Id.* at Ex. 20 ("No worries. We can connect tomorrow."),[11] Ex. 28 ("Hi there – I see we have the ISR taskforce [meeting] tomorrow. Let me know if you would like to keep this on the [calendar]"), Ex. 30 ("It would be great if we could touch base to go through the data in the next couple of weeks"), Ex. 29 ("You got it. There are a lot of very interesting things to look at.").) Others predate when litigation became reasonably foreseeable. (*Id.* at Ex. 13 (March 30, 2023 Teams chat).) Three more are mere requests for records or publicly available papers. (*Id.* at Exs. 17, 31,

---

before Lilly terminated the parties' license agreement (and therefore could not have used Teams chats in 2023 onward) and four others rarely or never used Teams chats, *leaving just seven custodians who use chats* (Christie Fanton, Ken Franke, Charlene Jue, Yi Liu, Lorin Sasaki, Danni Yu, and Jonathan Zalevsky). (Cummings Dep. Tr. at 182:2-183:13.) Each of those custodians has confirmed that, since Lilly terminated the license agreement, they have not used Teams chats to discuss the license agreement, Lilly's work under the agreement, or the lawsuit. (Zalevsky Dep. Tr. at 137:18-138:20; Jue Dep. Tr. at 120:25-122:2, 81:3-10; Yu Dep. Tr. at 142:14-143:7, 108:22-109:15; Liu Dep. Tr. at 212:5-213:5; Cummings Dep. Tr. at 185:23-186:16.)

[11] Lilly cites this *one* Teams chat totaling six words and no substance to claim that Lilly has "refuted Ms. Ruddock's representation" in her deposition that she typically does not chat. (Dkt. 184 at 6.) But Ms. Ruddock's testimony was accurate. (Ruddock Dep. Tr. at 330:8-14.) In all of the 1,317 Teams chats that Nektar produced to Lilly, Ms. Ruddock sent only *one.*

32.) The remaining eight relate to Nektar's Rezpeg development *years after the parties' agreement was terminated*, including in indications that Lilly did not develop Rezpeg to treat. (*Id.* Exs. 18, 19, 21, 22, 23, 24, 26, 27.)

Lilly evidently believes the following are among the most important Teams chats that support its narrative, but each undermines Lilly's position:

- In Lilly's Exhibit 17, an employee asked Dr. Liu for the location of *publicly available papers* published by the New England Journal of Medicine. In her deposition, Dr. Liu agreed that, "in this Teams chat, Heng is just asking . . . about the location of publicly available papers."[12] Contrary to Lilly's assertion, this chat says nothing about "lebrikizumab and its potential competition with REZPEG." (Dkt. 184 at 7.)

- In Lilly's Exhibit 19, which comes from March 2025—two years after the Nektar/Lilly relationship ended, Dr. Zalevsky asked Dr. Liu questions about a trial protocol, to which Dr. Liu responded by providing a screenshot of the protocol itself and writing, "here is the language we have in the protocol." Dr. Liu and Dr. Zalevsky both testified that the questions and answers were "documented in the protocol and SAP [statistical analysis plan]," which are maintained in Nektar's files forever.[13]

- In Lilly's Exhibits 29 and 30, an employee asked Dr. Zalevsky if they could schedule a meeting to "touch base to go through the data." Dr. Zalevsky responded, "You got it." Dr. Zalevsky testified that, "In essence, Ms. Fanton was asking for a meeting, and [he] said okay," which was "typical of [his] chat exchanges."[14]

- In Lilly's Exhibit 31, Dr. Liu asked Dr. Yu to circulate "the two mistakes you and Qing found." Dr. Yu followed up by *emailing* those mistakes. Such emails remain preserved at Nektar forever—and indeed were produced to Lilly in this case. (**Exhibit T** hereto (email without attachments.) As Dr. Liu testified, "So I sent the request to ask her to send the email and the email was sent and that was kept. So the content of the request is . . . documented in emails."[15]

In short, after extensive discovery, Lilly failed to identify a single Teams chat that would be material to this litigation. This confirms Nektar's consistent position: substantive business is conducted in emails and documents that Nektar preserves, not in ephemeral chat messages.

### III. Nektar Engaged Litigation Counsel When Litigation Became Reasonably Foreseeable and Promptly Issued a Comprehensive Preservation Notice

Lilly's May 9 submission incorrectly claims that Nektar "anticipated litigation against Lilly by March 2023." (Dkt. 184 at 1.) ████████████████████████████████████

---

[12] Liu Dep. Tr. at 215:12-217:12.
[13] Liu Dep. Tr. at 173:19-20, 175:7-9, 211:11-17; Zalevsky Dep. Tr. at 89:17-90:21, 91:12-15.
[14] Zalevsky Dep. Tr. at 131:22-134:23, 43:4-10.
[15] Liu Dep. Tr. at 159:2-160:8, 161:18-21.



