```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   NEKTAR THERAPEUTICS,            )
                                     )
 6        Plaintiff/Counter-Defendant, )
                                     ) CASE NO.
 7        v.                         ) 3:23-CV-03943-JD
                                     )
 8   ELI LILLY & CO.,               )
                                     )PAGES 1 - 129
 9        Defendant/Counter-Claimant.  )
                                     )
10   _____ )
11
12
13
14
                   DEPOSITION OF CHARLEEN JUE
15
              CONFIDENTIAL -- ATTORNEYS' EYES ONLY
16
                    Thursday, May 1, 2025
17
       APPEARING REMOTELY FROM HUNTINGTON BEACH, CALIFORNIA
18
19
20
21
22
23   STENOGRAPHICALLY REPORTED BY:
     LINDSAY A. STOKER, RDR, RMR, CRR, CRC
24   CA CSR No. 14373
     Job No.:  982543
25
```

25

09:24:57  1    disappearing; right?

09:24:58  2        A.    Yeah.   I don't use Teams chats for going

09:25:02  3    back, typically.   I use them administratively for

09:25:05  4    quick questions, just trying to get something

09:25:07  5    answered to move my work forward.   It is really just

09:25:11  6    a tool that I use in that way.   Sometimes I, you

09:25:16  7    know, might comment or ask a question of someone.

09:25:20  8    So I don't typically go back to Teams chats.

09:25:23  9        Q.    You never go back and review old Teams

09:25:25 10    chats?

09:25:27 11        MR. BATTER:   Objection.

09:25:28 12        THE WITNESS:   I didn't say never.   I said I

09:25:29 13    typically do not go back to Teams chats.   That's

09:25:34 14    not --

09:25:34 15    BY MR. HANEY:

09:25:34 16        Q.    Is that because -- is that because until

09:25:36 17    recently it was your understanding that Teams chats

09:25:38 18    would be deleted after 24 hours?

09:25:40 19        A.    It's because it is my practice in the way

09:25:44 20    that I do the work that I do.   I don't need to

09:25:48 21    typically go back to Teams chats for information.   I

09:25:51 22    get a quick answer to a question, and I move forward

09:25:53 23    with the work that I have to do.   It is

09:25:55 24    administrative for me.

09:25:57 25        Q.    Okay.   Well, you testified that generally

26

| | | |
|---|---|---|
| 09:26:00 | 1 | it is your understanding that Teams chats |
| 09:26:03 | 2 | disappeared after 24 hours; right? |
| 09:26:06 | 3 | A.  In the beginning, when we rolled out Teams, |
| 09:26:09 | 4 | I was a part of the Teams initiative.  And it was my |
| 09:26:14 | 5 | understanding that, at that time when we rolled it |
| 09:26:17 | 6 | out, that chats would disappear in 24 hours. |
| 09:26:22 | 7 | Q.  And at some point there was a change and |
| 09:26:28 | 8 | chats started to be retained; is that right? |
| 09:26:30 | 9 | A.  There was a change in which our legal |
| 09:26:36 | 10 | counsel met with us specifically to talk to us. |
| 09:26:40 | 11 | MR. BATTER:  I will just pause there to make an |
| 09:26:42 | 12 | objection.  Don't disclose any communications you've |
| 09:26:44 | 13 | had with Nektar counsel.  If you're aware of the |
| 09:26:47 | 14 | change in Teams chats, of course you can give that, |
| 09:26:51 | 15 | but not any communications with in-house or outside |
| 09:26:54 | 16 | attorneys. |
| 09:26:55 | 17 | THE WITNESS:  Thanks, Kyle. |
| 09:26:56 | 18 | BY MR. HANEY: |
| 09:26:57 | 19 | Q.  So if I'm hearing you right, you met with |
| 09:26:59 | 20 | counsel and they informed you that Teams chats after |
| 09:27:02 | 21 | that point would be retained longer than 24 hours; |
| 09:27:06 | 22 | is that right? |
| 09:27:07 | 23 | MR. BATTER:  Object.  I instruct the witness not |
| 09:27:10 | 24 | to reveal attorney-client communications. |
| | 25 | /// |

```
09:27:12  1    BY MR. HANEY:
09:27:12  2        Q.   When was the meeting with counsel?
09:27:15  3        A.   We had a team meeting after the
09:27:20  4    announcement of the lawsuit where our counsel
09:27:25  5    specifically instructed not to discuss -- either the
09:27:33  6    Lilly lawsuit, the Lilly work, anything about -- or
09:27:36  7    discuss in writing or communicate about what was
09:27:41  8    going on related to those items.  And if we had any
09:27:45  9    questions, we should specifically talk to Mark
09:27:47  10   Wilson, our attorney, about that.
09:27:49  11       Q.   When you say you had a meeting with
09:27:52  12   counsel, you mean you had a meeting with Mark
09:27:54  13   Wilson?
09:27:54  14       A.   No.  We had a team meeting and Mark Wilson
09:28:00  15   was there.
09:28:00  16       Q.   You said counsel.  Was there anyone besides
09:28:03  17   Mark Wilson that was there?
09:28:04  18       A.   No.  I just used that term to refer to Mark
09:28:07  19   Wilson.
09:28:07  20       Q.   Got it.  You said that that meeting
09:28:09  21   occurred sometime after the lawsuit was filed?
09:28:12  22       A.   It was on -- it was early August.
09:28:15  23       Q.   And after you had -- and after you had that
09:28:21  24   meeting in early August, your Teams chats stopped
09:28:25  25   disappearing after 24 hours.
```

09:28:27   1          Is that your testimony?

