1

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   NEKTAR THERAPEUTICS,          )
                                   )
 5              Plaintiff,         )
                                   )
 6        vs.                      ) Case No.
                                   ) 3:23-cv-03943-JD
 7   ELI LILLY & CO.,              )
                                   )
 8              Defendant.         )
     _____ )
 9

10

11

12

13

14

15              HIGHLY CONFIDENTIAL

16       REMOTE VIDEOTAPED DEPOSITION OF

17           JONATHAN ZALEVSKY, PhD

18            MONDAY, MAY 5, 2025

19

20

21

22

23

24
     Reported in Stenotype by:
25   Cody R. Knacke, RMR, CSR No. 13691
     Job No.:  982546
```

33

1    and other kinds of trainings.  There was, of course,

2    you know, like, segregation, you know, things that

3    are key to keep with one partner they only stay, you

4    know, with one partner and so on.

5            And so, yeah, I think it would be that --

6    to that kind of level.

7        Q.   And during the collaboration between

8    Eli Lilly and Nektar, other than standard

9    confidentiality guardrails, you don't recall any

10   specific instructions about how to use or not use

11   the Microsoft Teams chat function; correct?

12       A.   Yeah, there were no kind of specific things

13   given for that collaboration.

14           But I guess, you know, I do think there is

15   an important caveat here, which is, you know, you're

16   asking a lot of questions about Teams and it has, as

17   I described, many sort of capabilities.  And so the

18   chat feature is one of those.  It's -- it's for very

19   kind of, like, brief, you know, communications, very

20   small or -- like, like, "I'm running late for a

21   meeting," that kind of flavor of communication.

22           So, I mean, you know, so I guess in that

23   regard, there wasn't anything special because we

24   don't use it in -- in kind of a substantive way.

25           We do use other parts of the Teams platform

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 3 of 30
NEKTAR THERAPEUTICS v                                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                Highly Confidential                May 05, 2025

34

1    a lot, and they are treated very differently than

2    the way chats are.

3       Q.   So you're -- I think you're saying your

4    general experience with Teams' chat function is that

5    you don't engage in substantive communications on

6    the platform; is that right?

7       A.   Yeah, I --

8            MR. BATTER:  Objection.

9            THE WITNESS:  I'm sorry.

10           Yeah.  In the chat platform, yes.

11   BY MR. WEEKS:

12      Q.   What do you consider to be a substantive

13   communication about a development-related topic?

14      A.   Well, for example, something that requires

15   making a decision, maybe about how a study is

16   designed or how a, I don't know, a statistical

17   analysis is conducted or something, you know, those

18   are things that are substantive and really not

19   appropriate, you know, for a chat.

20           We may use a chat to set up a meeting to

21   discuss those things, right.  That would be -- it's

22   like a perfect, like, example of how a chat could be

23   used to facilitate that, but we wouldn't use a chat

24   to have that kind of a discussion.

25      Q.   But subjects like a clinical trial design

1          THE WITNESS:  Again, I'm not sure because

2    it's not referenced, so I can't say.  We work on a

3    lot of things, Christie and I.

4          But, you know, I mean, I appreciate that

5    you showed me both, because it does sort of

6    indicate, you know, how we use chat, which is let's

7    have a meeting, right?  I mean, that's basically

8    what this exchange is about, right, is setting up to

9    have a meeting to talk about some data about

10   something.

11         I mean, it also -- it's curious to me that

12   this is also before we terminated, you know, the

13   collaboration with Lilly.  So it was also, I guess,

14   during a collaboration.

15         But to be honest, I'm not sure if this is

16   about REZPEG even at all.

17   BY MR. WEEKS:

18     Q.   So again, Dr. Zalevsky, you don't have the

19   full context around your conversation with

20   Ms. Fanton from February 24, 2023, based on these

21   message previews; correct?

22         MR. BATTER:  Objection.

23         THE WITNESS:  Yeah.  I can't be certain

24   what this was about.

25   ///

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 5 of 30
NEKTAR THERAPEUTICS v                                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                Highly Confidential              May 05, 2025

70

1    seen, I would find it unlikely for her to send a

2    chat of that kind.

3    BY MR. WEEKS:

4        Q.   Did you ever instruct Katie not to use

5    Microsoft Teams chat to talk about things related to

6    the ISR task force?

7        A.   No, I have never instructed her about that,

8    but again, like the underlying kind of zeitgeist, if

9    you will, of your questions is that we just don't

10   use Teams chat in that way.  We really primarily use

11   them for scheduling or kind of logistical purposes.

12       Q.   So you keep saying "we," Dr. Zalevsky, but

13   what you mean by that is, based on your experience

14   using Teams chat, that is your opinion about its

15   common usage; correct?

16           MR. BATTER:  Objection.

17           THE WITNESS:  So thank you for the

18   clarification.

19           So the way that I see the Nektar employees

20   from the chats that I see and the way that I use

21   Teams chat, it is for those kind of short

22   communications that are typically around things like

23   logistics and administrative activities.

24   BY MR. WEEKS:

25       Q.   Right.  And so my question, though, is, you

89

1          Do you see that?

2     A.   Yes.

3          MR. WEEKS:  Thank you, Joshua.  Could we

4     just scroll down to see Dr. Liu's next messages.

5     BY MR. WEEKS:

6     Q.   So Dr. Liu then pastes a provision of the

7     protocol in response to your message; correct?

8     A.   Mm-hmm.

