1

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   NEKTAR THERAPEUTICS,          )
                                   )
 5              Plaintiff,         )
                                   )
 6        vs.                      ) Case No.
                                   ) 3:23-cv-03943-JD
 7   ELI LILLY & CO.,              )
                                   )
 8              Defendant.         )
     _____ )
 9

10

11

12

13

14              HIGHLY CONFIDENTIAL

15         REMOTE VIDEOTAPED DEPOSITION OF

16         30(b)(6) REPRESENTATIVE OF

17              NEKTAR THERAPEUTICS,

18              JOHN CUMMINGS

19              TUESDAY, MAY 6, 2025

20

21

22

23

24
     Reported in Stenotype by:
25   Cody R. Knacke, RMR, CSR No. 13691
     Job No.:  982548
```

50

1      Q.   And before that time did employees have the

2   regular Apple Mail app and get their company e-mail

3   that way?

4      A.   That's my understanding.

5      Q.   And do you recall whether Microsoft Teams

6   has been installed on company-issued mobile devices?

7      A.   I believe it has.

8      Q.   At one point in time in the past, Nektar

9   used Skype as a chat platform; is that right?

10      A.   That is correct.

11      Q.   And Skype enabled users to chat using the

12   program; is that right?

13      A.   That's correct.

14      Q.   Skype also included the ability to conduct

15   videoconferencing and audio calls; is that right?

16      A.   Correct.

17      Q.   At some point, Nektar stopped using Skype;

18   is that right?

19      A.   That is also correct.

20      Q.   And when was that?

21      A.   July 2021.

22          MS. BONK:  We can take down this exhibit

23   and put up Tab 4, please.

24          MR. BATTER:  And while that's coming up, I

25   would just like to check in with the witness,

 1    to Person)."

 2            Is that right?

 3        A.    That's what the slide says, yes.

 4        Q.    So was it your understanding when you

 5    worked on this presentation in 2021 in the rollout

 6    of Teams that Teams chats would be deleted within

 7    24 hours?

 8        A.    Yes.

 9        Q.    Is it accurate to say that when Nektar

10    first implemented Microsoft Teams, Nektar made a

11    decision to implement this 24-hour deletion policy?

12        A.    It was actually carried over from Skype.

13        Q.    When Nektar installed Microsoft Teams, that

14    was a new software, right, different than Skype?

15        A.    Yes.

16        Q.    And so when Microsoft Teams was set up, the

17    retention period was something that also needed to

18    be set up anew in Microsoft Teams; is that right?

19            MR. BATTER:    Objection.

20            THE WITNESS:    Correct.

21    BY MS. BONK:

22        Q.    Who made the decision at Nektar that the

23    retention period for Microsoft Teams would be

24    24 hours?

25        A.    It was my recommendation to my supervisor,

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 4 of 16
NEKTAR THERAPEUTICS v                                                John Cummings
ELI LILLY & CO.                    30(b)(6), Highly Confidential        May 06, 2025

71

1    who approved it.

2        Q.    And why did you make that recommendation?

3        A.    Nektar's longstanding business practice in

4    Skype carried through to Teams, is that chats are

5    typically short communications of an administrative

6    nature between employees.

7        Q.    Before, you stated that it was usually

8    legal who made the decision as to how long certain

9    data and documents would be retained, and then you

10   would then go implement those recommendations from

11   legal; is that right?

12            MR. BATTER:  Objection.

13            THE WITNESS:  Yes.  And I just said that I

14   made the recommendation, and it was approved.

15   BY MS. BONK:

16       Q.    When you say "it was approved," you mean

17   that it was approved by legal?

18       A.    It was approved by my supervisor.

19       Q.    And who was your supervisor?

20       A.    Gil Labrucherie.

21       Q.    At that time, what was his role?

22       A.    Chief financial --

23            MR. BATTER:  Objection.

24            THE WITNESS:  Chief financial officer.

25   ///

178

1   time.

2        MR. BATTER:  I do have some questions for

3   you, Mr. Cummings, but it shouldn't be more than

4   five to ten minutes.  Okay?

5        THE WITNESS:  Understood.

6        MR. BATTER:  So with that, I'll dive right

7   in.

8                    EXAMINATION

9   BY MR. BATTER:

