QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Diane M. Doolittle (Bar No. 142046)
  dianedoolittle@quinnemanuel.com
  Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
  Suong Nguyen (Bar No. 237557)
  suongnguyen@quinnemanuel.com
  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000

  David M. Elihu (Bar No. 303043)
  davidelihu@quinnemanuel.com
  Jimmy Bieber (Bar No. 301639)
  jimmybieber@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

Attorneys for Plaintiff Nektar Therapeutics

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>            Plaintiff,<br><br>    vs.<br><br>ELI LILLY & CO.,<br><br>            Defendant. | CASE NO. 3:23-cv-03943-JD<br><br>**PLAINTIFF NEKTAR THERAPEUTICS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON DEFENDANT ELI LILLY & CO.'S COUNTERCLAIMS**<br><br>[*Filed Concurrently with Declaration of Kyle Batter and Proposed Order Granting this Motion*]<br><br>Hon. James Donato<br>Hearing Date: July 17, 2025<br>Hearing Time: 10:00 a.m. |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** that on July 17, 2025 at 10:00 a.m., or as soon thereafter as this matter may be heard before the Honorable James Donato, in Courtroom 11 of the United States District Court for the Northern District of California in the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff and Counterclaim Defendant Nektar Therapeutics ("Nektar") shall, and hereby does, move this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Nektar in the following respects:

Nektar moves for summary judgment on Counter-Claimant Eli Lilly and Co.'s ("Lilly's") counterclaims for defamation and breach of contract. Summary judgment for Nektar is proper on these counterclaims because Lilly cannot prove every essential element of them. *First*, Lilly's counterclaim for breach of contract fails because the undisputed record reflects that Lilly has not suffered any cognizable damage from Nektar's alleged breach. *Second*, Lilly's counterclaim for defamation *per se* fails because the undisputed record reflects that the allegedly defamatory statements are not defamatory *per se* as a matter of law; they are literally and substantially true; and they were not made with actual malice, as required for a public figure like Lilly to establish defamation.

Nektar's motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Kyle Batter in support and exhibits thereto, all pleadings and papers on file in this action, such other matters of which this Court may take judicial notice, and such other evidence or arguments as may be presented to the Court.

DATED:  May 22, 2025

QUINN EMANUEL URQUHART
& SULLIVAN, LLP


By  /s/ Yury Kapgan
Yury Kapgan
Attorneys for Plaintiff Nektar Therapeutics

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

UNDISPUTED FACTS ..........................................................................................................2

    A.    The Nektar-Lilly Relationship .................................................................2

    B.    The August 2023 Statements....................................................................2

        1.    Lilly's Incorrect Calculation Of Rezpeg's Efficacy ......................3

        2.    Nektar's Statements About Lilly's Error......................................5

    C.    The February 2023 Statements..................................................................6

        1.    Lilly's Specified Criteria For Advancing To Phase 3 Lupus Trials...............6

        2.    Nektar's Statements About Lilly's Phase 3 Decision ...................6

LEGAL STANDARD ............................................................................................................7

ARGUMENT .........................................................................................................................8

I.    NEKTAR IS ENTITLED TO SUMMARY JUDGMENT ON LILLY'S COUNTERCLAIM FOR BREACH OF CONTRACT .......................................................8

II.    NEKTAR IS ENTITLED TO SUMMARY JUDGMENT ON LILLY'S DEFAMATION COUNTERCLAIM.................................................................................11

    A.    Nektar's Statements Are Not Defamatory *Per Se* ...................................12

        1.    Nektar's August 2023 Statements Are Not Defamatory *Per Se* .................13

        2.    Nektar's February 2023 Statements Are Not Defamatory *Per Se*...............15

    B.    Nektar's Statements Are Not False .........................................................16

        1.    Nektar's August 2023 Statements Are Literally And Substantially True ....................................................................17

        2.    Nektar's February 2023 Statements Are Literally And Substantially True ....................................................................18

    C.    Nektar's Statements Were Not Made With Actual Malice ......................19

        1.    Lilly Is A Public Figure................................................................19

        2.    Nektar Did Not Act With Malice .................................................20

CONCLUSION ....................................................................................................................21

1

## TABLE OF AUTHORITIES

2

**Page**

3

## Cases

4

*AmTrust N. Am., Inc. v. KF&B, Inc.*,
5     2020 WL 5503479 (S.D.N.Y. Sept. 11, 2020) ...................................................................... 11

6
*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................................. 20

7
*Barnes-Hind, Inc. v. Superior Ct.*,
8     181 Cal. App. 3d 377 (1986) ............................................................................... 12, 13, 15, 16

9
*Bartholomew v. YouTube, LLC.*,
    17 Cal. App. 5th 1217 (2017) ............................................................................................... 14
10

11
*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
    2022 WL 2222962 (N.D. Cal. June 21, 2022) ............................................................... 13, 14
12

*Coomes v. Edmonds Sch. Dist. No. 15*,
13     816 F.3d 1255 (9th Cir. 2016) ................................................................................................ 8

14
*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001) ........................................................................................... 13, 15
15

16
*Gomes v. Fried*,
    136 Cal. App. 3d 924 (1982) ................................................................................................. 12

17
*Hughes v. Hughes*,
18     122 Cal. App. 4th 931 (2004) ............................................................................................... 16

19
*I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.*,
    856 F. Supp. 168 (S.D.N.Y. 1994) ........................................................................................ 10
20

21
*Indus. Waste & Debris Box Serv., Inc. v. Murphy*,
    4 Cal. App. 5th 1135 (2016) ................................................................................................. 18

22
*Integrated Healthcare Holdings, Inc. v. Fitzgibbons*,
23     140 Cal. App. 4th 515 (2006) ............................................................................................... 12

24
*Issa v. Applegate*,
    31 Cal. App. 5th 689 (2019) ................................................................................................. 19
25

26
*Jamarillo v. Food 4 Less Madera*,
    2010 WL 3717307 (E.D. Cal. Sept. 15, 2010) ...................................................................... 14

27
*Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*,
28     2016 WL 4182402 (N.D. Cal. Aug. 8, 2016), *aff'd*, 773 F. App'x 623 (Fed. Cir.
    2019) ............................................................................................................................. *passim*

*Joshi v. Trs. of Columbia Univ. in City of New York*,
  515 F. Supp. 3d 200 (S.D.N.Y. 2021), *aff'd*, 2022 WL 3205883 (2d Cir. Aug. 9,
  2022) ...................................................................................................................... 9

*Karetsos v. Cheung*,
  670 F. Supp. 111 (S.D.N.Y. 1987) ...................................................................... 11

*La Marca v. Capella Univ.*,
  2009 WL 10698387 (C.D. Cal. Jan. 6, 2009) ...................................................... 20

*LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey*,
  173 F.3d 454 (2d Cir. 1999) .................................................................................. 8

*MacArthur Const. Corp. v. Coleman*,
  457 N.Y.S.2d 530 (App. Div. 1983) .................................................................... 10

