QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Diane M. Doolittle (Bar No. 142046)
  dianedoolittle@quinnemanuel.com
  Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
  Suong Nguyen (Bar No. 237557)
  suongnguyen@quinnemanuel.com
  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000

  David M. Elihu (Bar No. 303043)
  davidelihu@quinnemanuel.com
  Jimmy Bieber (Bar No. 301639)
  jimmybieber@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Plaintiff*
*Nektar Therapeutics*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>              Plaintiff,<br><br>       vs.<br><br>ELI LILLY & CO.,<br><br>              Defendant. | CASE NO. 3:23-cv-03943-JD<br><br>**PLAINTIFF NEKTAR THERAPEUTICS' OPPOSITION TO DEFENDANT ELI LILLY & CO.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. James Donato<br>Hearing Date: July 17, 2025<br>Hearing Time: 10:00 a.m. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD ....................................................................................................... 3

ARGUMENT .................................................................................................................... 3

I.    TRIABLE ISSUES OF FACT AND ESTABLISHED PRINCIPLES OF LAW
      PRECLUDE SUMMARY JUDGMENT ON LILLY'S LIABILITY ................................... 3

      A.    The CRE Claim Should Proceed to Trial .................................................... 3

            1.    There Are Numerous Disputed Material Facts as to the CRE Claim ........... 3

            2.    Triable Issues That Lilly Does Not Even Address ....................................... 10

            3.    Lilly's Position Conflicts With the Agreement and Case Law .................. 13

      B.    The Implied Covenant Claim Should Proceed to Trial ............................. 17

      C.    The Post-Termination Breach Claim Should Proceed to Trial ............... 18

II.   TRIABLE ISSUES OF FACT AND ESTABLISHED PRINCIPLES OF LAW
      PRECLUDE SUMMARY JUDGMENT ON DAMAGES .................................................. 19

      A.    Nektar Can Recover for Diminution in Rezpeg's Value............................ 19

            1.    Lost Asset Value Is Legally Distinct From Lost Profits .............................. 19

            2.    Lost Asset Value Is Not a Form of Special Damages Here......................... 21

            3.    The Lost Profits Waiver Does Not Apply ..................................................... 22

            4.    Nektar's Lost Asset Value Claim Is Not Speculative ................................. 23

      B.    The Termination Clause Does Not Prevent Recovery of Milestones and
            Royalties............................................................................................................ 23

      C.    Lilly Ignores Other Aspects of Nektar's Pre-Termination Damages ...... 25

      D.    Nektar Was Harmed by Lilly's Delay in Returning Rezpeg Materials .... 25

CONCLUSION .............................................................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*3DT Holdings LLC v. Bard Access Sys. Inc.*,
5
    2022 WL 409082 (S.D.N.Y. Feb. 10, 2022)..........................................................................3, 14

6

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
    98 N.Y.2d 144 (2002) .......................................................................................................17

7

*Atlanta Channel, Inc. v. Solomon*,
8
    583 F. Supp. 3d 174 (D.D.C. 2022) ..................................................................................20

9

*Avalyn Pharma, Inc. v. Vincent*,
    2023 WL 2731727 (S.D. Cal. Feb. 27, 2023) ....................................................................3
10

11

*Banc of Am. Sec. LLC v. Solow Bldg. Co. II*,
    847 N.Y.S.2d 49 (App. Div. 2007) ...................................................................................23

12

*Bancroft Com. v. Goroff*,
13
    2014 WL 7409489 (D. Md. Dec. 31, 2014).................................................................14, 15

14

*Barnhart v. Home Depot U.S.A., Inc.*,
    2007 WL 7700435 (N.D.N.Y. Mar. 30, 2007) .................................................................25
15

16

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
    22 N.Y.3d 799 (N.Y. 2014) ..............................................................................................22

17

*Caccuri v. Sony Interactive Entm't. LLC*,
18
    735 F. Supp. 3d 1139 (N.D. Cal. 2024) ...........................................................................23

19

*Capstone Logistics Holdings, Inc. v. Navarrete*,
    2018 WL 6786237 (S.D.N.Y. Dec. 13, 2018) ..................................................................21
20

21

*Cequel Commc'ns, LLC v. Mox Networks, LLC*,
    2024 WL 3924709 (S.D.N.Y. Aug. 23, 2024)..................................................................16

22

*ChemImage Corp. v. Johnson & Johnson*,
23
    2025 WL 1547616 (S.D.N.Y. May 30, 2025) ....................................................... 20, 21, 22

24

*Cole Pub. Co. v. John Wiley & Sons, Inc.*,
    1994 WL 532898 (S.D.N.Y. Sept. 29, 1994) ...................................................................24
25

26

*Davis v. Team Elec. Co.*,
    520 F.3d 1080 (9th Cir. 2008) ............................................................................................3

27

*Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*,
28
    469 F. App'x 596 (9th Cir. 2012)........................................................................................3

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
    343 F. Supp. 3d 789 (N.D. Ill. 2018) ...............................................................22

*Evans v. Ithaca Urb. Renewal Agency*,
    205 A.D.2d 844 (App. Div. 1994)......................................................................25

*Fantozzi v. Axsys Techs., Inc.*,
    2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008).................................................17, 18

*Frydman v. Endurance Am. Ins. Co.*,
    228 N.Y.S.3d 614 (App. Div. 2025) ...................................................................17

*FTC v. D-Link Sys., Inc.*,
    2018 WL 6040192 (N.D. Cal. Nov. 5, 2018) .........................................................3

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992) ..............................................................................16

*Gao v. Sidhu*,
    2013 WL 2896995 (S.D.N.Y. June 13, 2013) .....................................................23

*Gilsey v. Wm. Hengerer Co.*,
    147 N.Y.S.2d 210 (1955)....................................................................................25

*Hanover Ins. Co. v. D & W Cent. Station Alarm Co.*,
    560 N.Y.S.2d 293 (1990) ...................................................................................23

*Holland Am. Cruises, Inc. v. Carver Fed. Sav. & Loan Ass'n*,
    60 A.D.2d 545 (N.Y. App. Div. 1977)..................................................................3

*In re Indesco Int'l, Inc.*,
    451 B.R. 274 (Bankr. S.D.N.Y. 2011) ...............................................................22

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*,
    554 F. Supp. 3d 542 (S.D.N.Y. 2021)...........................................................14, 23

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*,
    2017 WL 11887460 (N.D. Ill. Sept. 19, 2017) ...................................................20

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
    424 F.3d 195 (2d Cir. 2005) ..............................................................................17

*Latham Land I, LLC v. TGI Friday's, Inc.*,
    948 N.Y.S.2d 147 (2012)....................................................................................22

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012)................................................................17

*N. Am. Photon Infotech Ltd. v. ZoomInfo LLC*,
    2021 WL 4482208 (S.D.N.Y. Sept. 30, 2021) ..........................................20, 21, 22

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
   2016 WL 3098842 (S.D.N.Y. June 1, 2016) ...................................................................23

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
   784 F.2d 127 (2d Cir. 1986) .........................................................................................16

*Pacific Northwest Solar, LLC v. Northwestern Corp.*,
   2023 WL 2945314 (9th Cir. Apr. 14, 2023) ..................................................................20

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ...........................................................................23

*Schneider v. YouTube, LLC*,
   649 F. Supp. 3d 872 (N.D. Cal. 2023) ..............................................................................3

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) ............................................................................. 20, 22, 23

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
   838 F. App'x 608 (2d Cir. 2020) ................................................................................6, 15

*Spinelli v. Nat'l Football League*,
   903 F.3d 185 (2d Cir. 2018) .........................................................................................17

*SRS v. Alexion Pharms., Inc.*,
   No. 2020-1069 MTZ (Del. Ch. June 11, 2025) ..............................................................24

*That's What She Said, Inc. v. Gutter Games Ltd.*,
   2024 WL 3678473 (S.D.N.Y. Aug. 5, 2024) ..................................................................21

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
   41 F.3d 1570 (2d Cir. 1994) .........................................................................................18

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
   2021 WL 3668092 (S.D.N.Y. Aug. 17, 2021).............................................................18, 24

1

## INTRODUCTION

Lilly's summary judgment motion ("MSJ") relies on one-sided versions of disputed facts and inaccurate statements of law. It ignores and mischaracterizes evidence, Nektar's claims, and the Agreement. Its core liability argument is that Lilly could make ***any*** decision it wanted over Rezpeg's development without consequence, a commercially unreasonable view that finds no support in the Agreement's text, legal precedent, or common sense. And its core damages argument is that the Agreement bars Nektar from recovering for any breach, another absurd result that conflicts with the actual contract terms and governing New York law. Summary judgment is improper on each ground.

