QUINN EMANUEL URQUHART & SULLIVAN, LLP
Diane M. Doolittle (Bar No. 142046)
dianedoolittle@quinnemanuel.com
Yury Kapgan (Bar No. 218366)
yurykapgan@quinnemanuel.com
Suong Nguyen (Bar No. 237557)
suongnguyen@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801 5000

David M. Elihu (Bar No. 303043)
davidelihu@quinnemanuel.com
Jimmy Bieber (Bar No. 301639)
jimmybieber@quinnemanuel.com
Julia Choe (Bar No. 287038)
juliachoe@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443 3000

*Attorneys for Plaintiff*
*Nektar Therapeutics*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>            Plaintiff,<br><br>    vs.<br><br>ELI LILLY & CO.,<br><br>            Defendant. | CASE NO. 3:23-cv-03943-JD<br><br>**PLAINTIFF NEKTAR THERAPEUTICS' PROFFER REGARDING EXPERT TESTIMONY**<br><br>Hon. James Donato |

Plaintiff Nektar Therapeutics ("Nektar") respectfully submits this proffer in response to the Court's March 24, 2026 order instructing each party to submit an evidence proffer "identifying the specific proposed opinions their expert witnesses will provide at trial, followed by a statement of the foundation, relevance, and usefulness to the jury of each opinion." Dkt. 313. Nektar identifies Dr. Arash Mostaghimi as its clinician expert, Dr. Mark Robbins as its drug development and regulatory affairs expert, and Dr. Mohan Rao as its commercial and damages expert.

## I.    DR. ARASH MOSTAGHIMI

Dr. Mostaghimi is a physician and clinical trial expert who Nektar retained to opine on Rezpeg's therapeutic potential from the perspective of a practicing physician and to provide rebuttal testimony on that subject.

Dr. Mostaghimi is a physician in the Department of Dermatology at Brigham and Women's Hospital in Boston, Massachusetts, where he serves as Vice Chair of Clinical Trials and Innovation, Director of the Dermatology Inpatient Service, and Co-Director of the Complex Medical Dermatology Fellowship Program. He treats patients with complex skin diseases, including lupus and eczema. He has served as a principal or co-investigator in eight clinical trials, consulted on others, oversees clinical trials at Brigham and Women's—including lupus and eczema trials—and has published over 200 peer-reviewed articles, including on lupus and eczema. Dr. Mostaghimi holds an MD from Harvard Medical School, a master's in public administration from the Harvard Kennedy School, and a master's in public health from the Harvard TH Chan School of Public Health, and also serves as an Associate Professor of Dermatology at Harvard Medical School.

### A.    Rezpeg Has the Potential to Address Significant Unmet Need

**Opinion**. Dr. Mostaghimi intends to opine that Rezpeg presents a novel approach to treating eczema and lupus, has a favorable product profile and advantages over existing treatments for those diseases, and has the potential to fill a significant unmet need in those treatment markets. Dr. Mostaghimi will also explain, from the perspective of a treating physician, how prescribing decisions are made and why Rezpeg's benefits make it a clinically attractive option.

**Foundation**. Dr. Mostaghimi's opinions on Rezpeg's therapeutic promise are grounded in: (1) an explanation of the etiology of eczema and lupus; (2) an analysis of current treatment options

for eczema and lupus; (3) an explanation of Rezpeg's mechanism of action; and (4) a comparison of Rezpeg's clinical trial data with the data and mechanisms of current treatment options for eczema and lupus. Dr. Mostaghimi's opinions are supported by peer-reviewed literature and his education, experience treating eczema and lupus patients, knowledge of prescribing habits, and research in developing treatment strategies.

**Relevance and Usefulness**. Lilly agreed to use "Commercially Reasonable Efforts" ("CRE") to develop and commercialize Rezpeg. Dkt. 33-2 (Agreement) §§ 1.1, 4.5. This required Lilly to develop Rezpeg using the "effort, expertise and resources" that Lilly "normally used" to develop "comparable" products "at a similar stage of development" taking numerous factors, such as "safety and efficacy," into account (the "CRE Factors"). *See id*. Dr. Mostaghimi's opinions on Rezpeg's therapeutic potential are relevant to Lilly's liability under the License Agreement and addresses several CRE Factors including "product profile" and "the competitiveness of the marketplace." Dkt. 33-2, § 1.1. They also undermine Lilly's defense that Rezpeg was clinically undesirable and insufficiently efficacious to be used as a lupus treatment or "first-line" eczema treatment.

