Emma Scott (SBN 352078)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: emma.scott@kirkland.com

James F. Hurst, P.C. (*pro hac vice* pending)
Diana M. Watral, P.C. (admitted *pro hac vice*)
Gabor Balassa, P.C. (admitted *pro hac vice*)
Ryan J. Moorman, P.C. (admitted *pro hac vice*)
Patrick Weeks (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.hurst@kirkland.com
Email: diana.watral@kirkland.com
Email: gbalassa@kirkland.com
Email: ryan.moorman@kirkland.com
Email: patrick.weeks@kirkland.com

*Counsel for Defendant Eli Lilly and Company*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY & CO.,<br><br>Defendant. | CASE NO. 3:23-CV-03943-JD<br><br>**DEFENDANT ELI LILLY AND COMPANY'S PROFFER OF EXPERT TESTIMONY**<br><br>Judge:        Hon. James Donato |

Eli Lilly and Company respectfully submits this proffer pursuant to the Court's March 24, 2026 minute order regarding expert testimony (ECF 313), which required each side to file an evidence proffer identifying the specific opinions their expert witnesses will provide at trial.

### JAMES G. KRUEGER, M.D., PH.D.

Dr. Krueger is a board-certified dermatologist with over 35 years' experience treating and researching inflammatory skin diseases, including atopic dermatitis and psoriasis. He is the D. Martin Carter Professor of Clinical Investigation and Head of the Laboratory for Investigative Dermatology at The Rockefeller University, CEO of The Rockefeller University Hospital, and a recognized key opinion leader who has consulted for dozens of major pharmaceutical companies. He is also a member of the American Society for Clinical Investigation.

Dr. Krueger has led or co-led more than 50 clinical trials, designed numerous early-stage drug studies, contributed to medical research on atopic dermatitis therapies, and helped obtain FDA approval for ten dermatological drugs. His experience includes advisory-board work for pharmaceutical companies developing drugs, where he advises on efficacy, safety, market positioning, and development strategy. He has authored roughly 460 academic publications (about 75 on atopic dermatitis) cited more than 79,000 times.

Drawing on this industry background, his clinical experience treating thousands of atopic dermatitis and psoriasis patients; his review of Lilly's and Nektar's clinical trial data and design proposals; and his analysis of Lilly's development proposals for other potential treatments such as CD200R. Dr. Krueger will offer the following testimony on the clinical and scientific bases for the development decisions at issue.

### 1. Rezpeg's Injection Site Reactions

Nektar has alleged that Lilly's efforts to address Rezpeg's injection site reactions ("ISRs") were not legitimate or were pretext for delay. To help the jury assess Lilly's response to Rezpeg's ISRs, Dr. Krueger will testify that Rezpeg caused ISRs that were typically larger and persistent compared to ISRs observed with other approved and pipeline atopic dermatitis treatments. Op. Rep. ¶¶ 99–111, 131–155; Reb. Rep. ¶¶ 106–159. Based on his clinical and development experience, his analysis of Rezpeg's clinical data, and his review of peer-reviewed literature comparing ISR rates across FDA-approved biologics, Dr.

Krueger will testify that Rezpeg's ISRs would create a barrier to adoption because practitioners will prescribe a drug without ISRs over one that causes them. Op. Rep. ¶¶ 76–97; Reb. Rep. ¶¶ 160–66. Dr. Krueger will also offer his clinical opinion that Lilly pursued available mitigation approaches, but these efforts were unsuccessful because Rezpeg's ISRs are an inherent consequence of the drug's mechanism of action, meaning they cannot be eliminated without altering the mechanism of the drug itself. Op. Rep. ¶¶ 112–121, 156–170.

This testimony will help the jury by providing a clinical framework to understand what ISRs are, how Rezpeg's ISR profile compares to the standard of care, and why prescribers' and patients' willingness to use a drug depends on that profile. This expert testimony from a leading physician will help the jury evaluate evidence presented on whether Lilly's decision to pursue ISR mitigation prior to Phase 3 was a clinically driven response to a development challenge—consistent with Lilly's approach to comparator products—not evidence of a pretextual delay as Nektar alleges.

### 2. Need for Differentiation and Design of Phase 2 Atopic Dermatitis Clinical Trial

Other disputes concern Lilly's approach to differentiating Rezpeg from existing atopic dermatitis treatments (like Dupixent) and the resulting design and timing of the Phase 2 atopic dermatitis trial. The parties dispute whether Lilly's focus on how prescribing physicians would evaluate Rezpeg relative to other available treatments reflects a legitimate development consideration or pretext for delay.

