Emma Scott (SBN 352078)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: emma.scott@kirkland.com

James F. Hurst, P.C. (admitted *pro hac vice*)
Gabor Balassa, P.C. (admitted *pro hac vice*)
Diana M. Watral, P.C. (admitted *pro hac vice*)
Ryan J. Moorman, P.C. (admitted *pro hac vice*)
Patrick Weeks (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.hurst@kirkland.com
Email: gbalassa@kirkland.com
Email: diana.watral@kirkland.com
Email: ryan.moorman@kirkland.com
Email: patrick.weeks@kirkland.com

*Counsel for Defendant Eli Lilly and Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY & CO.,<br><br>Defendant. | CASE NO. 3:23-CV-03943-JD<br><br>**DEFENDANT ELI LILLY AND COMPANY'S OPPOSITION TO UNTIMELY MOTION IN LIMINE**<br><br>Judge: Hon. James Donato |

Nektar's last-minute motion to exclude evidence of its current financial condition should be denied. Nektar's sole damages expert, Dr. Rao, measures damages by comparing Nektar's financial condition in a but-for world (where Lilly does not allegedly breach) to the actual world (Nektar's current financial condition). To make this calculation, Dr. Rao expressly states he is quantifying damages "***as of April 21, 2025***"—the date of his report, which is years after the last alleged breach and years after this lawsuit was filed. ECF No. 325 at 11 (emphasis added). He further premises his calculations on whether Nektar [redacted]—present tense—"[redacted] ECF No. 364-3 at Ex. 2, Rao Dep. Tr. at 195:8-19.

Evidence of Nektar's financial condition in the actual world—the very world Dr. Rao measures—is thus the best evidence of whether Nektar is harmed under Dr. Rao's own theory. And evidence rebutting the premises in Dr. Rao's opinion—including whether Nektar has the resources to develop REZPEG on its own—is all fair game at trial, for several independent reasons discussed below.

## I. Nektar Measures Damages as of April 2025, Years After the Alleged Breaches, and Further Relies On Current Information For Its Damages Claim.

Nektar's assertion that it is measuring damages as of the date of the alleged breaches between 2021 and 2023 is false. Nektar recently stated in its controlling Expert Proffer that its sole damages expert, Dr. Rao, "will quantify Nektar's damages" for each alleged breach "***as of April 21, 2025***," the date of Dr. Rao's expert report, years after the alleged breaches. *Id.* (emphasis added). And Nektar's opening slides claim that "[redacted]"—well after the alleged breaches occurred and apparently to the present. 9/8/2026 Nektar Opening Statement (emphasis added). That approach to damages, which looks to Nektar's recent purported financial status and expenditures, is incompatible with its current demand to prevent "Lilly from introducing evidence of Nektar's 2025 or 2026 financial condition." 9/7/2026 Nektar's Motion in Limine ("Mot.") at 1.

Even setting aside Nektar's own statements describing its damages theory, a review of Dr. Rao's actual approach—which Nektar tellingly declines to discuss—confirms that Nektar's ***current*** financial condition is the crux of Nektar's damages claim. Dr. Rao's ***2025*** damages model—which Nektar claims is still valid—rests on the assumption that Lilly's purported breaches deprived Nektar of a development "partner" for REZPEG, and thus [redacted]

[redacted] ECF 228-4 Ex. 80 ¶77 (emphasis added). As Dr. Rao subsequently testified in 2025, Nektar's damages theory is that [redacted]—still present tense—[redacted] ECF No. 364-3 at Ex. 2, Rao Dep. Tr. at 195:8-19 (emphasis added). And just a few weeks ago, Nektar told the Court that its damages model remains sound because "***contemporaneous documents*** confirm" that [redacted] and still has [redacted] ECF No. 371-2 at 1, 5 (emphases added).

Countless other statements by Dr. Rao and Nektar confirm Nektar's reliance on evidence of the ***actual*** current state of the world years after the alleged breaches, and not a mere snapshot in time from each alleged breach between 2021 to 2023 as Nektar now falsely claims. To give just a few examples.

- Nektar's primary sources for its damages model are a ***2025*** study "[redacted] based on current data and the [redacted] which Rao testified contained, as of his 2025 deposition, [redacted] ECF 228-4 Ex. 80 ¶¶ 66, 81, 88-89 (emphasis added); ECF No. 364-3 at Ex. 2, Rao Dep. Tr. at 52:4-15, 59:12-60:12 [redacted]
- Nektar's damages report relies on additional real-world events occurring well after the claimed breaches, including (i) Lebri's 2025 entry into the market as a competitor to Rezpeg, and (ii) Rao's [redacted] ECF No. 364-3 at Ex. 2, Rao Dep. Tr. at 107:4-14, 151:25-152:11.

Nektar's cursory case citations offer no support for its remarkable view that it can advance a damages theory based on current events, yet ignore current events. None of these cases involved such a theory. Rather, they involved circumstances where damages could be clearly measured on the date of the breach, such as the "***undisputed*** mean market price on the ***date*** of breach." *Alta Partners, LLC v. Getty Images Holdings, Inc.*, 165 F.4th 141, 156-57 (2d Cir. 2026) (emphases added). That bears no resemblance to Nektar's efforts to calculate damages based on the ***actual*** world, including Nektar's current financial capacities, years after the alleged breaches.

