Emma Scott (SBN 352078)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: emma.scott@kirkland.com

James F. Hurst, P.C. (admitted *pro hac vice*)
Gabor Balassa, P.C. (admitted *pro hac vice*)
Diana M. Watral, P.C. (admitted *pro hac vice*)
Ryan J. Moorman, P.C. (admitted *pro hac vice*)
Patrick Weeks (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.hurst@kirkland.com
Email: gbalassa@kirkland.com
Email: diana.watral@kirkland.com
Email: ryan.moorman@kirkland.com
Email: patrick.weeks@kirkland.com

*Counsel for Defendant Eli Lilly and Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEKTAR THERAPEUTICS,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY & CO.,<br><br>Defendant. | CASE NO. 3:23-CV-03943-JD<br><br>**DEFENDANT ELI LILLY AND COMPANY'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Judge: Hon. James Donato<br>Hearing Date: January 28, 2027<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

# NOTICE OF MOTION & MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on January 28, 2027 at 11:00 a.m., or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant Eli Lilly and Company ("Lilly") will and hereby does move for judgment as a matter of law.

This Motion is based on this Notice of Motion, Renewed Motion for Judgment as a Matter of Law, the accompanying appendices, all other pleadings and papers on file in this action and part of the trial record, any matters upon which the Court may take judicial notice, the arguments of counsel, and any other matters the Court may properly consider.

# TABLE OF CONTENTS

Page(s)

I. THE IMPLIED-COVENANT VERDICT LACKED A LEGALLY SUFFICIENT BASIS. ....3

A. The Implied-Covenant Claim Was Legally Defective Because The Agreement Included An Express Duty Of Good Faith. ....3

B. Nektar Failed To Show Distinct Conduct Supporting Its Implied-Covenant Claim. ....6

C. Nektar Did Not Prove Separate Damages. ....7

II. NEKTAR FAILED TO SHOW ANY LEGALLY COGNIZABLE DAMAGES. ....9

A. Nektar Failed To Prove A Vital Predicate For Damages. ....10

B. Nektar Failed To Offer Legally Competent Evidence Of Diminution In Value. ....11

1. Dr. Rao Failed To Calculate Rezpeg's Value To A Hypothetical *Buyer* Pre- And Post-Breach. ....11

2. Nektar's Damages Theory Was Just An Improper Lost-Profits Analysis. ....14

3. Dr. Rao's Testimony Was Flawed For Several Additional Reasons. ....16

C. Nektar Cannot Sustain The Damages Award On New Theories. ....21

D. The Damages Evidence Was Insufficient For Several Other Reasons ....24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*,
___ N.E.3d ____, 2026 WL 1502410 (N.Y. May 28, 2026) ........................................1, 3, 17, 18, 23

*AmTrust N. Am., Inc. v. KF&B, Inc.*,
2020 WL 5503479 (S.D.N.Y. Sept. 11, 2020)........................................................................22

*Bostany v. Trump Org. LLC*,
73 A.D.3d 479 (N.Y. App. Div. 2010) ....................................................................................7

*Canstar v. J.A. Jones Constr. Co.*,
212 A.D.2d 452 (N.Y. App. Div. 1995) ..................................................................................4

*Delucca v. Hayfin Cap. Holdings Ltd.*,
202 A.D.3d 591 (N.Y. App. Div. 2022) ..................................................................................4

*Dolp 1133 Props. II LLC v. Amazon Corp., LLC*,
2015 WL 4885343 (N.Y. Sup. Ct. Aug. 17, 2015)..................................................................4

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
309 F. Supp. 3d 89 (S.D.N.Y. 2018)...................................................................................1, 4

*ESPN, Inc. v. Office of Comm'r of Baseball*,
76 F. Supp. 2d 416 (S.D.N.Y. 1999)........................................................................................9

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*,
380 F.3d 849 (5th Cir. 2004) ........................................................................................ *passim*

*Gilsey v. Wm. Hengerer Co.*,
147 N.Y.S.2d 210 (N.Y. App. Div. 1955) ........................................................................22, 23

*Gray v. Pashkow*,
168 A.D.2d 849 (N.Y. App. Div. 1990) ................................................................................25

*Hendrix v. J-M Mfg. Co.*,
76 F.4th 1164 (9th Cir. 2023) ..........................................................................2, 8, 9, 10, 21

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*,
554 F. Supp. 3d 542 (S.D.N.Y. 2021)................................................................................6, 16

*Jakobovits v. PHL Variable Ins. Co.*,
645 F. Supp. 3d 95 (E.D.N.Y. 2022) ....................................................................................19

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
29 F.4th 118 (2d Cir. 2022) .........................................................................................1, 6, 7, 8

*Joshua David Mellberg LLC v. Will*,
386 F. Supp. 3d 1098 (D. Ariz. 2019) ....................10

*La Canada Ventures, Inc. v. MDalgorithms, Inc.*,
___ F. Supp. 3d ____, 2026 WL 1661666 (N.D. Cal. June 9, 2026).................... *passim*

*Lakeside-Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009) ....................11

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988) ....................10

*New Horizons Amusement Enters. v. Zullo*,
301 A.D.2d 825 (N.Y. App. Div. 2003) ....................2, 9, 23, 24, 25

*Pager v. Chubb Grp. of Ins. Cos.*,
718 F. Supp. 3d 243 (E.D.N.Y. 2024) ....................6, 7

*Red Apple Child Dev. Ctr. v. Cmty. Sch. Dists. Two*,
303 A.D.2d 156 (N.Y. App. Div. 2003) ....................18

*Ruvalcaba v. City of Los Angeles*,
167 F.3d 514 (9th Cir. 1999) ....................21

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000).................... *passim*

*In re Sept. 11 Litig.*,
802 F.3d 314 (2d Cir. 2015)....................11, 12, 14, 21

*Sharma v. Skaarup Ship Mgmt. Corp.*,
916 F.2d 820 (2d Cir. 1990)....................18

*WCA Holdings III, LLC v. Panasonic Avionics Corp.*,
704 F. Supp. 3d 473 (S.D.N.Y. 2023)....................6

*Windy Cove, Inc. v. Circle K Stores, Inc.*,
2023 WL 6284466 (S.D. Cal. Sept. 7, 2023)....................18

**Rules**

Fed. R. Civ. P. 26....................8

## INTRODUCTION

Lilly is entitled to judgment as a matter of law ("JMOL") on two independent grounds. First, the jury lacked a legally sufficient basis to find liability on an implied-covenant theory. Second, the jury lacked a legally sufficient basis to find any damages.

**Liability.** The implied-covenant verdict is defective because Nektar did not—and could not—show that Lilly breached any "particular ***unexpressed*** promise" to act in good faith that was "***implicit*** in the agreement when viewed as a whole." *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, ___ N.E.3d ____, 2026 WL 1502410, at *3 (N.Y. May 28, 2026) (emphases added). That is because the Agreement "***expressly*** required" Lilly to act in good faith, so an ***implied***-covenant claim based on a purported failure to act in good faith "add[ed] nothing to the mix" and was improper as a matter of law. *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 94 (S.D.N.Y. 2018). Nektar repeatedly conceded the point at trial; its counsel even "highlight[ed]" for the jury that Lilly's express "promise[] to act in good faith" was one of the "most important" provisions in the contract and "an essential part of what was going on here." App.1-2.

Nektar also flouted the rule that an implied-covenant claim must be "based on allegations different from those underlying the breach of contract claim" and must seek separate "relief … not intrinsically tied to the [contract] damages." *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022). Nektar's only implied-covenant theory at trial was that Lilly purportedly delayed Rezpeg's development and concealed its allegedly waning interest in Rezpeg. App.3. Yet Nektar contended that this purported conduct violated "***both*** [contractual] reasonable efforts ***and*** good faith," ostensibly because this conduct "broke[] a promise …. ***that was both express and implied*** to treat us fairly, to treat us honestly, and to move this drug forward in development." App.4-5 (emphases added). Nektar also failed to offer any distinct damages for its implied-covenant claim, opting instead to hang its entire damages case on Dr. Rao's testimony about breach-of-contract damages.