The legal standard is clear: for the duty to preserve evidence to arise, "[t]he future litigation must be ***probable,*** which has been held to mean ***more than a possibility***." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) (quotations and citations omitted, emphasis added); *see also Intex Recreation Corp. v. Bestway (USA), Inc.*, 2024 WL 3740100, at *2 (C.D. Cal. July 30, 2024) ("Plaintiff began working with Plaintiff's counsel to formulate a plan for the present litigation in June of 2019 (Doc. 257-40). It was then, ***and not before then***, that there occurred anticipation of litigation within the meaning of Rule 37(e) because ***it was then, and not before then, that this litigation became 'probable.'***") (emphasis added, alteration omitted).

Here, litigation was not "probable" until after May 2023, which is when Nektar discovered that Lilly had grossly miscalculated (and significantly understated) Rezpeg's efficacy in the drug's phase one clinical trial for the treatment of atopic dermatitis.

Just weeks after discovering Lilly's miscalculations, Nektar engaged litigation counsel, then implemented a robust document preservation notice the following week. (Wilson Dep. Tr. at 114:4-8, 141:18-24; **Exhibit L** hereto.) Given that Nektar already preserves all emails and documents as a standard business practice, this document preservation notice further reinforced Nektar's commitment to maintaining all relevant information.[17] Nektar's custodians acknowledged in writing receiving the notice and have complied with it by not deleting any materials relating to the dispute.[18]

---

[16] Robin Dep. Tr. at 139:4-140:24, 143:14-20; Ruddock Dep. Tr. at 183:19-184:2, 230:24-232:16.
[17] Cummings Dep. Tr. at 181:5-10.
[18] Zalevsky Dep. Tr. at 138:21-141:1, 101:17-102:15, 103:10-17, 149:12-150:3; Jue Dep. Tr. at 122:3-17, 126:1-18, 65:13-14, 75:1-77:3; Yu Dep. Tr. at 144:12-145:15; Liu Dep. Tr. at 213:6-215:11, 198:2-5; Cummings Dep. Tr. at 187:20-188:20.

### IV. Lilly Now Pivots to Claim That Nektar's *Current* Rezpeg Development is Relevant

Lilly now argues that Nektar's *current* use of Teams chats to discuss *current* Rezpeg development is somehow relevant. (Dkt. 184 at 6-7.) Yet the handful of Teams chats Lilly cites as "relevant to litigation" are from 2025, after the close of discovery, *and do not reference Lilly, the lawsuit, or Lilly's failed performance leading up to the 2023 termination of the license agreement*. (Dkt. 184 at 6-7, Exs. 18, 19, 21-24, 26, 27.) This pivot is unsurprising but unavailing.

*First*, when negotiating search terms and during the parties' Rule 26(f) conference regarding evidence preservation, Lilly itself proposed limiting discovery to the pre-lawsuit period. (**Exhibit S** hereto ("*Lilly proposes* applying the attached search terms . . . [to] data sources, for the period from July 1, 2017 *through August 7, 2023*").) Consistent with this approach, neither party has continued to produce materials to the present day.

*Second*, during discovery, Lilly served Nektar with its Request for Production Set 2, covering issues post-dating the lawsuit, including Nektar's current development of Rezpeg. Nektar objected to each request on relevance grounds. After Lilly moved to compel, it subsequently *withdrew its motion*—implicitly acknowledging that materials concerning Nektar's current, independent development of Rezpeg are not relevant to Lilly's contractual breaches from years earlier. (Dkts. 129, 160.) Remarkably, Lilly references its Request for Production Set 2 (Dkt. 184 at 7) to suggest that documents postdating the lawsuit are relevant—but fails to disclose that Nektar objected to the requested discovery *and Lilly abandoned its pursuit of these materials*.

This case centers on *Lilly's efforts* in developing Rezpeg from 2017 to early 2023, and (among other things) whether those efforts are commercially reasonable—a standard measured by comparison to *Lilly's efforts* on comparable drugs. Lilly cannot credibly argue that a handful of chats about *Nektar's post-termination* Rezpeg development is material to the claims in this litigation, or, more importantly, evidence of spoliation.

### V. Lilly's Own Chats Appear to Have Been Deleted

Lilly's suggestions of bad faith and inappropriate conduct by Nektar are particularly troubling given Lilly's own imperfect record of preserving electronic materials.



These examples come months *after* Lilly claims Nektar "threatened to 'sue'" (meaning Lilly should have been on notice to preserve them), and all pertain to Rezpeg development, the dispute, or the Nektar-Lilly relationship.

Nektar did not previously raise this issue because, as both parties have acknowledged throughout this litigation, discovery has been comprehensive and thorough. "Rule 37…does not call for perfection in preserving ESI; it calls for 'reasonableness.' Adv. Comm. Notes to 2015

Amend. of Fed. R. Civ. P. 37(e).  And whether preservation is reasonable depends on whether what was done—or not done—was proportional to [the] case." *Rodriguez v. Google LLC*, 2021 WL 8085492, at *2 (N.D. Cal. Dec. 1, 2021) (internal quotation omitted).  Nektar's preservation efforts have been reasonable and proportional to this case, where more than half a million documents have been produced and more than three dozen depositions have been taken.