09:28:27   2          A.   That's not what I said.  I just said that

09:28:33   3   Mark Wilson instructed us not to discuss it, not to

09:28:38   4   talk about it, in any way, shape, or form.  That was

09:28:42   5   not appropriate for us to be doing.  But if we had

09:28:44   6   questions specifically related to it, anything about

09:28:47   7   it, that we could contact him directly.

09:28:50   8          Q.   Okay.  Well, regardless of what you did or

09:28:53   9   did not talk about using Teams chats, after the

09:28:57  10   meeting with Mr. Wilson, did your Teams chats stop

09:29:01  11   disappearing after 24 hours?

09:29:03  12          A.   I believe they did.  I can't recall.

09:29:08  13          Q.   Okay.  So as of August 2023, your Teams

09:29:13  14   chats stopped disappearing after 24 hours; is that

09:29:15  15   right?

09:29:17  16          MR. BATTER:  Objection.

09:29:19  17          THE WITNESS:  I believe they did sometime around

09:29:23  18   there.  I don't know the exact date.

09:29:25  19   BY MR. HANEY:

09:29:25  20          Q.   So today, if I were to ask you to open up

09:29:28  21   Teams, you could go and look at chats from, say,

09:29:31  22   October of 2023?

09:29:32  23          A.   I don't know.  I'd have to look to see what

09:29:37  24   was actually there.  I don't know what disappeared

09:29:40  25   and what didn't.

29

| | | |
|---|---|---|
| 09:29:40 | 1 | Q. Did IT ever send you any guidance about |
| 09:29:44 | 2 | retaining Teams chats? |
| 09:29:46 | 3 | MR. BATTER: Objection. |
| 09:29:47 | 4 | THE WITNESS: No. I don't recall specific |
| 09:29:51 | 5 | guidance from IT, but we had guidance not to destroy |
| 09:29:58 | 6 | any information related to Lilly, the Lilly lawsuit, |
| 09:30:07 | 7 | Lilly communications. We don't destroy anything. |
| 09:30:14 | 8 | BY MR. HANEY: |
| 09:30:14 | 9 | Q. Okay. So we will talk about document |
| 09:30:16 | 10 | preservation in a bit. What I am trying to just |
| 09:30:17 | 11 | focus on is when your Teams messages stopped |
| 09:30:20 | 12 | disappearing after 24 hours. |
| 09:30:21 | 13 | A. I think it would be best to ask, you know, |
| 09:30:23 | 14 | IT. They are responsible for when they do that in |
| 09:30:26 | 15 | the system. I -- I don't have an exact date of when |
| 09:30:35 | 16 | my first chat disappeared. |
| 09:30:36 | 17 | Q. Okay. So you never changed any settings |
| 09:30:39 | 18 | regarding chat retention; correct? |
| 09:30:41 | 19 | A. No. |
| 09:30:44 | 20 | Q. IT would have been the ones to make any |
| 09:30:47 | 21 | adjustments to the chat retention function? |
| 09:30:49 | 22 | MR. BATTER: Objection. |
| 09:30:50 | 23 | THE WITNESS: IT is responsible for the |
| 09:30:54 | 24 | implementation of our technology. It is not my role |
| 09:30:57 | 25 | or responsibility. |

Case 3:23-cv-03943-JD    Document 187-1    Filed 05/15/25    Page 7 of 29
NEKTAR THERAPEUTICS vs                                                    Charleen Jue
ELI LILLY                          Attorneys Eyes Only                    May 01, 2025

37

| | | |
|---|---|---|
| 09:40:13 | 1 | Teams you can make group messages, right, to chat |
| 09:40:19 | 2 | with multiple people? |
| 09:40:20 | 3 | MR. BATTER:  Objection. |
| 09:40:20 | 4 | THE WITNESS:  Are you talking about chats now? |
| 09:40:24 | 5 | BY MR. HANEY: |
| 09:40:24 | 6 | Q.   Yeah.  I'm sorry.  I think that was the |
| 09:40:26 | 7 | confusion.  I'm not talking about a document |
| 09:40:29 | 8 | uploading anymore.  When I asked you about Teams |
| 09:40:31 | 9 | channels, I was thinking of the chat function. |
| 09:40:33 | 10 | A.   I see. |
| 09:40:35 | 11 | Q.   So with that understanding, what is a Teams |
| 09:40:43 | 12 | channel as it relates to the chat function? |
| 09:40:46 | 13 | A.   Well, the chat function allows you to |
| 09:40:55 | 14 | communicate, so, right?  Whatever you want to ask or |
| 09:40:59 | 15 | request or check in with someone on, you can do that |
| 09:41:04 | 16 | related to a certain team that you're on.  And then |
| 09:41:08 | 17 | everyone would receive that message that you |
| 09:41:12 | 18 | intended. |
| 09:41:14 | 19 | Or, if you're in a team meeting, you may also |
| 09:41:19 | 20 | use the chat function to say, "good job," you know, |
| 09:41:25 | 21 | "the team's doing great," "happy birthday," "are we |
| 09:41:29 | 22 | going to get to this on the agenda?"  Those are the |
| 09:41:32 | 23 | types of things that you would use the chat function |
| 09:41:37 | 24 | for when you're in a meeting. |
| 09:41:38 | 25 | Q.   Okay.  So maybe if I phrase it this way: |

65

10:31:54  1   hold required you to preserve instant messages that

10:31:57  2   are potentially relevant to a dispute with Lilly;

10:31:59  3   correct?