9          MR. WEEKS:  And then if we could scroll

10    down, Joshua, to -- right there.  That's good.

11    BY MR. WEEKS:

12    Q.   So Dr. Liu continues to provide her

13    thoughts on the interim analysis and the statistical

14    significance that Nektar can report following that

15    analysis; correct?

16         MR. BATTER:  Objection.

17         THE WITNESS:  She is just writing, you

18    know, what the protocol said.  And she's basically,

19    like, if anything, just restating what's already in

20    the clinical protocol.

21    BY MR. WEEKS:

22    Q.   Okay.  But she's also providing her

23    perspective on whether or not, consistent with your

24    original question, Nektar can say anything about the

25    statistical significance of interim study results in

90

1    a REZPEG trial; correct?

2            MR. BATTER:  Objection.

3            THE WITNESS:  So if you scroll up, she

4    pasted in the language from the protocol.

5    BY MR. WEEKS:

6        Q.   Yes.

7        A.   Right.  And then she's essentially

8    restating the language of that protocol.

9            And it's kind of too small to read, but

10   it's -- it basically indicates in the protocol that

11   it's an interim analysis and that you can't really

12   do anything on interim analysis.  That's, like, what

13   I believe it says.

14   BY MR. WEEKS:

15       Q.   So in other words, she was answering your

16   question about what, if anything, Nektar can say

17   about the statistical significance following an

18   interim analysis; correct?

19       A.   Yeah.  She was -- I believe that she's

20   restating the protocol, which is answering my

21   question.

22       Q.   So she's answering your question about the

23   statistical significance of a REZPEG clinical study

24   in a Microsoft Teams chat thread with you; correct?

25           MR. BATTER:  Objection.

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 8 of 30
NEKTAR THERAPEUTICS v                                              Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                    Highly Confidential                        May 05, 2025

91

1          THE WITNESS:  So, yeah, if you scroll up, I

2   ask her -- well, I ask the team, right, like, what

3   are some of the pivot points.

4          So, for example, many studies will have

5   something like an independent data monitoring

6   committee called a DMC.  And there are studies that

7   are ended early because they're successful, right.

8          And so I'm asking a question, like, in the

9   case that an interim is done, which isn't even a

10  decision, it's just if an interim is done, right,

11  what are some of the possible outcomes, right.

12          So that's the question that I'm asking,

13  which is, you know, in this text, and Yi grabbed the

14  protocol and answered my question.  The answer to my

15  question is right in the protocol.

16  BY MR. WEEKS:

17      Q.   And so Dr. Liu, in order to provide an

18  answer to that question, followed up in Teams chat

19  with an excerpt of the protocol and her assessment

20  of what that protocol meant; correct?

21          MR. BATTER:  Objection.

22          THE WITNESS:  So, I mean, I can only --

23  it's only what's on this page, right.  So, I mean,

24  it's whatever these words say.  But she pasted in

25  the protocol and then interpreted what the protocol

Case 3:23-cv-03943-JD   Document 187-2   Filed 05/15/25   Page 9 of 30
NEKTAR THERAPEUTICS v                                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.              Highly Confidential                    May 05, 2025

101

1   that you saw, viewed, and signed this document

2   preservation notice in July 1st of 2023?

3       A.   Yes.

4       Q.   Okay.

5            MR. WEEKS:  Scrolling back to the top of

6   the document, please, Joshua.

7       Q.   And so turning back to the first paragraph,

8   Dr. Zalevsky, this is the document preservation

9   notice related to the lawsuit between Nektar and

10  Eli Lilly and Company; correct?

11      A.   Mm-hmm.  Yes.

12      Q.   And after receiving, reviewing, and signing

13  this document preservation notice on July 1, 2023,

14  did you ever receive an updated document

15  preservation notice of any kind that you recall?

16      A.   I don't recall seeing another one.

17      Q.   Based on your receipt of this document

18  preservation notice, Dr. Zalevsky, what was your

19  understanding of any steps you had to take in order

20  to preserve potentially relevant documents related

21  to the lawsuit?

22      A.   Well, fundamentally, none, because, you

23  know, all of the -- the systems that we use at

24  Nektar, whether there are hard drives or shared

25  drives that are on our servers, our e-mails and all

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 10 of 30
NEKTAR THERAPEUTICS v                                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                  Highly Confidential                May 05, 2025

102

1    of our documents, they're all automatically

2    preserved; right?

3            And so I really didn't -- yeah, I didn't --

4    I didn't change my practice because I always

5    preserve all of the documents, all of the e-mails,

6    all the files on my hard drives, everything.

7        Q.   So your understanding was you weren't

8    required to take any action that deviated from your

9    normal use of documents because the company was

10   automatically preserving those materials; correct?

11           MR. BATTER:   Objection.

12           THE WITNESS:   I just -- you know, in my

13   work I never delete files or documents, right.  So

14   that's what I meant because all of my work is always

15   saved and preserved.

16   BY MR. WEEKS:

17       Q.   We talked earlier about how you're

18   generally aware that you're Microsoft Teams chat

19   communications were no longer available after a

20   couple of days when you used the platform; correct?

21       A.   Yes, we discussed that earlier.

22       Q.   Did you take any steps after receiving this

23   document preservation notice to start keeping those

24   Microsoft Teams chats somewhere else in your files

25   before they disappeared?

103