10       Q.   In your observation, what is Nektar's

11  typical practice for the use of Teams chats?

12       A.   Teams chats --

13       MS. BONK:  Objection.

14       THE WITNESS:  -- are used for procedural

15  and administrative items, typically short duration

16  between employees.

17  BY MR. BATTER:

18       Q.   And can you give me a few examples of the

19  types of Teams chats you would expect to see?

20       A.   Sure.  They vary from, can you join our

21  meeting, are you available for a call, to look at

22  this document, where should I place this document,

23  things like that to facilitate the storage of

24  documents and other things.

25       Q.   And I don't see this in the realtime, but

179

1    did you previously answer that they were for

2    administrative and procedural messages typically?

3            MS. BONK:  Objection.

4            THE WITNESS:  Yes.

5    BY MR. BATTER:

6        Q.   What was Nektar's rationale for setting the

7    Teams chat retention policy to 24 hours?

8        A.   It was the rationale that they are for

9    procedural and administrative work, and, as such,

10   since most of our substantive work, the majority of

11   our substantive work, is contained in business

12   documents such as Word, Excel, PowerPoint, that

13   these did not represent anything that needed to be

14   maintained.

15       Q.   To your knowledge, has Nektar's retention

16   policy for Teams chats ever been criticized,

17   challenged, or objected to by anyone, either inside

18   or outside of the company?

19       A.   No.  Not at all.

20       Q.   Have you observed that Teams chats are

21   typically used as a tool for substantive or

22   sensitive work at Nektar?

23           MS. BONK:  Objection.

24           THE WITNESS:  No.

25   ///

1    BY MR. BATTER:

2        Q.   What tools or software are used for the

3    substantive work that Nektar performs?

4        A.   It would be our --

5             MS. BONK:  Objection.

6             THE WITNESS:  -- Office documents such as

7    Word, Excel, PowerPoint, as well as our line of

8    business applications such as our financial systems,

9    our drug safety systems, and systems of those

10   natures.

11   BY MR. BATTER:

12       Q.   And what is the retention policy at Nektar

13   for all of those materials that Nektar uses for its

14   substantive work?

15       A.   Indefinitely.

16       Q.   Indefinitely meaning those materials are

17   maintained forever?

18       A.   Forever.  Maintained forever, yes, thank

19   you.

20       Q.   Can an individual employee at Nektar decide

21   what e-mails to keep or permanently delete?

22            MS. BONK:  Objection.

23            THE WITNESS:  No.

24   BY MR. BATTER:

25       Q.   And you say no.  Why is that?

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 8 of 16
NEKTAR THERAPEUTICS v                                              John Cummings
ELI LILLY & CO.                    30(b)(6), Highly Confidential          May 06, 2025

181

1      A.   Because of the settings we discussed

2    earlier, we have configured Microsoft Exchange to

3    retain all e-mails, even if a user believes they've

4    deleted it.

5      Q.   Did Nektar's IT department need to take any

6    action to maintain e-mails and documents related to

7    this dispute, or was it automatic, given that such

8    materials are maintained forever?

9           MS. BONK:  Objection.

10          THE WITNESS:   Automatic.

11   BY MR. BATTER:

12     Q.   How many Nektar document custodians are

13   there in this case?

14     A.   Could you clarify?  Currently employed by

15   Nektar?

16     Q.   Yeah, let me clarify that.

17          So the parties agreed that Nektar would

18   select -- excuse me.  Let me restart that.

19          The parties agreed that Nektar would

20   produce e-mails and documents for certain custodians

21   in this case.

22          Do you know the total number of custodians?

23     A.   Yes.  There's seven custodians.

24     Q.   Did you say seven or 17?

25     A.   No.  Seven, seven.  17 was the original

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 9 of 16
NEKTAR THERAPEUTICS v                                          John Cummings
ELI LILLY & CO.                    30(b)(6), Highly Confidential    May 06, 2025

182

1    number.

2        Q.    That's what I'm asking about.   So the total

3    number of custodians.

4        A.    Oh, yeah, the total number was 17.   My

5    apologies.

6        Q.    And did some number of those 17 custodians

7    leave Nektar's employment before Nektar filed suit?