*Makaeff v. Trump Univ., LLC*,
  715 F.3d 254 (9th Cir. 2013) ......................................................................... 12, 20

*Mattel, Inc. v. MCA Recs., Inc.*,
  28 F. Supp. 2d 1120 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002) .......... 20

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
  2018 WL 847014, *6 (S.D.N.Y. Jan. 12, 2018), *report and recommendation
  adopted*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ....................................... 19

*Momox-Caselis v. Donohue*,
  987 F.3d 835 (9th Cir. 2021) ................................................................................. 8

*One Stop 34, LLC v. Stimdel Props. (FL), Inc.*,
  2021 WL 8344133, at *13-14 (E.D.N.Y. Sept. 4, 2021), *report and
  recommendation adopted*, 2022 WL 985834 (E.D.N.Y. Mar. 31, 2022) ............... 10

*One Stop 34, LLC v. Stimdel Props. (FL), Inc.*,
  2021 WL 8344133 (E.D.N.Y. Sept. 4, 2021) ....................................................... 11

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ................................................................................. 8

*Reader's Digest Ass'n v. Superior Court*,
  37 Cal. 3d 244 (1984) .......................................................................................... 20

*Regalia v. Nethercutt Collection*,
  172 Cal. App. 4th 361 (2009) .......................................................................... 12, 14

*Reliance Ins. Co. v. Barron's*,
  442 F. Supp. 1341 (S.D.N.Y. 1977) ..................................................................... 20

*Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc.*,
  1995 WL 679256 (S.D.N.Y. Nov. 15, 1995) .......................................................... 9

1

2

*Shelomentseva v. Computools LLC*,
    2023 WL 8613556 (E.D.N.Y. Nov. 13, 2023), *aff'd*, 2024 WL 4509113 (2d Cir.
    Oct. 17, 2024) ............................................................................................................ 10

3

4

*Sidense Corp. v. Kilopass Tech. Inc.*,
    2012 WL 3545289 (N.D. Cal. Aug. 16, 2012) ...................................................... 13

5

6

*Smith v. Maldonado*,
    72 Cal. App. 4th 637 (1999), *as modified* (June 23, 1999) ........................... 11, 12, 16

7

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................................... 20

8

9

*Su v. Mayorkas*,
    698 F. Supp. 3d 1168 (N.D. Cal. 2023) ................................................................... 7

10

11

**Statutes**

Cal. Civ. Code § 45 ............................................................................................................ 13

12

13

**Other Authorities**

14

Fed. R. Civ. Proc. 56 ........................................................................................................... 1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

In February 2023, Nektar publicly and accurately explained why Lilly had terminated its clinical trial of Nektar's drug Rezpeg as a treatment for lupus.  In April 2023, Nektar publicly and accurately announced its commitment to continuing Rezpeg development, with or without Lilly.  In August 2023, after Lilly terminated the parties' collaboration agreement and turned over its clinical trial data, Nektar identified and publicly reported a significant and indisputable error in Lilly's efficacy calculations for two clinical trials of Rezpeg.  This statistical blunder significantly understated Rezpeg's therapeutic potential and is just one example of Lilly's bad faith and commercially unreasonable conduct.

Rather than merely defend its botched drug development conduct, Lilly—a globally-famous pharmaceutical company and indisputable public figure—has gone on the attack, asserting hollow counterclaims for breach of contract and defamation *per se* that challenge Nektar's truthful statements.  Neither claim presents a triable issue for a jury.

*First*, Nektar is entitled to summary judgment on Lilly's breach of contract counterclaim because there are no triable issues on damages, an essential element of that claim.  Numerous Lilly witnesses admitted that they could not identify ***any*** harm from Nektar's statements, which are the only purported breach.  Lilly claimed that it would demonstrate damages through expert testimony, then failed to offer any such opinions.  Indeed, Lilly expressly ***refused*** to produce evidence of the type of harm that a breach of contract counterclaim could even conceivably cover.  Lilly is thus left with only evidence-free assertions of reputational harm—which cannot support damages for breach of contract under governing New York law.

*Second*, Nektar is entitled to summary judgment on Lilly's defamation *per se* counterclaim for three independent reasons.  Because Lilly cannot prove any cognizable harm, it asserts only a *per se* theory, but the sober and straightforward statements that Lilly challenges fall far short of California law's high threshold for defamation claims without evidence of damages.  Indeed, Nektar's statements are not just short of the defamation *per se* standard, they are literally and substantially true, and thus not actionable under any theory of defamation.  And the undisputed evidence shows that the Nektar employees who made the challenged statements did so in good faith and with belief in their accuracy,

not with the actual malice required for defamation liability given Lilly's status as a public figure.

For these reasons and as further explained below, Nektar's motion for summary judgment on Lilly's counterclaims should be granted in full.

## STATEMENT OF FACTS

### A.    The Nektar-Lilly Relationship

In July 2017, Nektar and Lilly signed an agreement granting Lilly an "exclusive, royalty bearing . . . license" to develop and commercialize NKTR-358, a promising drug candidate later dubbed rezpegaldesleukin, or "Rezpeg."  Ex. A[1] (the "Agreement") § 2.1(a); Dkt. 54 (Answer) ¶ 17.[2] Under the Agreement, the parties agreed to develop Rezpeg to treat several diseases, including systemic lupus erythematosus (lupus), psoriasis, and atopic dermatitis (eczema).  Ex. B (Ruddock Dep. Tr.) 63:6-9; Dkt. 54 (Answer) ¶¶ 26-27.  Apart from a few early, pre-clinical studies and a Phase 1b study in lupus, Lilly was responsible for conducting clinical trials and other development activities for Rezpeg.  Agreement § 4.5.  The Agreement is governed by New York law.  *Id.* § 12.12.

Lilly bases its counterclaims on alleged breaches of two provisions of the Agreement, Sections 3.2(vii) and 12.6.  *See* Dkt. 54 (Counterclaims) ¶¶ 89-92.  Section 3.2(vii) provides that the "principal functions" of the Joint Steering Committee "will include . . . approving external communications[.]" Section 12.6 states that Nektar shall obtain Lilly's consent prior to publishing "Product Specific Information or Technology that are necessary or useful for the development of the Product [Rezpeg]."

### B.    The August 2023 Statements[3]

The "August Statements" relate to an indisputable, and indeed undisputed, error that Lilly

---

[1]  Unless stated otherwise, all "exhibit" citations are to the accompanying Declaration of Kyle Batter.

[2]  Lilly filed both its counterclaims and answer to Nektar's complaint in docket entry 54.  Lilly's counterclaims begin on page 1 and its answer begins on page 23.  Citations to this docket entry specify which portion Nektar is citing.