A jury could easily find Lilly liable for its breaches of the Agreement's express and implied terms. Most centrally, a Commercially Reasonable Efforts ("CRE") clause required Lilly to give Rezpeg the same "effort, expertise and resources normally used by [Lilly] in the development and/or commercialization of a comparable pharmaceutical product Controlled by [Lilly]," and to do so "in light of . . . strategic and commercial factors normally considered by [Lilly] in making product portfolio decisions." Ex. 1 ("Agreement") §§ 1.1, 4.9. Whether Rezpeg benefitted from the same efforts Lilly "normally used" for its own drugs and the same attention to "factors [Lilly] normally considered" is a quintessential, and hotly disputed, question of fact. The record shows that Lilly subjected Rezpeg to different standards, provided it with less oversight and careful statistical analysis, delayed Rezpeg's development to favor preferred Lilly drugs, re-designed trials that had already been funded and approved (a prejudicial change not made for other drugs), structured its trials in abnormal ways that made failure more likely, failed to advance Rezpeg even after it showed market-leading efficacy (something not seen for any other drug), and replaced a practice of carefully reviewing trial results with a summary termination that was memorialized before data was even received.

And Lilly's breaches went further. Internal Lilly communications reveal that, a year before Lilly finally terminated the Agreement, it ██████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ Whether such actions violated the Agreement and implied covenant are additional clear fact disputes.

Unable to meaningfully argue that there is no material dispute over whether Lilly breached its CRE obligation, Lilly instead relies on a reading of the Agreement and its CRE obligation that no court has endorsed and no counterparty would accept. The repeated contention that the contract "did not speak to Lilly's judgments" (MSJ at 1) both misunderstands the nature of Nektar's claim (which is that Lilly failed to use required "effort, expertise and resources," not a wrong judgment) and re-writes the Agreement (which holds Lilly to "the factors normally considered by [Lilly] in making product portfolio decisions," and thus plainly does not exempt "decisions" from its obligations). Tellingly, no court has accepted Lilly's position that a party cannot violate an efforts obligation as long as it describes the conduct at issue as a "decision" or "judgment," and indeed the principal case Lilly relies upon squarely rebuts its argument. And Lilly's efforts to channel all disputes over its breach into a framework that governs disagreements during the course of development fails, as the contract makes clear that any dispute "related to whether [Lilly] has performed its obligations under this Agreement" is not within the jurisdiction of the framework Lilly invokes, but instead is resolved via "any rights or remedies available at law or equity." Agreement § 13.1. No party would sign the contract Lilly imagines, in which its "judgments" about whether to treat Rezpeg equally with other drugs are unconstrained by any efforts obligation and unreviewable by any authority other than Lilly itself.

Lilly's bid for summary judgment on damages is likewise deficient. The claim that Nektar cannot seek its damages for Rezpeg's diminished asset value because the Agreement waives some (but not all) lost profits is wrong because lost asset value is not the same as lost profits, because this harm (whether viewed as lost asset value or lost profits) is a recoverable general damage, and because in all events the exception to any waiver for "gross negligence and willful conduct" applies. And the claim that Nektar cannot recover for the payments it should and would have received but for Lilly's breaches because Lilly terminated the Agreement before they came due transforms a right to terminate a contract (that is, to not have to perform it any more going forward) into a blanket get-out-of-jail-free card wiping away all liability for breaches that have already occurred. Lilly identifies ***no authority*** supporting either argument, and there is none. Rather, Lilly asks the Court to ignore on-point Second Circuit precedent and create new law on this issue as well. The Court should decline that invitation.

For each of these reasons, and as set forth further below, Lilly's motion should be denied.

## LEGAL STANDARD

"Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). "Summary judgment, or more aptly judgement without a trial," is appropriate only "when the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 877 (N.D. Cal. 2023) (Donato, J.). "To determine if there is a genuine dispute as to any material fact, the Court will view the evidence in the light most favorable to the nonmoving party." *Id.* "When a party asks for summary judgement on a contested factual record, the motion will be denied in short order." *Id.*; *see also FTC v. D-Link Sys., Inc.*, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018) (Donato, J.) (denying summary judgment where "voluminous declarations and exhibits" demonstrate a "panoply of genuine disputes of material fact").

## ARGUMENT

**I.     TRIABLE ISSUES OF FACT AND ESTABLISHED PRINCIPLES OF LAW PRECLUDE SUMMARY JUDGMENT ON LILLY'S LIABILITY**

**A.     The CRE Claim Should Proceed to Trial**

**1.     There Are Numerous Disputed Material Facts as to the CRE Claim**

Whether a party breached an efforts obligation is a fact-intensive dispute that generally cannot be resolved on summary judgment. *Holland Am. Cruises, Inc. v. Carver Fed. Sav. & Loan Ass'n*, 60 A.D.2d 545, 545 (N.Y. App. Div. 1977) (whether a party acts "in accordance with the reasonable commercial standards . . . presents a question of fact which precludes summary judgment"); *3DT Holdings LLC v. Bard Access Sys. Inc.*, 2022 WL 409082, at *10 (S.D.N.Y. Feb. 10, 2022) (denying summary judgment because "the determination of commercial reasonableness is usually a factual determination best made by the trier of fact"). Courts around the country are in accord. *Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*, 469 F. App'x 596, 598 (9th Cir. 2012); *Avalyn Pharma, Inc. v. Vincent*, 2023 WL 2731727, at *8 (S.D. Cal. Feb. 27, 2023) (collecting cases).

The voluminous motion papers, expert reports, declarations, and exhibits make clear there is "a panoply of genuine disputes of material fact that will require a trial" on Lilly's obligations. *FTC*,

2018 WL 6040192, at *1.  Lilly does not even contest most of them, inaccurately claiming instead that Nektar's CRE claim rests on only "three" grounds.  MSJ at 2-3, 10, 16-23.  Lilly's decision to address only those topics and ignore its other breaches is reason enough to deny its motion.  And the record shows that the issues that Lilly deigns to address cannot be resolved on summary judgment either.

(a)     **Triable Issues as to Lilly's Breach of CRE Regarding Rezpeg's Phase 2 Eczema Study Design and Delay**

The record contains more than sufficient evidence for a reasonable jury to conclude Lilly's conduct regarding Rezpeg's Phase 2 eczema study did not satisfy CRE.  The agreed-upon strategy was that if ███████████████████████████████████████████████████████████████████ ████████████████████████████████████. Ex. 2 at -347; Ex. 3 at -241. ████████████ ████████████████████████████████████████████████, Lilly did not conduct a Phase 2 eczema trial for Rezpeg.  Ex. 4 at -366; Ex. 5 (Skovronsky Tr.) at 185:12-16.  Rather, as set forth below, Lilly repeatedly delayed that trial and, nineteen months later when the Agreement was terminated, still had not initiated it.  Ex. 6 (Robbins Rep.) ¶ 85.  This delay was accomplished through several unprecedented proposals, each of which a reasonable jury could conclude did not satisfy CRE:

**Lilly's "█████████" on Rezpeg**. ███████████████████████████████████████ ████████████████. Ex. 4 at -366. ████████████████████████████████████████ ███████████████████████████████████. Ex. 7 at -615; Ex. 8 at -033. ██████████ ████████████████████████████████████. Ex. 9 at -715.

But the funded and approved study never came.  In late-March 2022, Phase 3 eczema trials for another drug, lebrikizumab, reported positive data.  Ex. 10.  In 2020, Lilly spent $1.1 billion acquiring rights to lebrikizumab—more than ██████ times what Lilly paid for Rezpeg years earlier.  Dkt. 54 ¶ 34; Ex. 5 at 47:12-16; MSJ at 2.  Just days after receiving Phase 3 results for this new, favored candidate, Lilly's CEO demanded a ████████████████ on Rezpeg, and no other drug.  Ex. 11 at -206.  In May 2022, Lilly began secretly exploring ██████████████████████████████████████ ████████████████████████████. Ex. 12 at -725-26; Ex. 13 (Ramseyer Tr.) at 225:1-228:10.  Lilly's "global brand development leader" for Rezpeg discussed ██████████████████████ ██████. Ex. 12 at -726; Ex. 13 at 238:5-240:16.  By late-May 2022, Rezpeg's funded and approved

Phase 2 eczema trial was [redacted] Ex. 14 at -612. There are ***zero*** other examples of Lilly approving and funding a trial, only to scrap the trial two months later.