Dr. Mostaghimi's opinions are useful because they will help the jury understand complicated medical and scientific issues including what causes eczema and lupus, how medications in the marketplace treat those diseases, the shortcomings and side effects of currently marketed treatments, and what advantages Rezpeg offers to patients so the jury can judge whether Rezpeg could fill a real gap the existing treatments leave open—a key disputed factual issue.

**B.    Injection Site Reactions Are No Barrier to Rezpeg's Adoption**

**Opinion**. Dr. Mostaghimi intends to opine that injection site reactions ("ISR") are a common side effect of injectable biologics, and that ISRs from Rezpeg administration are generally mild-to-moderate, self-resolving, and less concerning clinically than certain side effects associated with existing eczema and lupus medications. He will further opine that ISRs from Rezpeg administration would not pose a significant barrier to physicians prescribing it, particularly in light of Rezpeg's potential clinical benefits. Dr. Mostaghimi will also explain how Lilly's analysis of ISR solicitation, grading, and presentation practices likely overstated their risk and was inconsistent with Lilly's practices developing other drugs. Dr. Mostaghimi will further opine that ISRs do not undermine

Rezpeg's clinical viability and can potentially be mitigated through further clinical development.

**Foundation**. Dr. Mostaghimi's opinions are based on: (1) an analysis of data from Rezpeg's clinical trials; (2) an analysis of successfully commercialized biologics that have ISRs as a side effect; (3) a comparison of ISRs from Rezpeg use with side-effects of other drugs Lilly and other companies developed to treat eczema and lupus; and (4) an assessment of the clinical trial designs and practices Lilly deployed in Rezpeg's trials. They are grounded in Dr. Mostaghimi's experience treating eczema and lupus patients, his expertise in interpreting clinical trial data, and his experience conducting clinical trials. Dr. Mostaghimi supports his opinion by citing industry standards, FDA Guidance, and peer-reviewed literature.

**Relevance and Usefulness**. Dr. Mostaghimi's opinions on ISRs, coming from the perspective of a physician who treats eczema and lupus patients, are relevant because they undermine Lilly's principal defense—that ISRs limited Rezpeg's potential prescribing and uptake as an eczema and lupus drug. Dr. Mostaghimi's opinion also relates to Rezpeg's "product profile" and Lilly's "normal" adverse event collection practices and is thus relevant to Lilly's liability. Dkt. 33-2, § 1.1.

Dr. Mostaghimi's opinions are useful because Lilly's central defense turns on a clinical judgment—that eczema and lupus doctors would not prescribe Rezpeg because of ISRs—and the jury will greatly benefit from hearing how a physician who currently treats patients suffering from those diseases views ISRs from Rezpeg administration. They also provide much needed detail on the side-effect profiles of eczema and lupus treatments and how physicians balance side-effects against the benefits a treatment may offer. Dr. Mostaghimi will also help the jury understand how adverse event "solicitation" (which Lilly employed in Rezpeg trials) can bias results and inflate reported ISR rates.

**C.** **Lilly's Failure to Correctly Calculate Rezpeg's Efficacy Data, Flawed Clinical Trial Designs, and Failure to Advance Rezpeg**

**Opinion**. Dr. Mostaghimi intends to explain standard practices for clinical trial data verification and quality control and will illustrate how Lilly's failure to correctly calculate critical efficacy data from Rezpeg's clinical trials markedly departed from those standards and from Lilly's practices developing other eczema drugs. Dr. Mostaghimi will further opine that, from the perspective of a treating physician evaluating the drug, the efficacy miscalculation was material to

the assessment of Rezpeg's clinical performance, and that Lilly's delays to Rezpeg's eczema development—and its plan for a trial with ███ interim analyses permitting termination on data from just ███ of enrolled bio-naïve patients—lacked a clinical rationale.