Dr. Krueger will testify that patients and prescribers select atopic dermatitis therapies based on differentiating characteristics—such as efficacy, dosing frequency, and tolerability—that address unmet needs, and that pharmaceutical companies must therefore design trials to generate data showing whether a candidate offers those characteristics. Op. Rep. ¶¶ 41–43; Reb. Rep. ¶¶ 80–82. Applying that framework, Dr. Krueger will testify about the medicines against which Rezpeg needed to be evaluated, including Dupixent, the dominant atopic dermatitis therapy. Op. Rep. ¶¶ 56–75. He will testify that the Phase 2 trial's design tested whether Rezpeg could meet a medical need Dupixent did not—by focusing on bio-experienced patients (those for whom Dupixent did not adequately control their atopic dermatitis) and evaluated whether Rezpeg could be more efficacious or dosed less frequently than Dupixent. Op. Rep. ¶¶ 171–180; Reb. Rep. ¶¶ 17–23.

Dr. Krueger also offers testimony relevant to Nektar's allegations that Lilly created a nonstandard interim analysis plan to terminate Rezpeg early and that there was no reason to wait for additional data before starting the Phase 2 trial.  He will explain that the trial's interim analyses provided a standard mechanism for assessing whether to terminate the trial early, an approach Lilly took on other comparable treatments.  He will testify that when an interim analysis shows a drug is unlikely to meet its endpoints, clinical practice supports ending the trial early rather than continuing to expose patients to an experimental treatment unlikely to be approved.  Op. Rep. ¶¶ 181–189.  As for the decision to wait for more data, Dr. Krueger will testify that data from the ongoing Phase 2 lupus trial could inform design of the atopic dermatitis trial, and that waiting for those results reflected the standard practice of applying learnings from one clinical program to another.  Op. Rep. ¶¶ 190–195; Reb. Rep. ¶¶ 44–52.

Dr. Krueger's opinions are grounded in his clinical experience treating thousands of atopic dermatitis and psoriasis patients; his advisory-board work for pharmaceutical companies on early-stage atopic dermatitis and psoriasis clinical trials; and his review of Lilly's and Nektar's trial-design records, market research, and Lilly's design of comparator programs such as CD200R.

This testimony will help the jury assess Lilly's stated reasons for designing the Phase 2 trial as it did.  To evaluate whether Lilly's development decisions for Rezpeg were consistent with its approach to comparator products, the jury must understand the atopic dermatitis treatment landscape that informed those decisions.  Dr. Krueger's testimony is relevant because Nektar alleges Lilly lacked a legitimate basis for its trial design and that its stated reasons were pretext for delaying Rezpeg's development in breach of the commercially reasonable efforts provision.

**3.      Phase 1 Calculation Errors Did Not Impact Rezpeg's Development**

Nektar contends that a contract research organization's miscalculation of Rezpeg's Phase 1b efficacy endpoints affected Lilly's assessment of, and continued investment in, Rezpeg.  To assist the jury in assessing whether these calculations affected Rezpeg's development, Dr. Krueger will testify that Phase 1 efficacy data is inherently limited because these trials are designed primarily to assess safety and tolerability.  Accordingly, the patient numbers in those studies are small and typically do not enroll enough patients to generate meaningful efficacy conclusions beyond establishing "proof of concept"—whether a drug has therapeutic potential for a given indication such that advancing to Phase 2 makes sense.  Op.

Rep. ¶¶ 199–206. Dr. Krueger will testify that, consistent with this framework, Lilly decided to move forward with Rezpeg in atopic dermatitis based on the efficacy data as it was calculated, and the parties proceeded to design a Phase 2 trial notwithstanding the error, while Rezpeg's psoriasis program was discontinued for reasons unconnected to the PASI score. Op. Rep. ¶¶ 207–215. He will further testify that, from his perspective as a clinician, the corrected data do not reflect a meaningful improvement in Rezpeg's efficacy and are still inferior to Dupixent's Phase 1 efficacy. Op. Rep. ¶¶ 218–237.

Dr. Krueger's opinions on the calculation errors are grounded in his expertise interpreting efficacy scoring methodologies he has applied throughout his career, his experience advising drug developers on Phase 1 trial design and interpretation, and his review of clinical data and statistical analysis plans for Rezpeg's and comparator trials.