## II. Nektar's Financial Condition Allegedly Resulting From The Development-Agreement Breakdown Is Integral To Damages.

Independent of being a cornerstone of Nektar's own damages theory, Nektar's current financial

status is also inherent to the calculation of damages because it establishes that Nektar was not harmed by the purported breaches, but instead has benefitted from Lilly returning REZPEG free-and-clear. Nektar's own citations prove that the full financial consequences of the fallout from the development agreement (or lack thereof) are unavoidable. "[G]ains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable, ***unless such gains could not have been made had there been no breach.***" *Fertico Belgium S.A. v. Phosphate Chems. Export Ass'n, Inc.* 70 N.Y.2d 76, 84 (1987) (emphasis added); *see also Gray v. Pashkow*, 168 A.D.2d 849, 850 (N.Y. App. Div. 1990) (recognizing that "subsequent collateral recovery supplied by … the transgressor" ***can*** "alter the amount of the breaching party's obligation").

Here, Nektar has gained considerably from Lilly allegedly breaching the contract and returning REZPEG, and thus the financial successes Nektar has experienced is vital evidence—not an extrinsic windfall. Specifically, Nektar claims that if Lilly had continued to develop REZPEG with Nektar under the license agreement, Nektar "[redacted] ECF 228-4 Ex. 80 at 45-66 & Tab A. However, because Lilly purportedly breached the contract and ***fully returned*** REZPEG to Nektar much ***earlier*** than December 2042, the key mitigation question is whether Nektar is actually better off because now Nektar can develop and license REZPEG while keeping all (or the lion's share) of the profits.

Nektar's own CEO has repeatedly confirmed that Nektar's current financial status flows from Lilly's return of REZPEG. "We were incredibly pleased to have regained the rights to this first-in-class regulatory T cell program from Lilly. ***Importantly, there are no royalties owed to Lilly for this transfer and REZPEG now becomes a wholly owned asset of Nektar's.***" ECF No. 376-3 (emphasis added); *accord* Ex. 1 (2/23/2023 Nektar Special Call) ("[W]e'd be very happy to take ownership of REZPEG back"). In other words, because Nektar "regained the full right to REZPEG … 100% with no encumbrances" due to the termination, Ex. 2 (3/4/2024 FQ4 2023 Earnings Call), the ***actual*** consequences to Nektar in light of the termination is a central, vital question to Nektar's actual damages.

Simply put, Nektar cannot simultaneously complain that Lilly breached a development agreement under which Lilly would have reaped most of REZPEG's profits, yet leave out the vital qualifier that the

upshot is that Nektar fully controls a purportedly valuable and viable asset that it has used to raise money. Nektar must take the good with the bad, and thus cannot avoid inspection of the ***full*** consequences of the fallout of the development agreement.

**III. The Evidence Is Admissible For Other Purposes—Including Impeachment.**

As explained above, Nektar's damages expert makes several vital assumptions about Nektar's future prospects—not least of which is that Nektar ***must*** "[redacted] lacks [redacted] Phase 3 trials, and thus must [redacted] *Supra* at 1-2. When Lilly previously pointed out that these assumptions were untenable given Nektar's initiation of Phase 3 trial and influx of cash from touting REZPEG as a valuable asset to investors, ECF 364, Nektar deflected by claiming that these arguments "raise[] issues suitable … for ***cross-examination***," ECF 371-2 at 1 (emphasis added), and the Court concluded that Dr. Rao was "subject to cross-examination." 8/6/2026 Hr'g Tr. at 17. Nor could there be any dispute that Lilly (at minimum) is entitled to cross-examine Dr. Rao with his unsubstantiated "assumption[s]." *Hostetler v. Driscoll*, 2026 WL 608585, at *1-2 (N.D. Cal. Mar. 4, 2026) (Donato, J.).

Given this concededly legitimate and important purpose, Nektar's Rule 403 argument also falls flat. The risk of prejudice must "substantially" outweigh the probative value of the evidence, but here the equation tips heavily in favor of admission given that Nektar's sole, vital damages expert chose to make future information and assumptions central to his model. Fed. R. Evid. 403.

Nektar's 403 argument is also nonsense. There is zero reason to think that evidence of Nektar's finances will bias the jury against Nektar in its claim against Eli Lilly—a household name Fortune 100 company. Rather, Nektar wants to hide its finances simply because this information will show that Nektar (and its expert) are misleading the jury with fantastical assumptions and false claims that are key to Nektar's damages theories. That is a proper purpose.[1]

**IV. Nektar's Motion Is Untimely.**

The Court can deny Nektar's motion as untimely. Nektar has long known that the future development of REZPEG and Nektar's financial ability to pursue that development is a core question—

[1] Nektar also misstates this Court's prior motion in limine ruling. That consented-to-motion merely excluded evidence and argument that Nektar's financial condition "***motivate[ed] Nektar to bring this lawsuit***." ECF No. 334 at 1 (emphasis added).

indeed, one that ***Nektar*** put in issue. Nektar is simply now concerned that, having been forced to produce the damning information that Nektar has misrepresented its financial condition, that information is irrelevant. That is not legitimate reason for a delayed motion.

DATED: September 8, 2026

Respectfully submitted,

*s/ Ryan Moorman*

Emma Scott (SBN 352078)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: emma.scott@kirkland.com

James F. Hurst, P.C. (admitted *pro hac vice*)
Gabor Balassa, P.C. (admitted *pro hac vice*)
Diana M. Watral, P.C. (admitted *pro hac vice*)
Ryan J. Moorman, P.C. (admitted *pro hac vice*)
Patrick Weeks (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.hurst@kirkland.com
Email: gbalassa@kirkland.com
Email: diana.watral@kirkland.com
Email: ryan.moorman@kirkland.com
Email: patrick.weeks@kirkland.com

*Counsel for Defendant Eli Lilly and Company*