**Damages.** Even if Nektar had a viable implied-covenant theory, Lilly would still be entitled to JMOL because the damages evidence was "deeply flawed, and no reasonable jury could have relied on [it] to deduce a non-speculative … award." *La Canada Ventures, Inc. v. MDalgorithms, Inc.*, ___ F. Supp. 3d ____, 2026 WL 1661666, at *11 (N.D. Cal. June 9, 2026); *accord Hendrix v. J-M Mfg. Co.*, 76 F.4th

1164, 1175 (9th Cir. 2023). Governing New York law requires a plaintiff to prove damages with "competent admissible evidence." *New Horizons Amusement Enters. v. Zullo*, 301 A.D.2d 825, 827 (N.Y. App. Div. 2003); *see* App.10 §12.12. Nektar's damages evidence was defective as a matter of law and thus unable to sustain any award of damages on two key grounds—one of which this Court already identified in noting "the serious problems" in Nektar's case, and one of which led an appellate court to impose JMOL on similar facts. App.13.

First, Nektar never substantiated Dr. Rao's "vital" assumption that Rezpeg had a 34% "[p]robability of success," which was "an essential input into [his] damages model." App.13-18. Dr. Rao "relied entirely on Dr. Robbins" for this figure, but Nektar never elicited the critical testimony from Dr. Robbins: "there was no discussion of 34 percent, where that number came from, what it was based on, or anything else." App.16. Given this "enormous hole" in Nektar's damages case and the absence of any other basis for calculating damages, App.19, the verdict was necessarily "based on speculation or guesswork" instead of competent evidence, and thus cannot stand. *Hendrix*, 76 F.4th at 1175; *accord La Canada*, 2026 WL 1661666, at *11.

Second, Nektar purported to stake its damages theory on a "diminution in value" theory as a mechanism to avoid (among other problems) the Agreement's bar on lost-profits damages. App.20-23, 18; *see also* App.9 §10.6. The only support for this theory was Dr. Rao's testimony, but his testimony was not competent evidence of diminution in value as a matter of law for at least two independent reasons.

For starters, Dr. Rao never measured Rezpeg's "market value" as determined by "the price at which the property" (Rezpeg) "would change hands between a willing buyer and a willing seller." *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000). That is the ***very*** defect that led a federal appellate court—applying *Schonfeld* to diminution-in-value testimony—to "reverse [a] $120 million award of lost asset damages." *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 855, 860-61 (5th Cir. 2004). The expert in *Fluorine* "provided a damage estimate" that "discounted [a] stream of future profits to present value" without asking what a ***buyer*** would pay for the asset. *Id.* Dr. Rao made the same error. He applied a "Discount Factor" to "Payments" and "Royalties" that Nektar might earn from certain uses of the asset (Rezpeg), *e.g.*, App.15, while never explaining "what a ***hypothetical buyer*** would pay for [Rezpeg]" to acquire "the chance to earn future profits" from Rezpeg. *Fluorine*, 380 F.3d at 860-61.

Additionally, Dr. Rao's analysis was really a lost-profits analysis notwithstanding the diminution-in-value label: he calculated Nektar's projected revenue and subtracted costs. Revenue minus costs is the very definition of profits, as the Court recognized: "How is this not the same as lost profits?" App.24. And lost profits cannot sustain this verdict for multiple independent reasons: The Agreement bars them outright. App.9 §10.6. Even if that were not the case, Nektar did not try to satisfy New York's strict standard for proving lost profits on a speculative pharmaceutical product. *Schonfeld*, 218 F.3d at 172-73. Nektar also repeatedly disclaimed lost-profits damages. ECF 218-1 at 7-9; ECF 287 at 44; App.25. And the Court instructed the jury on diminution alone. App.25-26; ECF 451 at 16.

For each of these reasons (and others below that the Court need not reach), Lilly is entitled to JMOL.

## ARGUMENT

## I. THE IMPLIED-COVENANT VERDICT LACKED A LEGALLY SUFFICIENT BASIS.

Lilly is entitled to JMOL on Nektar's implied-covenant claim, which this Court has already described as the "world's weakest claim." App.27; *see also* App.3 ("[W]hat is the theory? I'm not really getting it."). That skepticism was warranted. A plaintiff faces a "heavy burden" on an implied-covenant claim because it must prove that an "***unexpressed*** promise sought to be enforced is in fact ***implicit*** in the agreement when viewed as a whole." *111 W. 57th*, 2026 WL 1502410, at *3 (emphases added). Nektar's claim fell short in three independent respects. First, an implied-covenant claim was unavailable as a matter of law because the Agreement included an express good-faith requirement. Second, Nektar's implied-covenant claim relied on the same evidence as its contract claim, contrary to Nektar's obligation to show distinct conduct for each claim. Third, Nektar failed to show implied-covenant damages distinct from its alleged breach-of-contract damages.

### A. The Implied-Covenant Claim Was Legally Defective Because The Agreement Included An Express Duty Of Good Faith.

The implied-covenant verdict was legally improper because the Agreement explicitly required Lilly to act in good faith, leaving no room for an implied obligation to do the same. The law is settled on this point: when a contract "***expressly*** required [the defendant] to exercise its discretion reasonably and equitably," an "implied-covenant claim[] add[s] nothing to the mix" and cannot support liability. *EFG*,

309 F. Supp. 3d at 94. Courts thus reject implied-covenant claims when a contract expressly compels a defendant to act "in good faith," *Dolp 1133 Props. II LLC v. Amazon Corp., LLC*, 2015 WL 4885343, at *5 (N.Y. Sup. Ct. Aug. 17, 2015), expressly requires "exercis[ing] … discretion reasonably and equitably," *EFG*, 309 F. Supp. 3d at 94, or expressly forbids "bad faith action," *Delucca v. Hayfin Cap. Holdings Ltd.*, 202 A.D.3d 591, 591-92 (N.Y. App. Div. 2022). Simply put, an implied-covenant claim that is "redundant" with the parties' contractual obligations is a nonstarter under New York law, and it does not get more "redundant" than an explicit good-faith obligation and an implied good-faith obligation. *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453 (N.Y. App. Div. 1995).

That rule disposes of Nektar's claim because the Agreement unambiguously imposed a duty of good faith. The Agreement did not simply require Lilly to apply "Commercially Reasonable Efforts" ("CRE") in developing Rezpeg, but compelled "Lilly [to] ***act in good faith***" when making those efforts. App.7 §4.1 (emphasis added). Nektar itself highlighted the express good-faith obligation from the beginning of the case to the close of proceedings. *E.g.,* App.1-2, 28. In its opening statement, Nektar's counsel called out the "promis[e] to act in good faith" as one of the "most important" ***express*** contract provisions—highlighting that "good faith" was ***not*** just implied, App.1-2 (emphases added):

> Here's the contract, but we're going to highlight certain sections that are most important. Lilly promised to act in good faith. … And you know what? ***As it speaks to good faith, usually good faith isn't set out in a contract; it's just implied. But in this contract, I have tabbed all the places where good faith is noted in the contract***. ***That was an essential part of what was going on here***, that Nektar could trust Lilly to be honest, to be candid, to be forthright, and not be manipulative and not conceal things, which is ultimately what Lilly did to it.

As Nektar's counsel made these pronouncements, she showed the jury a slide emphasizing that "Lilly Promised 'Good Faith'" with respect to "using Commercially Reasonable Efforts." App.29 (highlighting in original).