Moreover, throughout this litigation, Lilly has consistently advocated to **narrow** the scope of relevant discovery. (*See* Dkt. 76 at 1-2 (Lilly objecting to requests for documents "**unlimited** in time" because "all that remains are Nektar's contract claims, the bases of which are narrow."); Dkt. 94 (arguing against adding two custodians because "Nektar does not attempt to argue [they have] unique information on REZPEG"); Dkt. 95 (arguing against producing "irrelevant categories of documents and new, irrelevant drugs"); Dkt. 96 (arguing that discovery into Lilly's counterclaim damages are "irrelevant and unduly burdensome because they are not evidence relevant to the damages Lilly seeks to recover in this case"); Dkt. 137 (arguing against additional expert witnesses because "just one remaining claim and overarching issue in Nektar's case: the allegation that Lilly breached the 'Commercially Reasonable Efforts' provision of the parties' License Agreement").  Given Lilly's repeated positions on relevance and limiting the scope of discovery, Lilly cannot *now* credibly argue it is prejudiced by the possible absence of ephemeral Teams chats that post-date the relevant conduct, from the party whose conduct is not at issue, and that contain information available elsewhere.

### VI. The *Google* Case is Fundamentally Different From Nektar's Situation

Lilly's January 31 motion cites the Court's opinion in *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981 (N.D. Cal. 2023) to request sanctions against Nektar.  But *Google* is fundamentally distinguishable on multiple grounds.  Most significantly, Nektar's General Counsel explicitly instructed employees not to use Team chats to communicate about the lawsuit or the Nektar-Lilly relationship.  Upon learning this key fact during oral argument, the Court recognized this critical distinction and turned to Lilly's counsel, stating: **"So they told their people not to use Teams.  It's a big difference from *Google*."**  (3/27/25 Hearing Tr. at 9:7-10.)  In *Google*, the Court criticized the company for improperly "let[ting] employees make their own personal choices about preserving chats."  664 F. Supp. 3d at 982.  By contrast, Nektar's instruction regarding the appropriate use of Teams chats was mandatory—not discretionary.[19]  And Nektar's custodians complied with that instruction, as confirmed by their sworn testimony and the contents of the Teams chats produced to Lilly.

The *Google* case is also distinguishable in other material respects.  For example, sanctions in *Google* were appropriate because Google "is a frequent and sophisticated litigation party" that "[a]t any given time . . . has thousands of employees who are under a litigation hold for document preservation," with some employees subject to "at least ten or more . . . litigation holds" at once. 664 F. Supp. 3d at 982-83.  Nektar, by contrast, is rarely involved in litigation, has just two in-house attorneys (neither with litigation experience), has no litigation department, employs approximately 60 people total, and has issued just *one* litigation hold in roughly the last five years

---

[19] Cummings Dep. Tr. at 183:15-25; Wilson Dep. Tr. at 202:8-203:15; Jue Dep. Tr. at 93:18-20, 95:8-12.

to just 14 employees (the hold issued in this matter).  (Wilson Dep. Tr. at 195:18-199:2.)  The *Google* case involved 44 document custodians (664 F. Supp. 3d at 994), while just *seven* custodians are at issue here.

Moreover, Google employees acknowledged preservation obligations while simultaneously expressing intent to evade them: "we have to keep history on in this convo," "so that's why I'd prefer to move away from this group chat"; "I am on legal hold" but "prefer to keep chat history off."  664 F. Supp. 3d at 990-91.  In stark contrast, Lilly deposed 15 Nektar witnesses from November 2024 through January 2025, and then took an additional six depositions totaling over 23 hours specifically focused on Teams—yet failed to uncover a single instance of any Nektar employee expressing intent to conceal evidence or circumvent preservation obligations.  The nearly 200,000 documents Nektar has produced in this action—including over 1,300 Teams chats and chat chains—similarly contain no indication of any intent to conceal information.  Lilly does not, and cannot, argue otherwise.

Finally, the *Google* case concerned Google's ongoing antitrust violations alleged to be *continuing* throughout the lawsuit, making communications during the lawsuit directly relevant to the allegations.  The Court therefore focused on "how Google responded [to its preservation obligation] *after* the lawsuits were filed."  664 F. Supp. 3d at 992.  Here, by contrast, the relevant events concluded around April 2023, when Lilly terminated the parties' license agreement—*months before Nektar filed suit*.  Thus, Teams chats *after* mid-2023 have no bearing on Lilly's *earlier* failed contractual performance that forms the basis of this action.

\*    \*    \*

The Court granted Lilly extensive latitude to conduct discovery regarding Nektar's use of Teams chats.  Nektar responded with full transparency, producing nearly 1,400 additional (though irrelevant) documents and making six witnesses available for over 23 hours of depositions.  This discovery process has corroborated Nektar's consistent position: (1) Nektar's General Counsel instructed employees not to use Teams chats to communicate about Lilly, the parties' license agreement, or the lawsuit; (2) Nektar's custodians complied with that instruction; and (3) Nektar employees memorialize their substantive work in email and documents (not Teams chats), which are maintained in Nektar's records forever.  Accordingly, Lilly's motion and requested relief should be denied.

Respectfully submitted,

*/s/ Yury Kapgan*

Yury Kapgan