10:32:01  4        MR. BATTER:  Objection.

10:32:02  5        THE WITNESS:  This document says to preserve

10:32:07  6   potentially relevant information, all documents

10:32:11  7   relating to the dispute.  That includes instant

10:32:17  8   messages.

10:32:18  9   BY MR. HANEY:

10:32:18 10        Q.   And you did, in fact, preserve instant

10:32:21 11   messages potentially relevant to the dispute with

10:32:24 12   Lilly; is that right?

10:32:25 13        A.   To the best of my ability, I preserved all

10:32:32 14   of the potentially relevant information.

10:32:35 15        Q.   I would like to also direct your attention

10:32:40 16   to the paragraph above the bullet points.

10:32:44 17        Do you see that?

10:32:49 18        Oh, can you scroll down, Robert?

10:32:57 19        The June 30, 2023, litigation hold also

10:33:01 20   specifically instructed you to interpret broadly

10:33:04 21   documents that may relate to the dispute; correct?

10:33:08 22        MR. BATTER:  Objection.

10:33:09 23        THE WITNESS:  Yeah.  It says "You should

10:33:17 24   interpret equally broadly the documents."

        25   ///

10:33:20  1    BY MR. HANEY:

10:33:21  2        Q.   And the June 30, 2023, notice instructed

10:33:22  3    you to preserve documents whether internal or

10:33:26  4    external, didn't it?

10:33:27  5        A.   I don't know.  Can we go back up to the

10:33:31  6    wording?

10:33:33  7        Q.   It is the last line in the paragraph above

10:33:35  8    the three bullets.

10:33:37  9        A.   Whether internal or external.  It states

10:33:48 10    "whether internal or external."

10:33:51 11        Q.   And you understood, then, that this

10:33:54 12    litigation hold obligated you to retain internal

10:33:57 13    messages between Nektar employees sent using

10:34:00 14    Microsoft teams; correct?

10:34:02 15        MR. BATTER:  Objection.

10:34:03 16        THE WITNESS:  It encompassed, like you said, all

10:34:13 17    documents.

10:34:14 18    BY MR. HANEY:

10:34:20 19        Q.   All documents would include internal Teams

10:34:23 20    messages; correct?

10:34:25 21        MR. BATTER:  Objection.

10:34:26 22        THE WITNESS:  Well, internal Teams messages are

10:34:35 23    administrative messages, often to just ask a

10:34:39 24    question or let somebody know you're running late,

10:34:46 25    those types of things.

75

10:45:36  1        A.    The work that I do I preserve relevant

10:45:42  2    documents.  So that's just part of our standard

10:45:47  3    practice to do that, and to save documents and save

10:45:50  4    emails.  So that was my practice, was not to delete

10:45:58  5    items related to anything that I thought was

10:46:04  6    relevant to this activity.

10:46:06  7        Q.    Besides saving documents and emails, did

10:46:11  8    you take any other steps to ensure that you complied

10:46:13  9    with the June 30, 2023, document preservation

10:46:22  10   notice?

10:46:22  11       A.    Well, really the -- the documents that I --

10:46:30  12   I primarily were responsible for overseeing were the

10:46:34  13   documents that we received from Lilly for the trial

10:46:37  14   master files.  And what we did with those were -- we

10:46:42  15   put them in a secure location to keep them, you

10:46:49  16   know, in a file structure where they were accessible

10:46:54  17   only, you know, by limited people.  So we retained

10:46:58  18   all of the documents we received there.  That was

10:47:02  19   the step.

10:47:03  20       Q.    Besides retaining documents that you

10:47:07  21   received and placing them in a secure location, did

10:47:11  22   you take any other steps to ensure you complied with

10:47:14  23   the June 30, 2023, preservation order?

10:47:19  24       MR. BATTER:  Objection.

10:47:21  25       THE WITNESS:  Well, as part of my work, my

NEKTAR THERAPEUTICS vs
ELI LILLY

Attorneys Eyes Only

Charleen Jue
May 01, 2025

76

10:47:27  1    documents and my emails are typically retained, and

10:47:31  2    anything that's relevant for the conduct of a trial

10:47:35  3    would be saved.

10:47:37  4    BY MR. HANEY:

10:47:40  5        Q.   Besides the document preservation tactics

10:47:43  6    that you employ as part of your normal scope of

10:47:47  7    work, did you take any additional steps to ensure

10:47:49  8    you preserved relevant material as per the June 30,

10:47:54  9    2023, document preservation notice?

10:47:58  10       MR. BATTER:  Objection.

10:48:01  11       THE WITNESS:  The relevant material that I

10:48:04  12   typically came into contact with were, you know,

10:48:08  13   primarily these documents that we received from

10:48:11  14   Lilly.  And so that was a big part of my role, is

10:48:17  15   overseeing that.  And then, you know, anything that

10:48:23  16   would be in an email, would be in my email, that

10:48:28  17   would be preserved related to that.  Those are the

10:48:30  18   primary areas that I recall, sitting here today,

10:48:33  19   where I may come into contact with these documents.

10:48:37  20   BY MR. HANEY:

10:48:39  21       Q.   So beyond preserving your email and saving

10:48:41  22   key documents received from Lilly, did you do

10:48:44  23   anything else to ensure you complied with the

10:48:47  24   June 30, 2023, preservation order?