```
1        A.   No.

2        Q.   Was that because that -- it was your

3   understanding that the company was retaining those

4   Teams chat communics automatically like it did

5   for other electronic files?

6        A.   Well, I mean, I don't know the answer to

7   that.  I mean, we discussed earlier that I knew the

8   messages disappeared from my feed.  Where they went,

9   I'm not -- I'm not sure.

10            But I know that every e-mail, every file,

11   every draft document, every PowerPoint slide deck,

12   every minutes of every meeting, I mean, everything

13   that's truly, like, decisional and memorialized, and

14   everything, all of that is highly preserved; right?

15   It's all -- it's all there, as it is for everything

16   I have ever worked on in the ten years that I have

17   worked at Nektar.

18        Q.   But not the Teams chat communications that

19   have disappeared over the years at Nektar; correct?

20            MR. BATTER:  Objection.

21            THE WITNESS:  So I don't see them in my

22   feed; right?  So, yeah, where they go, but they're

23   not in my feed.

24   BY MR. WEEKS:

25        Q.   Yeah.
```

```
 1            MR. BATTER:  Objection.

 2            THE WITNESS:  I have not.

 3   BY MR. WEEKS:

 4       Q.   After receiving this document preservation

 5   notice, Dr. Zalevsky, did you receive additional

 6   instructions from anyone about the use of

 7   Microsoft Teams chat to discuss topics, one way or

 8   the other?