8        A.    They did.

9        Q.    How many?

10        A.    Six.

11        Q.    Of the remaining 11 employees out of the

12    17, have you learned that some of them do not use

13    Teams chats?

14        A.    Yes.

15            MS. BONK:   Objection.

16            THE WITNESS:   Howard Robin does not use

17    Teams chats.

18    BY MR. BATTER:

19        Q.    Okay.   You gave Howard Robin as one of the

20    11 who does not use Teams chats; is that correct?

21        A.    Yes, that's correct.

22        Q.    Anyone else?

23        A.    Well, Jennifer Ruddock, Brian Kotzin, and

24    Susan Evans rarely, if ever, used Teams chats.

25            MS. BONK:   Objection.

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 10 of 16
NEKTAR THERAPEUTICS v                                        John Cummings
ELI LILLY & CO.            30(b)(6), Highly Confidential        May 06, 2025

183

1    BY MR. BATTER:

2        Q.   So you've identified four employees there.

3        A.   Correct.  A total of four.

4        Q.   So that leaves just seven of the 17

5    custodians who use Teams chats?

6        A.   Correct.

7        Q.   And those custodians -- I mean, you have

8    them in your notes, Mr. Cummings, but is it correct,

9    those seven custodians are Charleen Jue, Jonathan

10   Zalevsky, Danni Yu, Yi Liu, Christie Fanton, Ken

11   Franke, and Lorin Sasaki?

12           MS. BONK:  Objection.

13           THE WITNESS:  That's correct.

14   BY MR. BATTER:

15       Q.   In August 2023 did Nektar's general

16   counsel, Mark Wilson, give an instruction that

17   employees should not chat about the lawsuit or

18   Nektar/Lilly relationship?

19           MS. BONK:  Objection.

20           THE WITNESS:  Correct.

21   BY MR. BATTER:

22       Q.   Were employees given an option to abide by

23   that instruction or was it mandatory?

24           MS. BONK:  Objection.

25           THE WITNESS:  It was mandatory.

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 11 of 16
NEKTAR THERAPEUTICS v                                              John Cummings
ELI LILLY & CO.                    30(b)(6), Highly Confidential          May 06, 2025

184

1    BY MR. BATTER:

2        Q.   Of the seven Nektar custodians in this

3    action who do use Teams chats, who attended that

4    meeting and received Mr. Wilson's instruction?

5        A.   There were four people who attended that

6    meeting and received his instruction.

7        Q.   So four of the seven custodians in this

8    action received Mr. Wilson's instruction?

9        A.   Yes.

10           MS. BONK:  Objection.

11   BY MR. BATTER:

12       Q.   And can you identify those four individuals

13   for me?

14       A.   Yes.  Christie Fanton, Ken Franke, Charleen

15   Jue, and Jonathan Zalevsky.

16       Q.   Have you taken steps to assess whether they

17   followed Mr. Wilson's instruction not to use Teams

18   chats to discuss the lawsuit or the Nektar/Lilly

19   relationship?

20           MS. BONK:  Objection.

21           THE WITNESS:  Yes.

22   BY MR. BATTER:

23       Q.   What steps did you take?

24       A.   Yes, we collected e-mails captured -- chats

25   captured in e-mails from 2022 to the present, as

1    well as e-mail chains from March to the present.

2        Q.   Did you also talk with each of these four

3    individuals about whether they received that

4    instruction?

5        A.   I did.

6             MS. BONK:  Objection.

7    BY MR. BATTER:

8        Q.   And what did each of those four individuals

9    convey to you about whether they received that

10   instruction?

11       A.   They conveyed that they did receive that

12   instruction.

13       Q.   And did each of those four individuals

14   convey to you anything about whether they followed

15   that instruction?

16       A.   Yes.

17            MS. BONK:  Objection.

18   BY MR. BATTER:

19       Q.   What did they convey to you about whether

20   they followed that instruction?

21       A.   They conveyed that they did, indeed,

22   receive and follow that instruction.

23       Q.   Regarding all seven of the custodians who

24   used Teams chats, so not just the four who received

25   Mr. Wilson's instruction, have you taken steps to

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 13 of 16
NEKTAR THERAPEUTICS v                                          John Cummings
ELI LILLY & CO.                  30(b)(6), Highly Confidential         May 06, 2025

186

1    confirm how those seven custodians used Teams chats?

2        A.   Yes.