[3]  Lilly has filed four documents that purport to identify, as the Court required, "an exact specification of the . . . publications that [Lilly] say[s] are defamatory," "highlight[ing] the language in each one of those publications that [Lilly contends] is the crux of [its] claim." Ex. C (6/20/24 Hearing Tr.) at 4:4-11.  These "crux" documents are a February 2023 investor call transcript and slide deck (Dkts. 81-1, 81-2, the "February Statements"), and an August 2023 press release and investor call transcript (Dkts. 81-3, 81-4, the "August Statements").  The events underlying the August Statements occurred before the events underlying the February Statements and are thus addressed first here.

1  made in calculating Rezpeg's efficacy for treating atopic dermatitis and psoriasis.

2         **1.**      **<u>Lilly's Statistical Error Significantly Understated Rezpeg's Efficacy</u>**

3        Lilly retained PRA Health Sciences ("PRA") to help conduct Phase 1 studies of Rezpeg in

4  atopic dermatitis and psoriasis.  Ex. D (Lilly Resp. to Request for Admission No. 8). ▮

5  ▮

6  ▮

7  ▮

8  ▮  Importantly, the Agreement explicitly made Lilly "liable to [Nektar] for any act or omission of

9  its subcontractor."  Agreement § 4.10.

10  ▮

11  ▮

12  ▮

13  ▮  EASI scores are calculated by adding together different

14  "intensity scores for discoloration, thickness, and scaling" for four regions of the body, each of which

15  is "multiplied by the amount of body area covered by the disease and by the body surface area for

16  each region."  Ex. H (Klekotka Dep. Tr.) at 180:1-10; Ex. I (EASI scientific article) at 13. ▮

17  ▮

18  ▮Ex. H at

19  180:11-181:10; Dkt. 54 (Answer) ¶ 35.

20  ▮

21  ▮

22  ▮

23  ▮  Ex. J (5/31/22 internal Lilly email chain) at -660.

24  ▮

25  ▮

26  ▮  *Id.* at -659; Ex. L (Zou Dep. Tr.) at 26:12-27:15. ▮

27  ▮

28  ▮

1    *Id.*[4]

2        Based on this flawed verification relying on Lilly's statistician's own calculations, Lilly

3    adopted and published the incorrect, lower efficacy calculations at a major dermatology conference.

4    Dkt. 54 (Answer) ¶¶ 45-46; Ex. K (Lilly Resp. to Request for Admission Nos. 27, 31).   Lilly

5    published similarly miscalculated psoriasis efficacy data (using the Psoriasis Area and Severity Index

6    or "PASI") at the same conference.  Dkt. 54 (Answer) ¶¶ 66-67, 69; Ex. K (Lilly Resp. to Request for

7    Admission Nos. 28, 32).

8        At deposition, Zou admitted



9    Ex. L at 193:1-4; *see also id.* at 196:8-12

10

11    ; *id.*

12    at 208:7-9

13

14    *See*

15    Ex. M (5/25/23 Manner email)  at -525

16    Ex.

17    N (5/24/23 Manner email)

18    .  Manner likewise acknowledged at deposition that

19    Ex. G at 219:5-220:4

20

21

22    And  Lilly  employees

23    represented to Nektar in 2023

24    Ex. B  147:20-149:7

25

26

27    [4]  Zou admitted in deposition that

28

1 ███████████████████████████████████████████████████

2 ████████████████████████████

3        **2.**    **Nektar Discovered and Accurately Reported Lilly's Error**

4 ████████████████████████████████████████████████████

5 ████████████████████ Ex. O (Skovronsky Dep. Tr.) at 187:24-188:6. █████████

6 ████████████████████████████████████████████████████

7 ████████████████ Ex. P (5/23/23 Schmitz email) at -890-91; Ex. Q (5/26/23 Zou email) at -

8 398; Agreement § 11.4(b)(ii); Ex. R (Robin Dep. Tr.) at 82:7-10.

9       Upon receiving this data, Nektar quickly discovered the error and retained an independent firm

10 to verify its findings.  Ex. B at 153:7-14, 183:10-18; Ex. P at -890-91; Dkt. 81-3.  That analysis

11 conclusively demonstrated what Lilly now concedes:  Rezpeg's true efficacy at twelve weeks showed

12 an approximately 83% decrease in EASI scores, significantly better than the 66% decrease that Lilly

13 had erroneously reported.  Dkt. 54 (Answer) ¶¶ 3, 45-46; Ex. K (Lilly Resp. to Request for Admission

14 Nos. 27, 31); *see also* Dkt. 081-3.  Additionally, the correct calculation revealed that 41% of patients

15 achieved EASI75 (*i.e.*, a 75% or greater improvement in EASI scores) at Week 12, not just the 29% as

16 Lilly had erroneously reported.  Dkt. 54 (Answer) ¶ 46; Dkt. 081-3 at 2.

17       On August 7, 2023, Nektar issued a press release announcing these corrected results, which

18 Lilly now accuses of defaming it *per se*.  Dkt. 081-3.  Importantly, Lilly does not dispute the accuracy

19 of Nektar's corrected data or even Nektar's statement that "EASI-Related and PASI-Related Clinical

20 Efficacy Endpoints in Atopic Dermatitis and Psoriasis Studies Were Incorrectly Calculated."  *Id.*

21 Lilly objects solely to Nektar's attribution of the calculation errors to Lilly, rather than Lilly's

22 subcontractor PRA.  *See, e.g.*, Dkt. 54 (Counterclaims) ¶¶ 80-82, 98-99.

23       In an investor earnings call the next day, Nektar discussed the miscalculated data and its

24 lawsuit against Lilly.  Dkt. 081-4.  Here too, Lilly accuses Nektar of defamation *per se* based on three

25 statements that identified this error, specifically: (1) "Yesterday, we announced that clinical efficacy

26 data previously generated by Eli Lilly for REZPEG were incorrectly calculated for both atopic

27 dermatitis and for psoriasis"; (2) "A leading independent statistical firm was then employed to analyze

28 the raw data de novo and the firm confirmed that the original statistical analysis calculated by Lilly

were incorrect"; and (3) "The lawsuit that we filed against Lilly, we'll be working on that, and as I said, it's very, very important to us.  But I don't know if many precedents for this.  It's a -- it's in my mind, an egregious error."  *Id.*  Again, Lilly does not dispute that there was an error, but claims that it was defamed *per se* by Nektar attributing the miscalculations to Lilly rather than Lilly's subcontractor.  Dkt. 54 (Counterclaims) ¶¶ 80-82, 98-99.  Lilly also asserts these statements breached the License Agreement because Nektar did not receive approval from Lilly before publishing them.  *Id.* ¶ 92.

### C.    The February 2023 Statements

The "February Statements" relate to Lilly's decision whether to continue developing Rezpeg to treat another autoimmune disease, lupus.

#### 1.    Lilly's Specified Criteria For Advancing To Phase 3 Lupus Trials

Lilly conducted a Phase 2b study of Rezpeg in lupus from August 2020 through February 2023.  Dkt. 54 (Answer) ¶ 70. ████████████████████████████████████

████████████████████████████████ Ex. S (2/18/22 Murray email and attachment) at -367 to -372. ████████████████████████████████████████████

██████████████████ Ex. T (Murray Dep. Tr.) at 108:20-111:11.