**Study Populations**. While Lilly was deciding how to [redacted] Rezpeg in mid-2022, internal messages show that it sought to [redacted] rather than immediately terminating the program. Exs. 15, 16. Lilly executed this plan in June 2022 by changing the patient population in Rezpeg's Phase 2 eczema study from a "bio-naïve" population to a "bio-experienced" population—a move that Lilly's scientist slated to run the study, Dr. Carsten Schmitz, concluded did not [redacted] Ex. 17 (Schmitz Tr.) at 119:17-120:10; Ex. 16; Ex. 18 [redacted]; Ex. 19. This patient population change was extremely prejudicial to Nektar, as it meant Rezpeg could be no longer used as a first-line treatment (and would not compete with Lilly's first-line drug, lebrikizumab). Ex. 6 ¶ 90.

Here, again, Lilly treated Rezpeg differently from its other drugs. At the same time Lilly ditched plans to study Rezpeg in bio-naïve eczema patients, it [redacted]. Ex. 20; Ex. 21 at -583; Ex. 22 (Nirula Tr.) at 41:19-42:1. A jury could plainly conclude that this disparate treatment of comparable drugs did not comply with CRE.

Moreover, the jury will hear evidence of *why* Lilly chose to breach its obligations. Dr. Schmitz's messages illuminate that Lilly's purpose in changing the patient population was to [redacted] Ex. 23. Lilly's [redacted] hinged on Nektar [redacted] from Nektar. Exs. 15, 18; *see also* Ex. 24 [redacted]; Ex. 25. Lilly cannot insist that its narrative prevail before trial.

**Interim Analyses**. Lilly insisted on including [redacted] interim analyses in Rezpeg's Phase 2 eczema study design, including a premature futility analysis designed to enable a [redacted] Ex. 12 at -744-45; Ex. 26 at -127; Ex. 27. Here again, Lilly has not identified any other Phase 2 eczema trial it has conducted with so many interim analyses or a futility analysis based on [redacted] of study patients. Ex. 28 (Lilly RFA Response No. 64). Lilly rejected

1    a similar design for ▓▓▓▓▓ Phase 2 eczema trial.  Ex. 29 at -504-05; Ex. 21 at -584; Ex. 30 at -729.

2    Lilly's suggestion (MSJ at 19) that it was following its "standard" procedure by changing

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    ▓▓▓▓▓▓ is belied by the record and, at most, a fact issue.  Lilly grossly mischaracterizes Dr.

5    Zalevsky's testimony; he did not testify that Lilly followed ▓▓▓▓▓▓ by delaying Rezpeg's Phase

6    2 eczema trial.  Rather, the testimony Lilly quotes was about Lilly's ▓▓▓▓▓▓▓▓▓

7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, a separate issue.  Ex. 31 (Zalevsky Tr.) at 136:12-

8    138:3.  The record shows that Lilly scrapped Rezpeg's approved and funded Phase 2 eczema trial

9    following a ▓▓▓▓ order from Lilly's CEO that put Rezpeg on ▓▓▓▓▓▓▓▓▓▓▓▓

10   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 11 at -206; Ex. 12 at -725-26; Ex. 16.  Indeed, Lilly

11   received this supposed ▓▓▓▓▓▓▓▓ *before* it approved and funded Rezpeg's Phase 2 eczema trial.

12   Ex. 32 at -365; Ex. 33 (study funded and approved after Lilly received injection site reaction

13   mitigation results).  Further, there is evidence Lilly treated Rezpeg differently than other drugs.  Lilly

14   did not scrap ▓▓▓▓▓ Phase 2 trial because of an updated profile; rather, it ▓▓▓▓▓▓▓▓

15   ▓▓▓▓▓▓▓▓▓▓▓▓▓.  Ex. 34 at -636.

16                    **(b)        Triable Issues as to Lilly's Miscalculation of Rezpeg's Efficacy**

17   Lilly mischaracterizes Nektar's claims related to the miscalculated efficacy data as

18   highlighting a mere "mistake" and making a hindsight comparison to some other approach that "might

19   have 'been undertaken to produce a better result.'"  MSJ at 22 (citing *Shane Campbell Gallery, Inc. v.*

20   *Frieze Events, Inc.*, 838 F. App'x 608, 610 (2d Cir. 2020)).  Lilly cites no authority for the proposition

21   that carelessly conducted calculations cannot constitute a breach of CRE, and the issues Nektar raises

22   amount to far more than one "mistake."  Further, in declaring that the "uncontested evidence"

23   establishes Lilly's efforts were "sufficient," MSJ at 22, Lilly ignores overwhelming evidence to the

24   contrary, raising triable issues of fact that preclude summary judgment:

25   **Lilly's Failure to Supervise PRA**.  Lilly engaged a subcontractor, PRA, to help conduct

26   Phase 1 studies of Rezpeg in eczema and psoriasis, including calculating efficacy endpoints.  Ex. 35

27   (Lilly RFA Response No. 8).  The most important clinical endpoints measuring the efficacy of such

28   drugs are the Eczema Area Severity Index ("EASI") and the Psoriasis Area Severity Index ("PASI"),

1   respectively.  Ex. 28 (Lilly RFA Response Nos. 17, 26); Ex. 36 (Mostaghimi Rep.) ¶¶ 238-239.

2        Under its Agreement with Nektar, Lilly was liable for PRA's acts and omissions.  Agreement

3   § 4.10.  Its organizational plan with PRA similarly made Lilly responsible for ███████████

4   ████████████████████████████████████████  Ex. 37 at -848.  Yet Lilly did

5   not supervise PRA consistent with its obligations.  For instance, although Lilly maintains ███████

6   ████████████████████████████████████████████████████████

7   ████████████████████████.  Ex. 38; Ex. 39 (Rylance Tr.) at 37:5-8, 67:14-69:22.

8   Instead, Lilly merely ██████████████████████████████████████████

9   ████████  Ex. 40; Ex. 41 at 112-13.  And the statistician that Lilly assigned to oversee PRA's

10  efficacy calculations, ████████████████████████████████████████

11  ████████.  Ex. 42 (Zou Tr.) at 69:17-24, 84:10-12.  ██████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████.  *Id.* 30:2-31:5, 86:19-87:3, 87:24-88:8.  What Lilly

14  portrays as a "mistake" was, instead, the predictable consequence of abdicating its responsibilities.

15       **Lilly's Failure to Correctly Calculate Rezpeg's Efficacy**.  In addition to failing to meet its

16  obligations to supervise a subcontractor, Lilly also introduced its own errors.

17       In May 2022, a Lilly statistician, ████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████  Ex. 43 at -660.  ████████████████████████

20  ██████████████████.  *Id.* at -659, -660.  ██████████████████████████

21  ████████████████████████████████████████████████████

22  *Id.* at -659, -660.  In response, Lilly failed to ████████████████████████████

23  ████████████████.  Exs. 43, 44, 45.  Instead, ██████████████████████

24  ████████████████████████████████  Ex. 43 at -659.  ██████████████

25  ████████████████████████.  Ex. 42 at 208:7-9, 213:2-15; Ex. 46 (Klekotka Tr.) at 226:25-

26  229:23.  ████████████████████████████████████████████████.

27  Ex. 43.  ████████████████████████████████████████████████████

28  ██████████████████████████.  *Id.*; Ex. 47 (Manner Tr.) at 179:1-23.

1    This was not simply a mistake; rather, the egregious failure to accurately calculate Rezpeg's

2  efficacy arose because Lilly failed to apply the same effort, expertise, and resources as it did for its

3  other drugs.  Lilly staffed the trial with inexperienced personnel, made minimal effort to ensure basic

4  procedures were followed, and failed to devote the appropriate level of resources to perform standard

5  data checks.  Lilly did not make any comparable blunder for its own eczema drugs, ████████

6  ████████.  Ex. 48 at -378; Ex. 49 at -373; Ex. 17 at 333:18-25.  This was not happenstance:  no

7  error occurred with ████████, for instance, because Lilly had ████████████████████

8  ████████████████████████████████████  Ex. 49.  It did not ████████

9  ████████████ for Rezpeg.  Ex. 44 at -525; Ex. 45.  Lilly's argument that "Nektar cannot show

10  that the efforts Lilly made leading up to the mistake fell short when compared to Lilly's usual

11  process," MSJ at 22, is simply false.  A jury could, and should, reach exactly that conclusion.

12    **Good Research Practices**.  The above evidence also raises triable issues over whether Lilly

13  breached Agreement Schedule 4.8 for failing to use "Eli Lilly and Company Good Research

14  Practices," including "qualified" personnel and proper data management and review practices.  This is

15  a disputed factual issue.  Lilly's argument that Schedule 4.8 does not impose obligations on Lilly

16  relies on a disputed contract interpretation that should be rejected.  The very title of the schedule is

17  "***Eli Lilly and Company*** Good Research Practices."  Lilly's argument that the parties did not intend

18  for Lilly to follow its own Good Research Practices is no basis for summary judgment.