**Foundation**.  Dr. Mostaghimi's opinions are based on: (1) an analysis of the clinical trial process and how sponsors ensure accurate clinical data is generated; (2) an assessment of how Lilly's failure to take basic steps to oversee Rezpeg's clinical trials compares with industry standards and Lilly's own practices; and (3) an analysis of clinical trial designs and Lilly's purported basis for delaying Rezpeg's development.  Dr. Mostaghimi's opinions are supported by his extensive experience running and overseeing clinical trials, his experience as a clinician treating eczema patients, peer-reviewed literature, and FDA Guidance documents.

**Relevance and Usefulness**.  Dr. Mostaghimi's opinions are relevant because they address central disputes regarding Lilly's failure to oversee Rezpeg's clinical trials and to correctly calculate and report Rezpeg's efficacy, and whether Lilly's clinical trial designs and delays to Rezpeg's eczema development lacked a clinical rationale.  These opinions will undermine Lilly's defenses and illuminate for the jury how Lilly's clinical-trial conduct and oversight for Rezpeg departed from accepted practice for its other drugs.

Dr. Mostaghimi's opinions are useful because they explain complicated industry standards and best practices for conducting clinical trials and will help the jury understand whether Lilly's failure to supervise its CRO and correctly calculate Rezpeg's efficacy deviated from those standards. Dr. Mostaghimi's specialized knowledge of the clinical trial process and view of Rezpeg's benefits from the perspective of a physician will also help the jury resolve critical factual disputes regarding whether Lilly's planned trial with ███ interim analyses, and its decision to scrap a Rezpeg trial in "bio-naïve" patients, were clinically justified or a path to thwarting Rezpeg's eczema development.

## II.    DR. MARK ROBBINS

Dr. Robbins is a clinical pharmacologist and a regulatory affairs expert who Nektar retained to opine on Lilly's efforts to develop Rezpeg and comparable eczema and lupus drugs and Rezpeg's likelihood to advance through the clinical trial process and achieve the Agreement's Milestone payments, and to provide rebuttal testimony on Rezpeg's development.

Dr. Robbins is the President and Chief Executive Officer of Kodiak Strategic Consultants, LLC, which provides clinical, regulatory, and strategic guidance to pharmaceutical and biotechnology companies. Dr. Robbins has more than forty years of experience in the pharmaceutical industry and has guided more than 15 drugs and devices through the FDA-approval process. He has served variously as a Chief Executive Officer, a Chief Scientific Officer, a Vice President in charge of regulatory affairs, clinical operations, and quality assurance, and a Vice President of Legal and Regulatory Affairs at several large pharmaceutical companies, including Upsher Smith and Mallinckrodt Group, and at large Contract Research Organization Certus International. He has further served as a principal clinical regulatory and strategic consultant for several pharmaceutical companies, including Teva Pharmaceuticals and Mylan Pharmaceuticals. Dr. Robbins has extensive experience analyzing results from clinical trials and designing clinical trials, and has conducted dozens of meetings with regulatory bodies, including the FDA, regarding drug development. He also has specific experience designing and executing trials and interpreting clinical data for drugs that treat autoimmune diseases and dermatological conditions by activating the immune system—just like Rezpeg. He holds a Ph.D. in Pharmacology (the study of drugs and their interactions with biological systems) from the University of Minnesota Medical School and serves as an adjunct professor at the University of Minnesota Medical School and College of Pharmacy.

**A.** **<u>Lilly's Failure to Develop Rezpeg as an Eczema or Lupus Treatment Is Inconsistent with Its Development of Worse Drugs for Those Diseases</u>**

**Opinion**. Dr. Robbins will testify that Lilly held Rezpeg to different clinical and regulatory standards than Lilly applied to its other eczema and lupus drugs, and that Lilly's efforts to develop Rezpeg were inconsistent with its efforts to develop its other eczema and lupus drugs.