This testimony will help the jury evaluate the utility of Phase 1 efficacy data and determine whether the calculation errors affected Rezpeg's development. It is relevant to Nektar's allegation that the miscalculated endpoints influenced Lilly's interest in Rezpeg and its development timeline.

**4.      Rebuttal Opinions.** Depending on the opinions the Court permits Nektar's experts to present at trial, Dr. Krueger may offer the following rebuttal opinions based on his clinical and industry experience described above. Lilly does not intend to offer these opinions affirmatively.

**(a) Rezpeg's Potential to Be Disease Modifying.** To the extent Nektar argues that Rezpeg's potential to be "disease modifying" required Lilly to continue developing Rezpeg, Dr. Krueger will testify that there is no conclusive evidence Rezpeg is curative or affords long-term disease control, and that any potential benefit as a second-line therapy for patients who do not respond to Dupixent remained theoretical and unproven as of the collaboration's end. Reb. Rep. ¶¶ 23–43. He will testify that this unproven potential, standing alone, did not show that Rezpeg could satisfy an unmet medical need— the very question the parties' trials were designed to answer. Reb. Rep. ¶¶ 23–43.

**(b) Lilly's Conduct and Assessment of the Phase 2 Lupus Trial.** To the extent Nektar's experts testify that Lilly should have "overenrolled" patients into the Phase 2 lupus trial or that the trial's results warranted continued investment, Dr. Krueger will testify to the contrary. He will testify that the decision not to overenroll midstream *sped up* development given the delays such a change would have caused. Reb. Rep. ¶¶ 55–58. He will also testify that Rezpeg failed to meet its primary endpoint and

nearly every critical success factor, and that the highest dose showed statistically significant disease worsening relative to placebo—results that reject the scientific hypothesis the trial was designed to test. Reb. Rep. ¶¶ 59–75.  He will testify that such failure weighs heavily in favor of ending development in that indication based on the clinical factors Lilly normally considers.  Reb. Rep. ¶ 62.

**(c) Method of Evaluating ISRs.**  To the extent Nektar's experts testify that Lilly's approach to soliciting and grading Rezpeg's ISRs was improper or overstated the drug's tolerability problems, Dr. Krueger will testify that Lilly's methods for collecting and assessing ISRs were consistent with FDA guidance and with the approach Nektar adopted in its own study protocols.  Reb. Rep. ¶¶ 146–152.  He will testify that Lilly's ISR grading scale, which assessed severity based on size and duration rather than a generic severity scale, reflected standard practice for a treatment whose principal risk is a localized skin reaction.  Reb. Rep. ¶¶ 146–152.

### EDWARD J. BUTHUSIEM

Edward J. Buthusiem is a former drug development executive with over 30 years of experience advising clients on a variety of business, regulatory, and transactional matters in the healthcare industry, including a 20-year tenure at GlaxoSmithKline.  Mr. Buthusiem has negotiated over 100 drug development collaborations, including a collaboration to develop a lupus treatment (one of the indications the parties studied for Rezpeg).  Mr. Buthusiem has extensive experience analyzing factors normally considered in the drug development process, including the unmet treatment needs among patients, the competitive landscape, market research, and clinical trial data, and he has served on governance committees responsible for deciding whether to advance research on potential drugs and how to position them for commercial success.  As Managing Director of Berkeley Research Group's Health Analytics practice, and co-leader of its Pharmaceutical Valuation practice, Mr. Buthusiem also routinely conducts market forecasting and valuations of prospective and marketed pharmaceutical products.  His expert opinions are supported by these credentials and decades of professional experience in the pharmaceutical industry.

While Mr. Buthusiem's opinions will be helpful for the jury to evaluate Lilly's efforts, expertise, and resources used to develop Rezpeg, Lilly is mindful of the Court's instruction on time limits for trial. Lilly also anticipates that testimony on Lilly's customary drug development strategies and practices and

comparative analyses of Lilly's efforts used on similar drugs at similar stages of development will be presented to the jury through lay witnesses with firsthand knowledge of Rezpeg's development.

Accordingly, Lilly intends to offer Mr. Buthusiem's expert testimony *only* to the extent it is required to rebut testimony from Nektar's development expert, Dr. Mark Robbins, or other Nektar witnesses on (i) industry custom or practice; (ii) Lilly's standard drug development process and how its development of Rezpeg compares to its development of similar products at similar stages of development; or (iii) Rezpeg's probability of success. If the Court permits Nektar to present testimony or evidence on the allegations below, Mr. Buthusiem will address the following topics.