Counsel emphasized again in closing that "[n]ormally in contracts you see no reference to the words 'good faith.' It is implied. But here, good faith was so important to the parties that we see it referenced ***19 separate times***." App.28 (emphasis added). To drive the point home, counsel showed the jury another slide that highlighted the phrase "good faith" in numerous contractual provisions, including the CRE provision. App.30 (highlighting in original). [1]




[1] This image was shown to the jury during closing, but comes from Nektar's draft deck because Nektar refused to timely produce the full build of its final slides despite the parties' agreement to exchange closing slides and multiple follow-up requests by Lilly.

Throughout the trial, Nektar similarly elicited testimony that "there was a contract between Lilly and Nektar where Lilly was supposed to use good faith," App.31, and Nektar's CEO confirmed that, "per the contract," Lilly was required to "act in good faith." App.32.

Under New York law, the Court can stop there. The Agreement explicitly and concededly incorporated a good-faith obligation. That precluded liability under an implied-covenant theory.

**B. Nektar Failed To Show Distinct Conduct Supporting Its Implied-Covenant Claim.**

Nektar's implied-covenant theory was defective for another independent reason: the claim "plainly concern[ed] the same underlying facts" as Nektar's contract theory. *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 567 (S.D.N.Y. 2021). An implied-covenant claim fails as a matter of law "where the ***conduct*** allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Pager v. Chubb Grp. of Ins. Cos.*, 718 F. Supp. 3d 243, 251 (E.D.N.Y. 2024) (emphasis added), *aff'd,* 2025 WL 855846 (2d Cir. Mar. 19, 2025); *accord JN*, 29 F.4th at 128. "[A] plaintiff must thread the needle of '[proving] an implied duty that is consistent with the express contractual terms, but base[d] ... on [facts] that are distinct from the factual predicate for its contract claims.'" *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 499 (S.D.N.Y. 2023).

Nektar did not thread that needle at trial: it failed to identify distinct conduct that allegedly violated only Lilly's purported duty of good faith. Nektar's good-faith theory was that Lilly "delay[ed]" Rezpeg's development and "hid[] important information." App.3.[2] But Nektar also offered the same alleged conduct as the predicate for its breach-of-contract claim. Nektar told the jury that Lilly "broke[] a promise …. that was ***both*** express ***and*** implied to treat us fairly, to treat us honestly, and to move this drug forward in development." App.5 (emphases added). Throughout the trial, Nektar likewise characterized its delay and concealment theory as rooted in contractual "promises" made by Lilly. App.35; *accord* App.36-37. Nektar claimed that Lilly's purported "effort to delay … violated … ***both*** reasonable efforts ***and*** good

[2] Nektar abandoned its prior suggestion of an implied-covenant claim based on Lilly's decision to discontinue development of Rezpeg for lupus by failing to make this argument at trial—even when the Court directly asked, "what is the [implied-covenant] theory?" App.3. Regardless, any lupus-based implied-covenant claim would have duplicated Nektar's contract claims and alleged damages, because Nektar argued that Lilly's discontinuation of Rezpeg's development for lupus was a breach of the Agreement's CRE provision. *E.g.*, App.33-34; *see also infra* n.3.

faith." App.4 (emphases added). It argued that delays meant that "Lilly w[as] … backtracking on its commitment to Nektar" and thereby "violat[ing] that contract" or the "agreement." App.38, 31, 39; *accord* App.40-43. It argued that "the license agreement" required Lilly "to be ***forthright*** with [its] business partner Nektar," App.44-45 (emphasis added). And in closing, Nektar showed the jury a slide lumping all of Lilly's alleged conduct under the claim that "Lilly Broke Its Promises." App.46.




This Court has already recognized the overlap. In recapping Nektar's contractual arguments—the "CRE breach"—the Court described Nektar's theories as "Well, they slow-balled us. They lied to us." App.47. That was an apt characterization of Nektar's contractual claim. And that characterization also means Nektar's implied-covenant claim based on the same allegations of delay and concealment is defective as a matter of law. *See JN*, 29 F.4th at 128; *Pager*, 718 F. Supp. 3d at 251.

**C. Nektar Did Not Prove Separate Damages.**

The evidence Nektar offered at trial on damages further confirmed the duplication of Nektar's contractual and implied-covenant claims—and was independently fatal. The "relief sought" for an implied-covenant claim cannot be "intrinsically tied to the damages that flow from the breach of contract." *JN*, 29 F.4th at 128; *see, e.g.*, *Bostany v. Trump Org. LLC*, 73 A.D.3d 479, 481 (N.Y. App. Div. 2010) (rejecting implied-covenant claim when "the alleged breach [was] intrinsically tied to the damages allegedly resulting from a breach of the contract"). Yet although Nektar acknowledged that damages are

an essential element of both its implied-covenant and breach-of-contract claims, *see* ECF 351 at 5-8, it never identified separate damages for each.

At trial, Nektar relied on Dr. Rao, who claimed to have measured damages for five alleged breaches—and nothing else.[3] He earmarked no damages for the implied-covenant claim; rather, all of his damages theories presumed "that Lilly ha[d] breached the license agreement." App.50; *see also* App.51 (invoking the "commercially reasonable effort standards"). Nor could Dr. Rao have even attempted to offer the required distinct contract and implied-covenant damages at trial, because his report committed him to opining "[redacted]" ECF 218-3, Ex. A at 22 (emphases added); *see also* Fed. R. Civ. P. 26(a)(2)(B)(i) (reports must contain "a complete statement of all opinions"). Nektar thus failed to carry its basic burden of proving implied-covenant damages that were distinct from its asserted contractual damages. *See JN*, 29 F.4th at 128.

This left Nektar without ***any*** conceivable damages theory (or evidence) to sustain the implied-covenant verdict. A "jury may not render a verdict based on speculation or guesswork," but must have "evidence from which [it] could reasonably determine [damages]." *Hendrix*, 76 F.4th at 1175. Here, ***all*** the purported damages evidence came from Dr. Rao: he gave "five options for the jury to pick from with a number for each option," and nothing else "was documented or quantified." App.21-23, 18, 52. If Nektar tries to justify the implied-covenant verdict by arguing that it is different from the contractual damages theories on which Dr. Rao testified, that is simply an argument that Nektar had no damages evidence at all—because Dr. Rao "was the man who was supposed to tell the jury, 'This is how much the case is worth.'" App.18. Of course, Dr. Rao completely failed in that endeavor, no matter the legal theory, as explained in detail below.[4] But he certainly did not provide competent damages evidence for an implied-covenant claim distinct from Nektar's contract claim, and so the implied-covenant claim was defective as a matter of law.

---

[3] The five alleged breaches were (1) the August 2021 math error for Phase 1 AtD data; (2) the May 2022 decision not to overenroll the Phase 2 lupus trial; (3) the April 2022 rethink of the Phase 2 AtD study design; (4) the June 2022 development of a Phase 2 AtD study; and (5) the February 2023 decision to terminate lupus development. App.48-49.

[4] To be clear, Dr. Rao's testimony was flawed in its own right and unable to sustain a verdict on its own terms—even if the jury had believed him and picked one of his "five options." App.21; *infra* 9-21.

* * *

For each of these independent reasons, Lilly is entitled to JMOL because the evidence was legally insufficient to establish liability.

## II. NEKTAR FAILED TO SHOW ANY LEGALLY COGNIZABLE DAMAGES.

Lilly is independently entitled to JMOL because Nektar failed to offer legally cognizable evidence of any damages whatsoever. An award of damages must be "supported by [] evidence" legally sufficient to recover under the governing law—here, New York law. *La Canada*, 2026 WL 1661666, at *10; App.10 §12.12. Absent such "competent admissible evidence [of] the damages allegedly suffered," JMOL is required. *New Horizons*, 301 A.D.2d at 827; *see, e.g.*, *Hendrix*, 76 F.4th at 1175 (affirming JMOL given flaws in damages evidence); *see also ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 416, 418 (S.D.N.Y. 1999) (explaining that New York law requires "prov[ing] the existence of damages with certainty," free from "conjecture or guesswork").