10:48:50  25       MR. BATTER:  Objection.

Case 3:23-cv-03943-JD    Document 187-1    Filed 05/15/25    Page 12 of 29
NEKTAR THERAPEUTICS vs                                              Charleen Jue
ELI LILLY                        Attorneys Eyes Only                May 01, 2025

77

10:48:51  1        THE WITNESS:  I did what I thought was the right

10:48:56  2    thing to do in practice, which was save relevant

10:48:59  3    documents.

10:49:00  4    BY MR. HANEY:

10:49:01  5        Q.   And beyond saving relevant documents, you

10:49:03  6    didn't take any other steps; right?

10:49:06  7        MR. BATTER:  Objection.

10:49:07  8        THE WITNESS:  Not sure what you mean by "any

10:49:10  9    other steps."  Could you clarify?

10:49:13 10    BY MR. HANEY:

10:49:14 11        Q.   I just want to know if there's anything

10:49:17 12    else you did.

10:49:18 13        MR. BATTER:  Objection.

10:49:18 14        THE WITNESS:  I just -- I just did my job.  I

10:49:21 15    carried out my responsibilities and all of the

10:49:26 16    instructions to the best of my ability.

10:49:31 17    BY MR. HANEY:

10:49:31 18        Q.   Did you save Teams chats?

10:49:32 19        A.   I don't know how to save Teams chats.

10:49:44 20        Q.   So you did not save Teams chats?

10:49:46 21        A.   No.  I don't recall doing that.  I don't

10:49:49 22    know how to do that.

10:49:49 23        Q.   You never changed the settings of your

10:49:52 24    Teams app; right?

10:49:53 25        A.   As we discussed earlier, no.  I don't know

81

10:54:01  1   use Teams chats to discuss the lawsuit or anything

10:54:04  2   related?

10:54:07  3       A.   Again, it is not appropriate for me in my

10:54:11  4   role to even consider discussing the lawsuit in any

10:54:13  5   form, therefore, I didn't.

10:54:19  6       Q.   So you have never used Teams chats to

10:54:20  7   discuss the lawsuit or anything even tangentially

10:54:23  8   related?

10:54:24  9       A.   I don't recall doing that.  It wouldn't be

10:54:29 10   appropriate.

10:54:30 11       Q.   Did you receive an oral instruction from

10:54:35 12   Mark Wilson on the use of Teams chats?

10:54:40 13       A.   At what time point are you talking about?

10:54:44 14       Q.   After receiving the June 30, 2023,

10:54:46 15   preservation notice, did you receive an oral

10:54:50 16   instruction from Mark Wilson about the appropriate

10:54:53 17   use of Teams chats?

10:54:55 18       A.   What the team received was oral instruction

10:55:01 19   from Mark Wilson in early August that it was not

10:55:07 20   appropriate for us to be discussing anything about

10:55:09 21   the lawsuit, Lilly, their work in any form.  And,

10:55:15 22   therefore, I did not.

10:55:20 23       Q.   And you say "what the team received."

10:55:28 24       MR. BATTER:  Objection.

         25   ///

83

10:56:37  1        THE WITNESS:  I don't recall exactly how much

10:56:41  2    time it was.

10:56:42  3    BY MR. HANEY:

10:56:46  4        Q.   And what exactly did Mr. Wilson instruct of

10:56:50  5    you at this team meeting?

10:56:54  6        MR. BATTER:  Objection.

10:56:54  7        THE WITNESS:  Well, what I recall is he

10:56:58  8    instructed us that it was not appropriate to discuss

10:57:05  9    the Lilly lawsuit, the Lilly work, in any form,

10:57:17 10    whether it is email or verbally, with each other,

10:57:19 11    with anyone, that what was appropriate is, if we had

10:57:26 12    any questions, even general questions, that they

10:57:28 13    should be directly related to him.

10:57:32 14    BY MR. HANEY:

10:57:33 15        Q.   So Mr. Wilson instructed the Nektar team

10:57:38 16    that it was inappropriate to discuss the Lilly

10:57:41 17    lawsuit at all, not just on Teams?

10:57:45 18        A.   The Lilly relationship, the Lilly lawsuit,

10:57:55 19    we were not to discuss anything related to that, but

10:57:56 20    that was not appropriate, and that if we had

10:57:58 21    questions, we should address them to him.

10:58:01 22        Q.   So when you left the meeting with Mark

10:58:06 23    Wilson, was it your understanding that you couldn't

10:58:11 24    use Teams chats to discuss REZPEG's Phase 2 atopic

10:58:17 25    dermatitis development?

Attorneys Eyes Only

84

10:58:19  1       A.    My understanding is that I can use Teams

10:58:23  2   chats to do the work that I have to do, but I don't

10:58:34  3   do any substantive work in Teams chats.  I might ask

10:58:38  4   a question or things of that nature.  But that's --

10:58:40  5       Q.    You might -- apologies.

10:58:40  6             (Discussion held off the record.)

10:59:20  7   BY MR. HANEY:

10:59:20  8       Q.    So I want to unpack what you said a little

10:59:22  9   bit.  You had said that it was -- your understanding

10:59:25 10   is Mark Wilson told you it was not appropriate to

10:59:28 11   discuss the Lilly lawsuit; right?

10:59:30 12       A.    He said we should not be discussing the

10:59:35 13   Lilly relationship, the Lilly lawsuit, any work

10:59:37 14   related to Lilly, with each other, with anyone, if

10:59:41 15   we had questions, typically we would come to him.