 9       A.   I did, yes.

10       Q.   And who did that instruction come from?

11       A.   The instructions came from Mark Wilson.

12   And they were in a meeting that we'd held for my

13   team, the R&D function, on the day that the

14   complaint was filed because, basically, my whole

15   entire team was unaware, right, that there was any

16   kind of action or complaint filed.  That came out

17   that morning in a press release.

18            And Mark held a meeting, and he gave, you

19   know, my team some instructions.  And that included

20   both being just available for answering questions

21   because people were surprised, that was the first

22   they'd heard of that, and then also for giving some

23   instructions, particularly on, you know, things like

24   etiquette and things to talk about or not talk

25   about.  Firstly for us and specifically in R&D,
```

1    there's no need to talk about Lilly or the lawsuit,

2    you know, with Lilly.

3         And also, particularly in chat, not to use

4    Teams chat for those kind of, you know, actions, in

5    addition to just not needing to really talk about

6    it.

7         And then if anybody did have any questions,

8    they should go and talk with Mark.

9    Q.   So I just want to focus on the instructions

10   about the subject matter and Teams chat specifically

11   that you just described.

12        So it was your understanding, based on the

13   instructions you heard at that meeting, that Teams

14   chat should not be used to discuss Lilly or the

15   lawsuit.  Those were the two categories; right?

16   A.   Mm-hmm.  Yes.

17   Q.   Were there any other categories of

18   communication that you were instructed not to use

19   Teams chat to discuss among your development teams?

20   A.   Well, no, because like we discussed

21   earlier, everybody has -- needed to pass a training,

22   right, on the use of computerized system and what's

23   the appropriate policies and things like that.  So

24   all of that is in effect.  And so that covers

25   confidentiality and all the related topics.  And

```
 1    few-minute break before I start, or would you like

 2    to dive right in?

 3              THE WITNESS:  No, we can go ahead.

 4              MR. BATTER:  Let's do that.

 5                      EXAMINATION

 6    BY MR. BATTER:

 7        Q.   Dr. Zalevsky, what do you typically use

 8    Microsoft Teams chats for?

 9        A.   I typically use them for short

10    communications.  Typically, they're for, like,

11    logistics and planning, and then sometimes they

12    might be to ask a question, you know, and then to

13    facilitate, you know, setting up a meeting or

14    something like that about a topic.

15        Q.   So you used the phrases "logistics and

16    planning" -- or rather, the words "logistics and

17    planning."

18              Can you give me some examples of the

19    typical chats you sent?

20        A.   Yeah, for me, a very typical chat is "I am

21    running late."  I have usually a very busy day of

22    back to backs and invariably, meetings run long for

23    me.  So for me, I think the most common use is "I'm

24    running late" or "I'll be there soon."

25              Others are, "Hey -- to a couple of
```

127

```
 1   people -- you know, I'd like to have a meeting to

 2   discuss," so I'll include my admin Ilse on that, and

 3   she'll set up a meeting or a conference.

 4              Those are some of the most common ways that

 5   I use Teams chats.

 6        Q.   Okay.  So it sounds like to inform people

 7   you're going to be late for a meeting or to arrange

 8   a meeting.

 9        A.   Yes.

10        Q.   Now, what about the Teams chats that you

11   receive from others at Nektar?  Do they tend to be

12   of the same nature?

13        A.   Yeah.  I would say that typically the chats

14   I receive are about some kind of schedules or some

15   kind of planning.  They might be around a meeting.

16   They might be to cancel a meeting or to schedule an

17   ad hoc meeting or something.  I also get the message

18   "I'm running late" as well.  I think we're all, kind

19   of, a little bit -- yeah, you know, very, very

20   overdeployed.

21        Q.   Now, Lilly's counsel continued to refer to

22   chats as being about REZPEG development.