3            MS. BONK:  Objection.

4    BY MR. BATTER:

5        Q.   What did you do?

6        A.   I either spoke with them personally or

7    conversed with them via e-mail to confirm their use

8    of Teams chats as related to this matter.

9        Q.   And what did each of those seven custodians

10   tell you about their usage or their practice of

11   using Teams chats?

12           MS. BONK:  Objection.

13           THE WITNESS:  They all -- they all

14   communicated to me that the Teams chats were not

15   used to discuss the lawsuit or Lilly's performance

16   under the obligations of the agreement.

17   BY MR. BATTER:

18       Q.   Now, you mentioned a moment ago,

19   Mr. Cummings, that you also collected and reviewed

20   chats that were embedded in e-mails from 2022

21   onward; is that correct?

22       A.   Correct.

23       Q.   As well as Teams chats full chains from

24   earlier this year onward; is that correct?

25           MS. BONK:  Objection.

Case 3:23-cv-03943-JD    Document 187-6    Filed 05/15/25    Page 14 of 16

NEKTAR THERAPEUTICS v
ELI LILLY & CO.                    30(b)(6), Highly Confidential

John Cummings
May 06, 2025

187

1           THE WITNESS:  Correct.

2    BY MR. BATTER:

3       Q.   And did you have an opportunity to look

4    through those materials?

5       A.   I did.

6       Q.   And what did those Team chats reflect as to

7    whether employees are following the directive not to

8    discuss the Nektar/Lilly relationship and the

9    lawsuit?

10           MS. BONK:  Objection.

11           THE WITNESS:  They confirmed -- they

12    confirmed that.

13    BY MR. BATTER:

14       Q.   "They" being the documents?

15       A.   Yes, the content of the chats.

16       Q.   I'd like to briefly show you Exhibit 1478.

17           MR. BATTER:  Ken, if you don't mind sharing

18    that on your screen.

19    BY MR. BATTER:

20       Q.   Do you recall, Mr. Cummings, that Lilly's

21    counsel asked you questions about the scope of what

22    this document preservation notice covers?

23       A.   Yes.

24       Q.   And do you see in the second paragraph, as

25    far as what materials should be maintained, the

Case 3:23-cv-03943-JD   Document 187-6   Filed 05/15/25   Page 15 of 16
NEKTAR THERAPEUTICS v                                           John Cummings
ELI LILLY & CO.                    30(b)(6), Highly Confidential      May 06, 2025

188

1    language used is, quote, "related" -- excuse me.

2    Let me start that over.

3            And you see in the second paragraph as far

4    as what materials should be preserved, the language

5    is those documents, quote, "relating to the

6    Dispute."

7        A.   Correct.  I do see that.

8        Q.   Does this preservation notice require that

9    Nektar employees preserve all documents, regardless

10   of subject matter?

11       A.   It does not.

12       Q.   Does this notice require only that Nektar

13   employees preserve documents to the extent they are,

14   quote, "relating to the Dispute"?

15       A.   It does.

16       Q.   And are the Teams chats that you reviewed

17   that we discussed a moment ago, are those related to

18   this dispute?

19           MS. BONK:  Objection.

20           THE WITNESS:  Not based on my review.

21           MR. BATTER:  No further questions.

22           MS. BONK:  I have a couple more.

23                   FURTHER EXAMINATION

24   BY MS. BONK:

25       Q.   Mr. Cummings, you testified earlier today

 1    COUNTY OF LOS ANGELES, )
                             )
 2    STATE OF CALIFORNIA,   )

 3

 4         I, Cody R. Knacke, Registered Merit

 5    Reporter, Certified Shorthand Reporter in and for

 6    the State of California, License No. 13691, hereby

 7    certify that the deponent was by me first duly sworn

 8    and the foregoing testimony was reported by me and

 9    was thereafter transcribed with computer-aided

10    transcription; that the foregoing is a full,

11    complete, and true record of said proceedings.

12         I further certify that I am not of counsel

13    or attorney for either or any of the parties in the

14    foregoing proceedings and caption named or in any

15    way interested in the outcome of the cause in said

16    caption.

17         The dismantling, unsealing, or unbinding of

18    the original transcript will render the reporter's

19    certificate null and void.

20         In witness whereof, I have hereunto set my

21    hand this day:  May 6, 2025.

22

23

24                    _____

25                    CODY R. KNACKE, RMR, CSR No. 13691