███████████████████████████████████████████████

██████ Ex. S at -372. ███████████████████████████████████

███████████████████████ Ex. T at 112:11-25; Ex. S at -372.

███████████████████████████████████████████████

████████████████████████████████████████████████

Ex. T at 128:13-129:12; Ex. U (2/16/23 Lilly Rezpeg team meeting presentation) at 183. ████████

████████████████████████████████████████████████

████████████████████████████████ Ex. V (2/20/23 Joint Steering Committee meeting minutes) at -234.

#### 2.    Nektar's Statements About Lilly's Phase 3 Decision

On February 23, 2023, Nektar issued a press release, held an investor earnings call, and presented a slide deck discussing the results of the Phase 2b lupus trial and Lilly's decision to discontinue Rezpeg's lupus development.  Two of the twenty slides had the title "ISLAND Phase 2

Study: Prespecified Criteria that Lilly Used for Phase 3 Decision-Making," which Lilly accuses of being defamatory *per se*. Dkt. 81-2. Lilly also challenges three oral statements from the earnings call: (1) "Lilly told us that their decision on advancement to Phase III in lupus is based upon their need for the study to have reached very high bars in this Phase II study for both SRI-4 and for BICLA in the modified intent-to-treat population"; (2) "Slide 4 … On this slide, we are showing the criteria that Lilly used to make that decision [not to advance to Phase 3]"; and (3) "The success criteria for advancing to Phase III required reaching these ranges for both endpoints, and these ranges were chosen based upon Lilly's experience in development with other agents in lupus in their pipeline." Dkt. 81-1. Lilly asserts that these statements were defamatory because Lilly allegedly did not establish the "very high bars" independently; rather, according to Lilly, Nektar participated in setting these standards. Dkt. 54 (Counterclaims) ¶¶ 3, 63, 95. Lilly also asserts these statements breached the Agreement because Nektar did not receive approval to publish them. *Id.* ¶¶ 91-92.

### D.     The April 2023 Statement

On April 17, 2023, Nektar issued a press release announcing a strategic reprioritization, emphasizing that it "intend[ed] to work with Eli Lilly to ensure the continuation of REZPEG development whether it is under the existing Eli Lilly agreement or Nektar regains the rights to Rezpeg." Ex. W (Nektar 4/17/23 press release). Lilly does not claim that this statement is defamatory, but accuses Nektar of breaching the License Agreement by publishing "Product Specific Information or Technology" without Lilly's consent. Dkt. 54 (Counterclaims) ¶ 92.

### LEGAL STANDARD

Nektar is entitled to summary judgment if it can (1) "produce evidence negating an essential element of [Lilly's] case" or (2) "show that [Lilly] does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Su v. Mayorkas*, 698 F. Supp. 3d 1168, 1174 (N.D. Cal. 2023) (cleaned up). Where, as here, "the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. This burden is not a light one. The non-moving party must show more than the

mere existence of a scintilla of evidence. The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue. In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 n.2 (9th Cir. 2016) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)).

"[I]f the nonmoving party contests summary judgment, the alleged factual dispute must be both genuine and material to the nonmoving party's claims . . . . The nonmoving party must produce specific facts, by affidavit or other evidentiary materials, to show that there is a *genuine* issue for trial." *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021). "A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party, and material if it could affect the outcome of the case." *Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*, 2016 WL 4182402, *2 (N.D. Cal. Aug. 8, 2016), *aff'd*, 773 F. App'x 623 (Fed. Cir. 2019).

## ARGUMENT

## I. NEKTAR IS ENTITLED TO SUMMARY JUDGMENT ON LILLY'S COUNTERCLAIM FOR BREACH OF CONTRACT

Lilly's breach of contract counterclaim fails as a matter of law because Lilly cannot prove damages—an essential element of any contract claim under New York law. *See, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999) (inability to prove damages is "fatal" to a breach of contract claim). While Lilly alleges that Nektar breached the Agreement by issuing press releases and making statements without proper authorization (Dkt. 54 (Counterclaims) ¶¶ 91-92), the Court need not address whether a breach occurred because the undisputed record demonstrates Lilly suffered no actionable harm.

As the Court recognized last year, "[t]here's an issue of the damages . . . . If it turns out there are no damages, [Nektar] can bring summary judgment." Ex. C at 3:16-19. Discovery has now confirmed precisely what the Court anticipated: Lilly cannot substantiate any cognizable damages arising from Nektar's alleged breach.

Lilly does not claim it suffered any economic losses typically recoverable in breach of contract actions. It identifies no expectation damages, no diminished revenue streams, and no other

quantifiable financial impact.  Rather, Lilly relies exclusively on alleged "reputational harm"—the entirety of which consists of these bare assertions in its initial disclosures:

**Lilly's Reputational Harm**

Lilly alleges that Nektar (a) published several statements in breach of the License Agreement and (b) Nektar made certain false and defamatory public statements concerning Lilly's performance during the parties' collaboration under the License Agreement. Nektar falsely and publicly blamed Lilly for unilaterally imposing unreasonably high bars on the Phase 2 lupus clinical trial when Nektar had agreed to the predetermined endpoints for that trial, which are widely used across the pharmaceutical industry.

Nektar also falsely claimed in public statements that Lilly was responsible for incorrectly calculating clinical trial data, when the parties' agreed-upon contract research organization was responsible for the error. These false statements ***harmed Lilly's reputation*** as a trusted clinical trial sponsor. These false statements also ***harmed Lilly's reputation*** as a trusted collaboration partner in the joint development of safe and effective pharmaceutical treatments.

Ex. X (Lilly Third Amended Initial Disclosures) at 9 (emphasis added).  When Nektar sought to test these vague assertions through discovery, Lilly actively obstructed any examination of its claimed harm, insisting it had "not alleged special damages for harm or impact on its stock price, market capitalization, financial projections, financial performance, or any other financial metric that Nektar seeks discovery into."  Dkt. 96 (Lilly Discovery Ltr.) at 1.  By explicitly disclaiming any concrete financial harm, Lilly has conceded it cannot prove the damages element of its contract claim.

Lilly's reliance on nebulous "reputational harm" is fundamentally at odds with governing New York law, which "generally does not allow contract damages for injury to reputation."  *Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc.*, 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995) (internal quotation omitted) (granting summary judgment on breach of contract counterclaim).  This prohibition is not merely technical—it reflects a foundational principle that contract damages must be tied to concrete economic harm, not speculative reputational impacts.  New York courts recognize only a narrow exception to this rule in "exceptional cases" where a plaintiff "proves specific business opportunities lost as a result of its diminished reputation."  *Id.*; *see also Joshi v. Trs. of Columbia Univ. in City of New York*, 515 F. Supp. 3d 200, 220 (S.D.N.Y. 2021) ("In this case, the plaintiff does not allege any specific business opportunities lost as a result of his allegedly damaged reputation. Instead, Dr. Joshi claims a more general diminution of his reputation.  Such a claim is insufficient to

obtain damages on a breach of contract claim."), *aff'd*, 2022 WL 3205883 (2d Cir. Aug. 9, 2022); *Shelomentseva v. Computools LLC*, 2023 WL 8613556, at *4 (E.D.N.Y. Nov. 13, 2023) (dismissing breach of contract claim where "[p]laintiffs' vague and conclusory allegations of supposed reputational harm fall far short of [the] considerable burden" required to recover reputational damages for contract claim), *aff'd*, 2024 WL 4509113 (2d Cir. Oct. 17, 2024).