19    **(c)    Triable Issues as to Lilly's Breach of CRE Regarding Lupus**

20    Lilly is not entitled to summary judgment on Nektar's lupus-related CRE claim either:

21    **Insufficient Enrollment**.  During Rezpeg's Phase 2 lupus study, Lilly evaluated whether to

22  ████████ the study by ████████████████  Ex. 50 at -915.  Doing so would help ████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████  *Id.*; Ex. 51; Ex. 46 at 237:2-11, 245:3-17, 246:14-24; Ex. 52

26  (Kotzin Tr.) at 162:2-163:4.  ████████████████████████████████████

27  ████████████████████████  Ex. 52 at 183:7-23; Ex. 50 at -915.  Although Lilly ████

28  ████████████████████████████  it refused to do so for Rezpeg, despite Nektar's

1    disagreement.  Ex. 46 at 244:21-245:1, 246:7-13; Ex. 52 at 162:16-163:4, 177:13-16.

2         Lilly argues that ███████████████████ would not have impacted trial results and that

3    Nektar supposedly "agreed" with not doing so.  MSJ at 17.  But Nektar contests both points, laying

4    bare the dispute of material fact.  *See* Ex. 52 at 162:16-163:4.

5         **Protocol Deviations**.  Lilly's Phase 2 study of Rezpeg in lupus was plagued with errors not

6    seen in trials of its other drugs.  The study had a ████████████████████████████

7    ████████████████.  Ex. 53 at -236.  These deviations significantly ██████ the power of the

8    study.  *Id*. at -235.  Days before the study data was read out, Lilly noted ████████████████

9    ████████████████████████.  Ex. 54; Ex. 13 at 298:24-300:13.  Further, clinicians

10   conducting the trial ███████████████████████████████.  Ex. 55 at -217.

11        **Terminating With Market-Leading Efficacy**.  Rezpeg surpassed the "high" critical success

12   factor Lilly set for it on the BICLA endpoint, showing a 16.4% difference from placebo in one of the

13   doses.  This result outperformed ████████████████████████████████████

14   ████████████.  Ex. 55 at -183; Ex. 6 ¶ 195.  Key Opinion Leaders (expert advisers) that Nektar

15   consulted confirmed that ████████████████████████████████.  Ex. 52 at 210:1-

16   211:8; Ex. 31 at 389:9-392:20.  Yet Lilly refused to proceed to a Phase 3 study.

17        This is not simply a question of "judgment," it is a question of Lilly's efforts, expertise, and

18   resources for this drug and others.  ***No Lilly witness, including its designated deponent and its***

19   ***proffered expert, could*** ████████████████████████████████████████

20   ████████████.  Ex. 46 at 248:14-21; Ex. 56 (Buthusiem Tr.) at 212:21-213:25, 251:19-23.  In fact,

21   ████████████████████████████████████████████████████████████

22   ███.  Ex. 6 ¶¶ 164-167.  Lilly also ████████████████████████████████████

23   ████████████████████████████████████.  *Id*. ¶¶ 185-188, 199-204; Ex. 57

24   (Murray Tr.) at 173:20-174:12.  Nektar is not arguing Lilly was "bound" to conduct a Phase 3 trial for

25   Rezpeg.  But the inexplicably different treatment of Rezpeg versus Lilly's other candidates means a

26   jury could, and should, find that these efforts to develop Rezpeg fell short of CRE.

27        **Lilly's Quick Kill**.  According to Lilly's prespecified criteria, Rezpeg's performance in its

28   Phase 2 lupus trial should have triggered a ████████████████████████████ and ████████



1  ███████████████████████████████ to assess whether to move Rezpeg into

2  Phase 3 (triggering one of Nektar's milestone payments).  Ex. 55 at -183; Ex. 57 at 31:7-14, 111:2-11;

3  Agreement § 6.2.  Such discussions last ████████████ Ex. 57 at 30:25-31:5.

4          Instead, Lilly terminated Rezpeg's lupus development ████████████████████

5  ██.  Ex. 55 at -180; Dkt. 54, ¶ 54.  Lilly Chief Scientific Officer ("CSO") Dr. Daniel Skovronsky

6  ██████████████████████████████████████████.  *See* Ex. 58.

7  Lilly employees ██████████████████████████████████████

8  ████████████████████████████████████████████

9  ██████████████████████  That is self-evidently inconsistent with using Lilly's "normal"

10  efforts, expertise, and resources, particularly when compared to other candidates.  Lilly even put more

11  effort into assessing results from a lupus trial of its █████████████████████

12  ███████████████.  Ex. 61 (Robbins Reb. Rep.) ¶¶ 45-47.

              **2.      Triable Issues That Lilly Does Not Even Address**

14          In focusing on only three of the CRE breaches Nektar has alleged, Lilly ignores numerous

15  other triable issues of fact that preclude summary judgment.

              **(a)      Lilly's ████████████ and Pretextual ISR Claims**

17          A reasonable jury could also find that Lilly breached its CRE obligation by deviating from its

18  ████████████████████████████████████████████

19  ████████████  to delay Rezpeg's eczema development:

20  **Deviation From Policy** ███████████████████████████.  Ex. 46 at

21  47:25-48:5.  Prior to conducting Rezpeg's Phase 1 eczema trial, Lilly agreed upon a company-wide

22  ████████████████████████████████████████████

23  ██████████████████████████████████████.  Ex. 62 at -769;

24  Ex. 63 at -035; Ex. 64 (Lancaster Tr.) at 50:14-24, 91:20-25.  ████████████████

25  ████████████████████████████████████.  Ex. 28 (Lilly RFA

26  Response No. 52).  ████████████████████████████

27  ██████████.  Ex. 66 (Pfeifer Tr.) at 44:20-24; Ex. 57 at 141:4-7; Ex. 67 (Evans Tr.) at 232:6-22.

28  **Novel** ████████████.  Lilly also created a novel ███████████████████

1   ████████████████████████.  Ex. 46 at 128:25-129:14; 139:3-142:21; Ex. 68; Ex. 65 at -

2   811; Ex. 69 at -622.  Lilly's 30(b)(6) witness could not identify ████████████████████

3   ████████████.  Ex. 46 at 150:16-25.

4          **Pretextual Exaggeration of ISRs**.  While Lilly argues that ISRs from Rezpeg administration

5   raised "concerns" about Rezpeg's prospects and necessitated changes to Rezpeg's development

6   strategy, MSJ at 2, 19, the record shows otherwise.  Rezpeg's ISRs were mild to moderate and did not

7   ███████████████  Ex. 70 (Ashrafzadeh Tr.) at 95:1-12; Ex. 71 at -065.

8          When presented with data on Rezpeg ISRs in September 2021, six leading eczema experts told

9   Lilly they were ███████████████ because the ISRs were ███████████ and Rezpeg's impressive

10  ████████████ allowed for ISRs to be ███████████████████  Ex. 72 at -188.  In

11  March 2022, another group of renowned eczema experts reported ███████████████████

12  ██████████████████████.  Ex. 73 at -007.  Similarly, investors reviewing

13  published Rezpeg data ███████████████████ which they found █████████████████

14  ████████████  Ex. 74; Ex. 75 at -122.  The parties' market research confirmed that ████

15  ███████████████████████████████████████████████████████████

16  ███████████████████████████  Ex. 76 at -372; Ex. 77 at 29.

17         Lilly witnesses, moreover, ████████████████████████████████████████

18  ███████████.  Ex. 64 at 31:13-21; Ex. 78 (Krueger Tr.) at 94:17-21.  ████████████████

19  ████████████████████.  Ex. 78 at 27:11-20.  ████████████████████████

20  ███████████████████████████████████████████████████████████

21  ████.  Ex. 79 at -600; Ex. 64 at 158:2-159:25; Ex. 80 (Rao Rep.) ¶¶ 64-65, Tab 3.  A jury could

22  properly credit this evidence; Lilly's counterfactual narrative only highlights disputed factual issues.

23         **(b)    Lilly's Deprioritization of Rezpeg in Favor of Advancing**

24  **████████████████████████████████████████████████**

25         A jury could also find that Lilly breached by secretly deprioritizing Rezpeg's development and

26  holding a "bake-off" between Rezpeg and ████████, under which only one (here, ████████) would

27  advance to Phase 2 in eczema.  Indeed, in *Fortis Advisors LLC v. Johnson & Johnson*, the court held

28  that the defendant breached its CRE obligation by conducting a "showdown" between the plaintiff's

1    robotics system and its own.  2024 WL 4048060, at \*26 (Del. Ch. Sept. 4, 2024).

2    **Deprioritization Due to Lebrikizumab**.  The effect of Lilly's 2020 acquisition of

3    lebrikizumab on Rezpeg was immediate.  Internal meeting minutes show Lilly ██████████████

4    ████████████████████████████████████████.  Ex. 81 at -576; Ex. 25; Ex. 82 at -862; Ex. 83.