**Foundation**. Dr. Robbins' opinions are grounded in: (1) analysis of results from clinical trials of other drugs Lilly developed to treat eczema and lupus; (2) analysis of the regulatory pathway facing Rezpeg and other drugs Lilly developed to treat eczema and lupus, including FDA concerns about the risk-benefit profile of those other drugs; (3) comparison of Rezpeg's clinical trial results with clinical trial results for other drugs Lilly terminated as potential eczema and lupus treatments; and (4) comparison of Rezpeg's clinical trial results with clinical trial results of other drugs Lilly advanced

to Phase 2 and Phase 3 eczema and lupus trials. Dr. Robbins' opinion draws on his education and expertise in regulatory affairs and interpreting clinical trial results, and is supported by peer-reviewed publications, FDA publications, Lilly's internal communications, and testimony from Lilly witnesses.

**Relevance and Usefulness**. Dr. Robbins' opinion is relevant to Lilly's liability because it examines several CRE Factors such as "safety and efficacy" and "regulatory structure" (*i.e.*, Rezpeg's path to regulatory approval). Dr. Robbins' assessment of Lilly's practices and efforts developing Rezpeg and "comparable pharmaceutical product[s]" is the analysis that the License Agreement contemplates and is relevant to whether Lilly's efforts met the CRE standard.

Dr. Robbins' opinion is useful because comparing Rezpeg's trial results against those of the other eczema and lupus drugs Lilly developed requires interpreting technical clinical trial outputs a lay juror cannot evaluate unaided—and that side-by-side comparison is what shows Lilly held Rezpeg to a different standard. Dr. Robbins' specialized knowledge will also help the jury understand complex and unfamiliar regulatory issues such as when/why regulatory authorities require safety warnings in product labeling and the impact such warnings can have on a product's development.

### B.    Rezpeg's Likelihood of Obtaining the Milestones

**Opinion**. Dr. Robbins will opine on Rezpeg's likelihood of achieving the License Agreement's Milestone payments had Lilly's efforts to develop Rezpeg been consistent with the efforts Lilly used to develop other drugs. Dr. Robbins will testify that Rezpeg's likelihood of achieving the first Milestone (first patient treated in a Phase 3 trial) was more likely than not in lupus ($\geq 67\%$) and eczema ($\geq 50\%$), and that Rezpeg's likelihood of achieving the remaining Milestones was consistent with industry average success rates.

**Foundation**. Dr. Robbins' opinions are grounded in an industry-standard methodology for determining a drug's probability of success: using industry average success rates (*i.e.*, the likelihood of moving from one phase to the next) as a guideline, and then adjusting the guideline based on his review of Rezpeg's clinical data, mechanism of action, and regulatory pathway. This is the same methodology Dr. Robbins uses to assess a drug's probability of success outside of litigation, and the same methodology that Lilly and Nektar use to calculate the probability of success of their drugs. *See* Dkt-201-3 at 307:5-309:1; Dkt. 216-1 at 3-9. Dr. Robbins determined which industry average success

NEKTAR THERAPEUTICS' PROFFER REGARDING EXPERT TESTIMONY

rates to use as a starting point by analyzing peer-reviewed publications reporting clinical success rates and selecting the article with the benchmark most similar to Rezpeg:  biologic drugs targeting similar diseases.    The peer-reviewed article Dr. Robbins relies on, Hay, Michael, et al., "Clinical Development Success Rates for Investigational Drugs," Nature Biotechnology, Vol. 32, No. 1, January 2014, pp. 40-51, is an industry-leading publication that has been cited more than 3,000 times. Dr. Robbins' adjustments to industry average rates from *Hay et al.* are based on Rezpeg's clinical trial data and peer-reviewed publications explaining that certain factors (like a known mechanism of action) will increase a drug's likelihood of success.  Dr. Robbins further supports his assessment by referencing Nektar's contemporaneous probability of success estimates for Rezpeg that are consistent with (and in some cases exceed) Dr. Robbins' analysis.

**Relevance and Usefulness**.  Dr. Robbins' opinion is relevant to Nektar's damages calculation, as Nektar's damages expert incorporates Dr. Robbins' probabilities into his Discounted Cash Flow models to calculate the diminution in Rezpeg's value due to Lilly's breaches.

Dr. Robbins' opinion is useful because the jury cannot derive a drug's probability of success from raw clinical data on its own—doing so requires selecting the right industry benchmark and adjusting it for Rezpeg's specific data, mechanism, and regulatory posture.  Dr. Robbins' testimony provides a methodologically sound, reasoned basis for this input into Dr. Rao's damages model.