1.      **Commercial and Business Considerations.** Nektar alleges that Rezpeg's early-stage safety and efficacy data alone justified accelerating Rezpeg's development in atopic dermatitis, and Lilly's failure to do so reflected a lack of reasonable efforts under the License Agreement. Drawing on his more than 30 years of experience in the pharmaceutical industry, Mr. Buthusiem will explain the additional commercial and business factors that also inform drug development strategy in the industry—including whether the drug can be differentiated from existing treatments—and that decisions cannot be made on the basis of early safety and efficacy data alone. *See, e.g.*, Op. Rep. ¶ 25; Reb. Rep. ¶¶ 9–23; 26–36. Mr. Buthusiem will also testify that whether a drug presents a meaningful alternative to existing therapies on the market depends on safety, efficacy, tolerability, dosing, the competitive landscape, prescriber and patient preferences as revealed by market research, the developer's experience in a disease area, and commercial differentiation from the existing standard of care. Reb. Rep. ¶¶ 9–23.

This testimony is relevant because the License Agreement's "Commercially Reasonable Efforts" provision requires Lilly to use the "effort, expertise and resources normally used [by Lilly]" in light of "the competitiveness of the marketplace," "profitability," "product profile," and "other relevant strategic and commercial factors [Lilly] normally considered ... in making product portfolio decisions." Op. Rep. ¶ 54. Mr. Buthusiem's testimony is helpful because he is familiar with the factors relevant to drug development strategy under the operative "Commercially Reasonable Efforts" standard, and his testimony will help the jury understand why Lilly's normal drug development process considers these factors when making decisions about Rezpeg and similar drugs in similar stages of development. *Id.* ¶¶ 86–89.

**2.      Comparative Analysis of Rezpeg's Development Against Internal Lilly Assets.**

Mr. Buthusiem will testify that a comparative analysis of Lilly's development of Rezpeg against internal comparators requires assessing whether Lilly deviated from the *standard* development strategies it uses to develop comparable drugs. Reb. Rep. ¶¶ 37–45. Mr. Buthusiem will opine that his industry experience and analysis of the efforts, expertise, and resources Lilly devoted to other immunology treatments in Lilly's portfolio leads to the conclusion that Lilly developed Rezpeg using a similar development process. *Id.* ¶¶ 46–84; *see also* Op. Rep. ¶¶ 21b–c, 103. Mr. Buthusiem applied his industry experience and understanding of the lupus and atopic dermatitis markets, *see* Op. Rep. ¶¶ 60–75, to perform a review of hundreds of pages of documents on Lilly's normal development process, *see* Op. Rep. ¶¶ 104–124, the factors Lilly considered to advance (or terminate) other candidates, and the resources it committed to Rezpeg and other drugs. Op. Rep. ¶¶ 125–194, 195–204; *see also* Reb. Rep. ¶¶ 37–84.

With this foundation, Mr. Buthusiem will rebut Nektar's allegations that Lilly's development of Rezpeg deviated from its normal practices on the following subjects by testifying that Lilly used its typical process to develop Rezpeg compared to the other drug candidates he evaluated:

- **Consistent Approach to Lupus Treatments**. Nektar alleges that Lilly failed to advance Rezpeg to Phase 3 for lupus after it missed its primary endpoint, and that this decision departed from how Lilly treated other drugs in development. Mr. Buthusiem will rebut that allegation by opining that Rezpeg's Phase 2 clinical trial endpoints and predetermined critical success factors were designed to position Rezpeg for success, consistent with Lilly's approach to other internal lupus treatments in its portfolio. Reb. Rep. ¶¶ 46–50; *see also* Op. Rep. ¶¶ 126–129, 135, 139–140. Mr. Buthusiem will further opine that the endpoints were adopted pursuant to a collaboration process with Nektar. Op. Rep. ¶¶ 130–138. He will also explain that Lilly's decision to terminate Rezpeg's development in lupus (and the timing related to that decision) was consistent with Lilly's decision to terminate other lupus treatments in its portfolio that missed predetermined endpoints or success factors. Reb. Rep. ¶¶ 46, 50–52, 55, 59; *see also* Op. Rep. ¶¶ 144, 146, 149, 152–154.