To try to prove up damages at trial, Nektar relied on Dr. Rao. When Nektar suggested at the charging conference that other witnesses had testified to alleged damages, the Court responded that "[n]one of that was documented or quantified" and that Dr. Rao "was the man who was supposed to tell the jury, 'This is how much the case is worth.'" App.23, 18. Before trial, Nektar had assured the Court that Dr. Rao would be measuring "the drug's diminution in value," which it called "fundamentally different from a lost profits calculation." ECF 218-1 at 6-7. The Court provisionally accepted that characterization, denying summary judgment "[o]n the record as it currently stands." ECF 312.

At trial, however, Nektar failed to substantiate any damages, let alone any diminution in the value of Rezpeg. The evidence was deficient on several grounds. First, Nektar's damages theory rested on an assumption about Rezpeg's future odds of success, yet Nektar failed to elicit testimony to prove that vital assumption. Second, Nektar's evidence was legally insufficient because Dr. Rao flouted New York law in calculating diminution-in-value damages. Third, even if Nektar could retreat from its defective diminution theory (it cannot), any alternative damages theory would fare even worse. Fourth, any damages award would be legally improper for several additional reasons.

### A. Nektar Failed To Prove A Vital Predicate For Damages.

Whatever legal viability Nektar's damages theory might have had in the abstract, Nektar never built the factual foundation for that theory. As the Court noted at trial, a "very serious problem" is that Nektar relied on an assumption it never proved: that Rezpeg had "a 34 percent chance of success" on an AtD indication as established by "another expert …, Dr. Robbins." App.13-14. Nektar's damages witness, Dr. Rao, treated that figure as one of his "vital inputs," and for that input "he relied entirely on Dr. Robbins." App.16. But "on the direct of Dr. Robbins, there was no discussion of 34 percent, where that number came from, what it was based on, or anything else." *Id.* Moreover, Dr. Rao made a parallel assumption that Rezpeg had a 45% chance of success on a lupus indication, *see* App.53, but that figure also never came up during Dr. Robbins' testimony.

Nektar's failure to substantiate these crucial assumptions about Rezpeg's future prospects is fatal. A plaintiff must establish a legally sufficient evidentiary basis for damages, which requires "evidence from which a jury could reasonably determine" the purported loss. *Hendrix*, 76 F.4th at 1175. Yet Nektar's damages expert "simply got on the stand," promised that a vital probability "percent[age]" was forthcoming, "and then stepped down." *La Canada*, 2026 WL 1661666, at *11. "That is not good enough" to provide the jury with sufficient evidence to award damages. *Id.*; *cf. McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (rejecting expert testimony that "rests on unsupported assumptions"). Given this "enormous hole" in Nektar's damages case, App.19, the jury could not have "deduce[d] a non-speculative" award. *La Canada*, 2026 WL 1661666, at *11.

Nektar cannot avoid its self-made problem by claiming that its attorneys—or worse yet, the jurors—were entitled to calculate the 34% and 45% figures independently as a "question of math." App.54, 19. The Court already correctly rejected that gambit: "That's you testifying. That's not evidence." App.19, 54-56. "You don't get to say that because he didn't say that." *Id.*; *see also Joshua David Mellberg LLC v. Will*, 386 F. Supp. 3d 1098, 1108 (D. Ariz. 2019) (collecting cases and requiring expert testimony).

Simply put, the lack of expert testimony on vital assumptions about Rezpeg's prospects of success left Nektar with legally insufficient evidence of any damages. That lack of foundational evidence means

that "the jury could have relied only on speculation," entitling Lilly to JMOL. *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-03 (9th Cir. 2009); *La Canada*, 2026 WL 1661666, at *11.

**B. Nektar Failed To Offer Legally Competent Evidence Of Diminution In Value.**

Even if Nektar had laid the basic foundation for its damages theory, what it built on top was not competent evidence of damages either. Unable to recover lost profits under the Agreement or New York law, *infra* 15-16, Nektar relabeled its asserted damages as "diminution" in Rezpeg's value. App.21-23, 18, 52; ECF 451 at 16. To prove diminution in value, a plaintiff must "calculat[e] the difference between the pre- and post-[breach] market values" of the allegedly damaged "asset"—here, Rezpeg—with the market value set by "the price at which the property would change hands between a willing buyer and a willing seller." *In re Sept. 11 Litig.*, 802 F.3d 314, 336 (2d Cir. 2015); *Schonfeld*, 218 F.3d at 178. "Competent [e]vidence" of diminution in value for an asset like Rezpeg takes the form of "prior sales history," "sales of comparable assets," "sufficiently qualified [testimony by the] asset's owner," or "expert[]" testimony. *Schonfeld*, 218 F.3d at 178.

Nektar did not introduce any such evidence. Nektar staked its "diminution" theory on the testimony of Dr. Rao, but his testimony was defective on two independent grounds. App.21-23, 18, 52.[5] First, he failed to measure Rezpeg's market value in an arm's-length transaction between a buyer and a seller—the ***very flaw*** that required JMOL in a similar case. Second, his purported diminution analysis was really a lost-profits model—"We would have made X but we're actually going to make Y"—which was improper as a matter of law and a retreat from Nektar's pretrial representations. App.24, 57.

**1. Dr. Rao Failed To Calculate Rezpeg's Value To A Hypothetical *Buyer* Pre-And Post-Breach.**

Dr. Rao failed to perform the diminution analysis that New York law requires: an assessment of "the price at which [Rezpeg] would ***change hands between a willing buyer and a willing seller***." *Schonfeld*, 218 F.3d at 178 (emphasis added). That failure is fatal, as the Fifth Circuit explained in an on-point decision: "*Schonfeld* requires" that an expert "analyze what a buyer would have paid" for the allegedly injured asset. *Fluorine*, 380 F.3d at 860-61. This principle means that an expert cannot "calculate[] the value based solely on expected future profits" that are "discounted … to present value"

[5] Additional dispositive flaws in Dr. Rao's testimony are addressed in Section II.B.3, *infra*.

***without*** going a step further to determine the asset's "market value" to "a hypothetical buyer." *Id.* That is because an object's purported value "to the owner" is insufficient without examining what "a willing buyer" would have paid "pre- and post-[breach]." *Schonfeld*, 218 F.3d at 178; *Sept. 11*, 802 F.3d at 336 (requiring identification of "the amount that a buyer in the open market would have paid to assume [the plaintiff's] rights" (emphasis omitted)). Failure to conduct that analysis requires rejecting an "award of lost asset damages" upon the defendant's "motion[] for judgment as a matter of law." *Fluorine*, 380 F.3d at 855, 861.

Dr. Rao made no pretense of conducting the required analysis of what "a willing buyer" would have paid "pre- and post-[breach]." *Schonfeld*, 218 F.3d at 178; *Sept. 11*, 802 F.3d at 336. Instead, he rehashed the exact approach that *Fluorine* rejected: calculating Rezpeg's purported value to Nektar based on expected future earnings which he ostensibly "discounted … to present value." 380 F.3d at 860-61. In Dr. Rao's own words, his model purportedly showed "***Nektar's*** … net present value in the world with no breach" and "***Nektar's*** damages." App.58, 51 (emphases added); *accord* App.59-60 (making "the same calculations" for lupus-related breaches); App.48 (opining on "what harm happened to Nektar").