10:59:45 16       Q.    What is your understanding of what would

10:59:50 17   fall under the umbrella of the Lilly work?

10:59:53 18       A.    I think it's the work related to the

11:00:05 19   conduct of the actual trials they conducted.

11:00:10 20       Q.    So you were instructed not to discuss any

11:00:13 21   of the trials that were predominantly run by Lilly;

11:00:20 22   is that right?

11:00:22 23       MR. BATTER:  Objection.

11:00:24 24       THE WITNESS:  No, that's not what I meant.  I

11:00:26 25   think any -- any of the work where there was

86

11:01:49  1   making sure that the CSRs were written, and that's

11:01:56  2   my Lilly-related work for me.

11:01:58  3       Q.   Well, you said that there were

11:02:05  4   discrepancies in Lilly's work.

11:02:11  5       What did you mean by "discrepancies"?

11:02:14  6       MR. BATTER:  Objection.

11:02:15  7       THE WITNESS:  I think if there's disagreement in

11:02:17  8   the results, that's an area that I am not an expert

11:02:21  9   in, and nor is it appropriate for me to discuss

11:02:24 10   disagreement in any discrepancies at the results.

11:02:29 11   BY MR. HANEY:

11:02:30 12       Q.   So Mark Wilson instructed you not to

11:02:35 13   discuss any results of Lilly trials where you

11:02:38 14   disagreed with the outcome; is that right?

11:02:42 15       MR. BATTER:  Objection.

11:02:42 16       THE WITNESS:  I think I told you a couple times

11:02:44 17   already what Mark Wilson told us, and he was very

11:02:46 18   clear that we should not be discussing the Lilly

11:02:51 19   lawsuit, the Lilly work, and the Lilly relationship.

11:02:59 20   That was not something that was appropriate for me

11:03:01 21   or other team members to be discussing, and that was

11:03:04 22   in his purview, and if we had questions to speak to

11:03:08 23   him about it.

11:03:08 24   BY MR. HANEY:

11:03:09 25       Q.   Right.  So what I'm trying to understand is

90

```
11:06:45  1   operational.  They are related, as I said, really

11:06:48  2   procedural related to making sure we got the

11:06:52  3   documents in, related to the Lilly documents and

11:06:56  4   making sure that the Lilly CSRs that had

11:06:59  5   transitioned to Nektar were then updated and then

11:07:05  6   finalized and published and then distributed.  That

11:07:09  7   was my work that had to be done according to

11:07:13  8   requirements.  You cannot not do that work, and it

11:07:19  9   is a very clear and straightforward work to do.

11:07:21 10   BY MR. HANEY:

11:07:22 11       Q.   Right.  And what I'm asking is Mark

11:07:23 12   Wilson's instruction to the Nektar team did not in

11:07:28 13   any way inhibit you from doing your core job as it

11:07:32 14   pertains to REZPEG's development; right?

11:07:38 15       MR. BATTER:  Objection.

11:07:38 16       THE WITNESS:  Mark Wilson's instructions to me

11:07:41 17   to not discuss the Lilly work, the Lilly lawsuit, or

11:07:46 18   the Lilly relationship were very clear, and I

11:07:50 19   followed those instructions.

11:07:53 20       In addition to that, I did my job, which was as

11:07:59 21   I've explained it to you already.

11:08:00 22   BY MR. HANEY:

11:08:01 23       Q.   So Mark Wilson's oral instruction left room

11:08:06 24   for you to perform your core job responsibilities as

11:08:09 25   they relate to REZPEG's development; right?
```

93

11:10:51  1   have to carry out according to the regulations and

11:10:54  2   how we perform duties and clinical development

11:10:57  3   operations.

11:10:59  4   BY MR. HANEY:

11:10:59  5       Q.   I think we're talking past each other.

11:11:01  6       So Mark Wilson specifically instructed you and

11:11:05  7   the Nektar team that it was inappropriate to discuss

11:11:09  8   the Lilly relationship, the Lilly lawsuit, and the

11:11:11  9   Lilly work; correct?

11:11:12 10       A.   That we should not do that, that's correct,

11:11:15 11   and that if we had questions, we should come to him.

11:11:20 12       Q.   And your understanding of that warning

11:11:23 13   meant that you were able to carry out all of the

11:11:25 14   functions of your job responsibility without

11:11:29 15   encroaching on or discussing the Lilly lawsuit, the

11:11:32 16   Lilly work, or the Lilly relationship; right?

11:11:37 17       MR. BATTER:   Objection.

11:11:38 18       THE WITNESS:   My understanding of that directive

11:11:43 19   was that I should comply with that directive because

11:11:46 20   that was the appropriate thing to do.

11:11:49 21   BY MR. HANEY:

11:11:49 22       Q.   And you were able to comply with Mark

11:11:51 23   Wilson's directive without in any way having to

11:11:59 24   shift the way you perform your normal, everyday job;

11:12:03 25   correct?

95

11:13:23  1    BY MR. HANEY:

11:13:23  2        Q.   Right.  So I think I'm asking a much

11:13:26  3    simpler question.

11:13:31  4        Mark Wilson's directive, you perceived that as

11:13:36  5    being unrelated to your core job responsibilities;

11:13:40  6    right?

11:13:40  7        MR. BATTER:  Objection.