23              Do you recall that?

24        A.   Yes, I do.

25        Q.   Would you characterize your Teams chats as
```

128

```
 1   typically being about REZPEG's development?
 2           MR. WEEKS:  Objection.  Form.
 3           THE WITNESS:  So, I mean, my Teams chats
 4   are about lots of different topics, many, many
 5   topics.  And they span all the work that we do at
 6   Nektar.  So that is work across research, across
 7   development.
 8           Some of that work includes REZPEG, but, you
 9   know, even now that we're no longer collaborating
10   anymore with Eli Lilly, who terminated the
11   agreement, we're still focused on the development of
12   REZPEG.
13           And as I described earlier, that's a big
14   umbrella.  That can be everything from scheduling a
15   meeting to talk about it to asking a question if
16   that site in Poland has enough collection kits for
17   the PK samples.  You know, I mean, just, you know, a
18   question.
19           So it's really very broadly used, and it
20   can be used for REZPEG as well as for other things,
21   but typically the most common use of it for me is
22   for logistics and planning, very short kind of
23   communications about that.
24   BY MR. BATTER:
25       Q.   So if you're not using Teams chats to
```

129

1  perform the substantive functions of your work at

2  Nektar, what applications or tools or software are

3  you using to perform the core functions of your

4  work?

5           MR. WEEKS:  Objection.  Form.

6           THE WITNESS:  So we actually used

7  Microsoft Teams a lot, but the other capabilities of

8  Microsoft Teams.

9           So probably the most common form of

10  communication that we have is an online meeting,

11  very much like this Zoom call that we're having now.

12  Microsoft Teams has a built-in, you know, video

13  conference feature, and it's very easy to have a

14  video meeting.  And also it's very easy, instead of

15  a phone call, to just set up a one-to-one or

16  one-to-two or one-to-three video meeting just

17  instantly.  So that's a very common feature.

18           The other most common feature is using

19  e-mails.  So we send a lot of e-mails at Nektar.  We

20  go, you know, back and forth with those, and I know

21  you've seen thousands, if not tens of thousands,

22  maybe even more, of those.

23           And then the other kind of -- probably the

24  third most common is we used shared document spaces.

25  So again, one of the great things about

130

```
1   Microsoft Teams is you can put a file like a Word

2   document or PowerPoint file and everybody can then

3   group edit it or group work on it.  You don't have

4   to e-mail it back and forth, losing version control.

5   So that's probably the third most common use that we

6   use to communicate.

7          And then phone call would be the fourth, I

8   guess.

9   BY MR. BATTER:

10     Q.   So you mentioned, among other things,

11  e-mail and documents as being two of the ways you

12  primarily do your work.

13     A.   Yes.

14     Q.   What is your understanding of how long

15  e-mails and documents are retained at Nektar?

16     A.   I know that they are permanently retained.

17     Q.   Is it important to you that the work you

18  perform at Nektar is permanently maintained?