Federal courts consistently grant summary judgment on contract claims where plaintiff "broadly claimed a loss of reputation" but failed to "enumerate[] any specific harms arising from the alleged loss of reputation." *I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.*, 856 F. Supp. 168, 175 (S.D.N.Y. 1994); *One Stop 34, LLC v. Stimdel Props. (FL), Inc.*, 2021 WL 8344133, at *13–14 (E.D.N.Y. Sept. 4, 2021) ("The absence of evidence of specific lost business opportunities entitles Defendant to judgment as a matter of law as to reputational damages."), *report and recommendation adopted*, 2022 WL 985834 (E.D.N.Y. Mar. 31, 2022); *MacArthur Const. Corp. v. Coleman*, 457 N.Y.S.2d 530, 531 (App. Div. 1983) ("The second cause of action seeks to recover $250,000 in damages for injury to plaintiff's reputation in the industry, claimed to have resulted from the alleged wrongful termination of the agreement. The claim, however, is not actionable[.]").

Even if reputational harm could theoretically support a contract claim in exceptional circumstances not present here, Lilly has produced zero evidence that its reputation actually suffered. In sworn interrogatory responses, Lilly admitted that



- █████████████████████████████████ ████████████ Ex. Y (Lilly Resp. to Interrogatory No. 24);
- █████████████████████████████████ ██████████████ (*id.*); or
- █████████████████████████████████ ████████████████ Ex. Z (Lilly Resp. to Interrogatory No. 10).

This evidentiary void continued at depositions. Lilly's designated corporate representative on "[a]ny harm Lilly incurred as a result of the Statements at Issue" ████████████ ████████████████████████████████████████████████

1    ██████████████████████████████  Ex. AA (Ramseyer Dep. Tr.) at 333:7-11.  Witnesses

2    likewise ████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████.[5]

4    Courts routinely grant summary judgment where, as here, a plaintiff cannot substantiate its

5    claimed reputational damages with concrete evidence.  *See, e.g.*, *AmTrust N. Am., Inc. v. KF&B, Inc.*,

6    2020 WL 5503479, at *2 (S.D.N.Y. Sept. 11, 2020) (granting summary judgment where "Plaintiffs

7    have identified no record materials to support the assertion that Plaintiffs suffered any reputational

8    damage as a result of Defendant's alleged breaches"); *see also Karetsos v. Cheung*, 670 F. Supp. 111,

9    115 (S.D.N.Y. 1987) (prohibiting recovery for reputational damages where party "fail[ed] to produce

10   any evidence showing the extent of harm, if any, that has been caused to her reputation by the alleged

11   breach").  Because Lilly cannot establish damages—an essential element of its breach of contract

12   claim—the Court should grant summary judgment to Nektar on this counterclaim.

13   **II.    NEKTAR IS ENTITLED TO SUMMARY JUDGMENT ON LILLY'S DEFAMATION
         COUNTERCLAIM**

14

15   Lilly's defamation counterclaim is equally deficient.  To establish defamation under California

16   law, Lilly must prove "the intentional publication of a statement of fact that is false, unprivileged, and

17   has a natural tendency to injure or which causes special damage."  *Smith v. Maldonado*, 72 Cal. App.

18   [5]  *See* Ex. O (Skovronsky Dep. Tr.) at 319:7-11 ███████████████

19   ██████████████████████████████████████████  Ex. BB (Pfeifer Dep. Tr.) at 73:21-74:2

20   ██████████████████████████████████████████████████████████████████████

21   ██████████████  *id.*  at 75:10-15 ████████████████████████████████████

22   ████████████████████████████  ; Ex. CC (Schmitz Dep. Tr.) at 72:24-73:3 ████████

23   ████████████████████████████████████████████  ; Ex. DD (Huckstep Dep.

24   Tr.) at 228:15-21 ██████████████████████████████████████████████████████

25   ██████████████████████████████████████████████████████████████████████

26   ████████████████████████████████  ; *id.* at 229:15-25 ████████████████████

27   ██████████████████████████████████████  *id.* at 230:10-24 █████████████

28   ████████████████████████████████████████████████████████████████

1    4th 637, 645 (1999), *as modified* (June 23, 1999).  Lilly cannot satisfy these requirements for three

2    independent reasons, each sufficient to warrant summary judgment.

3        First, having presented no evidence of special damages, Lilly is limited to a defamation *per se*

4    theory.[6]  It must therefore show statements so inherently injurious that a reader "would perceive a

5    defamatory meaning without extrinsic aid beyond his or her own intelligence and common sense," that

6    is, from the words alone.  *Barnes-Hind, Inc. v. Superior Ct.*, 181 Cal. App. 3d 377, 386-87 (1986)

7    (ordering dismissal of defamation claim where statements "cannot be libel per se" as matter of law).

8    Nektar's factual statements about clinical drug development fall far short of this demanding standard.

9        Second, the undisputed evidence demonstrates that Nektar's statements were true—"an

10   *absolute* defense to any libel action."  *Smith*, 72 Cal. App. 4th at 648; *see also Integrated Healthcare*

11   *Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 528-29 (2006) (California law requires public

12   figure plaintiffs to prove that the allegedly defamatory statements are false).

13       Third, as a public figure, Lilly must prove "by clear and convincing evidence" that Nektar

14   made the allegedly defamatory statements "with actual malice; that is, with knowledge of [their]

15   falsity or with reckless disregard for the truth," *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265 (9th

16   Cir. 2013).  The record contains no evidence of such malice.  Indeed, the uncontroverted deposition

17   testimony reflects that each Nektar speaker believed, and still believes, the accuracy of his comments,

18   and thus did not speak with actual malice.