5    Lilly ██████ a planned Phase 2 Rezpeg study in peanut allergies, Ex. 84 at -156, and did not initiate

6    trials of Rezpeg in *any* indication after 2020.  Lilly pulled █████████████████████

7    ███████████████████████████████████████████████████ Exs. 85, 86, 87.  In text

8    messages about the personnel switch, Lilly VIPs made their priorities clear: █████████████

9    ████████████████████████████████ Ex. 83.

10    **Competition With ██████**.  Given lebrikizumab's prioritization, Lilly had to decide what to

11    do with Rezpeg and the third eczema drug in its portfolio, ██████.  Lilly employes began operating

12    on the ███████████████████████████████████████████████████████████████

13    ██████," Ex. 88 at -497, and ███████████████████████████████████████ Ex.

14    89 at -205.  This was so even though Lilly is not constrained by █████████████████

15    █████████████████████████████.  Ex. 5 at 53:14-54:4, 31:10-32:4.

16    This lebrikizumab-inspired competition between the other eczema candidates meant stalling

17    Rezpeg, which was ███████████████████████████████████████████████

18    ██████████████████████████ Ex. 88 at -500.  Lilly resolved to ████████████████

19    █████████████████████████████████████████████████████████████████

20    █████████████████████████████████████████████████████████████████

21    ██████.  Ex. 12 at -747; Exs. 89, 90; Ex. 5 at 53:14-54:4, 31:10-32:4.

22    Lilly pitted Rezpeg and ██████ against one another based on their Phase 1 data (of which

23    Rezpeg's was undercalculated) even though Lilly's CSO testified it is ██████ to make such

24    comparisons before obtaining ██████████████████████████████████████

25    ███████████████████ Ex. 5 at 60:15-61:18.  Eventually, Lilly chose █████████████

26    █████████████████████████████████████████████████████████████████

27    ████████████████████.  Ex. 84.  By fall 2022, Rezpeg, which had been ahead of ██████ in

28    development, was ████████████████████████████████████████ Ex. 91.

1    Lilly held Rezpeg back even though its employees believed Rezpeg had ██████████

2    ████████████████████████████████████████████████████████████████████████

3    ██████████████████████████████████████████. Ex. 20; *see also* Ex. 277 at -010.

**(c)    Lilly Abandoning Rezpeg and Pursuing Worse Eczema Drugs**

A reasonable jury could find that Lilly breached its CRE obligation by taking Lilly-owned drugs with worse safety and no better efficacy than Rezpeg into Phase 2 and Phase 3 eczema trials, but not conducting such trials for Rezpeg. *See* Ex. 6 ¶¶ 169-192. For example, ██████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████. *Id*. ¶¶ 190-192.

Lilly also conducted Phase 3 trials for ████████ in eczema even though ████████

████████████████████████. *Id.* ¶¶ 184-189.  Even Lilly's expert Dr. Krueger conceded that

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. Ex. 78 at 130:24-136:17 ██████████████

██████████████████████████████████████████████████████████████████.

**3.    Lilly's Position Conflicts With the Agreement and Case Law**

Just two months ago, this Court admonished the parties not to "waste time" on "contract interpretation" arguments at summary judgment. *See* Ex. 94 (3/27/25 Hearing Tr.) at 31:18-32:17 ("[Y]ou show me the language; I'll give you a text order that says 'Here's what the language says' and that's it. Okay? I can't do anything more than that. Those are fact issues."). Lilly has done precisely that. Despite Nektar identifying several clear breaches (or at a minimum, fact disputes over a breach), Lilly claims it is entitled to summary judgment because the CRE clause speaks to "efforts," and not decision-making and "judgments." MSJ at 2-3, 6, 15. Further, Lilly argues the parties agreed to a "dispute resolution framework" that is the exclusive mechanism by which Nektar could challenge Lilly's decision making. *Id*. Under this supposed "framework," Nektar could disagree with Lilly's decisions, but Lilly's position would "control" and Nektar was not permitted to further challenge "Lilly's choices" through "arbitration or litigation." *Id*. at 6, 17-18. Lilly's textual interpretation defies common sense and is impossible to square with the Agreement's terms.

*First*, Lilly's argument that the CRE provision does not govern the conduct that Nektar accuses is foreclosed by the contract's plain text. Lilly was obligated to develop Rezpeg using the "effort, expertise and resources normally used by [Lilly] . . . in light of . . . factors normally considered by [Lilly] *in making product portfolio decisions*." Agreement §§ 1.1, 4.9. If Lilly's CRE obligation did not "speak to" Lilly's "decisions," it would not require Lilly to take into account the "factors normally considered by [Lilly] in making product portfolio decisions." Further, "expertise" means "expert skill or knowledge in a particular subject." Black's Law Dictionary (12th ed. 2024). Lilly does not identify any judgments or decisions made *without* deploying its expertise.

Lilly identifies no case in which a court adopted this nonsensical interpretation in which a party can avoid a CRE obligation by simply labeling its breaches exercises of "judgment" or "decision-making." *See* MSJ at 15-16. To the contrary, several courts have squarely rejected Lilly's argument and ruled that a party's decisions violated a CRE clause. In *Holland Loader Co. v. FLSmidth A/S*, the court ruled that several of the defendant's "decision[s]" violated its CRE obligation. 313 F. Supp. 3d 447, 477 (S.D.N.Y. 2018) ("The most blatant evidence of FLS's failure to use [CRE] to actively promote the Holland products is *the decision* made in mid–2015 to table the Holland Loader products") (emphasis added). Further, in *Fortis*, the court held that several of the defendant's decisions, including conducting a "showdown" between competing robotics systems, violated a CRE clause. 2024 WL 4048060, at *26-29, 32; *see also 3DT Holdings LLC v. Bard Access Sys. Inc.*, 2022 WL 409082, at *12 (S.D.N.Y. Feb. 10, 2022) (denying summary judgment because the jury might find the defendant's resource allocation decisions were not commercially reasonable).

None of Lilly's cases supports its position that a party's decision-making or judgments can never violate a CRE clause. Lilly's principal authority, *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542 (S.D.N.Y. 2021) (*see* MSJ at 15), *undermines* its position, because the court there took as its task to "*examine whether [defendant's] decision[s] . . . were commercially reasonable*." *Id*. at 555. The several pages of analysis that followed demonstrate that decisions can and must be evaluated for compliance with CRE provisions—the *InspiRx* court simply concluded, on the merits, that the decisions in that case were not a breach. *See generally id*. at 557-63.

*Bancroft Com. v. Goroff*, 2014 WL 7409489 (D. Md. Dec. 31, 2014) (*see* MSJ at 15), also does

1    not support Lilly's position.  In *Bancroft*, the plaintiff alleged that the defendant breached its

2    obligation to use its "best efforts to secure appropriate . . . media to promote" the plaintiff's books. *Id.*

3    at *1.  In dismissing the claim, the court ruled that the plaintiff's allegations generally concerned the

4    defendant's failure to "garner a degree of publicity satisfactory to [plaintiff] where the contract speaks

5    not of results but of efforts."  *Id*. at *7.  That is not this case; Nektar's allegations are not based on

6    Lilly's failure to obtain "results," be it FDA approval or anything else, and nothing in *Bancroft*

7    suggests that decisions ***about what efforts to expend*** cannot violate an efforts clause.

8         *Shane Campbell v. Frieze Events*, 838 F. App'x 608 (2d. Cir. 2010), is likewise inapposite (*see*

9    MSJ at 22).  In *Shane Campbell*, the Second Circuit upheld dismissal of a CRE claim because the

10   plaintiff failed to "plausibly allege an objective standard of commercial reasonability" to which the

11   defendant was to be held. *Id*. at 609-10.  The Second Circuit made no holding about a party's right to

12   challenge its counter-party's judgments and decisions under a CRE clause.  None of these authorities,

13   and nothing in the Agreement itself, supports Lilly's effort to gut the CRE clause by claiming it does

14   not apply to Lilly's "decisions" or "judgments" about what efforts to exert.

15        ***Second***, Lilly's argument that Section 3.7(b)'s "dispute resolution framework" is the exclusive

16   avenue by which any of Lilly's decisions about Rezpeg could be challenged, and that Nektar gave up

17   its right to sue over those decisions, is belied by the text of that provision and several others.  Section

18   3.7 merely governs how Committees or Working Groups would work through deadlocks about how to

19   proceed.  Agreement §§ 3.7(a)-(b).  The disputes at issue here are expressly not within the jurisdiction

20   of these Committees or Working Groups, or at all subject to Section 3.7: "The Committees shall have

21   no authority to amend, modify or waive compliance with the terms and conditions of this Agreement,

22   or to interpret, alter, increase, expand, or waive compliance by a Party with, a Party's obligations

23   under this Agreement . . . in no event shall a Committee or Deciding Party have any authority or right

24   to amend the rights and obligations of the Parties under this Agreement." *Id.* § 3.7(c).