### C.    No Clinical or Regulatory Basis to Abandon Rezpeg's Development

**Opinion**.  Dr. Robbins will opine that clinical trials of Rezpeg in eczema and lupus patients showed promising results that warranted further clinical study, and there was no clinical or regulatory basis for Lilly to abandon Rezpeg as an eczema or lupus treatment.  He will further opine that, as a matter of regulatory compliance, "Good Clinical Practices" require companies to validate their systems and ensure accurate data is generated to support regulatory submissions, and that Lilly failed to meet those requirements when it incorrectly calculated and reported Rezpeg's efficacy data.

**Foundation**.  Dr. Robbins' opinion is grounded in: (1) analysis of safety and efficacy data from Rezpeg's clinical trials; (2) analysis of regulatory correspondence regarding Rezpeg; and (3) assessment of FDA and EMA regulatory requirements.  Dr. Robbins' opinion draws on his education as a clinical pharmacologist and his experience and expertise in regulatory affairs, the drug approval

process, and interpreting clinical trial results.  It is further supported by peer-reviewed literature, FDA publications, Lilly's internal documentation, and testimony from Lilly's witnesses.

**Relevance and Usefulness**.  Dr. Robbins' opinion is relevant to Lilly's liability because it confirms that Rezpeg's continued development faced no clinical or regulatory hurdles and undermines Lilly's defense that mild ISRs from Rezpeg administration posed a regulatory approval barrier.  Dr. Robbins' opinion also addresses CRE Factors including "regulatory structure," as well as Lilly's failure to follow Good Research Practices in developing Rezpeg. Dkt. 33-2, § 1.1, Schedule 4.8 Part A.

The jury will benefit from Dr. Robbins' testimony because his specialized knowledge will help the jury resolve factual disputes regarding the strength of Rezpeg's clinical trial results and whether Rezpeg faced barriers to regulatory approval.  Dr. Robbins will provide needed analysis of Rezpeg-related FDA communications, regulatory requirements, and the regulatory approval process.  Without his testimony, the jury will be left with competing narratives from party witnesses who lack Dr. Robbins' extensive regulatory expertise and understanding of FDA processes.

## III.    DR. MOHAN RAO

Dr. Rao is an economist and pharmaceutical company executive who Nektar retained to opine on Rezpeg's commercial potential and the damages arising from Lilly's breaches, and to provide rebuttal testimony on commercial issues.

Dr. Rao is the Chief Executive Officer of Epsilon Economics, where he specializes in economics with an emphasis on life sciences and technology.  He is also the Executive Chairman of Expression Therapeutics Inc., a biotechnology company that develops gene and cell therapies for hematology and oncology.  Previously, Dr. Rao was a professor at UCLA and Northwestern University and a Teaching Fellow at Harvard University.  He has taught courses in finance, statistics, game theory, and competition policy and has written on these topics in academic and professional publications.  Dr. Rao has a Bachelor of Science in Engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado.

Dr. Rao sits on the Board of Directors of the Children's Hospital of Chicago, one of the leading pediatric medical centers in the world, and the Stanley Manne Children's Research Institute, a premier

pediatric research center.  He has served as an economics expert on collaboration and licensing disputes and has evaluated numerous pharmaceutical projects at all stages of development.  He has been described as "among the foremost experts when it comes to pharmaceutical economics" by IAM, the publisher of *The World's Leading Patent Professionals*.

### A.    Rezpeg Warranted Continued Development

**Opinion**.  Dr. Rao will testify that, from an economic perspective, Rezpeg warranted further development by Lilly as an eczema and lupus drug and that there is no economic evidence supporting the proposition that Rezpeg was commercially inferior to other drugs Lilly developed to treat those diseases.  Dr. Rao will further opine that companies routinely bring to market products that are neither best nor first in class—as Lilly did with lebrikizumab, an undifferentiated eczema drug.