- **Consistent Approach to Atopic Dermatitis Treatments**. Nektar alleges that Lilly "delayed and obstructed" Rezpeg's development in atopic dermatitis by proposing development strategies to advantage the development of other Lilly drugs. Mr. Buthusiem will rebut that allegation by opining that Lilly's decisions to (i) adjust Rezpeg's target patient population in atopic dermatitis, (ii) wait for injection site reaction ("ISR") mitigation study results, and (iii) wait for additional Phase 2 lupus data before initiating the Phase 2 atopic dermatitis trial were consistent with a sophisticated pharmaceutical company's drug development decisions, and consistent with Lilly's usual drug development process on comparable assets. Reb. Rep. ¶¶ 64–71; *see also* Op. Rep. ¶¶ 173–191. He will testify that it is Lilly's standard practice ███████████████████████ Reb. Rep. ¶¶ 68–69.

- **Consistent Approach to Evaluating Potential Drugs with ISRs.** Nektar alleges that Lilly evaluated Rezpeg's injection site reactions using an approach that "deviated" from Lilly's normal drug development practices. Mr. Buthusiem will rebut that allegation by opining that it was Lilly's standard practice to ████████████████████████████████████ ████████████████████████████████████████████ *Id.* ████ 72–84; *see also* Op. Rep. ¶¶ 166–167. Mr. Buthusiem will testify that Lilly ████████████████ due to prior experiences with ISRs in its autoimmune projects. Reb. Rep. ¶ 75; *see also* Op. Rep. ¶¶ 168–170. He will also testify that, contemporaneously with its development of Rezpeg, Lilly ████████████████████. Reb. Rep. ¶ 76; *see also* Op. Rep. ¶¶ 171–172.

3. **Parallel Development of Multiple Assets.** Nektar alleges that Lilly's acquisition of lebrikizumab (through its purchase of Dermira) while it was developing Rezpeg gave Lilly an incentive to prioritize lebrikizumab at the expense of Rezpeg. Mr. Buthusiem will rebut that allegation by testifying that it is customary for Lilly, like other pharmaceutical companies, to develop multiple potential treatments in parallel, including potential treatments for the same diseases in similar stages of development. Reb. Rep. ¶¶ 85–97; *see also* Op. Rep. ¶¶ 21d, 205–209. He will further explain that this parallel development strategy requires balancing the prospect of developing a differentiated drug for patients in the context of the entire portfolio. Reb. Rep. ¶¶ 85–97; *see also* Op. Rep. ¶ 217. Mr. Buthusiem will also testify that Lilly spent and allocated resources for Rezpeg that were comparable to or even exceeded that of other assets. Reb. Rep. ¶¶ 88–89; *see also* Op. Rep. ¶¶ 21c, 198–204.

4. **Probability of Success Analyses.** Nektar intends to present evidence regarding the probability of Rezpeg progressing through development in multiple diseases and at various stages of development. To the extent this testimony is permitted—either through expert or fact witnesses— Mr. Buthusiem will testify to the lack of data underpinning those analyses. *See* Reb. Rep. ¶¶ 139–150. Applying the same probability of success methodology he used working at GSK and in his role within BRG's pharmaceutical valuation practice, where he routinely calculates phase-transition and approval probabilities to value developmental drugs for investment decisions, Mr. Buthusiem will testify that at least three probabilities Nektar will present are inaccurate and unsupported: ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* ¶¶ 98–103. Mr. Buthusiem analyzed the bases for these probabilities against the peer-reviewed industry literature and Rezpeg's own

contemporaneous company and third-party valuation data, and he will testify that the probabilities do not account for the range of probabilities in economic literature for similar drugs; they were adjusted upward based on subjective factors that are untethered to Rezpeg's actual data; and they were derived using a methodology based primarily on unsubstantiated assumptions. *Id.* ¶¶ 104–133, 150.

### M. LAURENTIUS MARAIS, PH.D.

Dr. Marais holds a Ph.D. and master's degrees in business administration, mathematics, and statistics from Stanford University. He has taught and conducted scholarly research at Stanford University and the University of Chicago. He is a member of the American Economic Association, the American Statistical Association, and the Society for Industrial and Applied Mathematics, and he has served as a referee for numerous academic journals, including the *Journal of Business and Economic Statistics*, the *Journal of Accounting and Economics*, and the *Journal of Financial Research*. His work focuses on applied mathematical and statistical analysis, including the application of those methods to the analysis of economic damages—the discipline at the center of the damages dispute in this case.