The underlying math confirmed that Dr. Rao did not measure Rezpeg's value to a hypothetical buyer pre- and post-breach, but instead measured the future revenue streams Nektar itself allegedly lost. Dr. Rao assumed that, in a world with "No Lilly Breach," Nektar would have received $12.1 billion in "Payments" and "Royalties" (*i.e.*, revenue) less "Development Costs" (*i.e.*, costs), with these contractual earnings (*i.e.*, profits) having an "NPV" of $1.432 billion for an AtD indication based on a "Discount Factor" of 6.25%. App.15 (damages opinion for AtD); *see also* App.53 (using similar approach to claim an "NPV" of $526 million for the lupus indication); App.61 ("those sales turn into money that goes back to Nektar"). Dr. Rao then assumed that in a world with "Lilly Breach," "Nektar" would have received $8.4 billion in "Payments" and "Royalties" for the AtD indication, which had a "N[et] P[resent] V[alue]" of $694,759,099 based on a "Discount Factor." App.15 (AtD); *see also* App.53 (using similar approach to assert $2.7 billion in royalties and a $287 million "NPV" for the lupus indication); App.20, 62-66 (discounting "cash inflows and cash outflows" and looking to "sales of the product … where ***Nektar*** has a new partner" and "what ***Nektar*** would need to spend" (emphases added)). Dr. Rao concluded by comparing the Nektar-focused discounted values to arrive at total damages based on the assumption that

"Nektar is making less [*i.e.*, profit] in th[e] world with the breach." App.15 (highlighting added), 66-68; *see also* App.53 (similar approach to lupus).

**Nektar's Damages for Eczema Assumed Breach (August 2021)**

| Category | No Lilly Breach | Lilly Breach |
|---|---|---|
| Probability of Success | 34% | 34% |
| Biosimilar Entry Date | 2043 | 2043 |
| Nektar Development Costs | 25% | 100% / 25% |
| Market Launch | Jan. 2027 | Nov. 2029 |
| Sales | $57.4B | $32.5B |
| Payments | $250M | $537M |
| Royalties | $12.1B | $8.4B |
| Discount Factor | 6.25% | 6.25% / 12% |
| **NPV** | **$1,432,338,898** | **$694,759,099** |

**DAMAGES: $737,579,799**

At no point did Dr. Rao evaluate "what a hypothetical buyer would pay" for Rezpeg immediately before and after the supposed breaches. *Fluorine*, 380 F.3d at 860; *contra Schonfeld*, 218 F.3d at 178 (rejecting analysis based on the "peculiar value the object in question may have had to the owner"). Despite identifying five purported breaches in 2021, 2022, and 2023, *see* App.49, Dr. Rao declined to assess what Rezpeg would be worth on the open market at any of these points (let alone how the alleged breaches diminished such value(s)). Instead, he offered a Nektar-specific, AtD- and lupus-focused damages calculation based on what "Nektar" expected "to spend" and to "mak[e]" with respect to those potential indications. App.14, 58, 63-66. That is not a proper diminution analysis, and thus requires "judgment as a matter of law" for Lilly. *Fluorine*, 380 F.3d at 855, 858-61.

Lilly acknowledges that the Court previously questioned whether a hypothetical-buyer analysis was necessary because "there's nothing to buy because there's no product." App.69. Respectfully, that question inverts the diminution inquiry, which looks to the value of the "asset" itself, "not the lost profits that the asset could have produced in the future." *Schonfeld*, 218 F.3d at 176. Here, the asset is Rezpeg, which a willing buyer might purchase based on, for example, its assessment of Rezpeg's potential to generate future profits through commercialization. *E.g.*, App.15 (projecting future profits). Thus, Nektar

was obligated to measure what a "hypothetical buyer would pay for [Rezpeg]" to acquire "the chance to earn [those] future profits" from Rezpeg "pre- and post-[breach]." *Fluorine*, 380 F.3d at 860; *Sept. 11*, 802 F.3d at 336.

Ample caselaw—and the facts of this case—confirm that Rezpeg was susceptible to a buyer-oriented, asset-level diminution-in-value analysis, which Nektar never performed. Courts have explained that this analysis can be applied to many types of property rights that might generate future profits, ranging from an "exclusive license," *Fluorine*, 380 F.3d at 860, to a "supply contract," *Schonfeld*, 218 F.3d at 177. Here, Rezpeg was an asset capable of being purchased by a buyer; Nektar never claimed that the molecule could not be sold, and Nektar indeed has raised hundreds of millions of dollars by telling investors that Rezpeg is a valuable "asset." App.70-75.

Yet despite ample opportunity to determine what Rezpeg would be worth in an arm's-length sale, Nektar refused to address the fundamental question of "what a hypothetical buyer would pay [for Rezpeg] for the chance to earn future profits" from Rezpeg before and after the purported breach. *Fluorine*, 380 F.3d at 860. On this independent ground, the Court should reject "the $[90] million award of lost asset damages" and grant "judgment as a matter of law" to Lilly. *Fluorine*, 380 F.3d at 855, 858-61.

**2. Nektar's Damages Theory Was Just An Improper Lost-Profits Analysis.**

Although Nektar called Dr. Rao's testimony a "diminution" analysis, the trial evidence took the form of a "lost profits" analysis, as this Court already observed. App.22, 47. But a lost-profits analysis was not competent evidence of damages under the plain text of the Agreement and black-letter New York law, thus leaving the jury without any legitimate non-speculative basis for a damages award.

To begin, Dr. Rao clearly conducted a lost-profits analysis. As shown above, he projected Nektar's own revenues on two indications (AtD and lupus), subtracted Nektar's projected costs, and compared the resulting figures in hypothetical worlds with and without the alleged breaches. App.15, 20, 51, 53, 58-60, 66, 76. Per his own slides, he looked at "Cash Inflows" minus "Cash Outflows," and he told the jury that "***Nektar is making less*** in that world with the breach" than Nektar would have made under the Agreement "in the world with Lilly." App.77 (highlighting added); App.64-66 (emphasis added).




The Court rightly recognized this lost-profits calculation for what it was: "Overall we would have made this had they not breached. Now we're only going to make this, which is less." App.78.

Dr. Rao's reliance on a lost-profits model is fatal. For three independent reasons, a lost-profits theory is not valid evidence and thus cannot provide the necessary foundation for any award of damages.

First, the Agreement bars lost profits (hence Nektar's purported pivot to diminution in value): "In no event shall either Nektar or Lilly be liable for … special damages, ***including lost profits***, arising out of this Agreement based on contract, tort or any other legal theory." App.9 §10.6 (emphasis added).

Second, Nektar disclaimed lost profits, and the case went to the jury on diminution in value alone. To survive exclusion and summary judgment, Nektar insisted that Dr. Rao's analysis was "fundamentally different from a lost profits calculation." ECF 218-1 at 7. It told the Court before trial that its diminution damages "are not lost profits or special damages." ECF 287 at 44. And at the charging conference, Nektar's counsel confirmed, "we're not arguing for special damages." App.25. The Court took Nektar at its word: "There's no evidence of lost profits. So I'm not going to give an instruction on something to which there's no evidence." *Id.*; *see* App.25-26 ("There's no evidence and no argument on lost profits; is that right?" — "I understand, Your Honor."). The Court likewise rejected Nektar's request for a catch-all

damages instruction as "too open-ended," correctly observing that Nektar's other claimed losses were never "documented or quantified." App.23. Nektar cannot now defend the verdict on a theory it disavowed, never presented, and on which the jury was never instructed.

Third, even setting aside those flaws, any lost-profits claim would be too "speculative" as a matter of black-letter New York law. *Schonfeld*, 218 F.3d at 172. Rezpeg was a novel molecule—several years from any potential commercialization—with "no historic record of operations from which lost profits could have been projected." *Id.* at 173. Any claim of future profits thus would rest on "a multitude of assumptions," such as Rezpeg's ability to survive several clinical trials, obtain FDA approval, and win market share from existing medicines. *Id.* at 172-75 (affirming summary judgment against lost-profits damages and noting the "risks" of "competitors," "technological developments," "regulatory changes," and "general market movements"). Courts applying New York law have deemed future medical-product sales too speculative, *e.g.*, *InspiRx*, 554 F. Supp. 3d at 563-66, and even Dr. Rao's unsubstantiated assumptions predicted ***less*** than a 50% chance of Rezpeg even obtaining regulatory approval as needed for Rezpeg to so much as enter the market (to say nothing of Rezpeg actually becoming commercially viable). *See* App.14-16 (34% for AtD); App.53 (45% for lupus).