11:13:41  8        THE WITNESS:  I took Mark Wilson's directive as

11:13:45  9    what I needed to do as a responsible team member and

11:13:49 10    leader within Nektar clinical development

11:13:55 11    operations.  So I did that.  I followed his

11:14:00 12    directive.

11:14:00 13    BY MR. HANEY:

11:14:00 14        Q.   And I think you said earlier you were able

11:14:02 15    to follow his directive and still do your job;

11:14:05 16    correct?

11:14:06 17        A.   I have to do my job regardless of his

11:14:11 18    directive.  I have a big responsibility at Nektar.

11:14:13 19    So I do my job.

11:14:15 20        Q.   You just said you have to do you job

11:14:20 21    regardless of Mark's directive.

11:14:22 22        If your job responsibilities required you to

11:14:23 23    ignore Mark's directive, would you do so?

11:14:30 24        MR. BATTER:  Objection.

11:14:31 25        THE WITNESS:  Yeah.  Let me restate that.

96

```
11:14:33  1       My job continues every single day at Nektar in
11:14:36  2   the world of clinical trial operations.  Someone
11:14:38  3   needs to run clinical trial operations.  And that's
11:14:40  4   what I do.  That's ongoing.  It is an everyday
11:14:44  5   thing.  It doesn't stop.
11:14:45  6       And Mark's directive of what we should do with
11:14:49  7   respect to Eli Lilly and the lawsuit and the work
11:14:53  8   that they do and that they did and the relationship
11:14:58  9   is outside of our scope.  It is not within our scope
11:15:02 10   to be discussing that.  And that is what he asked us
11:15:06 11   to do, was to not discuss it, not write about it,
11:15:09 12   and come to him with questions, and that is related
11:15:12 13   to those topics.
11:15:28 14       MR. HANEY:  Got it.
11:15:30 15       Robert, can you please publish -- let's see
11:15:33 16   here -- tab 8 for me.
11:15:38 17           (Exhibit 1414 was marked for
11:15:48 18            identification.)
11:15:48 19       MR. HANEY:  For the record, we will be marking
11:15:51 20   tab 8 as Exhibit 1414.  All right.  Thank you.
11:16:29 21   BY MR. HANEY:
11:16:29 22       Q.   Can you see that okay, Ms. Jue?
11:16:37 23       A.   I can see it.  It's a little blurry.  Can
11:16:39 24   you make it a little bit bigger, possibly?  Thank
11:16:44 25   you.
```

115

11:48:43  1      MR. HANEY:  Kyle, you will be delighted to know

11:48:46  2  that I have no more questions.

11:48:46  3      MR. BATTER:  Okay.  Great.  Thank you.  I

11:48:47  4  appreciate that, Landen.  Since we just took a

11:48:48  5  break, I can go straight into my direct exam.

11:48:56  6                    CROSS-EXAMINATION

11:48:56  7  BY MR. BATTER:

11:48:57  8      Q.   Thank you, Charleen, for being with us

11:48:59  9  today.  We do appreciate your time.

11:49:00 10      Charleen, do you prefer I call you Ms. Jue or

11:49:05 11  Charleen?  I know informally I have been referring

11:49:06 12  to you as Charleen.  I want to be respectful.

11:49:09 13      A.   Charleen is great.  Thanks.

11:49:10 14      Q.   So, as you testified during your questions

11:49:11 15  with Lilly's counsel, you have these Microsoft Teams

11:49:14 16  chats?

11:49:14 17      A.   Yes, that's correct.

11:49:15 18      Q.   What do you typically send chats for?

11:49:18 19      A.   Typically, I use chats administratively to

11:49:27 20  ask if someone is coming to a meeting or to get a

11:49:29 21  meeting scheduled and to move my work forward.  In a

11:49:39 22  Teams setting, I might ask a question in a team

11:49:47 23  meeting or say I have to leave early to a meeting.

11:49:50 24  That's typically what my practice is.

11:49:51 25      Q.   Can you give me some examples of what you

116

11:50:01  1    might chat?

11:50:02  2        A.   Just yesterday we celebrated a 16-year

11:50:05  3    celebration for an employee.  We write

11:50:07  4    congratulations, great job, we're so proud of you,

11:50:10  5    different things like that.  If the team is

11:50:12  6    presenting or doing a really good job or making good

11:50:16  7    progress, we try to put positive things in the chat

11:50:18  8    during a meeting.

11:50:19  9        But administratively, I would chat with my admin

11:50:25  10   and asking if she can set up a meeting for me.  Or

11:50:29  11   if someone is coming to a meeting, if someone is

11:50:32  12   late, or if I'm late, I will let people know if

11:50:35  13   they're in a meeting already.  Those are the typical

11:50:38  14   types of things that I do.

11:50:39  15       Q.   So you might chat "I am running late," for

11:50:42  16   instance?

11:50:42  17       A.   Correct.

11:50:43  18       Q.   Or "Can we meet today?"

11:50:45  19       A.   Yes.

11:50:47  20       Q.   What about when you're looking for certain

11:50:49  21   documents, is that the topic you cover in chats?

11:50:52  22       A.   Yes.  I've asked for help sometimes.  When

11:50:56  23   I can't find a document, I will ask for the location

11:51:00  24   of a document and ask someone to help me provide

11:51:05  25   that location.