19     A.   Absolutely.  You know, I mean, the greatest

20  driver of value in a company like ours is our

21  intellectual property.  And to maintain intellectual

22  property, whether it's anything from the priority

23  date, you know, for your original invention to all

24  of the data and information that makes up the

25  ultimate patent, all of that requires maintaining
```

131

1    all the records, everything from the earliest lab

2    notebooks to then preserving all of the, you know,

3    related and subsequent files.

4            And that doesn't just cover, you know,

5    discovery where you're dealing with inventions.  It

6    covers the ongoing development, the manufacturing,

7    which has so many trade secrets and all of the

8    things in it.  All of those require very detailed

9    and meticulous retention records.

10       Q.   I'd like to show you Exhibit 1447, which

11   Lilly's counsel previously questioned you about.

12           MR. BATTER:  Josh, if you're able to put

13   that up on the screen, I'd appreciate that.

14       Q.   Dr. Zalevsky, you see this on your screen?

15       A.   Yes.

16       Q.   You recall Lilly's counsel previously

17   questioned you about this?

18       A.   Yes.

19       Q.   Do you see that Mary's message ends with an

20   ellipses, reflecting that her chat continues?

21       A.   Yes, I do.

22       Q.   All right.  Now I'd like to show you

23   Exhibit 1446, which Lilly's counsel also questioned

24   you about.

25           MR. BATTER:  Josh, if you can please

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 20 of 30
NEKTAR THERAPEUTICS v                                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                  Highly Confidential                May 05, 2025

132

1    display that.

2        Q.    Dr. Zalevsky, do you see Ms. Fanton's chat

3    to you?

4        A.    Yes, I do.

5        Q.    Does Ms. Fanton's chat end with an

6    ellipses?

7        A.    No, it does not.

8        Q.    So this is not a, quote, "preview chat," as

9    Lilly's counsel continually represented to you?

10            MR. WEEKS:   Objection.   Form.

11            THE WITNESS:   Yeah, I would think this is

12   the entire chat.

13   BY MR. BATTER:

14       Q.    And you see Ms. Fanton wrote:   "It would be

15   great if we could touch base to go through the data

16   in the next couple of weeks."

17            Do you see that?

18       A.    Yes.

19       Q.    So in essence, she's asking for a meeting.

20       A.    Yes.   This is, again, typically one of the

21   most common ways that Teams chats are used.

22       Q.    Would you consider this to be a substantive

23   chat or a procedural and administrative one?

24       A.    This is a --

25            MR. WEEKS:   Objection.   Form.

Case 3:23-cv-03943-JD   Document 187-2   Filed 05/15/25   Page 21 of 30
NEKTAR THERAPEUTICS v                          Jonathan Zalevsky, PH.D.
ELI LILLY & CO.              Highly Confidential          May 05, 2025

133

1          THE WITNESS:  Yeah, this is a procedural

2    and an administrative chat, to me.

3    BY MR. BATTER:

4        Q.   You see the date and time, February 24,

5    2023, at 12:21 p.m.?

6        A.   Yes, I do.

7        Q.   Do you recall Lilly's counsel questioning

8    you about whether you knew what your response could

9    be because it's not retained -- excuse me -- it's

10   not within this document.

11          Do you recall that?

12       A.   Yes.

13       Q.   Well, let's look at that response, which

14   Lilly marked in reverse order.  It's Exhibit 1445.

15          Dr. Zalevsky, you see the date and time,

16   same day, February 24, 2023, at 4:10 p.m.?

17       A.   Yeah, it's about four hours later.

18       Q.   Does your chat end with an ellipses?

19       A.   No.

20       Q.   So do you understand your chat here to be

21   a, quote, "preview chat," as Lilly's counsel

22   represented to you?

23          MR. WEEKS:  Objection.  Form.

24          THE WITNESS:  Yeah, this -- this is the

25   entire chat memorialized in this e-mail.

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 22 of 30

NEKTAR THERAPEUTICS v
ELI LILLY & CO.

Jonathan Zalevsky, PH.D.
May 05, 2025

Highly Confidential

134

1    BY MR. BATTER:

2        Q.    So this is not a preview chat?

3        A.    Correct.

4        Q.    You responded to Ms. Fanton's chat,

5    writing:  "You got it.  There are a lot of very

6    interesting things to look at."

7              You see that?

8        A.    Yes.

9        Q.    So you were responding to Ms. Fanton's

10   request for a meeting, saying, "You got it."

11             Right?

12       A.    Yeah.  Correct.  Again, this is the most

13   common way that we use Teams chats.

14       Q.    In essence, Ms. Fanton was asking for a

15   meeting, and you said okay.

16       A.    Correct.

17       Q.    Would you consider this to be a substantive

18   chat or a procedural and administrative one?

19       A.    I consider this to be procedural and

20   administrative.