19       **A.    Nektar's Statements Are Not Defamatory *Per Se***

20       "It is a question of law, for the court to determine, whether a communication is libelous or

21   slanderous per se."  *Regalia v. Nethercutt Collection*, 172 Cal. App. 4th 361, 368 (2009) (internal

22   quotation omitted).  The standard is exacting: the statement must "seriously impugn morals, character

23   or reputation in a way that jumps off the page without the need for further explanation."  *Johnstech*

24   *Int'l Corp. v. JF Microtechnology SDN BHD*, 2016 WL 4182402, *3 (N.D. Cal. Aug. 8, 2016)

25   (Donato, J.) (granting summary judgment on defamation *per se* counterclaim).  Courts regularly

---

26   [6]  Indeed, Lilly expressly *disclaimed* special damages.  Ex. EE (8/29/24 Hearing Tr.) at 15:5-6

27   ("MR. MOORMAN: We're seeking general damages for general harm to our reputation, not
     special damages."); *see also Gomes v. Fried*, 136 Cal. App. 3d 924, 940 (1982) ("special

28   damages" sufficient to support a defamation *per quod* claim "must be pled and proved precisely").

dispose of defamation *per se* claims at or before the summary judgment stage when—as here—the challenged statements do not meet this standard. *See, e.g.*, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, *7 (N.D. Cal. June 21, 2022) (dismissing defamation *per se* counterclaim where "the implicit claim that some of [Defendant's] products do not work as advertised does not rise to the level of 'seriously impugn[ing Defendant's] morals, character or reputation'" (quoting *Johnstech*, 2016 WL 4182402, at *3)); *Barnes-Hind*, 181 Cal. App. 3d at 388 (ordering dismissal of defamation *per se* claim where "knowledge of the extrinsic facts alleged was necessary to make the asserted libel apparent"); *Downing*, 265 F.3d at 1010 (affirming summary judgment on defamation *per se* claim where declarations from "lifetime surfers and leaders in the surf industry" were insufficient to establish that "average reader" would find recognize publication as defamatory); *Sidense Corp. v. Kilopass Tech. Inc.*, 2012 WL 3545289, *6 (N.D. Cal. Aug. 16, 2012) (limiting plaintiff to defamation *per quod*, even after ruling "the statement is subject to a defamatory meaning," because "innuendo is subject to the reader's interpretation, a question for the jury and therefore not libel *per se*").

When this Court previously allowed the defamation counterclaim to proceed at the pleading stage, it expressed considerable "doubt[]" about the claim, which it characterized as "weak." Ex. C at 3:25-4:1. The Court allowed Lilly "time to sort it out on the record," *id.* at 7:6-7, but discovery has only confirmed that Nektar's statements fall well short of defamation *per se*.

### 1.  Nektar's August 2023 Statements Are Not Defamatory *Per Se*

None of the August Statements discussing Lilly's miscalculation of Rezpeg's efficacy in treating eczema or psoriasis (*see supra*, at 5-6) could have plausibly "expose[d]" Lilly "to hatred, contempt, ridicule, or obloquy," "cause[d Lilly] to be shunned or avoided," or had "a tendency to injure [Lilly] in [its] occupation." Cal. Civ. Code § 45.

Statements identifying a calculation error in clinical trial data simply do not "impute" to Lilly "fraud, dishonesty or questionable business methods." *Barnes-Hind*, 181 Cal. App. 3d at 385 (internal quotation omitted). California law requires statements that "disparage the integrity or honesty of a business" to establish defamation *per se* based on occupational injury. *Johnstech*, 2016 WL 4182402, at *3. Acknowledging an analytical error—even one characterized as "egregious"—does not meet this threshold. California courts consistently reject defamation *per se* claims based on allegations far

more damaging than computational errors in clinical trials. *See Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, *7 (N.D. Cal. June 21, 2022) ("[T]he implicit claim that some of Dexon's products do not work as advertised does not rise to the level of seriously impugning Dexon's morals, character or reputation[.]" (cleaned up)); *Jamarillo v. Food 4 Less Madera*, 2010 WL 3717307, *7-8 (E.D. Cal. Sept. 15, 2010) (statements that "Plaintiff was an unreliable employee who did not adhere to Defendant's attendance policy and who deserved to be terminated for poor performance" not defamatory *per se*); *see also Bartholomew v. YouTube, LLC.*, 17 Cal. App. 5th 1217, 1233 (2017) ("[s]everal courts have found that a statement alleging a breach of contract is not defamatory per se" and must be supported by innuendo); *Regalia*, 172 Cal. App. 4th at 369 (statements that plaintiff "demanded a finder's fee to which he was not entitled and that other employees would not work for [plaintiff] and would leave if he remained employed" were not defamatory *per se*).

While Nektar's statements about the significant miscalculation of clinical trial data could ***never*** constitute defamation *per se*, the record here makes even more clear that these statements cannot support Lilly's counterclaims. Lilly witnesses ███████████████████████████ ███████████████████████████████████████████ Among them was Lance Pfeifer, an Associate Vice President in External Innovation at Lilly ███████████ █████████████████████████ Ex. BB at 15:20-16:1. In this role, Mr. Pfeifer ██████████████████████████████████ *Id.* at 73:17-20. Yet Mr. Pfeifer testified that ███ ███████████████████████████████████████. *See, e.g.*, *id.* at 73:21-74:2 ██████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████; *id.* at 75:10-15 ███████████████████████████████████████████ ████████████████████ *id.* at 75:23-76:6 ███████ ███████████████████████████████████████████ ███████████████████████████████████████████

1    ████████████████████████████████████████[7]

2         The August Statements did not "seriously impugn [Lilly's] morals, character or reputation in a

3    way that jumps off the page without the need for further explanation." *Johnstech*, 2016 WL 4182402,

4    at *3. They have not harmed Lilly's standing on any of those fronts, nor would they ever be expected

5    to by a reasonable reader. Nektar is thus entitled to summary judgment of the defamation

6    counterclaim as to the August Statements.

7            **2.**     **Nektar's February 2023 Statements Are Not Defamatory *Per Se***

8         The five February Statements—two of which were in a slide deck for an investor earnings call

9    and three of which were oral statements made during that call (*see supra*, at 6-7)—similarly are not

10    defamatory *per se* as a matter of law. Rather, each is simply a plain-vanilla discussion of the results of

11    the Phase 2b lupus trial and Lilly's decision to terminate Rezpeg's lupus development—far from the

12    type of outrageous statements that qualify as defamatory *per se*.

13         These statements in no way convey a defamatory meaning that "jumps off the page without the

14    need for further explanation." *Johnstech*, 2016 WL 4182402, at *3. The Court recognized as much

15    last year: "I thought a lot of these were iffy; okay? . . . . But maybe in the biotech world, high bars

16    mean something. I don't know." Ex. C. at 7:2-5. There is nothing in the record to even suggest that

17    "high bars" has any special meaning in any relevant industry—and even if it did, that would only

18    reinforce that these statements are not defamatory *per se*: "[I]f the reader would be able to recognize a

19    defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances,

20    extrinsic to the publication, which are not matters of common knowledge rationally attributable to all

21    reasonable persons, then . . . the libel cannot be libel per se." *Barnes-Hind*, 181 Cal. App. 3d at 387;

22    *see Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1010 (9th Cir. 2001) (affirming grant of

23    summary judgment on defamation *per se* claim where all declarations in support of plaintiffs came

24    from "lifetime surfers and leaders in the surf industry," and thus as a matter of law could not establish

25    that a reasonable reader would understand the comment to be defamatory).