25        Instead, disputes about whether Lilly's actions with respect to Rezpeg are consistent with CRE

26   are governed by Section 13.1.  That provision, titled "Dispute Resolution," provides that for a

27   "dispute, controversy or claim under, arising out of or relating to this Agreement" that is "***related to***

28   ***whether [Lilly] has performed its obligations under this Agreement***," Nektar has the right to "avail

1  itself of, subject to the terms and conditions of [the] Agreement, ***any rights or remedies available at***

2  ***law or equity***." *Id.* § 13.1 (emphasis added).

3          This interpretation is reinforced by Section 11.3(d), which granted Nektar rights to "terminate"

4  or "maintain the Agreement" and "***pursue any legal or equitable remedy available to it***" should Lilly

5  breach its CRE obligation. *See also id.* §§ 11.3(a), 11.5 ("Termination is not the sole remedy under

6  this Agreement, and, whether or not termination is effected, ***all other remedies will remain available***

7  except as the Parties have expressly agreed to otherwise herein.") (emphasis added).

8          The Agreement thus sets forth a clear framework. Lilly had some discretion over Rezpeg's

9  development after the "Initial Development Phase," but that discretion was always cabined by its CRE

10 obligation. *Id.* § 4.9. Lilly did not have authority to make decisions over Rezpeg's development that

11 were inconsistent with CRE, and Nektar remained free to challenge Lilly's decisions that breached

12 that obligation in court, like any other breach of contract. *Id.* §§ 3.7(a), 11.3(a), 11.3(d), 13.1.

13         Lilly's position—that Nektar ceded full decision-making authority to Lilly over Rezpeg and

14 gave up its right to challenge "Lilly's choices" through "arbitration or litigation," and that Lilly could

15 make any "decision" with respect to Rezpeg with impunity—is absurd. *See* MSJ at 2-3, 6, 15. It

16 renders Lilly's CRE obligation and Sections 3.7(a), 11.3(a), 11.3(d), 13.1 illusory because every

17 application of efforts, expertise, and resources involves a decision—indeed, Lilly characterizes ***all***

18 Nektar's breach claims as relating to "judgments." Under Lilly's interpretation, nothing in the parties'

19 contract prevented Lilly from sabotaging Rezpeg in favor of competing drugs, by for example

20 exercising its "judgment" to allocate one employee to the Rezpeg team and reduce its budget to $1.

21 According to Lilly's argument, all Nektar could do—assuming it was even aware of these issues,

22 which it was not here because Lilly halted Rezpeg's development while "hid[ing] the timelines" from

23 Nektar, Exs. 15, 18, 62—is raise concerns about these "decisions" to Lilly under Section 3.7(b), and

24 then allow Lilly to determine whether it breached the Agreement. The Court should reject this

25 nonsensical interpretation. *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992); *see also Newmont Mines*

26 *Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (interpretations that lead to "absurd results

27 should be avoided") (New York law); *Cequel Commc'ns, LLC v. Mox Networks, LLC*, 2024 WL

28 3924709, at *11 (S.D.N.Y. Aug. 23, 2024) ("New York law . . . provides that a contract should not be

1   interpreted to produce a result that is absurd [or] commercially unreasonable.").

2       **Third**, even if Lilly's interpretation of the Agreement somehow could be credited as plausible,

3   Nektar's understanding of the contract terms is at minimum reasonable.   Parties' competing

4   interpretations preclude summary judgment.  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,

5   424 F.3d 195, 205 (2d Cir. 2005) (New York law) ("[W]hen the meaning of the contract is ambiguous

6   and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot

7   be resolved on a motion for summary judgment"); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,

8   842 F. Supp. 2d 682, 706 (S.D.N.Y. 2012) (same).

9       **B.       The Implied Covenant Claim Should Proceed to Trial**

10      "In New York, all contracts imply a covenant of good faith and fair dealing in the course of

11  performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  The

12  implied covenant "is breached when a party acts in a manner that deprives the other party of the

13  benefits of the contract." *Frydman v. Endurance Am. Ins. Co.*, 228 N.Y.S.3d 614, 615 (App. Div.

14  2025).  There is overwhelming evidence that Lilly breached the implied covenant, including by ██

15  ████████████████████████████████████████████████████████████████████████████████████████

16  ██████████████████████.  Lilly does not dispute any of this.  Instead, it raises several

17  arguments that it asserts preclude Nektar's implied covenant claim as a matter of law.  None has merit.

18      **First**, Lilly argues that Nektar's implied covenant claim is duplicative of its breach of contract

19  claim because they rest on the same "factual predicate."  MSJ at 24.  But "[a] claim for breach of

20  contract does not preclude a party from bringing a claim for breach of the implied covenant of good

21  faith and fair dealing when they are brought in the alternative." *Fantozzi v. Axsys Techs., Inc.*, 2008

22  WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008).  For example, "where, as here, there is a dispute over the

23  meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types

24  of claims in the alternative." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 206 (2d Cir. 2018).

25      Here, the parties dispute the CRE clause's meaning.  Lilly contends that "efforts, expertise and

26  resources" does not include "judgments," which Nektar disputes.  *See supra* § I.A.3.  This dispute

27  dooms Lilly's argument.  "On a summary judgment motion where the contract meaning is yet to be

28  determined, a party can continue in both a claim for breach of contract and one for breach of the

covenant of good faith and fair dealing." *Fantozzi*, 2008 WL 4866054, at *7. Indeed, if Lilly is correct that its "judgments" are not governed by the express terms of the Agreement, the need for them to be governed by background principles of good faith and fair dealing would be even stronger.

**Second**, Lilly wrongly contends Nektar's good-faith theories would impose obligations on Lilly inconsistent with the Agreement's express terms supposedly giving Lilly unfettered discretion. MSJ at 24.[1] That argument misunderstands the nature of the implied covenant. Even where "a contract gives a party discretion," the party exercising such discretion "must not act arbitrarily or irrationally." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC,* 2021 WL 3668092, at *7 (S.D.N.Y. Aug. 17, 2021). For example, a party may violate the implied covenant by acting with an "improper motive" rather than for "valid, good faith" reasons. *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575-77 (2d Cir. 1994) (New York law).

The evidence shows Lilly took actions intended to ███████████████████████ ███████████████████. Lilly's argument that these are "judgment" calls immune from liability because anything less would impose a "different[] standard" on Lilly, MSJ at 24, does not reflect New York law. *See Travellers*, 41 F.3d at 1575-77; *Pleiades Publ'g., Inc. v. Springer Sci. + Bus. Media LLC*, 987 N.Y.S.2d 36, 36-37 (App. Div. 2014) ("While the agreement granted defendant the discretion to decide how to market and promote [plaintiff's products], defendant did not have the right to exercise that discretion in such a way as to frustrate plaintiff's rights under the agreement, deprive plaintiff of the value of its [products], or benefit itself at plaintiff's expense.").

### C.    The Post-Termination Breach Claim Should Proceed to Trial

Contrary to Lilly's contention that Nektar has not identified what Lilly failed to return after the Agreement terminated, MSJ at 11, 25, Nektar has evidence raising a triable issue of fact on this issue too. Nektar's Chief R&D Officer, Dr. Jonathan Zalevsky, testified that Nektar has a ███████ ███████████ itemizing Lilly's failures. Ex. 31 at 376:1-377:23. Dr. Christie Fanton, the Nektar employee in charge of ██████████████████████████ testified that Lilly has failed to return █████████████████ from Rezpeg's ████████████████████████

---

[1]    Nektar is not seeking damages for the fact of termination and thus does not address Lilly's argument that the implied covenant cannot negate its right to terminate at-will. *See* MSJ at 24.

1    ██████████ Ex. 95 (Fanton Tr.) at 17:20-23, 175:20-176:13. Nektar also requested, but never

2    received, ████████████████████████████████████████. Ex. 31 at 376:17-20.

3    **II.    TRIABLE ISSUES OF FACT AND ESTABLISHED PRINCIPLES OF LAW PRECLUDE SUMMARY JUDGMENT ON DAMAGES**

4

5            Lilly's breaches have caused significant harm, including by delaying Rezpeg's development

6    and causing Nektar to miss out on Milestone and royalty payments. Nektar has set forth several

7    distinct damages theories, including (1) the diminution in Rezpeg's value due to Lilly's breaches; (2)

8    lost Milestone and royalty payments; (3) trial costs; and (4) Lilly's failure to return Rezpeg materials.