**Foundation**.  Dr. Rao's opinion is based on: (1) how pharmaceutical companies assess the commercial attractiveness of drug products and when products are pursued; (2) examination of Rezpeg's substantial market opportunity in eczema and lupus, which is informed by Dr. Mostaghimi's opinions on significant unmet medical needs in those markets and Rezpeg's ability to fill those needs, and is confirmed by internal Lilly documents[1]; (3) analysis of Lilly's forecasts from as late as October 2022 projecting ███████ in revenue and ████████████████ in peak annual sales for Rezpeg[2]; (4) Dr. Robbins' and Dr. Mostaghimi's opinions that there were no clinical or regulatory developments that warranted delaying or abandoning Rezpeg's eczema or lupus development corroborated by independent economic analysis; (5) economic assessments that Nektar commissioned in 2022 and 2025 confirming Rezpeg's substantial potential profitability; and (6) a comparison of the economic opportunity Lilly identified for Rezpeg and for its other drugs it developed to treat eczema and lupus.

**Relevance and Usefulness**.  Dr. Rao's opinion is relevant to Lilly's liability and directly

---

[1]  This includes an internal Lilly presentation ranking atopic dermatitis and lupus a " ██████ " area of focus for Lilly and a 2020 document describing the eczema market as having a " ████████████████████████████████ " and the lupus market as having a " ████████████ " *See* LLY00795002–5018 at LLY00795010; LLY00104733–4754 at LLY00104739.

[2]  *See*, *e.g.*, LLY00827987–7996 at LLY00827993 (~$████████ NPV for Rezpeg); LLY02436164–6185 at LLY02436171 (year 5 sales as high as $████████ across four indications, including lupus); LLY00860323–0344 at LLY00860325 (annual peak revenues exceeding $4██ ████ in bio-experienced eczema patients alone (a sub-population of eczema patients)).

addresses the "profitability" and "commercial" CRE Factors.  Dkt. 33-2, § 1.1.  Dr. Rao's assessment of Rezpeg's commercial opportunity and that of Lilly's "comparable pharmaceutical product[s]" is the analysis that the License Agreement contemplates and is relevant to whether Lilly's efforts on Rezpeg met the CRE standard.

Dr. Rao's opinion is useful because it will allow the jury to better understand the commercial factors enumerated in the CRE definition.  Specifically, Dr. Rao's testimony will provide much-needed analysis of market opportunity, profitability, and other factors explicitly enumerated in that provision.  Those are not simple topics, particularly as applied in the specialized and complex pharmaceutical industry, and the jury will benefit from Dr. Rao's explanation and reasoning on them.  Dr. Rao's testimony will assist the jury's evaluation of whether Lilly applied CRE in developing Rezpeg, which is one of the central liability questions at trial.  Absent such testimony, the jury may be left with competing factual stories from the witnesses of each party, without a disciplined and methodical way of evaluating the various commercial factors at issue.

**B.     Lilly's Breaches Delayed Rezpeg's Development and Diminished Its Value**

**Opinion**.  Dr. Rao will testify that Lilly's breaches delayed Rezpeg's clinical development and expected launch by between 22-38 months (depending on the indication and breach date) which diminished Rezpeg's value.  Dr. Rao will quantify Nektar's damages (as of April 21, 2025) as follows:

<u>**Atopic Dermatitis**</u>

| Date of Alleged Breach | Damages |
| --- | --- |
| August 2021 | $825 million |
| April 2022 | $697 million |
| June 2022 | $563 million |

<u>**Lupus**</u>

| Date of Alleged Breach | Damages |
| --- | --- |
| May 2022 | $257 million |
| February 2023 | $193 million |

**Foundation**.  Dr. Rao calculated damages by using industry-standard Discounted Cash Flow ("DCF") models to compare (1) Rezpeg's NPV without Lilly's alleged breach, with (2) Rezpeg's

NPV with Lilly's breach.[3]  This analysis quantifies how Lilly's breaches before Lilly terminated the License Agreement diminished Rezpeg's value and provides a discrete set of damage numbers based on the indication of development and breach dates (the damages figures within each indication table are alternatives).