Consistent with the Court's March 24, 2026, order, and for brevity of trial presentation, Lilly intends to narrow Dr. Marais' testimony and will not have him testify to the opinions in Sections II.A-B of his report. In those sections, Dr. Marais opined that a forecast prepared by Nektar's consultant LifeSci is "unmoored from economic reality" because the forecast portrayed Rezpeg as extremely valuable, which is inconsistent with Lilly voluntarily terminating the License Agreement and returning Rezpeg to Nektar for free, and with Nektar failing to secure a new development partner after termination—opinions that are the focus of Nektar's *Daubert* challenge against Dr. Marais. *See* ECF 203. Nor will Dr. Marais use the term "concoct" (or equivalent terms) to describe the preparation of the LifeSci report—another focus of Nektar's *Daubert* motion. *See id.* at 3-7 (challenging report paragraphs in section II of Dr. Marais' report and his use of the word "concoct."). Instead, if Nektar's damages expert is permitted to give the opinions stated in his report, Lilly expects Dr. Marais will testify as follows.

1. **Nektar Is Better Off With Sole Ownership of Rezpeg.** Dr. Marais will show that Nektar is better off now than it would have been in the but-for world posited by Nektar—a hypothetical world in which Lilly would have continued developing Rezpeg under the Agreement—and, therefore, that Nektar has suffered zero economic harm from Lilly's alleged misconduct. *See* Rep. ¶¶ 30–33. When Lilly

terminated the Agreement, Nektar regained full ownership of Rezpeg, including exclusive rights to any future profits. If Lilly had instead continued developing Rezpeg with Nektar, as Nektar alleges Lilly should have done, Nektar would have been entitled only to milestone payments and ██████████ if Rezpeg ultimately received commercial approval. In the actual world, Nektar owns Rezpeg and 100% of its future profits outright. Dr. Marais shows that, under the financial projections Nektar's own damages expert used, Nektar is (unsurprisingly) better off now owning Rezpeg than it would have been if Lilly was entitled to the lion's share of its economic upside. Rep. ¶¶ 30–33. Dr. Marais' conclusion is firmly rooted in his expertise in applied math and statistics, does not touch on Nektar's state of mind, and will help the jury understand that Nektar has not been harmed by any alleged breaches.

2.    **Adjustments to Nektar's Damages Calculation.**  Nektar intends to offer a damages expert who purports to calculate economic harm to Nektar from Lilly's alleged breaches. Based on his expertise, a review of relevant academic literature and industry sources, and the factual record, Dr. Marais opines that using different, more-appropriate inputs in Nektar's expert's damages model reduces Nektar's alleged damages. Dr. Marais' analysis of each variable will help the jury understand that Nektar has not suffered the economic harm that it alleges to have suffered.

(a)    **Differential Discount Rates.**  Businesses use "discount rates" (which, like interest rates, measure the time value of money and the opportunity cost of capital) to calculate the "present values," as of relevant decision dates, of streams of future net revenues projected to flow from their potential investment projects. ████████████████████████████████████████████████████████████████████████████████████████████████████████. Dr. Marais will explain that the appropriate discount rate depends on the level of risk of the project in which capital is to be invested—not on the identity of the entity funding the project. A preeminent treatise on corporate finance relied upon by Nektar's damages expert as well as other source materials prepared by Nektar, its financial advisors, and Nektar consultant LifeSci, all confirm this well-established principle. Rep. ¶¶ 58–63. Dr. Marais will show that ████████████████████████████████████████████ ████████████████████████████████████████████ Rep. ¶¶ 63–64.

**(b)**      **Probability of Success.**  Dr. Marais will also calculate the impact of changing the probability of success figures that Nektar uses in its damages model.  Dr. Marais first explains that the probabilities on which Nektar relies fall outside the plausible ranges described in the scholarly literature Nektar cites, and they are inconsistent with Nektar's own internal projections and its consultants' reports. Rep. ¶¶ 66–70.  Dr. Marais will then recalculate alleged damages by applying probabilities of success that are specifically traceable to published scholarly research for drugs with modalities and therapeutic indications similar to Rezpeg.  This calculation reduces Nektar's damages by 11% for atopic dermatitis and 41% for lupus.  Rep. ¶¶ 71–72.