### 3. Dr. Rao's Testimony Was Flawed For Several Additional Reasons.

Beyond his two key failures to properly measure the diminution-in-value damages theory on which Nektar staked its case, *supra* 11-16, Dr. Rao's testimony was legally insufficient to support any damages award for several more independent reasons.

#### a. Dr. Rao Failed To Measure Rezpeg's *Overall* Value As An Asset.

As explained above, Dr. Rao failed to conduct a proper diminution-in-value analysis because he did not even try to measure Rezpeg's value from the perspective of a buyer and really just performed a lost-profits analysis. But in addition, Dr. Rao's purported diminution testimony also defied New York law because it did not attempt to measure Rezpeg's ***overall*** value as an asset. A diminution-in-value analysis requires assessing the "market value of the asset" as a whole, *Schonfeld*, 218 F.3d at 176, but Dr. Rao valued just two potential revenue streams—Nektar's expected earnings from Rezpeg's AtD and lupus indications—explicitly omitting any value from Rezpeg's ability to treat "other indications." App.15, 51, 53, 58, 79. That is like appraising a five-room house by measuring only two of its rooms.

And the rooms Dr. Rao skipped are substantial. He concededly "did no analysis" of Rezpeg's value in treating alopecia (even though Nektar projects billions in alopecia sales). App.80. Nor did he consider any of the other indications Nektar has "prioritized," such as asthma, allergic rhinitis, IBD, and rheumatoid arthritis. App.81-82. He instead insisted that "damages need to be calculated on an ***indication-by-indication*** basis," App.80 (emphasis added)—which is precisely why his numbers say nothing about what Rezpeg was worth ***overall*** as a molecule with the potential to treat a wide range of conditions.

Dr. Rao's failure to value the asset as a whole requires JMOL. Nektar staked its case on a "diminution" theory based on his testimony, *see* App.18, 21-23, 52, yet he never provided "competent evidence" of diminution in value under black-letter law and thus left the jury without a legally viable, "non-speculative" basis for damages. *Schonfeld*, 218 F.3d at 176-78; *La Canada*, 2026 WL 1661666, at *11.

**b. Dr. Rao Improperly Assumed That Lilly Could Not Terminate.**

Dr. Rao's model also rested on a legally untenable premise: that Lilly was not allowed to walk away. His asserted damages consisted of the milestone "[p]ayments" and "[r]oyalties" Nektar supposedly would have collected had Lilly continued to develop and commercialize Rezpeg under the Agreement. App.15, 53. But Nektar would have received those payments only if the Agreement stayed in place, yet the Agreement gave Lilly the right to terminate it at will. Once Lilly lawfully ended the relationship—which it indisputably did before any milestones or royalties accrued—Nektar had no entitlement to any future milestones or royalties, and Dr. Rao's model had nothing left to measure. Dr. Rao admitted as much. He testified that "the ***termination*** with breaches … is what caused [Nektar] harm," and he conceded that if "the contract gave Eli Lilly every right in the world to terminate this agreement without cause," Nektar's damages "***would be zero***." App.83-84 (emphases added).

The Agreement ***did*** give Lilly the right to terminate without cause. Section 11.2 explicitly allowed "[t]ermination at will by Lilly." App.9 §11.2. The only limitations on this unfettered right were a 90-day notice requirement and a tolling period upon first commercial sale, neither of which Nektar invoked here. *Id.* The New York Court of Appeals recently reiterated that an at-will termination right is "immune from the implied covenant," even if ***other*** types of discretion-granting contractual provisions might be subject

to the implied covenant of good faith. *111 W. 57th*, 2026 WL 1502410, at *4 n.5 ("We do not alter or put into question the specific rule treating sole discretion to terminate a contract as a distinct right.").[6] Thus, under the "well-established principle of [New York] law that when a contract affords a party the unqualified right to limit its life by notice of termination," Lilly's right to terminate was "absolute," must "be upheld in accordance with its clear and unambiguous terms," and is "not subject to judicial review." *Red Apple Child Dev. Ctr. v. Cmty. Sch. Dists. Two*, 303 A.D.2d 156, 157-58 (N.Y. App. Div. 2003).

Dr. Rao's false premise that Lilly could not terminate the Agreement at will thus renders his testimony "deeply flawed" as a matter of law. *La Canada*, 2026 WL 1661666, at *11. Lilly had an absolute right to terminate the Agreement immune from the implied covenant of good faith, so "no reasonable jury could have relied on" damages testimony based on unlawful assumptions "to deduce a non-speculative … award." *La Canada*, 2026 WL 1661666, at *11; *see also Windy Cove, Inc. v. Circle K Stores, Inc.*, 2023 WL 6284466, at *5 (S.D. Cal. Sept. 7, 2023) (rejecting expert testimony "based on an erroneous understanding or application of the law"), *aff'd*, 121 F.4th 1344 (9th Cir. 2024).

**c. Dr. Rao Failed To Measure Damages At The Time Of Breach.**

In addition to failing to follow New York's basic rules for calculating diminution in value, *supra* 11-16, Dr. Rao also failed to heed New York's requirement to calculate damages based on "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825-26 (2d Cir. 1990). That rule requiring damages to be measured at the time of breach applies to both sides of Dr. Rao's ledger, *i.e.*, the purported worlds with and without the alleged breach. *See* App.15, 53. To measure damages as of the time of the breach, Dr. Rao therefore had to assess ***both*** worlds as of each breach date, using only what knowledgeable investors could have anticipated then.

He did not. Dr. Rao looked to the world in 2025—after the purported breaches between 2021 and 2023, after Lilly's termination, after new clinical data, and after the market had moved. *See* App.15, 49, 53, 85, 88. His analysis thus improperly relied on purported "fact[s] that w[ere] uncertain at the time of

---

[6] In addressing jury instructions, the Court focused on the New York Court of Appeals' analysis of discretion-granting provisions ***generally***, *see 111 W. 57th*, 2026 WL 1502410, at *3, but the operative aspect of the case here is the New York Court of Appeals' reaffirmation that provisions creating "sole discretion to ***terminate*** a contract" are subject to a distinct analysis, *id.* at *4 n.5 (emphasis added).

the alleged breach but ha[ve supposedly] been made clear with hindsight." *Jakobovits v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 113 (E.D.N.Y. 2022).

Just a few examples illustrate this improper "hindsight" approach. *Id.* Nektar staked much of its breach case on the ***August 2021*** math error, yet Dr. Rao's damages analysis rested on events entirely unforeseeable at that time—including, for example, the Agreement's termination years later in ***spring 2023*** after the lupus failure—thus foreclosing any claim that he was measuring damages as of the date of breach. *Compare* App.64, *with* App.86. And despite assuming breaches in 2021, 2022, and 2023, Dr. Rao relied on a ***2025*** "LifeSciences ***forecast***" report commissioned by Nektar. App.85, 88 (emphasis added); *contra* App.49 (alleged breach dates). Although he claimed he was using this data to calculate damages at the time of breach, App.87—whereas Nektar actually told the Court that "Dr. Rao will quantify Nektar's damages []as of April 21, ***2025***," ECF 325 at 11 (emphasis added)—the LifeSciences report itself makes clear that it relied on data and assumptions unavailable at the time of breach. Its ***primary*** source is a post-termination "June - August 2024" research study cited in over a dozen places. App.89-106. The report also cites other publications from 2024 and 2023, App.96-97, relies on then-current "NEKTAR Guidance," App.107-09, examines current "corporate tax rate[s]," App.109, and discusses "improvement in discount rates ***as of 2024***," App.110 (emphasis added).