117

| Time | # | Text |
|---|---|---|
| 11:51:06 | 1 | Q.   And what about chats that you received from |
| 11:51:09 | 2 | other people?  Do they tend to be of the same nature |
| 11:51:12 | 3 | of the chats that you send? |
| 11:51:14 | 4 | A.   I think, in general, yes.  You know, we're |
| 11:51:17 | 5 | working to progress our work forward, and so just |
| 11:51:23 | 6 | really asking simple, straightforward questions and |
| 11:51:27 | 7 | more administrative tasks in general. |
| 11:51:29 | 8 | Q.   So typically procedural and administrative? |
| 11:51:31 | 9 | A.   Yes, that's correct. |
| 11:51:32 | 10 | Q.   Now, earlier you testified your |
| 11:51:34 | 11 | understanding that Teams chats are currently being |
| 11:51:37 | 12 | retained at Nektar. |
| 11:51:40 | 13 | Do you recall saying that? |
| 11:51:41 | 14 | A.   I do. |
| 11:51:42 | 15 | Q.   You don't know when Nektar changed its |
| 11:51:44 | 16 | Teams chats retention policy? |
| 11:51:50 | 17 | A.   I don't know the date. |
| 11:51:51 | 18 | Q.   And your testimony that it happened after |
| 11:51:53 | 19 | the August 2023 meeting wasn't intending to suggest |
| 11:51:58 | 20 | that the retention period changed immediately after |
| 11:52:00 | 21 | that meeting? |
| 11:52:03 | 22 | A.   I'm sorry, Kyle.  Can you say that again. |
| 11:52:06 | 23 | MR. HANEY:  Object to form. |
| 11:52:07 | 24 | BY MR. BATTER: |
| 11:52:07 | 25 | Q.   Your testimony that the Nektar changed its |

119

| | | |
|---|---|---|
| 11:53:08 | 1 | Q.   And does the fact that, at least for that |
| 11:53:11 | 2 | time period, they were only maintained for 24 hours, |
| 11:53:14 | 3 | did that change or impact the way in which you would |
| 11:53:18 | 4 | chat? |
| 11:53:19 | 5 | MR. HANEY:  Object to form. |
| 11:53:20 | 6 | THE WITNESS:  No, because I typically use chats |
| 11:53:25 | 7 | for administrative-type communication.  So my |
| 11:53:32 | 8 | practice hasn't changed. |
| 11:53:33 | 9 | BY MR. BATTER: |
| 11:53:36 | 10 | Q.   If you're not using Teams chats, then, for |
| 11:53:39 | 11 | the core functions of your work, what applications |
| 11:53:41 | 12 | or tools or software do you use for the core |
| 11:53:45 | 13 | functions of your work? |
| 11:53:48 | 14 | MR. HANEY:  Object to form. |
| 11:53:49 | 15 | THE WITNESS:  For the core functions of my work, |
| 11:53:51 | 16 | it's primarily email and documents that we would |
| 11:53:58 | 17 | attach in email, such as PowerPoint presentations or |
| 11:54:03 | 18 | Word documents, sometimes Excel. |
| 11:54:06 | 19 | BY MR. BATTER: |
| 11:54:07 | 20 | Q.   And is it your understanding that emails |
| 11:54:10 | 21 | and the types of documents you just described are |
| 11:54:12 | 22 | preserved at Nektar forever? |
| 11:54:14 | 23 | A.   Yes. |
| 11:54:16 | 24 | Q.   Is it important to you that the work you |
| 11:54:19 | 25 | perform at Nektar is preserved? |

120

11:54:22  1        A.    Absolutely.  I live in a very regulated

11:54:27  2   role at Nektar, and we are required to be able to

11:54:32  3   re-create a study from the ground up and all of the

11:54:37  4   things we did to conduct this study and to be

11:54:42  5   inspection ready.  So it is important that we retain

11:54:45  6   all of the relevant documents.

11:54:48  7        Q.    You're aware that after Lilly terminated

11:54:51  8   the parties' collaboration agreement, Lilly was

11:54:54  9   supposed to return to Nektar materials related to

11:54:57  10  REZPEG development?

11:54:58  11       A.    Yes.

11:55:00  12       Q.    And did you have a role in that?

11:55:02  13       A.    I did.  I oversaw or managed two of the key

11:55:10  14  people that were responsible for receiving documents

11:55:16  15  and then placing the document into the TMF file

11:55:20  16  structure and then working on the QC of the

11:55:27  17  documents that we received, or to make sure we had

11:55:31  18  complete TMF files so that we could, in fact, write

11:55:35  19  or update the CSR work that we had received.

11:55:39  20       Q.    As part of that process, did you

11:55:42  21  periodically have procedural questions or comments

11:55:45  22  about where documents might reside or how they were

11:55:48  23  organized?

11:55:49  24       A.    I did.  I did have questions.