21       Q.    Is this typical of your chat exchanges,

22   arranging meetings?

23       A.    Yes.

24             MR. WEEKS:  Objection to form.

25             THE WITNESS:  Typically and most common,

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 23 of 30
NEKTAR THERAPEUTICS v                                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                Highly Confidential                May 05, 2025

137

1      Q.   So is it the case that you were just asking

2   Sohail for information that you could obtain in

3   primary documents for convenience?

4      A.   Yeah, that's exactly what this exchange is

5   about.   I know that he has that information much

6   more top of mind, and it was going to be faster for

7   me to send him a very quick chat than for me to, you

8   know, get it out of the -- out of this app.

9      Q.   And is the answer that he gave you, is that

10   unique information or is it information you could

11   have obtained looking at the statistical analysis

12   plan?

13      A.   Oh, it's directly in the statistical

14   analysis plan.

15         MR. BATTER:   Josh, you can take that

16   exhibit down.   Thank you.

17   BY MR. BATTER:

18      Q.   Dr. Zalevsky, after Lilly terminated the

19   parties' collaboration agreement in April 2023, have

20   you used Teams chats to communicate about that

21   collaboration agreement between Nektar and Lilly?

22      A.   No, I have not.

23      Q.   After Lilly terminated the collaboration

24   agreement, have you used Teams chats commenting

25   about the work that Lilly performed under the

138

1    agreement?

2        A.   No, I have not.

3        Q.   After Nektar sued Lilly in August 2023,

4    have you used Teams chats to communicate about the

5    lawsuit or the claims in the lawsuit?

6        A.   No.

7        Q.   Why is it that you're not using Teams chats

8    to discuss these topics?

9        A.   Well, firstly, those are not topics that

10   require discussion.  Secondly, if I ever did discuss

11   them, it would be with a lawyer, and I certainly

12   wouldn't use Teams chat at all for that.

13       Q.   And why wouldn't you use Teams chats to

14   discuss these topics?

15       A.   Well, again, it's just not an appropriate

16   medium to discuss this kind of information.  I was

17   given direct training by Mark Wilson, you know,

18   about that, like we discussed earlier in this

19   examination.  And, you know, it's just not an

20   appropriate medium by any -- by any configuration.

21       Q.   I'd like to show you the document

22   preservation notice that Lilly's counsel showed to

23   you.  It's Exhibit 1457.

24            MR. BATTER:  Josh, if you wouldn't mind

25   sharing the screen with that.

1    BY MR. BATTER:

2        Q.    Do you see in the second paragraph starting

3    "Effective immediately," the preservation notice

4    refers to preserving documents, quote, "relating to

5    the dispute."

6            Do you see that?

7        A.    Yes, I see that.

8        Q.    Dr. Zalevsky, do your Teams chats relate to

9    the dispute with Lilly?

10       A.    No, they do not.

11       Q.    And if we can scroll down just a bit, there

12   are three bullets there on the page.

13           MR. BATTER:  Perfect.  Thank you, Josh.

14   BY MR. BATTER:

15       Q.    Dr. Zalevsky, the first bullet relates to:

16   "The action (or inactions) taken by Lilly in the

17   development NKTR-358 (REZPEG)."

18           Do you see that?

19       A.    Yes, I do.

20       Q.    Post-terminations of the collaboration

21   agreement, did you chat about that topic?

22       A.    No, I did not.

23       Q.    Actually, let me re-ask that to be more

24   articulate.

25           Post-termination of the collaboration

140

1    agreement, did you use Teams chats to communicate

2    about that topic?

3        A.    No, I did not.

4        Q.    And the second bullet refers to:  "The

5    standard of care Lilly used in performing its

6    obligations under the agreement."

7              Do you see that?

8        A.    Yes, I see that.

9        Q.    After Lilly terminated the agreement, did

10   you use Teams chats to communicate about that topic?

11       A.    No, I did not communicate about that topic

12   with Teams chats.

13       Q.    And the third bullet:  "Nektar's various

14   discussions, negotiations, collaborations, and

15   agreements with Lilly relating to the development of

16   NKTR-358 (REZPEG)."

17             Do you see that?

18       A.    Yes.

19       Q.    After Lilly terminated the license

20   agreement, did you use Teams chats to communicate

21   about that topic?

22       A.    No, I did not use Teams chats to

23   communicate about that.

24       Q.    Did you comply with the document

25   preservation notice?

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 27 of 30
NEKTAR THERAPEUTICS v                    Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                Highly Confidential          May 05, 2025

141