26         The context of the February Statements confirms that they are not defamatory *per se*. They are

27

28      [7]  *See also supra*, at 11 n.5.

1    a dispassionate analysis of clinical trial results, "hardly the stuff of scandal or an accusation that the

2    average reader would reasonably interpret, without more, as showing [Lilly] in a disreputable or

3    contemptible light." *Johnstech*, 2016 WL 4182402, at *4.  For example, the anodyne sentences before

4    and after the alleged defamatory statements (underlined) show that Nektar's statement about "very

5    high bars" could not reasonably be understood to show Lilly in a contemptible light:

> Lilly has already informed us they do not plan to move REZPEG into Phase III
> in lupus. We believe the data supporting advancing into Phase III, and our
> belief is based upon the totality of the data, contemporary regulatory approvals
> and the current developments in this field.  Lilly told us that their decision on
> advancement to Phase III in lupus is based upon their need for the study to
> have reached very high bars in this Phase II study for both SRI-4 and for
> BICLA in the modified intent-to-treat population.  While the study did achieve
> the high bar for BICLA, it did not for SRI-4.

11    Dkt 081-1 at 4.  Nektar's other earnings call statements are similarly innocuous in context.  *Id.* at 5

12    ("As Howard stated, Lilly has told us they do not plan to advance to Phase III.  On this slide, we are

13    showing the criteria that Lilly used to make that decision."); *id.* (discussing clinical endpoint results of

14    other lupus drugs to contextualize Rezpeg success criteria before noting endpoint "ranges were chosen

15    based upon Lilly's experience in development with other agents in lupus in their pipeline").  The same

16    is true of the February 2023 slide deck slides whose title ("ISLAND Phase 2 Study: Prespecified

17    Criteria that Lilly Used for Phase 3 Decision-Making") Lilly alleges is defamatory.  There is simply

18    nothing about this slide, title or otherwise, that could reasonably be understood as showing Lilly in a

19    disreputable or contemptible light.  These technical, industry-specific slides merely outline the criteria

20    "Lilly used" to make decisions.  Dkt. 081-2 at 4.  They are not defamatory *per se* as a matter of law.

21    *Barnes-Hind*, 181 Cal. App. 3d at 387.

22        **B.**    **Nektar's Statements Are Not False**

23        Nektar is entitled to summary judgment for the independent reason that its supposed

24    defamatory statements were true.  "Truth is, of course, an *absolute* defense to any libel action." *Smith*,

25    72 Cal. App. 4th at 648.  In assessing an allegedly defamatory statement, courts focus not just on the

26    statement's literal truth, but instead on whether the "*substance* of the charge, irrespective of slight

27    inaccuracy in the details" is true.  *Id.* at 646-47.  A defamation claim thus fails as a matter of law if a

28    statement is "substantially true as to justify the 'gist or sting' of the remark." *Hughes v. Hughes*, 122

1  Cal. App. 4th 931, 936 (2004).

2         **1.**      <u>**Nektar's August 2023 Statements Are Literally and Substantially True**</u>

3        Nektar's August Statements provide corrected Rezpeg efficacy data and note that the previous

4  data were "incorrectly calculated by Lilly." *See* Dkts. 81-3, 81-4. Lilly does not dispute that the data

5  were miscalculated. Dkt. 54 (Counterclaims) ¶¶ 79, 99; Dkt. 54 (Answer) ¶¶ 45-46. Lilly's sole

6  theory of falsity is that Nektar's August Statements blamed Lilly, rather than Lilly's subcontractor

7  PRA, for the miscalculations. Dkt. 54 (Counterclaims) ¶¶ 79, 99.

8        The undisputed record reflects that Nektar's statements are true twice over. *First*, they are

9  *literally* true: ███████████████████████████████████████████

10  ████████████████████████████████████. *Second*, Nektar's

11  statements are *substantially* true: Under the Agreement, Lilly is liable for PRA's acts and omissions,

12  including PRA's miscalculation of the data; ████████████████████

13  ███████████████████████████████████████.

14          **(a)**      <u>**Lilly Miscalculated the Data**</u>

15        The undisputed record—including documents and testimony from Lilly's own witnesses—

16  show that Nektar spoke accurately when it stated that Rezpeg's efficacy data "were incorrectly

17  calculated by Lilly." As explained above, ██████████████████████

18  ████████████. Exs. E, J. However, ████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████    ████████████████████████████████████

22  ████████████████████████ *Id.* at 336:25-337:6 Lilly's chief statistician for these studies

23  likewise ████████████████████████████████ Ex. G (Manner Dep.

24  Tr.) at 219:5-220:24. And ████████████████████████████████████

25  ████████████████████████████ Ex. B. (Ruddock Dep. Tr.) at 149:1-7.

26        Lilly then published the incorrect results ██████████████████

27  ██████████ including at a major dermatology conference. Dkt. 54 (Answer) ¶¶ 45-46; Ex. K (Lilly

28  Resp. to Request for Admission Nos. 27, 31). It was in no world false, much less defamatory, for

1   Nektar to explain that Rezpeg's efficacy data "were incorrectly calculated by Lilly."

2         **(b)**      **Lilly Is Responsible For PRA's Miscalculation Of The Data**

3         Even if there were triable issues as to whether Lilly itself miscalculated the data (there are not),

4   Nektar's August Statements are substantially true because the "gist or sting" of Nektar's statements—

5   that Lilly is responsible for the miscalculated data—is indisputably true. Lilly is contractually

6   responsible for PRA's miscalculations because, under the Agreement, Lilly is "liable to [Nektar] for

7   any act or omission of its subcontractor." Agreement § 4.10. It is undisputed that Lilly retained PRA

8   as a subcontractor to help conduct the Phase 1 trials of Rezpeg in atopic dermatitis and psoriasis. *see*

9   Ex. D (Lilly Resp. to Request for Admission No. 8). ███████████████████████

10  ██████████████████████████████████████████████████████████

11  ████████████████████████████████████████ Ex. E at -848.