9            Lilly does not offer a damages calculation of its own. Rather, Lilly argues that in the event it

10   is found liable, the Agreement bars Nektar from recovering any damages. Lilly identifies ***no***

11   ***authority*** supporting its position, and there is none.

12           **A.    Nektar Can Recover for Diminution in Rezpeg's Value**

13           Because Rezpeg has been returned to Nektar, calculating damages requires ascertaining

14   Rezpeg's diminution in value due to Lilly's breaches. To determine that amount, Nektar's damages

15   expert, Dr. Mohan Rao, ████████████████████████████████████████████████████

16   ████████████████████████████████████████. Ex. 80 ¶¶ 45-47. Dr. Rao

17   concludes that ████████████████████████████████████████████████

18   ████████████████████. *Id.* ¶ 11. He calculates damages for the valuation reduction as between

19   ████████████████████, depending on the indication and breach date. *Id.*

20           Lilly offers no comparable expert analysis to dispute any of this. Instead, Lilly wrongly argues

21   Dr. Rao's model, and Nektar's damages claims, amount to a "lost profit analysis" precluded by a

22   provision of the Agreement that precludes several types of "special damages, including lost profits."

23   Agreement § 10.6. That argument depends on at least three unsupported and incorrect assumptions:

24   (1) diminution in value is the same as "lost profits" (it is not); (2) the liability provision in the

25   Agreement precludes recovery of general damages (it does not); and (3) the provision's exception for

26   "damages arising out of the gross negligence or willful misconduct of the liable party" does not apply

27   (it does, and at a minimum presents a disputed issue of material fact).

28           **1.    Lost Asset Value Is Legally Distinct From Lost Profits**

1    Lilly fundamentally mischaracterizes Nektar's damages theory as a "lost profits analysis" to

2    argue that it is barred by the Agreement's partial lost profits waiver.  MSJ at 14.  But Dr. Rao

3    calculates Rezpeg's ███████████, a measure of damages legally distinct from lost profits, even

4    though future profits are one portion of an asset's value.  Lilly's argument is also inconsistent with

5    New York law, including in a leading decision by the Second Circuit, and should be rejected.

6    In *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000), the Second Circuit, applying New York

7    law, ***rejected the argument Lilly asserts here***.  There, the district court granted summary judgment to

8    the defendant, holding that the plaintiff could not recover damages for lost profits and that the

9    plaintiff's separate request for lost asset damages was "nothing more than a 'back door' attempt to

10   recover lost profits."  *Id*. at 171.  The Second Circuit reversed, holding that lost profits and damages

11   for the diminished value of an asset are "separate and distinct categories of damages," and that the

12   unavailability of lost profits "in no way impairs" the ability to seek lost asset value.  *Id.* at 175-76.

13   Other courts have reached the same conclusion: "While [lost asset] damages takes 'future

14   profits into account' indirectly, as asset prices reflect the income streams that can be generated with

15   them, it is not the same as lost profits."  *See N. Am. Photon Infotech Ltd. v. ZoomInfo LLC*, 2021 WL

16   4482208, at *7 (S.D.N.Y. Sept. 30, 2021) (New York law); *ChemImage Corp. v. Johnson & Johnson*,

17   2025 WL 1547616, at *19 (S.D.N.Y. May 30, 2025) ("In addition to lost profits, however, a

18   defendant's breach of contract may also cause a party to lose 'an income-producing asset' . . . whose

19   fair market value 'may be based on a buyer's projections of what income he could derive from the

20   asset in the future.'") (New York law); *Atlanta Channel, Inc. v. Solomon*, 583 F. Supp. 3d 174, 198

21   (D.D.C. 2022) ("Lost profits and diminution in asset value are distinct measures of damages"); *Kreg

22   Therapeutics, Inc. v. VitalGo, Inc.*, 2017 WL 11887460, at *5 (N.D. Ill. Sept. 19, 2017) ("[C]ourts

23   have universally recognized that lost profit damages and lost asset damages are separate and distinct

24   categories of damages."); *Pacific Northwest Solar, LLC v. Northwestern Corp.*, 2023 WL 2945314, at

25   *1, *4 (9th Cir. Apr. 14, 2023) (vacating improper lost profits award, but declining to "reduce the

26   amount of the judgment to zero" because the judgment also included diminished asset value damages).

27   Lilly identifies no authority supporting its argument that diminution in value damages are

28   legally equivalent to lost profits.  Indeed, neither of Lilly's cases addresses diminution in value

damages at all.  In *That's What She Said, Inc. v. Gutter Games Ltd*., 2024 WL 3678473 (S.D.N.Y. Aug. 5, 2024), the plaintiff expressly sought "lost profit damages."  *Id.* at *16.  *Capstone Logistics Holdings, Inc. v. Navarrete*, 2018 WL 6786237, at *1, *5 (S.D.N.Y. Dec. 13, 2018), is even more inapposite, as it only related to whether defendant's costs were relevant to calculating plaintiff's lost profits.  The statement Lilly selectively excerpts—that, "in performing a lost profits analysis, 'the economic loss suffered by a business is a loss of net profits,' not revenue"—has no application to the distinction between lost profits and diminution in value, or to this case at all.

### 2.    Lost Asset Value Is Not a Form of Special Damages Here

Lilly also mischaracterizes and greatly expands the Agreement's liability limitation provision, which precludes several types of "special damages, including lost profits."  Agreement § 10.6.  It does *not* preclude the recovery of general damages, of any type.  But the loss in Rezpeg's value is a general damage, not a special or consequential damage, so it is not barred by any waiver.

"[L]ost asset damages can be either general or consequential depending on the asset lost." *ChemImage*, 2025 WL 1547616, at *20.  Where a plaintiff seeks the market value of the asset at issue under the contract, the damages sought are general.  *Id*.  "For example, if a party breached a contract to agree to a lease, lost asset damages for the value of the lease would be general because the lease would be the promised performance." *ZoomInfo*, 2021 WL 4482208, at *7.  "But if a party breached a contract and the breach incidentally led to the loss of a separate valuable supply agreement, the asset value of the supply agreement would be consequential damages." *Id.*

Here, the performance Lilly promised was to use CRE to develop and commercialize Rezpeg. Because Nektar seeks to recover Rezpeg's market value lost due to Lilly's failure to use CRE, its lost asset damages are general rather than special or consequential.  *ChemImage* is instructive.  There, plaintiff sought to recover for "IP impairment" calculated based on the "market value" of IP defendant had promised to return.  2025 WL 1547616, at *19-20.  Defendant argued these damages were prohibited by the parties' agreement as consequential damages.  *Id*.  The court disagreed, reasoning that because plaintiff sought only the market value of the very performance promised, the damages were general and thus not included in the agreement's liability limitation provision.  *Id.; see also ZoomInfo LLC*, 2021 WL 4482208, at *7-8 (denying summary judgment on damages and finding lost

asset damages were general damages because they stemmed from the contract the parties entered rather than a hypothetical contract); *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 152 (2012) (loss in market value of plaintiff's property were general damages, rather than consequential damages barred by the parties' contract, where it amounted to loss of benefit of bargain).

Lilly may point to dicta in *Schonfeld* describing lost asset damages as "consequential, rather than general, in nature," but lost asset damages were only consequential there because they related to a collateral business arrangement and were not part of the contract that was breached. 218 F.3d at 169-171 (plaintiff suing to recover value of collateral "supply agreements" due to breach of a separate "interim agreement"). *Schonfeld* does not stand for the proposition that lost asset damages are *per se* consequential, as evidenced by multiple New York cases decided after *Schonfeld* (and citing it) concluding lost asset damages were general damages. *See ZoomInfo LLC*, 2021 WL 4482208, at *7-8; *Latham Land*, 948 N.Y.S.2d at 152; *ChemImage Corp.*, 2025 WL 1547616, at *19-20.

For the same reason, the Agreement's bar on "remote, speculative, punitive or exemplary, or other special damages, including lost profits" would not apply to Nektar's damages ***even if they were lost profits***. "Lost profits may be either general or consequential damages," and contracts that bar special lost profit damages do not bar general lost profit damages. *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789, 804-05 (N.D. Ill. 2018) (applying New York law and denying summary judgment because viewing "lost profits" in the "context of surrounding words," "it is not reasonable to interpret the term to refer to general lost profit damages"); *In re Indesco Int'l, Inc.*, 451 B.R. 274, 315–16 (Bankr. S.D.N.Y. 2011) (liability limitation prohibited "recovery of consequential lost profits, but not general lost profits"); *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 806 (N.Y. 2014) ("lost profits" are general damages where, as here "the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract").