Dr. Rao's models rely on objective numerical inputs including expected development timeline, probability of technical and regulatory success, expected market launch, expected market penetration, pricing, biosimilar entry date (when Rezpeg's patent exclusivity will lapse), discount rate, development costs, and the risk-adjusted milestone and royalty payments that Lilly promised to pay to Nektar under the License Agreement.  Some of these inputs are the same in the "but-for" world and real world.  For example, Rezpeg's biosimilar entry date is keyed to Nektar's patents, which expire at the same time in either "world."  Other inputs differ based on Lilly's breach:  for instance, Rezpeg's expected market launch is delayed in the real world compared to one in which Lilly diligently advances Rezpeg through development.

To populate these inputs, Dr. Rao relies on third-party and Lilly commercial forecasts for Rezpeg commissioned in 2022 (*i.e.*, contemporaneous with Lilly's breaches) and 2025 (reflecting updated forecasts following Lilly's breaches); on Lilly's internal development timelines for Rezpeg before the breach dates; on Dr. Robbins' assessment of Rezpeg's likelihood of success; and on the License Agreement's provisions on milestone and royalty payments and development costs.  To estimate the terms of a hypothetical partnership (*i.e.*, Rezpeg's post-breach value), Dr. Rao uses published studies of pharmaceutical partnerships and adjusts the terms of Nektar's License Agreement with Lilly to be more favorable to Nektar (lowering his damages calculation), based on the lower risk and higher potential of licensing a Phase 2 asset as opposed to an asset with no clinical history (like Rezpeg when Lilly licensed it in 2017).  While Dr. Rao's NPV models incorporate projected market share and pricing, NPV is fundamentally a point-in-time estimate of the value of a sellable asset.  In this case, the asset is Rezpeg, which Nektar licensed to Lilly expressly to develop and commercialize.  Dr. Rao calculates Rezpeg's NPV at different breach dates within the operative

---

[3]  Dr. Rao terms the "but-for" world without Lilly's alleged breach as the world "With Lilly" and the world with Lilly's alleged breach as the world "Without Lilly."

term of the License Agreement and compares them to Rezpeg's diminished NPV after the breaches to determine the damage done by Lilly during the pendency of the License Agreement.

In analyzing Rezpeg's diminished NPV for eczema, Dr. Rao calculates a 22-, 29-, or 34-month launch delay, depending on the breach date used.  Dr. Rao's DCF model shows that Rezpeg's NPV in atopic dermatitis was diminished by $563 million if damages are calculated based on an initial June 2022 breach (when Lilly scrapped Rezpeg's approved and funded Phase 2 trial); by $697 million if damages are calculated based on an initial April 2022 breach (when Lilly's CEO demanded a "███████████" of Rezpeg); or by $825 million if damages are calculated based on an initial August 2021 breach (when Lilly first miscalculated Rezpeg's efficacy).

For lupus, Dr. Rao employed the same methodology with appropriate adjustments to the inputs.  Dr. Rao's DCF model shows that Rezpeg's NPV in lupus was diminished by $257 million based on an initial May 2022 breach (when Lilly elected to under-power Rezpeg's Phase 2 lupus trial); or by $193 million based on an initial February 2023 breach date (when Lilly terminated Rezpeg's lupus development).

In conducting his analysis, Dr. Rao relies on his education, experience, and review of expert reports, pleadings, documents produced by both parties, deposition testimony, economic and financial information, as well as publicly available information.  He also interviewed experts Dr. Mark Robbins and Dr. Arash Mostaghimi and Nektar employees Jennifer Ruddock and Lorin Sasaki.

**Relevance and Usefulness**.  Dr. Rao's opinion is relevant to a key question disputed in this case: the amount of damages Lilly owes for its alleged breaches.  Dr. Rao's opinion is useful because without his analysis, the jury, having found liability, would have a limited basis on which to award a reasonable amount of damages to Nektar.  Dr. Rao's opinions are crucial to enabling the jury to understand how distinct factors can be weighed and used to calculate a well-reasoned damages amount.  Calculating damages in drug development cases is difficult absent expert testimony; a lay jury would likely struggle to apply forecasting, valuation, and modeling concepts on its own.

DATED: July 20, 2026

By: */s/ Yury Kapgan*
Yury Kapgan
*Attorneys for Plaintiff Nektar Therapeutics*

NEKTAR THERAPEUTICS' PROFFER REGARDING EXPERT TESTIMONY