**(c)**      **Overstated Delay.**  Dr. Marais will also calculate the impact of the delay in Rezpeg's development that Nektar attributes to Lilly.  Rep. ¶¶ 42–47.  In its damage analysis for atopic dermatitis, Nektar assumes Lilly's alleged breaches caused a 34-month delay in Rezpeg's launch in atopic dermatitis.  Dr. Marais calculates alternative alleged damages using a ███████████████████████ ████████████████████ was the delay caused by Lilly.  *Id*.

In calculating damages for lupus, Nektar assumes a 38-month delay.  Dr. Marais calculates alternative alleged damages using a three-month delay, given Rezpeg finished its phase 2 trial in February 2023, and Nektar regained full ownership of the molecule in May 2023.  Rep. ¶¶ 48–49.  Dr. Marais will show that correcting the overstatement of delay reduces alleged damages by 37% for atopic dermatitis and 60% for lupus.  Rep. ¶¶ 47, 50–51.

**(d)**      **Differential Market Penetration.**  Dr. Marais will also calculate the impact of peak market share figures that Nektar uses.  Nektar assumes that Rezpeg would achieve a higher peak market share with Lilly as a development partner than the drug would achieve with another development partner.  Rep. ¶¶ 52–53.  Dr. Marais will opine there is no support for the position that Nektar developing Rezpeg with Lilly would yield a higher peak market share than if Nektar developed Rezpeg with another pharmaceutical partner of comparable size, scope, and resources to Lilly.  Rep. ¶¶ 54–56.  Dr. Marais will then recalculate alleged damages applying a consistent market penetration rate to both the hypothetical ("with Lilly") and actual ("without Lilly") worlds, and he will show it reduces claimed damages by 57% for atopic dermatitis and 68% for lupus.  Rep. ¶¶ 56–57.

**3.      Nektar's Valuation of Rezpeg Is Inconsistent with Market Data.**  Dr. Marais will explain that Nektar's assessment of Rezpeg's value is inconsistent with real-world observable evidence. Rep. ¶¶ 27–29.  Drawing on his expertise in economic and statistical principles and their application to real-world situations, Dr. Marais will opine that the assessment of rational economic actors—reflected in Nektar's stock price and market capitalization—is inconsistent with Nektar's valuation.  Dr. Marais will explain that Nektar's public market valuation was less than the value of cash Nektar had on hand, which strongly suggests that the market—comprised of sophisticated actors—had the same view of Rezpeg Lilly had at the time it terminated, not the optimistic assessments Nektar and its experts adopted.  *Id.*

This testimony is relevant to Nektar's and its experts' contention that Rezpeg was a high-value project, and that Lilly's decision not to proceed suggests Lilly had a nefarious motive—because, in Nektar's view, commercially reasonable efforts require proceeding with projects that have a high net present value.  Dr. Marais will provide the jury with a framework to assess whether the market's independent assessment of Nektar's value supports Nektar's optimistic assessment and valuation of Rezpeg or if the market shared Lilly's skepticism of Rezpeg's promise.  And expert testimony is appropriate on these subjects because these valuation principles are beyond the ordinary knowledge of lay jurors.

DATED:  July 20, 2026                    Respectfully submitted,


                                          *s/ Ryan Moorman*
                                          Emma Scott (SBN 352078)
                                          KIRKLAND & ELLIS LLP
                                          555 California Street, Suite 2700
                                          San Francisco, CA 94104
                                          Telephone: (415) 439-1400
                                          Facsimile: (415) 439-1500
                                          Email: emma.scott@kirkland.com

                                          James F. Hurst, P.C. (*pro hac vice* pending)
                                          Diana M. Watral, P.C. (admitted *pro hac vice*)
                                          Gabor Balassa, P.C. (admitted *pro hac vice*)
                                          Ryan J. Moorman, P.C. (admitted *pro hac vice*)
                                          Patrick Weeks (admitted *pro hac vice*)
                                          KIRKLAND & ELLIS LLP
                                          333 West Wolf Point Plaza
                                          Chicago, IL 60654
                                          Telephone: (312) 862-2000
                                          Facsimile: (312) 862-2200
                                          Email: james.hurst@kirkland.com
                                          Email: gbalassa@kirkland.com
                                          Email: diana.watral@kirkland.com
                                          Email: ryan.moorman@kirkland.com
                                          Email: patrick.weeks@kirkland.com

                                          *Counsel for Defendant Eli Lilly and Company*