Dr. Rao's other testimony betrayed his hindsight approach and reliance on post-breach projections and data. He based his opinion on "Nektar's ***current*** [2025] ***forecasts*** of when it expects to launch [Rezpeg]" and what "Nektar ***now*** expects." App.111 (emphases added). The slides he showed to the jury explaining the bases for his opinion expressly invoked Exhibit 1943, a Nektar "Development" document "***Updated January 21, 2025***," and "[b]ased on 2025 Budget submissions." App.112-14. Dr. Rao relied on his contemporary "understanding from Mr. Robin [that] they ***do not have*** the capital to complete this Phase 3 trial" based on a post-litigation "interview[]." App.115-16 (emphasis added). And, at trial, he shifted from his "initial" pretrial "assumption[] that [Nektar] would need a partner to even ***start*** the Phase 3 [Rezpeg] trials" to a trial-time "understanding … [that Nektar does not] have the capital to ***finish***" Phase 3. App.82 (emphases added). This pivot to account for current facts is incompatible with New York's requirement to calculate damages without "hindsight." *Jakobovits*, 645 F. Supp. 3d at 113.

**d. Dr. Rao's Assumptions Flouted The Undisputed Evidence.**

Even if Dr. Rao had presented a viable damages theory (he did not), the trial evidence was flatly incompatible with his assumptions, leaving the jury with nothing but "guesswork" unable to support any award of damages. *La Canada*, 2026 WL 1661666, at *11.

For each of the asserted indications (AtD and lupus), Dr. Rao made two key sets of assumptions about (1) Rezpeg's future sales and (2) Nektar's receipts from those sales, and he applied those assumptions to two worlds with and without the alleged breaches—thus resulting in four total assumptions. For example, on AtD, he assumed that in a world ***without*** Lilly's alleged breach, (1A) Rezpeg's AtD sales would be $57.4 billion and (2A) Nektar would receive approximately a 21% royalty. In contrast, he claimed that in the world ***with*** Lilly's breach, the corresponding assumptions would be that (1B) AtD sales would be $32.5 billion and (2B) Nektar would receive less than a 30% royalty because Nektar ***needed*** to find a partner to advance Rezpeg into Phase 3 trials—thus requiring Nektar to surrender most of Rezpeg's future sales to secure that partner. App.15, 58, 63, 65-67, 82, 117-19; *see also* App.53 (similar approach for lupus).

However, Nektar's own evidence and admissions at trial failed to support both vital assumptions about the world with breach, thus leaving the jury with nothing to support a verdict except speculation.[7]

First, as to AtD sales, Nektar itself (speculatively) projects Rezpeg to make "over $70 billion"—not the $32.5 billion Dr. Rao assumed. App.120. Thus, applying Dr. Rao's own model (*i.e.*, assuming that Nektar will receive approximately 26% of Rezpeg's revenues in the current world with "Lilly['s] breach"), Nektar still comes out well ahead by earning over $18 billion in royalties (as compared to the expected $12.1 billion with "No Lilly Breach"). App.15.

Second, as to Nektar's supposed need to find a development partner (and thus Nektar's need to give up over 70% of sales to that partner), Dr. Rao's assumption is also unsupported by the evidence. Nektar admitted that it has started ***multiple*** Phase 3 trials on its own, directly contradicting Dr. Rao's assumption that Nektar could not do so. App.121-22. Moreover, Nektar's CEO told investors on ***May 9,***

[7] To the extent the trial evidence involved post-breach events contradicting Dr. Rao's assumptions, that is a problem for Nektar, not Lilly. Dr. Rao himself relied on post-breach information and assumptions, *supra* 18-19, so Nektar cannot hide from post-breach realities. Independently, the uncontested evidence of post-breach events also establishes that, even if Dr. Rao's assumptions were based on time-of-breach information (they were not), those assumptions were fantastical from the outset.

***2023***—just after the last of the alleged breaches—that he had "no plans to partner with anybody else," App.71, 123, and at trial he testified that Nektar had options to raise capital and had obtained advice on multiple financing options, App.124-28, and represented that Nektar's cash position would allow it to advance multiple indications through Phase 3 trials, App.73, 129. Even Dr. Rao ultimately admitted that his assumption was "incorrect." App.82. And—tellingly—he failed to offer any legitimate explanation for why he did not model a partner-free world, despite Nektar's CEO's consistent and contemporary insistence that a partner was not needed.

* * *

The numerous defects in Dr. Rao's vital testimony left the jury without "competent evidence of market value"—*i.e.*, the delta between "the price[s] at which [Rezpeg] would change hands between a willing buyer and a willing seller" in the "pre- and post-[breach]" periods. *Schonfeld*, 218 F.3d at 178; *Sept. 11*, 802 F.3d at 336. Given all these flaws, "no reasonable jury could have" returned "a non-speculative" verdict, and Lilly is entitled to JMOL. *La Canada*, 2026 WL 1661666, at *11; *accord Fluorine*, 380 F.3d at 855, 860.

### C. Nektar Cannot Sustain The Damages Award On New Theories.

Because there was no legitimate basis for diminution-in-value damages, Nektar may try to invent alternative damages theories. Such efforts would fail on two independent grounds.

First, this Court instructed the jury only on diminution damages. ECF 451 at 16. Because "the jury was not instructed" to award damages on any other theory, it "is presumed not to have" done so. *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 523 (9th Cir. 1999).

Second, any substitute theory Nektar might raise would fail for lack of sufficient evidence, and thus any verdict premised on such a theory would be improperly based "on speculation or guesswork." *Hendrix*, 76 F.4th at 1175. Indeed, when Nektar tried to pivot to other damages theories at trial, the Court explained that "[n]one of that was documented or quantified." App.23. Sure enough, each potential theory lacks evidentiary (and legal) justification for a litany of independent reasons.

**Reputational Damages.** First, the Court already correctly found at trial that Nektar offered "zero evidence of damages tied to reputation." App.130.

Second, "a plaintiff cannot recover for damage to reputation in a breach of contract action under New York law," and Nektar did not offer evidence satisfying the "limited exception" that requires "specific proof of lost business opportunities." *AmTrust N. Am., Inc. v. KF&B, Inc.*, 2020 WL 5503479, at *1 (S.D.N.Y. Sept. 11, 2020).

Third, the Agreement's limitation-of-liability provision bars such "remote," "speculative," and "special damages." App.9 §10.6.

**Stock Dilution.** First, Nektar waived this claim: "We're not seeking that as a measure." App.131.

Second, such damages are improperly speculative. Nektar did not try to identify, much less quantify, these damages.

**Milestones.** First, this Court held at summary judgment that Nektar had abandoned a separate milestone claim, instead baking this theory into its flawed diminution claim. ECF 312. Nektar again waived the point at trial, claiming that "[t]he milestone payments … are incorporated into the reduction in the value of the assets." App.57.

Second, as the Court previously suggested, Nektar failed to present evidence that it would have received any milestones—let alone $90 million in milestones—absent any alleged breach. App.132 ("I hear you on causation.").

Third, because Lilly indisputably terminated the Agreement at will before any milestone accrued, Nektar cannot demand those milestones. When a purported "right to" a contractual payment can "be defeated at will" by the defendant's "notice of termination," "there is no basis for recovery of any part of the prospective [payment]." *Gilsey v. Wm. Hengerer Co.*, 147 N.Y.S.2d 210, 210-11 (N.Y. App. Div. 1955).

Fourth, milestones are just a form of lost profits—*i.e.*, money Nektar expected to earn—and thus fail for the same reasons as a lost-profits claim. *Supra* 15-16.

**Royalties.** First, royalties are too "speculative" as a matter of law, especially for an uncommercialized product with no "record" of success. *Schonfeld*, 218 F.3d at 172-73; *supra* 16. Again, the Agreement specifically stated that "there can be no guarantee … that [Rezpeg] will yield commercially successful products." App.11-12.

Second, because Lilly indisputably "terminat[ed]" the Agreement "at will" before any royalties accrued, Nektar cannot demand those payments. *Gilsey*, 147 N.Y.S.2d at 210-11; *supra* 22.

Third, this claim is just a re-labeled lost-profits claim, and thus fails for the same reasons. *Supra* 15-16.

**Nektar's Development Costs.** First, Nektar's suggestion that Lilly must bear Nektar's development costs despite terminating the Agreement is a frontal assault on Lilly's ironclad at-will "terminat[ion]" right, which is "immune" from the implied covenant under recent New York precedent. *111 W. 57th*, 2026 WL 1502410, at *4 n.5. The testimony of Nektar's CEO made plain the impropriety of such damages. He complained that "***since the termination***," Nektar needed "to spend a hundred percent rather than 25 percent of the cost of development." App.133 (emphasis added). That is a naked claim that termination was a breach (a theory Nektar's counsel explicitly waived, *see* App.26), and that Lilly was obliged to continue funding Rezpeg's development.

Second, Nektar waived any freestanding claim to development costs at trial, instead arguing that its "out-of-pocket development costs … are incorporated into" the diminution theory. App.57.

Third, Nektar failed to offer non-speculative evidence of its development costs. A glancing reference to "[a]pproximately $255 million," App.133, is too "ambiguous" to support damages. *E.g.*, *New Horizons*, 301 A.D.2d at 827 (rejecting "testimony [that] the damage caused by the alleged destruction of the property was 'about four—three, four thousand dollars' and, with regard to the loss of business, 'about 25,000.'").

Fourth, Nektar's purported expenses in developing Rezpeg without Lilly's assistance are unrecoverable because Nektar alone will reap the benefits of that development. Unlike under the Agreement—where Nektar paid a small fraction of development costs for a small fraction of Rezpeg's potential future profits—now Nektar owns the full rights to Rezpeg with "no royalties owed." App.70-71; *compare* App.8 §6.3 (royalties). Nektar failed to show that this upside is worth ***less*** than the $255 million it allegedly spent—to the contrary, its expert predicted ***billions*** in future royalties—so Nektar has no ability to complain about the investment it is making in its own future. App.15. In other words, Nektar cannot claim damages based on the increased costs of developing Rezpeg on its own without accounting for the benefits it expects to receive from developing Rezpeg on its own.

**<u>Nektar's Purported Inability To Advance Other Products</u>.** <u>First</u>, Nektar's suggestion that it lacks funding to pursue other projects is derivative of its development-costs argument and thus fails on the same grounds. *Supra* 23.

<u>Second</u>, Nektar offered no specific testimony on this speculative harm, much less attempted to quantify it. *Contra New Horizons*, 301 A.D.2d at 827 (rejecting vague testimony of losses).

**D. The Damages Evidence Was Insufficient For Several Other Reasons.**

Independent of all the foregoing problems, the evidence at trial was insufficient to support damages for three additional reasons.

<u>First</u>, even if Nektar had offered any proper measure of damages, its claim would still fail because those damages would be unrecoverable as special damages. Damages—including diminution-in-value damages—are "special or consequential" when they are "one step removed from the naked performance promised by the defendant"—*i.e.*, when the defendant promised to provide "funding," but failed to do so, resulting in harm to an asset. *Schonfeld*, 218 F.3d at 170, 176-77. That precisely describes this case. Lilly never promised that Rezpeg would achieve or maintain any particular value, much less that Nektar itself would avoid the harms that it (vaguely) suggests it may have experienced. To the contrary, the Agreement expressly ***disclaimed*** any "guarantee … that [Rezpeg would] yield commercially successful products." App.11-12. Protecting Rezpeg's purported value was not "the very performance promised" by Lilly, and thus Nektar is seeking special damages. *Schonfeld*, 218 F.3d at 176-77.

Special damages are unavailable on several grounds: Nektar waived any right to special damages, telling the Court that "we're not arguing for special damages." App.25. The Agreement's limitation-of-liability provision squarely barred "special damages." App.9 §10.6. And Nektar failed to prove "that liability for the loss of the asset was within the contemplation of the parties at the time the contract was made"; rather, the Agreement disclaimed any promise of success. *Schonfeld*, 218 F.3d at 177; App.11-12.

<u>Second</u>, Nektar received a windfall from Lilly's purported breach. Nektar believes that Rezpeg will make "over $70 billion" in AtD sales alone. App.120, 134-35. Thus, applying its expert's own breach-world model under which Nektar keeps approximately 26% of Rezpeg's sales ($8.4 billion divided by $32.5 billion), Nektar expects to earn over $18 billion in royalties—far more than the $12.1 billion that

Dr. Rao assumed that Nektar expected to earn with Lilly. App.15. Moreover, because Nektar now "wholly own[s]" Rezpeg without any obligation to give Lilly almost 80% of Rezpeg's sales, as would have been required under the Agreement, its windfall is in fact far greater, easily surpassing the few billion dollars it expected to earn with "No Lilly Breach." App.15, 53, 70-71, 8 §6.3.

Nektar's real-world windfall must be considered if the Court adopts Nektar's own damages theory. Dr. Rao admitted that "***[a]nything*** that's related to the breach[]" should be "consider[ed]" in his model. App.117, 136 (emphasis added). Here, by Nektar's own theory of the case, its current circumstances in which it has started Phase 3, raised funds, and obtained free-and-clear ownership of Rezpeg are "related" to the purported breach because they flow directly from the dissolution of the Agreement. *Id.* Dr. Rao expressly opined that "the allegation is [that Lilly] breached the license agreement ***and gave the asset back***, which is what ***caused*** damage." App.80 (emphases added). Thus, by the same token, any benefits to Nektar from Lilly "g[iving] the asset back" are fair game. *Id.*; *see, e.g.*, *Gray v. Pashkow*, 168 A.D.2d 849, 850 (N.Y. App. Div. 1990) (explaining that "recovery supplied by a source ***other than the transgressor*** does not alter the amount of the breaching party's obligation" (emphasis added)). Indeed, Nektar's CEO expressly touted that ownership to investors in raising money: "We were incredibly pleased to have regained the rights" to the program; "there are no royalties owed to Lilly for this transfer"; and Rezpeg "now becomes a wholly owned asset of Nektar's." App.138-39, 70-71. Simply put, Nektar's own evidence claims that Nektar came out ahead, and thus Nektar failed to produce sufficient evidence of damages.

<u>Third</u>, the trial evidence showed that Nektar urged the termination, thus severing the right to any damages whatsoever. Its CEO asked Lilly to return Rezpeg, and Nektar's written request stated that "Nektar would like Lilly to return Rezpeg to us." App.140-43. Nektar "knew or should have known" those demands would result in Lilly walking away, so Nektar's intervening choice necessarily defeats "proximate cause" as a matter of law. *New Horizons*, 301 A.D.2d at 827.

## <u>CONCLUSION</u>

The Court should grant Lilly judgment as a matter of law.

DATED: November 2, 2026

Respectfully submitted,

*s/ Ryan Moorman*

Emma Scott (SBN 352078)
KIRKLAND & ELLIS LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: emma.scott@kirkland.com

James F. Hurst, P.C. (admitted *pro hac vice*)
Gabor Balassa, P.C. (admitted *pro hac vice*)
Diana M. Watral, P.C. (admitted *pro hac vice*)
Ryan J. Moorman, P.C. (admitted *pro hac vice*)
Patrick Weeks (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.hurst@kirkland.com
Email: gbalassa@kirkland.com
Email: diana.watral@kirkland.com
Email: ryan.moorman@kirkland.com
Email: patrick.weeks@kirkland.com

*Counsel for Defendant Eli Lilly and Company*