11:55:53  25       Q.    Other than regarding the procedural and

121

| | | |
|---|---|---|
| 11:55:56 | 1 | administrative issues about those documents, after |
| 11:56:02 | 2 | Lilly terminated the parties' collaboration |
| 11:56:04 | 3 | agreement, have you used Teams chats to communicate |
| 11:56:08 | 4 | about the collaboration agreement between the |
| 11:56:10 | 5 | parties? |
| 11:56:10 | 6 | A.    No. |
| 11:56:11 | 7 | Q.    After Lilly terminated the collaboration |
| 11:56:14 | 8 | agreement, have you used Teams chats to comment |
| 11:56:16 | 9 | about the work that Lilly performed under the |
| 11:56:19 | 10 | agreement? |
| 11:56:20 | 11 | A.    No. |
| 11:56:22 | 12 | Q.    And then after Nektar sued Lilly several |
| 11:56:25 | 13 | months later in August 2023, have you used Teams |
| 11:56:29 | 14 | chats to communicate about the lawsuit, the |
| 11:56:31 | 15 | allegations in the lawsuit, the claims at issue? |
| 11:56:36 | 16 | MR. HANEY:  Object to form. |
| 11:56:40 | 17 | BY MR. BATTER: |
| 11:56:40 | 18 | Q.    What was your answer, Ms. Jue? |
| 11:56:42 | 19 | A.    No, I did not. |
| 11:56:43 | 20 | Q.    Why is it that you're not using Teams chats |
| 11:56:49 | 21 | to discuss these topics? |
| 11:56:50 | 22 | A.    Specifically because we were instructed by |
| 11:56:52 | 23 | Mark Wilson back in August 2023 not to discuss the |
| 11:56:57 | 24 | lawsuit, the work Lilly did, the relationship, in |
| 11:57:02 | 25 | any form, just Teams chats, emails, or verbal |

122

11:57:06   1    communication, and that if we had questions, we

11:57:08   2    needed to address them to him.

11:57:10   3        Q.   Earlier you testified about the document

11:57:15   4    preservation notice you signed.

11:57:17   5        Do you recall that testimony?

11:57:18   6        A.   I do.

11:57:20   7        Q.   And you recalled that the preservation

11:57:24   8    notice referred to documents, quote, "relating to

11:57:26   9    the dispute with Lilly"?

11:57:28  10        A.   Yes.  I remember that.

11:57:30  11        Q.   Do your Team chats, quote, "relate to the

11:57:34  12    dispute with Lilly"?

11:57:36  13        A.   Absolutely not.

11:57:38  14        Q.   Did you comply with the document

11:57:41  15    preservation notice by not deleting materials

11:57:44  16    relating to Nektar dispute with Lilly?

11:57:50  17        A.   I did.

11:57:50  18        Q.   You mentioned that Mr. Wilson gave an

11:58:02  19    instruction regarding it proper use of Teams chats

11:58:03  20    and other communication pertaining to Lilly and the

11:58:08  21    lawsuit.

11:58:09  22        Is that a fair characterization?

11:58:10  23        A.   Yes.

11:58:12  24        Q.   Did you abide by Mr. Wilson's instruction?

11:58:15  25        A.   I did.

Case 3:23-cv-03943-JD    Document 187-1    Filed 05/15/25    Page 28 of 29

NEKTAR THERAPEUTICS vs
ELI LILLY                          Attorneys Eyes Only

Charleen Jue
May 01, 2025

126

12:01:59  1      Q.    To best of your recollection, do you recall

12:02:01  2  deleting any documents related to Lilly at all

12:02:09  3  whether or not related to the dispute?

12:02:10  4      A.    No.  I don't recall deleting any documents.

12:02:12  5  That wouldn't be my typical practice.  And the

12:02:14  6  documents that we received for Lilly for the work

12:02:19  7  that I do all went on a shared -- a space, a TMF

12:02:24  8  file structure where they are kept and stored there.

12:02:28  9      MR. HANEY:  I will just note for -- sorry, Kyle.

12:02:30 10  I will just note for the court reporter that I

12:02:31 11  objected to Mr. Batter's previous question.

12:02:39 12  BY MR. BATTER:

12:02:39 13      Q.    So if it is not your typical practice to

12:02:42 14  delete documents, what is your typical practice?

12:02:46 15      MR. HANEY:  Object to form.

12:02:49 16      THE WITNESS:  The typical practice is to save

12:02:51 17  documents and to save my emails and communications

12:02:55 18  that I have.

12:02:58 19      MR. BATTER:  No further questions.

12:03:02 20      MR. HANEY:  All right.  Thank you, Ms. Jue.

12:03:05 21      MR. BATTER:  Thank you very much for your time

12:03:06 22  today, Ms. Jue.

12:03:08 23      I think we can go off the record.

12:03:10 24      Actually, before we go off the record, let's

12:03:11 25  stay on the record and just provisionally mark this

Case 3:23-cv-03943-JD    Document 187-1    Filed 05/15/25    Page 29 of 29
NEKTAR THERAPEUTICS vs                                              Charleen Jue
ELI LILLY                        Attorneys Eyes Only                May 01, 2025

129

1    STATE OF CALIFORNIA    )

2                           )    ss.

3    COUNTY OF ORANGE       )

4            I, LINDSAY ANNE STOKER, RDR, RMR, CRR, CRC,

5    and Certified Shorthand Reporter of the State of

6    California, does hereby certify:

7            That the foregoing deposition was taken

8    before me at the time and place therein set forth, at

9    which time the witness was duly sworn by me;

10           That the statements made on the record were

11   recorded stenographically by me and were thereafter

12   transcribed; said transcript being a true and correct

13   copy of the proceedings thereof;

14           I further certify that I am neither counsel for

15   nor related to any party to said action, nor in any way

16   interested in the outcome thereof;

17           Further, that if the foregoing pertains to the

18   original transcript of a deposition in a federal case,

19   before completion of the proceedings, review of the

20   transcript was not requested/offered on the record.

21           In witness whereof, I have subscribed my name,

22   this ___ day of ____, 2025.

23

24   _____

             Lindsay A. Stoker, RDR, RMR, CRR, CRC

25           CA CSR No. 14373