```
 1       A.   I did, yes.

 2            MR. BATTER:  Josh, you can take that down,

 3   please.

 4   BY MR. BATTER:

 5       Q.   Earlier, Dr. Zalevsky, you testified about

 6   an August 2023 meeting where Nektar's general

 7   counsel Mark Wilson gave you and others an

 8   instruction not to chat about Lilly or the lawsuit.

 9            Do you recall that?

10       A.   Yes.

11       Q.   Did you abide by that instruction?

12       A.   Yes.

13            MR. BATTER:  No further questions.

14            MR. WEEKS:  I have a couple more questions.

15                    FURTHER EXAMINATION

16   BY MR. WEEKS:

17       Q.   Dr. Zalevsky, you just told Mr. Batter that

18   none of your Teams chats relate to the dispute with

19   Lilly.

20            Do you remember saying that a minute ago?

21       A.   Yes.

22       Q.   Okay.  What assessment have you conducted

23   across your Teams chat use over the last two years

24   to determine whether those Teams chats relate to the

25   lawsuit with Lilly or not?
```

Case 3:23-cv-03943-JD    Document 187-2    Filed 05/15/25    Page 28 of 30
NEKTAR THERAPEUTICS v                                Jonathan Zalevsky, PH.D.
ELI LILLY & CO.                Highly Confidential            May 05, 2025

149

1    Q.   So you considered Microsoft Teams chats

2    lumped together with everything else on your

3    computer; right?

4    A.   Yes.

5         MR. BATTER:  Objection.

6         MR. WEEKS:  I have nothing further.

7         MR. BATTER:  Dr. Zalevsky, just a few

8    questions to clear up your understanding of the

9    document preservation notice.

10                    FURTHER EXAMINATION

11   BY MR. BATTER:

12    Q.   Was it your understanding that that

13   preservation notice required preserving all

14   documents, regardless of topic, or was limited to

15   those relating to the dispute?

16    A.   It was for those relating to the dispute.

17    Q.   So if you had an administrative and/or

18   procedural chat not relating to the dispute, did you

19   believe you had to preserve that?

20    A.   Well, no, it was outside of the reference

21   point of the preservation notice, which was only

22   related to the dispute.

23    Q.   And if you had a communication that was

24   relating to the dispute with Lilly, was it your

25   understanding that that should be preserved?

150

1         A.    Yes.   If it was related to the dispute, it

2    should be -- it was in the confines of that document

3    preservation notice.

4              MR. BATTER:   No further questions.

5              MR. WEEKS:   I'm done.

6              MR. BATTER:   Before we go off the record, I

7    would like to mark the transcript as confidential

8    under the protective order.

9              MR. WEEKS:   You got it.

10             And with that, I think we can go off the

11   record.

12             THE VIDEOGRAPHER:   All right.   The time is

13   2:43 p.m., and this concludes today's deposition.

14             (Deposition concluded at 2:43 p.m.)

15                        -o0o-

16

17

18

19

20

21

22

23

24

25

153

```
 1   COUNTY OF LOS ANGELES, )
                            )
 2   STATE OF CALIFORNIA,   )

 3

 4        I, Cody R. Knacke, Registered Merit

 5   Reporter, Certified Shorthand Reporter in and for

 6   the State of California, License No. 13691, hereby

 7   certify that the deponent was by me first duly sworn

 8   and the foregoing testimony was reported by me and

 9   was thereafter transcribed with computer-aided

10   transcription; that the foregoing is a full,

11   complete, and true record of said proceedings.

12        I further certify that I am not of counsel

13   or attorney for either or any of the parties in the

14   foregoing proceedings and caption named or in any

15   way interested in the outcome of the cause in said

16   caption.

17        The dismantling, unsealing, or unbinding of

18   the original transcript will render the reporter's

19   certificate null and void.

20        In witness whereof, I have hereunto set my

21   hand this day:  May 5, 2025.

22

23

24        _____

25        CODY R. KNACKE, RMR, CSR No. 13691
```