12        Lilly's theory of falsehood that Nektar wrongly blamed Lilly, rather than a subcontractor, for

13  the miscalculated data, thus has no basis in the factual record. It also strains common sense. A client

14  who publicly criticizes a law firm partner for an unpersuasive brief is not liable for defamation

15  because the brief was actually drafted by a junior associate. Nor is a homeowner who publicly blames

16  a general contractor for shoddy workmanship tortiously liable because the nails were actually pounded

17  in by a subcontracted carpenter. So too here. Nektar is not liable as a matter of law for stating that

18  Lilly miscalculated data even if its subcontractor PRA was the first party to introduce an error into

19  results that Lilly would later present to the public. *Cf. Indus. Waste & Debris Box Serv., Inc. v. Murphy*,

20  4 Cal. App. 5th 1135, 1162 (2016) ("[Plaintiff's] declaration criticizes the Report for referring to the MRF

21  as the "Industrial Carting MRF" when it is [Plaintiff's sister company] Global Materials, not [Plaintiff]

22  Industrial Carting, that operates the MRF. Of course, that alone hardly renders the Report defamatory.").

23        **2.**      **Nektar's February 2023 Statements Are Literally and Substantially True**

24        The February Statements also cannot support Lilly's defamation claim because they too are

25  literally and substantially true: Lilly did not advance Rezpeg to Phase 3 trials for lupus because it did

26  not meet the high bars set for Phase 3 decision-making. *See supra*, at 6-7. There is nothing false in

27

28

1  these statements at all, as it is undisputed that Lilly *did* set the success criteria,[8] *did* choose those

2  criteria based on its experience developing drugs,[9] and *did* ultimately decide against advancing

3  Rezpeg further based on its performance against these "very high bars."[10]

4        Lilly contends otherwise only by alleging—contrary to the unambiguous language of the

5  February Statements—that "Nektar stated publicly that REZPEG's failure . . . was a result of criteria

6  Lilly had *unilaterally* imposed that set *unreasonably* high bars for REZPEG to meet."  Dkt. 54

7  (Counterclaims) ¶ 95 (emphasis added).  But the words "unilateral" and "unreasonable" appear

8  nowhere in the February Statements.  Nor are those words a clear or even reasonable implication of

9  Nektar's fact-based and historically accurate statement about Lilly's preselected criteria and ultimate

10  decision.  Lilly cannot avoid summary judgment on this defamation claim by rewriting the statements

11  it attacks.  *Issa v. Applegate*, 31 Cal. App. 5th 689, 707 (2019) ("[A] plaintiff may not construct an

12  actionable statement by reading whatever implication it wishes into the defendants' words.").  The

13  February Statements, as they were actually written and actually spoken, are true.

14        **C.**    **Nektar's Statements Were Not Made with Actual Malice**

15        Nektar is entitled to summary judgment on the defamation counterclaim for yet another reason:

16  The undisputed record shows that Nektar did not have the actual malice required for a public figure

17  like Lilly to establish a defamation claim.

18        **1.**    **Lilly Is a Public Figure**

19        In the rare instances where large corporations bring defamation claims, they are properly

20  treated as public figures.  *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 847014, *6

21  (S.D.N.Y. Jan. 12, 2018), *report and recommendation adopted*, 2018 WL 4735717 (S.D.N.Y. Sept.

22  29, 2018) ("When the plaintiff is a public figure, such as a public company, the plaintiff must

---

[8]  *See* Ex. S at -360 ███████████████████████████████████████████ Ex. FF (11/19/21 joint meeting minutes) at -937 (████████████████████████████████.

[9]  *See* Ex. S at -360, -378 ██████████████████████████████████████; Ex. T (Murray Dep. Tr.) at 69:5-13 ███████████████████████████████████████████████████████████

[10]  *See* Ex. U at -183, -184 (████████████████████████████████████████████████████; Ex. V at -234 ██████████████████████████████████

1   demonstrate that the defendant acted with 'actual malice' in connection with the defamatory

2   statements."); *La Marca v. Capella Univ.*, 2009 WL 10698387, *7 (C.D. Cal. Jan. 6, 2009) (entity's

3   "size and global presence render it an all-purpose public figure"); *Reliance Ins. Co. v. Barron's*, 442

4   F. Supp. 1341, 1348 (S.D.N.Y. 1977) ("We find that plaintiff is indeed a public figure.  It is a large

5   corporation with more than a billion dollars in assets."); *Mattel, Inc. v. MCA Recs., Inc.*, 28 F. Supp.

6   2d 1120, 1162 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002) (considering party's status as "an

7   international conglomerate" in public figure determination).

8          Here, Lilly is one of the world's largest pharmaceutical companies, and therefore is an all-

9   purpose public figure fully able to "contradict the lie or correct the error" in Nektar's statements

10   (though no such lie exists).  *Makaeff*, 715 F.3d at 265.  "Lilly admits that it is one of the world's

11   leading pharmaceutical companies."  Dkt. 54 (Answer) ¶ 1.  As Lilly's Chief Scientific Officer and

12   President of Immunology, Dr. Daniel Skovronsky testified, ████████████████████████

13   ████████████████████████████████████████████████████████████

14   ██████████████████████████████ Ex. O at 174:12-13, 214:21-23.  Moreover,

15   "Lilly is 3,000 times larger [than Nektar] by market cap."  Dkt. 86 (Lilly Discovery Letter Br.) at 3.

16   Lilly's "size and global presence render it an all-purpose public figure" that must establish actual

17   malice to prevail on a defamation counterclaim.  *La Marca*, 2009 WL 10698387, at *7.

18                    **2.      <u>Nektar Did Not Act with Malice</u>**

19          Having triggered the actual-malice requirement, Lilly's defamation claim can survive

20   summary judgment only if there is "sufficient evidence to permit the conclusion that [Nektar] in fact

21   entertained serious doubts as to the truth of [its] publication[s]."  *Reader's Digest Ass'n v. Superior*

22   *Court*, 37 Cal. 3d 244, 256-57 (1984); *see Makaeff*, 715 F.3d at 265 (public figure must "demonstrate

23   by clear and convincing evidence" that the allegedly defamatory statements are made "with

24   knowledge of [their] falsity or with reckless disregard for the truth").  The Supreme Court has

25   emphasized that only false statements "made with a high degree of awareness of probable falsity"

26   satisfy this demanding standard, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (cleaned up), and

27   that this standard increases the showing a defamation plaintiff must make at the summary judgment

28   stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).

1    Here, there is no evidence, let alone clear and convincing evidence, that Nektar acted with

2  actual malice.  Rather, the record shows that, at all times, Nektar believed in the truth of its public

3  statements.  Nektar's CEO testified that ████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████ *See*

6  Ex. R at 190:20-191:13.  He also testified that ████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████  *id.* 181:21-184:2.  The record also shows that ████████████

9  ████████████████████████████████████████████  *See* Ex. B

10  (Ruddock Dep. Tr.) at 183:2-18 (████████████████████████████████████████

11  ████████████████████████████); Ex. GG (Zalevsky Dep. Tr.) at 384:12-

12  386:16 (████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████  Lilly cannot meet its high burden in showing

15  actual malice by clear and convincing evidence.  Nektar is thus entitled to summary judgment on

16  Lilly's defamation claim for this independent reason.

17                                    <u>**CONCLUSION**</u>

18    For the foregoing reasons, the Court should grant summary judgment to Nektar on Lilly's

19  counterclaims.

20  DATED:  May 22, 2025                Respectfully submitted,

21                                      QUINN EMANUEL URQUHART
                                          & SULLIVAN, LLP
22
                                      By:   */s/ Yury Kapgan*
23                                          Diane M. Doolittle
                                            Yury Kapgan
24                                          Suong Nguyen
                                            David M. Elihu
25                                          Kyle Batter
                                            Jimmy Bieber
26

27                                      *Attorneys for Plaintiff Nektar Therapeutics*

28