### 3. The Lost Profits Waiver Does Not Apply

Lilly's lost profits argument fails for the independent reason that Section 10.6 contains an exception where damages arise out of "gross negligence or willful misconduct." Agreement § 10.6. Lilly conspicuously omits this text from its motion and does not dispute that whether its conduct constituted gross negligence or willful misconduct is a disputed factual issue for the jury to resolve.

1    *See Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 900-01 (N.D. Cal. 2011) (proof of "intentional

2    wrongdoing" may render inoperable a contract's prohibition of lost profits under New York law);

3    *Hanover Ins. Co. v. D & W Cent. Station Alarm Co.*, 560 N.Y.S.2d 293, 295 (1990) (disputed issues

4    of fact whether defendant acted with "gross negligence" precluded summary judgment based on

5    liability limitation provision); *Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 847 N.Y.S.2d 49, 53, 57

6    (App. Div. 2007) (affirming denial of summary judgment where, despite liability exclusion provision,

7    evidence existed that defendant's conduct was "willful or grossly negligent").

8                    **4.    Nektar's Lost Asset Value Claim Is Not Speculative**

9            In a throwaway eight-word argument, Lilly's argues that Nektar's damages are impermissibly

10   "speculative." *See* MSJ at 13.  The Court need not address this "undeveloped argument." *Caccuri v.*

11   *Sony Interactive Entm't. LLC*, 735 F. Supp. 3d 1139, 1151 (N.D. Cal. 2024).  In any event, the

12   argument is wrong.  The case Lilly cites uses an inapplicable standard that does not address lost asset

13   damages.  *InspiRx*, 554 F. Supp. 3d at 563.  "The market value of an income-producing asset is

14   inherently less speculative than lost profits because it is determined at a single point in time."

15   *Schonfeld*, 218 F.3d at 177.  For this reason, "it is appropriate to apply these proof requirements more

16   leniently than is the case with proof of lost profits." *Id.*  Nektar's proffered expert testimony on

17   Rezpeg's value is sufficient to establish a stable foundation for Rezpeg's value on summary judgment.

18   *Id.* at 180; *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 2016 WL 3098842, at *15-17 (S.D.N.Y.

19   June 1, 2016) (expert valuation based on lost asset claim held to be "sufficient evidence of damages . .

20   . to survive summary judgment"); *Gao v. Sidhu*, 2013 WL 2896995, at *4 (S.D.N.Y. June 13, 2013)

21   (recommending judgment for plaintiff where expert's DCF valuation established damages).

22           **B.    The Termination Clause Does Not Prevent Recovery of Milestones and Royalties**

23           Lilly wrongly contends that Nektar's second damages methodology—lost Milestone and

24   royalty payments—are precluded by its right to terminate the Agreement.  MSJ at 12-13.  This

25   argument lacks any support in New York law and recycles the same failed argument Lilly advanced in

26   its motion to dismiss.  Dkt. 32 at 11-12; Dkt. 38 at 6; Dkt. 45.  Adopting Lilly's position would also

27   render the CRE provision illusory and create a perverse incentive to destroy Rezpeg's value, as long

28   as Lilly remembered to terminate the Agreement to insulate itself from liability.  That is not what the

1    parties intended, nor what New York law permits.

2        **First**, Nektar is not attempting to "requir[e] Lilly to make payments that would have been

3    available only absent the intervening cause of a termination."  MSJ at 12.  Rather, Nektar seeks

4    payments that would have been "available" absent breaches that took place long before the

5    termination. These **pre**-termination breaches include Lilly's flawed lupus study conduct and analysis

6    from August 2020 to February 2023, and Lilly's miscalculation of Rezpeg's efficacy in 2021.  Dkt.

7    62-2 ¶¶ 42, 70.  Dr. Rao calculated damages based on █████████████████████

8    ████████████████████████████████████████████████.  Ex. 80 ¶¶ 21, 74-75.

9        Lilly's argument that Milestone and royalty payments are precluded because "Rezpeg never

10    advanced to those stages," MSJ at 12, only underscores a disputed issue of material fact:  whether,

11    **but-for Lilly's failure** to use CRE and good faith, Rezpeg **would have achieved** regulatory and

12    commercial success.  This is often the central dispute in CRE cases.  *See Trireme*, 2021 WL 3668092,

13    at *3-4 (denying motion to dismiss implied covenant claim brought over failure to exercise reasonable

14    efforts and achieve milestone); *Fortis*, 2024 WL 4048060, at *56 (in breach of CRE and implied

15    covenant case, awarding $1 billion in earnout payments for milestones defendant failed to achieve);

16    *SRS v. Alexion Pharms., Inc.*, No. 2020-1069 MTZ (Del. Ch. June 11, 2025) (Ex. 97) (awarding $180

17    million in lost milestone payments where CRE breach decreased likelihood of achieving milestones).

18        **Second**, Lilly's argument that permitting Nektar to recover lost Milestones and royalties would

19    "nullify" Lilly's at-will termination rights makes no sense and is inconsistent with the Agreement's

20    terms.  MSJ at 12-13.  Lilly's right to terminate the Agreement allowed Lilly to "walk away" from its

21    obligation to **continue** using CRE to develop Rezpeg.  Agreement § 11.2.  It is not a "get out of jail

22    free card" that relieves Lilly from paying damages for having **already** breached its CRE obligation.

23    Indeed, the Agreement has a limitation-of-liability section that says nothing about Lilly's termination

24    rights cutting off Nektar's right to seek lost payments.  *Id*. § 10.6.

25        **Third**, courts applying New York law have awarded damages even where the agreement was

26    terminated, which contradicts Lilly's argument.  *Matter of Arb. between Cole Pub. Co. v. John Wiley

27    & Sons, Inc.*, 1994 WL 532898, at *1-2 (S.D.N.Y. Sept. 29, 1994) (affirming award of lost profits

28    under sales contract based on sales projection even though defendant "unilaterally terminated" the

contract). And where agreements were not terminated, courts have left it to the jury to decide whether termination was likely. *Evans v. Ithaca Urb. Renewal Agency*, 205 A.D.2d 844, 847 (App. Div. 1994) (where termination notice provision was not invoked, jury was properly instructed to determine the likelihood of defendants issuing a notice).

Here, again, Lilly fails to cite *any* caselaw, from New York or elsewhere, supporting its sweeping proposition that an at-will termination provision defeats damages claims for pre-termination breaches. The sole case it cites is completely inapposite. *Gilsey v. Wm. Hengerer Co.*, 147 N.Y.S.2d 210 (1955) (per curiam)—a one-paragraph decision from 1955—involved a claim against a decedent's employer for a prospective bonus under his employment contract. *Id.* The court held that because his employment contract was terminable at-will, there was no guarantee the bonus would have been paid had he not died. *Id.* The case did not involve pre-termination breaches.

### C.    Lilly Ignores Other Aspects of Nektar's Pre-Termination Damages

Lilly focuses on what it calls Nektar's "lost profit" damages, disregarding that Nektar's damages encompass more than Rezpeg's loss in value. For instance, Lilly was obligated, but failed, to run four Phase 2 trials. Agreement § 4.9; Ex. 96 at -538. Nektar must now bear these increased development costs, another claimed harm. Dkt. 62-2 ¶ 117. The Court should not grant Lilly's motion based on an incomplete assessment of Nektar's damages.

### D.    Nektar Was Harmed by Lilly's Delay in Returning Rezpeg Materials

Lilly fares no better in arguing that Nektar cannot recover for Lilly's failure to return Rezpeg materials. Multiple witnesses testified that Lilly failed to return ███████████ it needs. Ex. 95 at 175:20-176:13; Ex. 31 at 376:1-377:23. A jury may find Lilly's actions contributed to Rezpeg's delay to market, and Nektar is not obligated to put forward expert testimony to establish damages from this breach, particularly where Nektar has fact witnesses on this issue. In *Barnhart v. Home Depot U.S.A., Inc.*, 2007 WL 7700435 (N.D.N.Y. Mar. 30, 2007), cited by Lilly, the plaintiffs relied "heavily" on an expert to establish their claims. *Id.* at *1. Because the expert was excluded, plaintiffs could not meet their burden. But that does not mean that all damages issues require expert testimony.

### CONCLUSION

For the foregoing reasons, the Court should deny Lilly's motion for summary judgment.

1   DATED:  June 12, 2025                Respectfully submitted,

2                                        QUINN EMANUEL URQUHART
                                            & SULLIVAN, LLP
3
                                         By:   _/s/ Yury Kapgan_____
4                                              Yury Kapgan
                                               Diane Doolittle
5                                              David Elihu
                                               Suong Nguyen
6                                              Kyle Batter
                                               Jimmy Bieber
7

8                                              *Attorneys for Plaintiff*
                                               *Nektar Therapeutics*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NEKTAR'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT